## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| _____ ) | **No. 2:09-cv-13616-AJT-MKM** |
| **DENNIS BLACK,** *et al.*, ) |  |
| ) | **RENEWED MOTION TO DISMISS OF** |
| **Plaintiffs,** ) | **DEFENDANTS U.S. DEPARTMENT OF** |
| ) | **THE TREASURY, PRESIDENTIAL** |
| **v.** ) | **TASK FORCE ON THE AUTO** |
| ) | **INDUSTRY, TIMOTHY F. GEITHNER,** |
| **PENSION BENEFIT GUARANTY** ) | **STEVEN L. RATTNER, AND RON A.** |
| **CORPORATION,** *et al.*, ) | **BLOOM** |
| **Defendants.** ) |  |
| _____ ) |  |

Defendants U.S. Department of the Treasury, Presidential Task Force on the Auto

Industry, Timothy F. Geithner, Steven L. Rattner, and Ron A. Bloom hereby move pursuant to

Fed, R. Civ. P. 12(b)(1) and (6) to dismiss plaintiffs' claim against them for lack of subject

matter jurisdiction and for failure to state a claim upon which relief can be granted.  The grounds

for that motion are set forth in the memorandum submitted herewith.  Plaintiffs advise through

counsel that they oppose the motion.

Respectfully submitted,

TONY WEST
Assistant Attorney General
BARBARA L. McQUADE
United States Attorney
PETER A. CAPLAN
Assistant United States Attorney
SANDRA M. SCHRAIBMAN
Ass't Branch Dir., Dep't of Justice, Civil Division

s/ *David M. Glass*
DAVID M. GLASS, DC Bar 544549
Sr. Trial Counsel, Dep't of Justice, Civil Division
20 Mass. Ave., N.W., Room 7200
Washington, D.C.  20530
Tel: (202) 514-4469/Fax: (202) 616-8470
E-mail: david.glass@usdoj.gov
Attorneys for Defendants U.S. Department of the
Treasury, Presidential Task Force on the Auto
Industry, Timothy F. Geithner, Steven L. Rattner,
Dated: December 20, 2010        and Ron A. Bloom

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2010, I served the renewed motion to dismiss of

defendants U.S. Department of the Treasury, Presidential Task Force on the Auto Industry,

Timothy F. Geithner, Steven L. Rattner, and Ron A. Bloom, the memorandum in support of that

motion, and the exhibits to the motion on all counsel of record by filing them with the Court by

means of its ECF system.

s/ *David M. Glass*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DENNIS BLACK,** *et al.*,        ) | **No. 2:09-cv-13616-AJT-MKM** |
| ) | |
| **Plaintiffs,** ) | **MEMORANDUM IN SUPPORT OF** |
| ) | **THE RENEWED MOTION TO** |
| ) | **DISMISS OF DEFENDANTS U.S.** |
| **v.** ) | **DEPARTMENT OF THE TREASURY,** |
| ) | **PRESIDENTIAL TASK FORCE ON** |
| **PENSION BENEFIT GUARANTY** ) | **THE AUTO INDUSTRY, STEVEN L.** |
| **CORPORATION,** *et al.*, ) | **RATTNER, AND RON A. BLOOM** |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

## STATEMENT OF ISSUES PRESENTED

Defendants in this action are the Pension Benefit Guaranty Corporation (PBGC), the U.S. Department of the Treasury, the Presidential Task Force on the Auto Industry, Timothy F. Geithner, Steven L. Rattner, Ron A. Bloom, and DOES 1-50.  For the following reasons, the non-PBGC defendants are entitled to the dismissal of this action.

I.      Plaintiffs lack standing to contest the validity of the Contested Commitments because the injury they allege does not meet the requirements of causation and redressability.  The Contested Commitments are certain commitments into which General Motors Co. (New GM) has entered that require New GM to pay supplemental pension benefits to certain participants in the Delphi Hourly Plan represented by the United Auto Workers, the International Union of Electrical Workers, or the United Steel Workers.  The Delphi Hourly Plan is the pension plan formerly maintained by Delphi Corporation (Delphi) for certain of its hourly employees.

II.     Even assuming, *arguendo*, that plaintiffs had standing to contest the validity of the Contested Commitments, they have failed to state a claim that the Contested Commitments are subject to constitutional scrutiny.

      A.      Plaintiffs have failed to state a claim that the non-PBGC defendants are responsible for the existence of the Contested Commitments under the public function test.

      B.      Plaintiffs have failed to state a claim that the non-PBGC defendants are responsible for the existence of the Contested Commitments under the state compulsion test.

      C.      Plaintiffs have failed to state a claim that the non-PGBC defendants are responsible for the existence of the Contested Commitments under the symbiotic relationship or nexus test.

      D.      Plaintiffs have failed to state a a claim that the non-PBGC defendants are responsible for the existence of the Contested Commitments under the entwinement test.

III.    Even assuming, *arguendo*, that the Contested Commitments were subject to constitutional scrutiny, they would not deny plaintiffs equal protection.

      A.      The Contested Commitments withstand rational basis scrutiny.

      B.      The Contested Commitments are not subject to strict scrutiny.

1.  Plaintiffs have failed to state a claim that the Contested Commitments were entered into for "political reasons."

2.  Government action taken for "political reasons" does not violate the First Amendment in cases like this.

IV.  Even if plaintiffs were entitled to any relief against the non-PBGC defendants – and they are not – they would not be entitled to the relief that they seek.

A.  Plaintiffs are not entitled to an order directing the non-PBGC defendants to "extend the top-up benefits to all [Delphi] Salaried Plan participants" because the Court does not have authority to order the payment of supplemental pension benefits from the Federal Treasury.

B.  Plaintiffs are not entitled to an award of damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), because no remedy under *Bivens* should be recognized here and because the non-PBGC defendants from whom plaintiffs seek an award under *Bivens* are entitled to qualified immunity.

1.  No remedy under *Bivens* should be recognized here.

2.  The non-PBGC defendants from whom plaintiffs seek an award under *Bivens* are entitled to qualified immunity.

a.  The facts that plaintiffs allege do not make out the violation of a constitutional right.

b.  The constitutional right that the non-PBGC defendants allegedly have violated was not clearly established at the time of the alleged violation.

C.  Plaintiffs are not entitled to a declaratory judgment because the declaration they seek would be nothing more than an advisory opinion.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY
## FOR RELIEF SOUGHT

*Abbott v. Fed. Forge, Inc.*, 912 F.2d 867 (6th Cir. 1990)

*Alliance for Envtl. Renewal v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d. Cir. 2006)

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)

*Berg v. Obama*, 586 F.3d 234 (3d Cir. 2009)

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2001)

*Brown v. Philip Morris, Inc.*, 250 F.3d 789 (3d Cir. 2001)

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)

*Campbell v. PMI Food Equip. Group*, 509 F.3d 776 (6th Cir. 2007)

*CenTra, Inc. v. Estrin*, 538 F.3d 402 (6th Cir. 2008)

*Cent. States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934 (7th Cir. 2000)

*Citizens United v. FEC*, 130 S. Ct. 876 (2010)

*Club Italia Soccer & Sports Org. v. Charter Twp. of Shelby*, 430 F.3d 286 (6th Cir. 2006)

*Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007)

*FCC v. Beach Commc'ns*, 508 U.S. 307 (1993)

*FDIC v. Meyer*, 510 U.S. 471 (1994)

*Flagg Bros., Inc. v. Brooks*, 436 U.S. 140 (1978)

*Friends of Tims Ford v. TVA*, 585 F.3d 955 (6th Cir. 2009)

*Heller v. Doe ex rel. Doe*, 509 U.S. 312 (1993)

*Hester v. Lowndes County Comm'n*, 2006 WL 2547430 (M.D. Ala. Sept. 1, 2006)

*Hewitt v. Helms*, 482 U.S. 755 (1987)

*In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009)

*In re Motors Liquid'n Co.*, 428 B.R. 43 (S.D.N.Y. 2010)

*In re Motors Liquid'n Co.*, 430 B.R. 65 (S.D.N.Y. 2010)

*Joseph v. City of Birmingham*, 510 F. Supp. 1319 (E.D. Mich. 1981)

*Kiesinger v. Mexico Acad.*, 427 F. Supp. 2d 182 (N.D.N.Y. 2006)

*King v. Forest*, 2008 WL 4951049 (N.D. Tex. Nov. 14, 2008)

*Lance v. Coffman*, 549 U.S. 437 (2007)

*Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000)

*Lyng v. UAW*, 485 U.S. 358 (1988)

*Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976)

*McCloud v. Testa*, 97 F.3d 1536 (6th Cir. 1996)

*OPM v. Richmond*, 496 U.S. 414 (1990)

*Pearson v. Callahan*, 129 S. Ct. 808 (2009)

*Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417 (6th Cir. 2000)

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992)

*San Fran. Arts. & Ath., Inc. v. U.S. Olympic Comm.*, 483 U.S. 522 (1987)

*Schweiker v. Chilicky*, 487 U.S. 412 (1988)

*Sugarland Indus. v. Comm'r*, 15 B.T.A. 1265 (1929)

*Summe v.Kenton Cnty. Clerk's Office*, 604 F.3d 257 (6th Cir. 2010)

*TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783 (6th Cir. 2005)

*U.S. Shoe Co. v. United States*, 296 F.3d 1378 (Fed. Cir. 2002)

*Vieth v. Jubelirer*, 541 U.S. 267 (2004)

*Vistein v. Am. Registry of Radiological Tech.*, 342 F. App'x 113 (6th Cir. 2009)

*Wilson v. Layne*, 526 U.S. 603 (1999)

**EXHIBITS**

I.   **Exhibits Filed With the Motion of Defendants U.S. Department of the Treasury, Presidential Task Force on the Auto Industry, Timothy F. Geithner, Steven L. Rattner, and Ron A. Bloom to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 120)**

Ex. A    GM Media, *GM Statement Regarding Delphi Pensions*, 2009-07-21 (ECF No. 120-2) (copied from ECF No. 48-9)

Ex. B    Gen. Motors Corp., Rep. on Form 8-K (Oct. 8, 2005) (ECF No. 120-3)

Ex. C    Mem. House to Schneider (Apr. 17, 2009) (ECF No. 120-4) (copied from ECF No. 49-9)

Ex. E    *Delphi Corp. Files Voluntary Chapter 11 Business Reorganization Cases to Execute Transformation Plan and Address Legacy Issues and High-Cost Structure in the U.S.*, Delphi News Rel. (Oct. 8, 2005) (ECF No. 120-5)

Ex. F    Congressional Oversight Panel, *September Oversight Report: The Use of TARP Funds in the Support and Reorganization of the Domestic Automotive Industry* (Sept. 9, 2009) (ECF Nos. 120-6 & 120-7)

Ex. G    *Geithner, Summers Convene Official Designees to Presidential Task Force on the Auto Industry*, Treas. Press Rel. tg36 (Feb. 20, 2009) (ECF No. 120-8)

Ex. H    *Statement From Treasury Secretary Geithner on the Presidential Task Force on the Auto Industry*, Treas. Press. Rel. TG-207 (July 13, 2009) (ECF No. 120-9)

Ex. I    *Ron Bloom, Senior Advisor at the U.S. Treasury Department[,] Statement Before the Congressional Oversight Panel Regarding Treasury's Automotive Industry Financing Program (AIFP)*, Treas. Press. Rel. TG-236 (July 27, 2009) (ECF No. 120-10)

Ex. K    *Written Testimony of Herbert M. Allison, Jr., Assistant Secretary for Financial Stability, Domestic Policy Subcommittee of the Oversight and Government Reform Committee, December 17, 2009*, Treas. Press Rel. (Dec. 17, 2009) (ECF No. 120-12)

Ex. N         Export Development Canada, *Introduction to Corporate Information*, http://www.edc.ca/english/corporate.htm (accessed Dec. 8, 2009) (ECF No. 120-15)

Ex. P         *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y.), Not. Filing of Settlement Agreement Betw. Delphi Corp. and the Pension Benefit Guarantee Corp. (July 21, 2009) (ECF No. 120-17)

Ex. Q         DPH Holdings Corp., Notice (Undated) (ECF No. 120-18)

## II.    Exhibits Filed With This Motion

Ex. T         Government Accountability Office, *Troubled Asset Relief Program: Automaker Pension Funding and Multiple Federal Roles Pose Challenges for the Future*, GAO-10-492 (Apr. 2010) (copied from ECF Nos 138-5 & 138-6)

Ex. U         UAW-Delphi-GM Memorandum of Understanding; Delphi Restructuring (June 22, 2007)

Ex. V         *Treasury Department Releases Text of Letter From Secretary Geithner to Hill Leadership on Administration's Exit Strategy for TARP*, Treas. Press. Rel. TG-433 (Dec. 9, 2009)

Ex. W       Office of the Special Inspector General for the Troubled Asset Relief Program, *Factors Affecting the Decisions of General Motors and Chrysler to Reduce Their Dealership Networks*,SIGTARP-10-008 (July 19, 2009) (copied from ECF No. 138-4)

Ex. X         Master Sale and Purchase Agreement by and Among General Motors Corp., Saturn LLC, Saturn Distribution Corp., & Chevrolet - Saturn of Harlem, Inc., as Sellers, and Vehicle Acquisition Holdings LLC, as Purchaser, Dated As of June 1, 2009

Ex. Y         *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y.), Objection to Debtors' Proposed Modifications to Debtors' First Amended Plan of Reorganization (as Modified)

Ex. Z         Gen. Motors Co., Rep. on Form 8-K (Sept. 17, 2009)

Ex. 2A       *In re Motors Liquid'n Co.*, No. 09-50026 (REG) (Bankr. S.D.N.Y.), Order Pursuant to Sections 363(b) and 105 of the Bankruptcy Code and Bankruptcy Rule 9019(a) Approving Settlement Agreement With Certain Labor Unions (Nov. 12, 2009)

Ex. 2B  Chrissie Thompson*, What GM's IPO Means to Detroit*, Det. Free Press (Nov. 18, 2010).

Ex. 2C  T*reasury Announces Pricing of Public Offering of General Motors Common Stock*, Treas. Press. Rel. TG-959 (Nov. 17, 2010)

Ex. 2D  *General Motors Announces Underwriters' Exercise of Over-Allotment Options*, GM Press Rel. (Nov. 26, 2010)

## PRELIMINARY STATEMENT

In 2009, Delphi Corporation (Delphi) sold most of its assets and, except for the winding up of its affairs, ceased operations.  In connection with its doing so, Delphi entered into certain agreements with the Pension Benefit Guaranty Corporation (PBGC).  Pursuant to those agreements, Delphi terminated the pension plan that it formerly had maintained for certain of its salaried employees (Delphi Salaried Plan); terminated the pension plan that it formerly had maintained for certain of its hourly employees (Delphi Hourly Plan); and placed both plans under the trusteeship of PBGC.[1]

During the same year, General Motors Co. (New GM) commenced operations as a manufacturer of motor vehicles and parts.[2]  In connection with its doing so, New GM entered into certain commitments (Contested Commitments) to pay supplemental pension benefits to certain participants in the Delphi Hourly Plan represented by the United Auto Workers (UAW), the International Union of Electrical Workers (IUE), or the United Steel Workers (USW).[3]  By

---

[1] The full name of the Delphi Salaried Plan was the Delphi Retirement Program for Salaried Employees. Mem. House to Schneider (Apr. 17, 2009) (ECF No. 49-9) at 1.  The full name of the Delphi Hourly Plan was the Delphi Hourly-Rate Plan.  *Id.*  During the time that Delphi maintained the Delphi Salaried and Hourly Plans, it also maintained certain pension plans for employees not covered by either of those plans.  *See PBGC to Assume Delphi Pension Plans*, PBGC Press Rel. (July 22, 2009), at 1.

[2] General Motors Co. should not be confused with General Motors LLC.  *See* 2d Am. Compl. (ECF No. 145) ¶ 13.  Pursuant to a corporate reorganization that took place on October 19, 2009, General Motors Co. was renamed General Motors LLC and became a wholly-owned subsidiary of a holding company named General Motors Co.  *See* Gen. Motors Co., Rep. on Form 8-K (Oct. 23, 2009), Item 8.01.

[3] Effective October 1, 2000, IUE merged with the Communications Workers of America (CWA) to become the Industrial Division of CWA (IUE-CWA).  *See* Thomas J. Sheeran, *Gore Applauds Merger of Unions*, Akron Beacon Journal (Sept. 24, 2000) at C7.  "IUE" is used in this memorandum to refer to IUE prior to the merger and to IUE-CWA following the merger.

entering into the Contested Commitments, New GM honored certain agreements into which General Motors Corporation (Old GM) had entered in 1999.

Plaintiffs Dennis Black, Charles Cunningham, and Kenneth Hollis describe themselves as "retired salaried employees of Delphi" who are participants in the Delphi Salaried Plan. Plaintiff Delphi Salaried Retirees Association describes itself as an organization of "participants in the [Delphi] Salaried Plan and dependents of participants who are beneficiaries in the [Delphi] Salaried Plan." Defendants are PBGC; the U.S. Department of the Treasury (Treasury); the Presidential Task Force on the Auto Industry (Auto Task Force); three present or former Treasury officials, Timothy F. Geithner, Steven L. Rattner and Ron A. Bloom; and certain agents, employees, or representatives of Treasury or the Auto Task Force whose identities are unknown to plaintiffs (DOES 1-50).

Suing PBGC, plaintiffs allege that the termination of the Delphi Salaried Plan violated the Due Process Clause of the Fifth Amendment because plaintiffs were not given notice of the termination or an opportunity for a pre-termination hearing. In addition, plaintiffs allege that the termination of the Delphi Salaried Plan violated the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* For relief, plaintiffs ask the Court to undo the termination of the plan.

Suing the non-PBGC defendants, plaintiffs allege that the Contested Commitments are subject to constitutional scrutiny because the non-PBGC defendants are responsible for their existence. Based on that allegation, plaintiffs allege that the Contested Commitments deny them equal protection because they require New GM to pay supplemental pension benefits to certain participants in the Delphi Hourly Plan represented by UAW, IUE, or USW, but not to themselves.

For relief, plaintiffs ask the Court to direct the non-PBGC defendants to pay them the same supplemental pension benefits that New GM is required to pay under the Contested Commitments, and to pay those benefits from the Federal Treasury.  In addition, plaintiffs ask the Court to award them damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and to issue a judgment declaring the Contested Commitments to be unconstitutional.

As is shown below, plaintiffs lack standing to contest the validity of the Contested Commitments because the injury they allege does not meet the requirements of causation and redressability.  Even assuming, *arguendo*, that plaintiffs had standing to contest the validity of the Contested Commitments, they have failed state a claim that the Contested Commitments are subject to constitutional scrutiny.  Even assuming, *arguendo*, that the Contested Commitments were subject to constitutional scrutiny, they would not deny plaintiffs equal protection.  And even if plaintiffs were entitled to any relief against the non-PBGC defendants – and they are not – they would not be entitled to the relief that they seek.  For all of these reasons, the renewed motion to dismiss of Treasury, the Auto Task Force, and defendants Geithner, Rattner, and Bloom should be granted.[4]

---

[4] Fictitious defendants whose identities are unknown cannot make the requests for representation that would permit government counsel to represent them in their individual capacities.  For that reason, the renewed motion to dismiss of Treasury, the Auto Task Force, and defendants Geithner, Rattner, and Bloom is not made on behalf of DOES 1-50.  However, DOES 1-50 are entitled to the dismissal of this action for the same reasons as the other non-PBGC defendants.  In addition, DOES 1-50 are entitled to the dismissal of this action because "[c]ourts lack personal jurisdiction over unidentified fictitious defendants," *King v. Forest*, 2008 WL 4951049, at *4 (N.D. Tex. Nov. 14, 2008), and because, "[g]enerally, fictitious party pleading is not permitted in federal court."  *Hester v. Lowndes County Comm'n*, 2006 WL 2547430, at *9 (M.D. Ala. Sept. 1, 2006).

## BACKGROUND

The facts that follow are provided from public sources for the Court's convenience. Those facts do not form the basis for the renewed motion to dismiss of Treasury, the Auto Task Force, and defendants Geithner, Rattner, and Bloom.  Instead, that motion relies exclusively on the allegations of the second amended complaint.

### A.      Old GM and Delphi

Tracing its roots back to 1908, Old GM was primarily engaged in the world-wide production of cars, trucks and parts.  Ex. A at 1[5]; *In re Gen. Motors Corp.*, 407 B.R. 463, 475 (Bankr. S.D.N.Y. 2009).  As of March 31, 2009, Old GM had approximately 91,000 employees in the United States, of whom approximately 62,000 were represented by unions.  *Gen. Motors*, 407 B.R. at 475.  Approximately 98% of the unionized employees were represented by UAW.  *See id.*


Delphi, an auto parts supplier, began its existence as a "business sector" of Old GM.  *See* Ex. B, Sub-Ex. 99.1 at 1; Ex. T at 17.  In September 1998, Delphi was incorporated as a wholly-owned subsidiary of Old GM.  *Id.*  On May 28, 1999, Delphi was spun off by Old GM as a separate company.  *See id.*

Two events relevant to this action occurred at or about the time that Delphi was spun off from Old GM.  First, Old GM established the Delphi Salaried and Hourly Plans by spinning them off from the Old GM salaried and hourly plans.  *See* Ex. C at 5.   Delphi became the "sponsor and administrator" of the two plans at the time of their establishment.  *See id.*

---

[5] Exs. A - S were filed with the Motion of Treasury, the Auto Task Force, and Defendants Geithner, Rattner, and Bloom to Dismiss or, in the Alternative, for Summary judgment (ECF No. 120).  Exs. T - 2D are filed with this motion.

Second, Old GM entered into separate agreements (Benefit Guarantee Agreements) with UAW, IUE, and USW.  Ex. B, Item 8.01 at 1.  In each of the Benefit Guarantee Agreements, Old GM agreed to pay "Covered Employees" the difference between the amount payable under the Delphi Hourly Plan and the amount actually received if Delphi experienced "a risk affecting [its] continuing financial ability" on or before October 18, 2007.  *See, e.g., id.*, Item 8.01 at 2, Sub-Ex. 99.2 ¶ (e) & p.3.  "Covered Employees" were defined in the Benefit Guarantee Agreements as certain employees of Delphi, represented by UAW, IUE, or USW, who had unbroken seniority and were employed by Old GM as of the date of the spin-off of Delphi from Old GM.  *See, e.g., id.*, Sub-Ex. 99.2 at 1.

In October 2005, Delphi applied for relief under Chapter 11 of the Bankruptcy Code.  *See* Ex. E at 1.  At the time that Delphi did so, it expected "to complete its U.S.-based restructuring and emerge from chapter 11 business reorganization in early to mid-2007."  *Id.* at 1-2.  However, the Delphi bankruptcy remained unresolved until mid-2009.  *See* Ex. Q at 1.

As late as 2007, Delphi was Old GM's largest supplier and the employer of thousands of employees represented by UAW.  Ex. U at 1.  By memorandum of understanding (MOU) dated June 22, 2007, Old GM, UAW, and Delphi agreed to take certain actions "dramatically reducing Delphi's ongoing benefit costs and liabilities."  *Id.*  As part of the MOU, Old GM, UAW, and Delphi agreed that the pension guarantee contained in the Old GM - UAW Benefit Guarantee Agreement would continue in effect, and become enforceable if "benefit accruals for future credited service in the [Delphi Hourly Plan]" were frozen and the Delphi Hourly Plan was terminated.  *Id.*, Att. B ¶¶ 3, 11.  Benefit accruals in the Delphi Hourly Plan were frozen "as of November 2008."  Ex. C at 5.

5

### B.    The Financial Crisis of 2008

In the fall of 2008, the United States "[stood] on the precipice of the most serious financial crisis since the Great Depression."  154 Cong. Rec. H10702 (Oct. 3, 2008) (statement of Rep. Slaughter).  On October 3, 2008, Congress responded to that crisis by enacting the Emergency Economic Stabilization Act of 2008 (EESA), Pub. L. No. 110-343, 122 Stat. 3765.  Seeking "to immediately provide authority and facilities that the Secretary of the Treasury [could] use to restore liquidity and stability to the financial system of the United States," EESA authorized the Secretary of the Treasury

> to establish the Troubled Asset Relief Program (or "TARP") to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with this Act and the policies and procedures developed and published by the Secretary.

EESA §§ 2(1), 101(a)(1).  Subject to certain conditions, EESA authorized the Secretary to spend up to $700 billion to purchase "troubled assets."  *Id.* § 115(a)(3).  For purposes of EESA, the term "troubled assets" meant any "financial instrument" the purchase of which was determined by the Secretary to be "necessary to promote financial market stability."  *Id.* § 3(9)(B).  The Secretary was required by EESA to exercise his or her authority to purchase "troubled assets" on or before December 31, 2009, but was permitted by EESA to file a certification extending that authority through the second anniversary of EESA's enactment.  *Id.* § 120(a), (b).  The Secretary filed such a certification on December 9, 2009.  Ex. V at 2.

### C.    The Bankruptcy of Old GM

"Historically, [Old] GM was one of the best performing [Original Equipment Manufacturers] in the U.S. market."  *Gen. Motors*, 407 B.R. at 476.  "But with the growth of

competitors with far lower cost structures and dramatically lower benefit obligations, [Old] GM's leadership position in the U.S. began to decline." *Id.* "By the fall of 2008, [Old] GM was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more uncertain with each passing day." *Id.* at 476-77. "As a result, in November 2008, [Old] GM was compelled to seek financial assistance from the U.S. Government." *Id.* at 477.

"The U.S. Government understood the draconian consequences of the situation – one that affected not just [Old] GM, but also Chrysler." *Gen. Motors*, 407 B.R. at 477. "[A]fter negotiations, [Treasury] and [Old] GM entered into a term loan agreement on December 18, 2008, that provided [Old] GM up to $13.4 billion in financing on a senior secured basis." *Id.* In addition, "Treasury required [Old] GM to submit a proposed business plan to demonstrate its future competitiveness that went significantly farther that the one [Old] GM [earlier] had submitted to Congress." *Id.* at 478.

On February 15, 2009, the President announced the creation of the Auto Task Force and gave it the initial task of reviewing the business plans that Old GM and Chrysler had been asked to submit. *See* Ex. F at 10. Co-chaired by defendant Geithner, the Secretary of the Treasury, the Auto Task Force consisted of 10 cabinet-level officials and possessed a 15-member staff (Auto Team). *See* Ex. F at 10 n.31; Ex. G at 1; Ex. W at 2. Until July 2009, defendants Bloom and Rattner were the leaders of the Auto Team. *See* Ex. F at 10-11; Ex. H. At that time, defendant Rattner left the government and defendant Bloom became the sole leader of the Auto Team. *See* Ex. H.

On March 30, 2009, the President announced that the Auto Team had completed its evaluation of the business plans submitted by Old GM and Chrysler but that neither plan went

"far enough to warrant the substantial new investments that these companies are requesting." *See* Ex. J at 1.  Despite the inadequacy of the plans, the President said that "[his] administration [would] offer [Old] GM and Chrysler a limited additional period of time to work with creditors, unions, and other stakeholders to fundamentally restructure in a way that would justify an investment of additional taxpayer dollars." *Id.*  However, the President said that both companies would need to "produce plans" during that period that would "give the American people confidence in their long-term prospects for success." *Id.*

During the next 60 days, a plan was developed under which "a purchaser sponsored by [Treasury]," New GM, would acquire "the bulk of [Old GM's] assets" pursuant to a sale under § 363 of the Bankruptcy Code, 11 U.S.C. § 363, and assume "some, but not all, of [Old GM's] liabilities." *Gen. Motors*, 407 B.R. at 473, 496 (emphasis omitted).  Among other thing, the plan called for the following:

- New GM would abide by every extant contract between Old GM and UAW, except a certain contract dealing with post-retirement medical care. *See* Ex. X §§ 1.1, 6.17(f).

- Treasury would "convert most of its loans to the Old GM" into New GM common stock and other securities. Ex. K at 3.  The ownership of New GM common stock would be distributed among the following owners in the following proportions: Treasury, 60.8%; Export Development Canada (EDC), an agency of the Government of Canada, 11.7%; the UAW healthcare trust, 7.5%; and Old GM, 10%. *See Gen. Motors*, 407 B.R. at 482-83; Ex. N.

On June 1, 2009, Old GM applied to the bankruptcy court for relief under Chapter 11 of the Bankruptcy Code and moved for an order under § 363 of the Code permitting the sale of the of the bulk of its assets to New GM.  *See Gen. Motors*, 407 B.R. at 473, 479.  As of that date, the government was Old GM's largest creditor.  *See id.*

8

IUE, USW, and the International Union of Operating Engineers (IUOE) objected to the

proposed sale under § 363 on the ground that the sale required New GM to assume liability for

certain benefits payable to retirees of Old GM represented by UAW but not to assume liability for

similar benefits payable to retirees of Old GM represented by IUE, USW, or IUOE. *See Gen.*

*Motors*, 407 B.R. at 509. Holding that the disparity in treatment resulted from commercial

necessity, not from "a conscious decision that [IUE, USW, and IUOE] retirees would not be

offered as good a deal as others," the court overruled that objection and said:

> [A]s a matter of reality, [New GM] needs a properly motivated workforce to
> enable New GM to succeed, requiring it to enter into satisfactory agreements with
> the UAW – which includes arrangements satisfactory to the UAW for UAW
> retirees. And [New GM] is not similarly motivated, in triaging its expenditures, to
> assume obligations for retirees of unions whose members, with little in the way of
> exception, no longer work for GM.

*See id.* at 512.

By decision and order dated July 5, 2009, the court approved the proposed sale under

§ 363. *See Gen. Motors*, 407 B.R. at 520. The sale was carried out on July 10, 2009. *See* Ex. I at

3.

### D. The Resolution of the Delphi Bankruptcy

An amended plan for the reorganization of Delphi was filed with the bankruptcy court and

modified by that court on June 16, 2009. Ex. P at 1-2. On July 15, 2009, plaintiffs filed an

objection to certain proposed modifications to the modified reorganization plan. *See* Ex. Y at 1-2.

Notwithstanding plaintiffs' objection, Delphi was authorized by order dated July 30, 2009, to

consummate the modified reorganization plan. *In re Delphi Corp.*, 2009 WL 2482146, at *37

(Bankr. S.D.N.Y. July 30, 2009). On October 6, 2009, Delphi announced that the modified

reorganization plan had been "substantially consummated"; that "Delphi ha[d] now become a

private company following the acquisition of substantially all of its global core businesses by a group of private investors"; that an affiliate of New GM had acquired Delphi's "non-core steering business and certain US manufacturing plants"; and that the sole tasks that remained for Delphi as it formerly had existed involved the winding-up of its affairs. *See* Ex. Q at 1.

Effective July 21, 2009, Delphi entered into an agreement with PBGC providing for the termination of the Delphi Salaried Plan and the Delphi Hourly Plan and the placement of the two plans under the trusteeship of PBGC. *See* Ex. P, Sub-Ex. 1, Preamble & ¶ 3.  The bankruptcy court approved that agreement by order dated July 30, 2009. *Delphi*, 2009 WL 2482146, at *19. On July 31, 2009, the Delphi Salaried and Hourly Plans were terminated. *See* Ex. T at 53. Because New GM was required by the terms of the sale under § 363 to honor every extant contract between Old GM and UAW except a certain contract dealing with post-retiree medical care, the termination of the Delphi Hourly Plan triggered the obligation of New GM to begin paying supplemental pension benefits to participants in the Delphi Hourly Plan covered by the UAW - Old GM Benefit Guarantee Agreement. *See* Ex. U, Att. B, ¶ 11; Ex. X § 6.17(f).

### E.    The Settlement Agreement of September 2009

The approval of the sale under § 363 did not resolve the claims of IUE and USW that "[Old GM] and/or [New GM]" was "required to continue to provide retiree medical benefits in accordance with [certain] collective bargaining agreements and [a certain] class settlement agreement and, further, to provide certain pension benefit guarantees in accordance with collectively bargained memorandums of understanding regarding establishment or restructuring of Delphi." Ex. Z, Sub-Ex. 10.1 at 1. By settlement agreement among Old GM, New GM, IUE, and USW dated as of September 10, 2009, IUE and USW agreed to "withdraw and release" those

10

claims. *See id.*, Item 1.01.  In return, IUE and USW received "an allowed pre-petition unsecured

claim in [Old GM's] Chapter 11 Proceedings, in the amount of one billion dollars with respect to

[certain] retiree health and life insurance benefits." *Id.*  Other provisions of the settlement

agreement provided as follows:

- Old GM and New GM agreed jointly "to continue providing retiree health care for eligible [IUE] and USW retirees in accordance with the terms of the [New GM] Health Care Program for Hourly Employees through December 31, 2009." *Id.*

- New GM agreed to "assume from [Old GM] the [IUE] agreement known as the 'Moraine Closure Agreement,' subject to certain modifications." *Id.*

- New GM "agreed to provide certain retirement health care and life insurance, as well as certain pension benefits to certain retirees and surviving spouses represented by [IUE and USW]." *Id.*  The "pension benefits" that New GM agreed to provide were the supplemental pension benefits called for by the Old GM - IUE and Old GM - USW Benefit Guarantee Agreements. *See id.*, Sub-Ex. 10.1 ¶ 1(a).

The settlement agreement stated in its preamble that it was being entered into "[a]fter due

consideration of the factual and legal arguments regarding [the] issues [covered by the agreement],

as well as the costs, risks, and delays associated with litigating these issues." Ex. Z, Sub-Ex. 10.1

at 1.  The effectiveness of the agreement was made contingent upon its approval by the court

overseeing the Old GM bankruptcy. *Id.*, Sub-Ex. 10.1, ¶ 13.  That court approved the agreement

by order dated November 12, 2009.  Ex. 2A at 2.

     **F.**    **The Initial Public Offering (IPO)**

On November 18, 2010, more than 500 million shares of New GM common stock were

sold to the public in an IPO.  *See* Ex. 2B at 1.  Most of the shares sold in the IPO were shares

owned by Treasury.  *See* Ex. 2C.  The IPO caused the proportion of New GM common stock

owned by Treasury to decline "by nearly half – from 60.8 percent" to 33.3%.  *See id.*; Ex. 2D at 2.

**THIS ACTION**

Plaintiffs commenced this action against PBGC on September 14, 2009.  By first amended complaint filed November 5, 2009, plaintiffs added New GM and the non-PBGC defendants as defendants; asked the Court to direct the non-PBGC defendants to direct New GM to "'top-up' the [Delphi] Salaried Plan in the same manner as it is topping up the union-affiliated plans"; and asked the Court to award them an unspecified amount of compensatory and punitive damages under *Bivens* against New GM, defendants Geithner, Rattner, Bloom, and DOES 1-50.  1st Am. Compl. (ECF No. 10) ¶¶ 6-13, 61, 64.  By order dated March 12, 2010, New GM was dismissed from this action.  ECF No. 129.  On August 26, 2010, plaintiffs filed a second amended complaint.  The second amended complaint is substantially the same as the first amended complaint except that it drops New GM as a defendant; seeks an order directing "[the non-PBGC defendants] only (and not New GM) to extend the top-up benefits to all [Delphi] Salaried Plan participants"; limits the defendants from whom damages are sought under *Bivens* to defendants Geithner, Rattner, Bloom, and DOES 1-50; and seeks a judgment declaring that the "selective provision of top-up benefits to certain Delphi retirees on the basis of associational status violates the Constitution."  *See* 2d Am. Compl. (ECF No. 145) ¶¶ 7-12, 61, 63 & Prayer ¶¶ (F)-(H).

PBGC estimates that the Delphi Salaried Plan was underfunded by $2.7 billion at the time of its termination.  Decl. of Neela Ranade (ECF No. 37) ¶ 9.  PBGC further estimates that "it will pay $2.1 billion from its own resources to cover the [plan's] unfunded guaranteed liability." *Id.* ¶ 10.  These estimates indicate that an order directing "[the non-PBGC defendants] only (and not New GM) to extend the top-up benefits to all [Delphi] Salaried Plan participants" would require the payment of approximately $600 million from the Federal Treasury.  *See id.* ¶¶ 9, 10.

12

**ARGUMENT**

I.   **PLAINTIFFS LACK STANDING TO CONTEST THE VALIDITY OF THE CONTESTED COMMITMENTS BECAUSE THE INJURY THEY ALLEGE DOES NOT MEET THE REQUIREMENTS OF CAUSATION OR REDRESSABILITY.**

"The standing doctrine imposes both constitutional and procedural limitations on who may properly bring suit in federal court." *Club Italia Soccer & Sports Org. v. Charter Twp. of Shelby*, 470 F.3d 286, 291 (6th Cir. 2006).  "The basis for constitutional standing is derived from Article III's 'Case or Controversy' requirement, which limits federal court authority to legal issues 'which are traditionally thought to be capable of resolution through the judicial process.'" *Id.* (quoting *Nat'l Rifle Ass'n v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)) (internal quotation marks omitted). "Constitutional standing requires a plaintiff to 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  "This encompasses three distinct elements":

> "First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Id.* (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)).  "'Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed.'" *Berg v. Obama*, 586 F.3d 234, 242 (3d Cir. 2009) (quoting *Tailaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006)).

"'A plaintiff bears the burden of demonstrating standing and must plead its components with specificity.'" *Campbell v. PMI Food Equip. Group*, 509 F.3d 776, 783 (6th Cir. 2007) (quoting *Coyne ex rel. Ohio v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999).  In addition,

13

"[t]he plaintiff bears the burden of showing standing as to each type of relief sought." *Friends of Tims Ford v. TVA*, 585 F.3d 955, 967 (6th Cir. 2009). "[T]he proper procedural route" for resolving a "standing challenge[]" is a motion to dismiss under Fed. R. Civ. P. 12(b)(1). *Alliance for Envtl. Renewal v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). "[T]he law 'does not dictate a sequencing of jurisdictional issues.'" *Aarti Hospitality, Inc. v. City of Grove City*, 350 F. App'x 1, 5 (6th Cir. 2009) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). However, "[f]ederal courts must determine that they have jurisdiction before proceeding to the merits." *Lance v. Coffman*, 549 U.S. 437, 439 (2007).

The standing of a plaintiff to maintain an equal protection challenge to a classification pursuant to which benefits are distributed "does not depend on [the plaintiff's] ability to obtain increased [benefits]." *See Heckler v. Mathews*, 465 U.S. 728, 737 (1975). However, "'[d]iscrimination cannot be the cause of injury to [a plaintiff] who could not have obtained the benefit even in the absence of the discrimination.'" *Day v. Bond*, 500 F.3d 1127, 1134 (10th Cir. 2007) (quoting *Wilson v. Glenwood Intermountain Props.*, 98 F.3d 590, 594 (10th Cir. 2005)). Accordingly, a plaintiff who alleges that his or her ineligibility for a particular benefit is based on an impermissible classification "lacks the requisite personal stake in the outcome [if] he [or she] would still not qualify for the benefit following a decision in his [or her] favor." *Id.* Couched in terms of standing, such a plaintiff cannot meet the requirements of "[c]ausation and [r]edressability." *See id.* at 1134-35.

*Day* is illustrative. In *Day*, the plaintiffs alleged that Kan. Stat. Ann. § 76-731a, a statute "permit[ting] certain illegal aliens to qualify for in-state tuition rates," denied equal protection to

14

United States citizens who did not reside in Kansas.  500 F.3d at 1130.  The injuries on which the

plaintiffs premised their standing to contest the validity of § 76-731a included the following:

> (1) The denial of equal treatment, in and of itself, caused by barriers in
> [§] 76-731a making it impossible for nonresident U.S. citizens to obtain the benefits
> extended by the statute.  * * * *
>
> (4) The extra tuition paid by non-resident [plaintiffs] during the 2004 - 2005
> academic year over the in-state tuition paid by nonresident illegal aliens, as a
> consequence of the discriminatory operation of [§] 76-731a.

*Id.* at 1132-33.

Relying on *Heckler*, the court held these "theories of injury" to be "sufficiently concrete,

particularlized, and nonspeculative to support injury."  500 F.3d at 1134; *see id.* at 1133.

However, the court further held that these "theories of injury" "founder[ed] on the [p]laintiffs'

inability to establish either injuries caused by the allegedly unlawful discrimination [they] decry or

that any such injuries would be redressed by a favorable decision from this court."  *Id.* at 1134.

Concluding that the plaintiffs "[did] not have standing to challenge § 76-731a on equal protection

grounds," the court said:

> None of these [p]laintiffs would be eligible to pay resident tuition under § 76-731a
> even if the allegedly discriminatory test of § 76-731a(c)(2) favoring illegal aliens
> were stricken, because none attended Kansas high schools for at least three years
> and either graduated from a Kansas high school or received a Kansas GED
> certificate.  This is a nondiscriminatory prerequisite for benefits under § 76-731a,
> regardless of the citizenship of the students.  The [p]laintiffs' [aforesaid] theories of
> injury, under which they seek equal treatment with illegal aliens under § 76-731a,
> were therefore not caused by the statute's allegedly discriminatory operation, nor
> would these injuries be redressed by a decision striking down the discriminatory
> classification embedded in its provisions.

*Id.* at 1135 (citations omitted).

In this case, the sole injury that plaintiffs allege is that the Contested Commitments have

"directly and substantially interfered with [their] associational rights, in that, as a direct

consequence of their decision not to associate with particular unions, [they] have been forced to forfeit a significant portion of their pension benefits."  2d Am. Compl. ¶ 60.  However, plaintiffs would not become eligible for the supplemental pension benefits that New GM is required to pay under the Contested Commitments if the Court were to invalidate those commitments.  To the contrary, the invalidation of those commitments would mean that no one was eligible to receive supplemental pension benefits.  Plaintiffs would only become eligible to receive supplemental pension benefits if the Court were to direct the non-PBGC defendants to begin paying such benefits from the Federal Treasury.  As is shown below, however, the Court does not have the authority to order the non-PBGC defendants to do so.  Point IV(A), *infra.*  For that reason, plaintiffs' "theory of injury" "founder[s] on [their] inability to establish either injuries caused by the allegedly unlawful discrimination [they] decry or that any such injuries would be redressed by a favorable decision from this court."  *See Day*, 500 F.3d at 1134.  In view of that fact, plaintiffs do not have standing to contest the validity of the Contested Commitments because the injury they allege does not meet the requirements of causation and redressability.  *See id.* at 1134-35.

## II.      EVEN ASSUMING, *ARGUENDO*, THAT PLAINTIFFS HAD STANDING TO CONTEST THE VALIDITY OF THE CONTESTED COMMITMENTS, THEY HAVE FAILED TO STATE A CLAIM THAT THE CONTESTED COMMITMENTS ARE SUBJECT TO CONSTITUTIONAL SCRUTINY.

"[M]ost rights secured by the Constitution are protected only against infringement by governments."  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978).  Accordingly, private entities "will not be held to constitutional standards unless 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  Whether the actions of a private

16

entity should be attributed to the state "is a matter of normative judgement, and the criteria lack

rigid simplicity":

> From the range of circumstances that could point toward the State behind an
> individual face, no one fact can function as a necessary condition across the board
> for finding state action; nor is any set of circumstances absolutely sufficient, for
> there may be some countervailing reason against attributing activity to the
> government.

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001).  Accordingly,

"[t]he Supreme Court has established four tests for determining whether the challenged conduct

may be fairly attributable to the State for purposes of a [constitutional] claim.  These are (1) the

public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and

(4) the entwinement test." *Vistein v. Am. Registry of Radiological Techs.*, 342 F. App'x 113, 127

(6th Cir. 2009).

In this case, plaintiffs allege that "the [non-PBGC defendants] are responsible for the

decision [of New GM] to provide pension top-ups to only those Delphi retirees associated with

particular unions, and not to Plaintiffs."  2d Am. Compl. ¶ 62.  Based on that allegation, plaintiffs

allege that the Contested Commitments "are subject to the guarantees of the United States

Constitution," and further allege that those commitments "violate[] the Equal Protection

component of the Fifth Amendment."  *See id.* ¶¶ 13, 60.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In this case, plaintiffs have failed to plead factual matter stating a claim that the non-PBGC defendants are responsible for the existence of the Contested Commitments under any of the tests that the Supreme Court has established. In view of that fact, the Contested Commitments are not subject to constitutional scrutiny. For that reason, plaintiffs' claim against the non-PBGC defendants should be dismissed.

### A.   Plaintiffs Have Failed to State a Claim That the Non-PBGC Defendants Are Responsible for the Existence of the Contested Commitments Under the Public Function Test.

"The public function test requires that the private entity exercise powers that are traditionally exclusively reserved to the State, such as holding elections, or exercising the power of eminent domain." *Vistein*, 342 F. App'x at 127 (citation omitted). "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros.*, 436 U.S. at 158 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974)). In this case, New GM entered into the Contested Commitments in connection with its becoming a manufacturer of motor vehicles and parts. However, "the lawful sale and marketing of a legal, albeit federally regulated, consumer product [is] a private rather than public, and *a fortiori* not 'exclusively' public, function." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 802 (3d Cir. 2001).

For that reason, the non-PBGC defendants cannot be held responsible for the existence of the Contested Commitments under the public function test.

**B.      Plaintiffs Have Failed to State a Claim That the Non-PBGC Defendants Are Responsible for the Existence of the Contested Commitments Under the State Compulsion Test.**

"The state compulsion test requires that a State has 'exercised such coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'"  *Vistein*, 342 F. App'x at 127-28 (quoting *Blum*, 457 U.S. at 1004). "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the State responsible for those initiatives." *Id.* at 128.

In this case, plaintiffs invoke the state compulsion test by alleging that "the federal government * * * exercised significant coercive power and provided significant encouragement to New GM in connection with the benefits decision such that New GM's ultimate decision in this regard must be deemed to be that of the government."  *See* 2d Am. Compl. ¶ 62.  However, all of the courts that have considered the issue have rejected the notion that the federal government did anything in connection with the restructuring of Old GM that constituted overreaching.  The following remarks of the bankruptcy court are typical:

> Here there is no proof that [New GM] (or its U.S. and Canadian governmental assignors) showed a lack of integrity in any way.  To the contrary, the evidence establishes that the 363 Transaction was the product of intense arms' length negotiations.

> * * * *

> [N]one of the U.S. Treasury, the Government of Canada, the Government of Ontario, or EDC acted inequitably in any way.  They advanced funds to help thousands of creditors, citizens, employees of GM, and employees of suppliers and others.  Their efforts to ensure that they were not throwing their money away in a useless exercise

19

and were expecting GM to slim down so it could survive without governmental assistance, are hardly inequitable; they were common sense.

*Gen. Motors*, 407 B.R. at 494, 499; *see In re Motors Liquid'n Co.*, 428 B.R. 43, 47 (S.D.N.Y. 2010) (*Motors Liquid'n I*); *In re Motors Liquid'n Co.* 430 B.R. 65, 79 (S.D.N.Y. 2010) (*Motors Liquid'n II*) (similarly).

Despite these holdings, plaintiffs allege that the government compelled New GM to enter into the Contested Commitments because, "at all relevant times, [the government] was the majority shareholder and a significant creditor of New GM." *See* 2d Am. Compl. ¶ 62. However, plaintiffs allege no fact suggesting that the government made any use of its status as "the majority shareholder and a significant creditor of New GM" to compel New GM to enter into the Contested Commitments. The Supreme Court has held that "[t]he Government may subsidize private entities without assuming constitutional responsibility for their actions." *San Fran. Arts & Ath., Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987). In addition, "the primary purpose of the corporate form is to prevent a company's owners, whether they are persons or other corporations, from being liable for the activities of the company. Where corporate formalities have been observed, a company's owners reasonably expect that they cannot be held liable for the faults of the company." *Cent. States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). In this case, "Treasury [has] admitted that it was likely [Old] GM's 'lender of last resort' and that, as [a] result, it had 'leverage' over [Old] GM." *Motors Liquid'n II*, 430 B.R. at 78-79. However, "that leverage speaks to [Old] GM's desperate financial condition in the early 2009, not the Government's bad faith." *Id.* at 79. Accordingly, the mere fact that the government was "the majority shareholder and a significant creditor of New GM" is insufficient to "allow[] the court

20

to draw the reasonable inference" that the government compelled New GM to enter into the Contested Commitments.  *See* 2d Am. Compl. ¶ 62; *Iqbal*, 129 S. Ct. at 1949.

Plaintiffs also allege that the government compelled New GM to enter into the Contested Commitments because the government was "extensively involved in questions related to the outcome of pension benefits to Delphi's retirees."  *See* 2d Am. Compl. ¶ 62.  To draw a link between the government's alleged "involve[ment]" in those "questions" and the Contested Commitments, plaintiffs allege that New GM entered into the settlement agreement with Old GM, IUE, and USW "as the result of significant pressure by the United States."  *See id.* ¶ 37.  However, plaintiffs make that allegation solely "[o]n information and belief."  *See id.*  Accordingly, the allegation that the government was "extensively involved in questions related to the outcome of pension benefits to Delphi's retirees" does nothing to "allow[] the court to draw the reasonable inference" that New GM entered into the Contested Commitments because the government compelled it to do so.  *See id.* ¶ 62; *Iqbal*, 129 S. Ct. at 1949.  For that reason, the non-PBGC defendants cannot be held responsible for the existence of the Contested Commitments under the state compulsion test.

### C.   Plaintiffs Have Failed to State a Claim That the Non-PBGC Defendants Are Responsible for the Existence of the Contested Commitments Under the Symbiotic Relationship or Nexus Test.

"Under the symbiotic relationship or nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."  *Vistein*, 342 F. App'x at 128.  "The cases establish no clear standard for identifying a 'sufficiently close nexus.'"  *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (quoting *Wolotsky v.*

21

*v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).  "[N]evertheless," the Supreme Court and the Sixth Circuit have "identified some factors which are decidedly insufficient, by themselves to justify a finding of a close nexus between the state and a private actor."  *Id.*  Thus, it is "well-established" that "neither public funding nor private use of public property is enough to establish a close nexus between state and private actors."  *Id.*  In addition, the fact that a private entity is required to "coordinate" with the state before taking a particular action "demonstrates the independence of their actions" instead of "establishing a nexus between them."  *Id.* at 832.  Furthermore, "the [nexus] test requires a close nexus not merely between the [state] and the [private party] in general, but specifically between [the state] and [the private party]" with respect to the matter at issue.  *See id.* at 831.

The "seminal, albeit somewhat idiosyncratic case" under the symbiotic relationship or nexus test is *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).  *Brown*, 250 F.3d at 801.  In *Burton*, a municipal agency that wished to build a parking facility could not finance the construction of the facility without "enter[ing] into long-term leases with responsible tenants for commercial use of some of the space."  365 U.S. at 719.  Accordingly, the agency leased portions of the facility to a number of commercial tenants, including a restaurant.  The lease between the agency and the restaurant had a term of 20 years, renewable for another 10 years.  The lease required the agency to "furnish heat for [the restaurant's] premises, gas service for the boiler room, and to make, at its own expense, all necessary structural repairs, all repairs to exterior surfaces except store fronts and any repairs caused by lessee's own act or neglect."  *Id.* at 720.

Suing the agency and others, the plaintiff alleged that he was denied equal protection by the restaurant's refusal to serve him because of his race.  Rejecting the contention of the defendants

22

that the restaurant was "acting in 'a purely private capacity'" when it refused to serve the plaintiff,

the Supreme Court said:

> It cannot be doubted that the peculiar relationship of the restaurant to the parking
> facility in which it is located confers on each an incidental variety of mutual
> benefits.  Guests of the restaurant are afforded a convenient place to park their
> automobiles, even if they cannot enter the restaurant directly from the parking area.
> Similarly, its convenience for diners may well provide additional demand for the
> [agency's] parking facilities.  Should any improvements effected in the leasehold by
> [the restaurant] become part of the realty, there is no possibility of increased taxes
> being passed on to it since the fee is held by a tax-exempt government agency.
> Neither can it be ignored, especially in view of [the restaurant's] affirmative
> allegation that for it to serve Negroes would injure its business, that profits earned
> by discrimination not only contribute to, but also are indispensable elements in, the
> financial success of a governmental agency.

365 U.S. at 716, 724.  Though cautioning that "the conclusions drawn from the facts and

circumstances of this record are by no means declared as universal truths on the basis of which

every state leasing agreement is to be tested," the Court held that, "when a State leases public

property in the manner and for the purpose shown to have been the case here, the proscriptions of

the Fourteenth Amendment must be complied with by the lessee as certainly as though they were

binding covenants written into the agreement itself."  *Id.* at 725, 726.

In this case, plaintiffs make no allegation suggesting that government ever had a "mutual[ly]

benefi[cial]" relationship with Old GM or New GM of the sort that existed in *Burton*.  *See* 365 U.S.

at 724.  Still less have plaintiffs made any allegation suggesting that the government ever obtained

any "benefit[]" from the existence of the Contested Commitments.  *See id.*  Because  "the [nexus]

test requires a close nexus not merely between the [state] and the [private party] in general, but

specifically between [the state] and [the private party]" with respect to the matter at issue, the non-

PBGC defendants cannot be held responsible for the existence of the Contested Commitments

under the symbiotic relationship or nexus test.  *See Lansing*, 202 F.3d at 831.

      **D.**     **Plaintiffs Have Failed to State a Claim That the Non-PBGC Defendants Are Responsible for the Existence of the Contested Commitments Under the Entwinement Test.**

"The entwinement test requires that the private entity be 'entwined with governmental policies' or that the government be 'entwined in [the private entity's] management or control.'" *Vistein*, 342 F. App'x at 128 (quoting *Brentwood*, 531 U.S. at 298).  The "crucial inquiry under the entwinement test is whether the 'nominally private character' of the private entity 'is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.'" *Id.*

The leading case under the entwinement test is *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) .  In *Brentwood*, "a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools" was held to have "engage[d] in state action when it enforce[d] a rule against a member school" because of "the pervasive entwinement of state school officials in the structure of the association."  531 U.S. at 290, 291.  The "pervasive entwinement" that existed in *Brentwood* consisted of entwinement "from the bottom up" and "entwinement from top down."  *Id.* at 300.  The entwinement "from the bottom up" consisted of the fact that 84% of the association's members were "public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling" and the fact that "no recognizable [a]ssociation, legal or tangible, [would have existed] without the public school officials who [did] not merely control but overwhelmingly perform[ed] all but the purely ministerial acts by which the [a]ssociation exist[ed] and function[ed] in practical terms."  *Id.* at 299-300.  The "entwinement from top down" consisted

of the fact that members of the State Board of Education were "assigned ex officio to serve as members of [the association's governing bodies]" and the fact that "the [a]ssociation's ministerial employees [were] treated as state employees to the extent of being eligible for membership in the state retirement system." *Id.* at 300.

In this case, plaintiffs invoke the entwinement test by alleging that "the [non-PBGC defendants] were extensively entwined with New GM's management and control in making the [benefits] decision." 2d Am. Compl. ¶ 62.   However, plaintiffs do not allege any fact suggesting that the "'nominally private character'" of New GM was "'overborne'" by the government with respect to the Contested Commitments, much less "'overborne'" to such a degree that "'there [would be] no substantial reason to claim unfairness in applying constitutional standards'" to those commitments. *See Vistein*, 342 F. App'x at 128 (quoting *Brentwood*, 531 U.S. at 298).  For these reasons, the non-PBGC defendants cannot be held responsible for the existence of the Contested Commitments under the entwinement test.

## III.   EVEN ASSUMING, *ARGUENDO*, THAT THE THE CONTESTED COMMITMENTS WERE SUBJECT TO CONSTITUTIONAL SCRUTINY, THEY WOULD NOT DENY PLAINTIFFS EQUAL PROTECTION.

"[T]he Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.'" *Schlesinger v. Ballard*, 419 U.S. 498, 500 n.3 (1975) (quoting *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).  "[E]qual protection analysis requires strict scrutiny of a legislative classification * * * when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *See Mass Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (footnotes omitted).  First Amendment rights are "fundamental right[s]" for

the purpose of "equal protection analysis." *Murgia*, 427 U.S. at 312 & n.3.  Accordingly,

classifications that infringe upon rights guaranteed by the First Amendment deny equal protection

unless they "serve compelling state interests, unrelated to the suppression of ideas, that cannot be

achieved through means significantly less restictive of [First Amendment] freedoms."  *See*

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

      In contrast to classifications that "involv[e] fundamental rights [or] proceed[] along

suspect lines," classifications that do neither are "accorded a strong presumption of validity."

*Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993).  Such classifications "must be upheld against

equal protection challenge if there is any reasonably conceivable state of facts that could provide

a rational basis for the classification[s]."  *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993).

For that reason, "[e]verything rides on the initial – and often formalistic – inquiry regarding the

presence of specially protected constitutional interests."  *Joseph v. City of Birmingham*, 510 F.

Supp. 1319, 1336 (E.D. Mich. 1981).

      In this case, plaintiffs allege that New GM was compelled by the non-PBGC defendants to

enter into the Contested Commitments for "political reasons."  2d Am. Compl. ¶ 59.  Based on

that allegation, plaintiffs allege that the Contested Commitments violate "the First Amendment's

associational and speech guarantees"; that they therefore are subject to strict scrutiny for purposes

of equal protection analysis; that they cannot withstand that scrutiny; and that they therefore deny

plaintiffs equal protection.  *See id.* ¶ 60.  Recognizing that the Contested Commitments may *not*

be subject to strict scrutiny, plaintiffs allege in the alternative that the Contested Commitments

are "not rationally related to any legitimate purpose" and, for that reason, deny them equal

protection.  *See id.* ¶ 59.

As is shown below, the Contested Commitments withstand rational basis scrutiny.  In addition, the Contested Commitments are not subject to strict scrutiny.  For those reasons, the Contested Commitments do not deny plaintiffs equal protection even assuming, *arguendo*, that they are subject to constitutional scrutiny.

A.      **The Contested Commitments Withstand Rational Basis Scrutiny.**

"[G]overnmental action subject to equal protection scrutiny under the rational basis test must be sustained if *any* conceivable basis rationally supports it." *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (court's emphasis).  For that reason, a plaintiff cannot prevail under the rational basis test without "negativing every conceivable basis for the [government's] decision." *Id.* at 791.  "The [government] has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* at 790 (quoting *Beach Commc'ns*, 508 U.S. at 315).  In addition, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the [government]." *Beach Commc'ns*, 508 U.S. at 315.  Accordingly, the rational basis test is "'a paradigm of judicial restraint,' growing out of recognition that 'equal protection is not license for courts to judge the wisdom, fairness or logic of [the government's] choices.'" *TriHealth*, 430 F.3d at 791 (quoting *Beach Commc'ns*, 508 U.S. at 313-14).

In this case, the Contested Commitments withstand rational basis scrutiny.  "[A]s a matter of reality, [New] GM need[ed] a properly motivated workforce to enable New GM to succeed, requiring it to enter into satisfactory arrangements with the UAW – which include[d] arrangements satisfactory to the UAW for UAW retirees." *Gen. Motors*, 407 B.R. at 512.

27

Accordingly, New GM had no realistic choice but to honor the commitment of Old GM to pay supplemental pension benefits to participants in the Delphi Hourly Plan covered by the Old GM - UAW Benefit Guarantee Agreement if UAW insisted that it do so.

In addition, IUE and USW possessed claims against New GM that New GM considered litigiable.  *See* Ex. Z, Sub-Ex. 10.1 at 1.  "After due consideration of the factual and legal arguments regarding these issues, as well as the costs, risks, and delays associated with litigating these issues, " New GM entered into an agreement with Old GM, IUE, and USW "to resolve all claims regarding such matters."  *Id.*  The agreement of New GM to pay supplemental pension benefits to participants in the Delphi Hourly Plan covered by the Old GM - IUE and Old GM - USW Benefit Guarantee Agreements was merely part of the *quid pro quo* for the settlement agreement.  *See id.,* Sub-Ex. 10.1 ¶ 1(a).

Despite these facts, plaintiffs allege that the Contested Commitments are "not rationally related to any legitimate public purpose."  2d Am. Compl. ¶ 59.  However, "'equal protection is not a license for courts to judge the wisdom, fairness or logic of [the government's] choices.'"  *TriHealth*, 430 F.3d at 791 (quoting *Beach Commc'ns*, 508 U.S. at 314).  Even assuming, *arguendo*, that the Contested Commitments are subject to constitutional scrutiny, New GM did not act irrationally by agreeing to pay supplemental pension benefits to participants in the Delphi Hourly Plan covered by the Old GM - UAW Benefit Guarantee Agreement because every employer needs "an adequate, suitable, and loyal supply of labor."  *See Sugarland Indus. v. Comm'r*, 15 B.T.A. 1265, 1269 (1929).  Similarly, New GM did not act irrationally by agreeing to pay supplemental pension benefits to participants in the Delphi Hourly Plan covered by the Old GM - IUE and Old GM - USW Benefit Guarantee Agreements because "'[a] fact-finder [can]

28

conclude that it [is] reasonable for [a potential defendant] to attempt to quell [a] controversy that [is] brewing and to avoid litigation." *See Kiesinger v. Mexico Acad.*, 427 F. Supp. 2d 182, 194 (N.D.N.Y. 2006). Accordingly, the Contested Commitments withstand rational basis scrutiny even assuming, *arguendo*, that they are subject to constitutional scrutiny and further assuming that it would have been "'wis[er], fair[er], or [more] logic[al]" for New GM not to have entered into them. *See TriHealth*, 430 F.3d at 791 (quoting *Beach Commc'ns*, 508 U.S. at 314).

**B.     The Contested Commitments Are Not Subject to Strict Scrutiny.**

Plaintiffs have failed to state a claim that the Contested Commitments were entered into for "political reasons." In addition, government action taken for "political reasons" does not violate the First Amendment in cases like this. For both of these reasons, the Contested Commitments are not subject to strict scrutiny even assuming, *arguendo*, that they are subject to any level of constitutional scrutiny.

**1.     Plaintiffs Have Failed to State a Claim That the Contested Commitments Were Entered Into for "Political Reasons."**

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Iqbal*, 129 S. Ct. at 1949. In this case, plaintiffs allege that the Contested Commitments were entered into for "political reasons." *See* 2d Am. Compl. ¶ 59. However, plaintiffs plead no fact in substantiation of that allegation. Accordingly, plaintiffs have failed to state a claim that the Contested Commitments were entered into for "political reasons." *See Iqbal*, 129 S. Ct. at 1949. For that reason, the Contested Commitments are not subject to strict scrutiny even assuming *arguendo*, that they are subject to

29

any level of constitutional scrutiny and further assuming that they would be subject to strict

scrutiny if entered into for "political reasons."

> ### 2. Government Action Taken for "Political Reasons" Does Not Violate the First Amendment in Cases Like This.

The First Amendment "renders unlawful *all* consideration of political affiliation in hiring

for non-policy level government jobs." *Vieth v. Jubelirer*, 541 U.S. 267, 294 (2004) (op. of

Scalia, J., for four justices) (court's emphasis).  However, the principle that government action

taken for political reasons violates the First Amendment applies solely to public employment.

*See id.*  In other contexts, "[r]eliance on a 'generic favoritism or influence theory . . . is at odds

with standard First Amendment analyses because it is unbounded and susceptible to no limiting

principle.'" *Citizens United v. FEC*, 130 S. Ct. 876, 910 (2010) (quoting *McConnell v. FEC*, 540

U.S. 93, 296 (2003) (op. of Kennedy, J.).  *See also Vieth*, 541 U.S. at 281, 305 (op. of Scalia, J.)

(holding that the Equal Protection Clause does not provide "a judicially enforceable limit on the

political considerations that the States and Congress may take into account when districting"

because "no judicially discernible and manageable standards for adjudicating political

gerrymandering claims have emerged").

This case does not involve public employment.  Accordingly, this case is not governed by

any of the Supreme Court's "political patronage cases," e.g., *Elrod v. Burns*, 427 U.S. 347 (1976).

*See McLoud v. Testa*, 97 F.3d 1536, 1542 (6th Cir. 1996).   Instead, this case is governed by the

general rule that the First Amendment does not prohibit acts of political favoritism because any

rule to the contrary would be "'unbounded and susceptible to no limiting principle.'"  *See*

*Citizens United*, 130 S. Ct. at 910 (quoting *McConnell*, 540 U.S. at 296 (op. of Kennedy, J.)).

Accordingly, the Contested Commitments are not subject to strict scrutiny even assuming,

*arguendo*, that they are subject to any level of constitutional scrutiny and further assuming that plaintiff have stated a claim that they were entered into for "political reasons."

> **IV.   EVEN IF PLAINTIFFS WERE ENTITLED TO ANY RELIEF AGAINST THE NON-PBGC DEFENDANTS – AND THEY ARE NOT – THEY WOULD NOT BE ENTITLED TO THE RELIEF THAT THEY SEEK.**

Plaintiffs seek an order directing "the [non-PBGC defendants] only (and not New GM) to extend the top-up benefits to all [Delphi] Salaried Plan participants." 2d Am. Compl. ¶ 61(a)(ii). By seeking such an order, plaintiffs ask that they be paid an estimated $600 million in supplemental pension benefits from the Federal Treasury. *See* Ranade Decl. ¶¶ 9, 10. However, plaintiffs are not entitled to the order that they seek because the Court does not have authority to order the payment of supplemental pension benefits from the Federal Treasury.

Plaintiffs also seek an award of damages under *Bivens* from defendants Geithner, Rattner, and Bloom and DOES 1-50. *See* 2d Am. Compl. ¶ 63. However, plaintiffs are not entitled to an award of damages under *Bivens* because no remedy under *Bivens* should be recognized here and because the non-PBGC defendants from whom plaintiffs seek an award under *Bivens* are entitled to qualified immunity.

Finally, plaintiffs seek a judgment declaring that the Contested Commitments are unconstitutional. However, plaintiffs are not entitled to a judgment so declaring because such a judgment would be nothing more than an advisory opinion. Accordingly, plaintiffs are not entitled to any of the relief that they seek against the non-PBGC defendants. For that reason alone, plaintiffs' claim against the non-PBGC defendants should be dismissed.

A.   **Plaintiffs Are Not Entitled to an Order Directing the Non-PBGC Defendants to "Extend the Top-Up Benefits to all [Delphi] Salaried Plan Participants" Because the Court Does Not Have Authority to Order the Payment of Supplemental Pension Benefits From the Federal Treasury.**

The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  Art. I, § 9, cl. 7.  The decisions of the Supreme Court "underscore the straightforward and explicit command of the Appropriations Clause.  'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'"  *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).  Accordingly, "[i]t is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation."  *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992)

In this case, plaintiffs ask that the non-PBGC defendants be directed to pay them, from the Federal Treasury, the same supplemental pension benefits that New GM is required to pay under the Contested Commitments.  *See* 2d Am. Compl. ¶ 61(a)(ii).  However, plaintiffs do not identify any appropriation from which such benefits could be paid.  At one time, plaintiffs might have argued that EESA contained such an appropriation because EESA authorized the Secretary of the Treasury to spend up to $700 billion to purchase "troubled assets."  *See* EESA §§ 101(a)(1), 115(a)(3).  However, the payment of supplemental pension benefits from the Federal Treasury would not involve the purchase of any "financial instrument" from any "financial institution," much less the purchase of any "financial instrument * * * the purchase of which is necessary to promote financial market stability."  *See id.* §§ 3(9)(B), 101(a)(1).  In addition, the authority to purchase "troubled assets" that the Secretary possessed under EESA expired by law on October 3, 2010.  *See* EESA § 120(b); Ex. V at 2.  Accordingly, the Court no longer possesses authority

32

under EESA to order the payment of supplemental pension benefits from the Federal Treasury even assuming, *arguendo*, that it ever did.

"Federal courts are courts in law and in equity." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999). In addition, "a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Id.* However, "principles of equity are insufficient to waive the government's sovereign immunity." *U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1386 (Fed. Cir. 2002). "As the business of the Federal Legislature has grown, Congress has placed the individual adjudication of claims based on the Constitution, statutes, or contracts, or on specific authorizations of suit against the Government, with the Judiciary." *Richmond*, 496 U.S. at 430. Despite that fact, "Congress has always reserved to itself the power to address claims of the very type presented [here], those founded not on any statutory authority, but upon the claim that 'the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual.'" *See id.* at 431 (quoting H. Comm on the Judiciary, Subcomm. on Admin. Law & Gov't Rel., *Supplemental Rules of Procedure for Private Claims Bills* 2 (Comm. Print 1989)). Accordingly, a court may not order the payment of funds from the Federal Treasury except "on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *See id.* at 432.

These principles apply in particular to claims arising from the bankruptcy of Old GM. In *Motors Liquidation II*, an owner of Old GM bonds appealed the order of the bankruptcy court approving the proposed sale under § 363. One of the bondholder's claims was that the district court "could order the Bankruptcy Court to enter judgment against the United States of America

to make him, (if not all bondholders) whole." 430 B.R. at 81-82.  Holding that the bondholder

was not entitled to such relief, the court referred to "the sovereign immunity that would protect

the Government from any such result." *Id.* at 82.

In theory, a court has "'two remedial alternatives'" when it holds that a statute providing

benefits to certain persons is "constitutionally underinclusive": "'[i]t may either declare [the

statute] a nullity and order that its benefits not extend to the class that the legislature intended to

benefit, or it may extend the coverage of the statute to include those who are aggrieved by the

exclusion.'"  *Heckler*, 465 U.S. at 738 (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970)

(Harlan, J., concurring in result)).  However, the existence of these "'remedial alternatives'" does

not mean that the courts have the authority to order, for remedial purposes, the disbursement of

federal funds for which no appropriation has been made.  Nor does *Heckler* suggest otherwise.

No issue of remedies existed in *Heckler* because the statute at issue in *Heckler* was upheld against

equal protection challenge.  *See id.* at 744, 750-51.

In addition, the Supreme Court has made it clear in numerous cases decided since *Heckler*

that the courts do not have the authority to order, for remedial purposes, the disbursement of

federal funds for which no appropriation has been made.  In *Lyng v. UAW*, 485 U.S. 360 (1988),

the Court held that the Constitution "'does not confer an entitlement to such funds as may be

necessary to realize all the advantages of [a particular] freedom" even where the Constitution

"'prohibits coercive governmental interference with specific individual rights.'"  485 U.S. at 369

(quoting *Regan v. Taxation With Rep.*, 461 U.S. 540, 549 (1983)).  In *OPM v. Richmond*, 496

U.S. 414 (1990), the Court held that "erroneous oral and written advice given by a Government

employee to a benefits claimant may [not] give rise to estoppel against the Government and so

entitle the claimant to a monetary payment not otherwise permitted by law."  In *FDIC v. Meyer*,

510 U.S. 471 (1994), the Court declined to imply "directly against an agency of the Federal

Government" a cause of action for damages resulting from the government's violation of the

plaintiff's constitutional rights.  510 U.S. at 473.  All of these cases make it clear that plaintiffs

would not be entitled to an order directing the non-PBGC defendants to pay them supplemental

pension benefits from the Federal Treasury even assuming, *arguendo*, that they were entitled to

any relief against the non-PBGC defendants.

      **B.**     **Plaintiffs Are Not Entitled to an Award of Damages Under *Bivens* Because No
Remedy Under *Bivens* Should Be Recognized Here and Because the Non-
PBGC Defendants From Whom Plaintiffs Seek an Award Under *Bivens* Are
Entitled to Qualified Immunity.**

          **1.**     **No Remedy Under *Bivens* Should Be Recognized Here.**

"In *Bivens* – proceeding on the theory that a right suggests a remedy – [the Supreme

Court] 'recognized for the first time an implied private action for damages against federal officers

alleged to have violated a citizen's constitutional rights.'" *Iqbal*, 129 S. Ct. at 1947 (quoting

*Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)).  Relief under *Bivens* is available solely

against "federal agents who allegedly violated the Constitution."  *See Meyer*, 510 U.S. at 473.

"[I]mplied causes of action are disfavored."  *Iqbal*, 129 S. Ct. at 1947.  For that reason,

"the [Supreme] Court has been reluctant to extend *Bivens* liability to 'any new context or new

category of defendants.'"  *Id.* (quoting *Malesko*, 534 U.S. at 68).  In particular, the Court has

avoided "creat[ing] additional *Bivens* remedies" in cases where "the design of a Government

program suggests that Congress has provided what it considers adequate remedial mechanisms for

constitutional violations that may occur in the course of its administration."  *Schweiker v.

Chilicky*, 487 U.S. 412, 423 (1988).  In such cases, the fact that the statutory scheme "makes no

provision for remedies in money damages against officials responsible for unconstitutional conduct" is not dispositive. *See id.* at 424. What is dispositive is whether Congress has provided "meaningful safeguards or remedies for the rights of persons situated as [the plaintiffs are]." *See id.* at 425.

*Chilicky* is illustrative. Alleging that they had been denied due process by the termination of their Social Security disability benefits, the plaintiffs in *Chilicky* sought an award of damages under *Bivens* against the Secretary of Health, Education, and Welfare and other "government officials who administered the federal Social Security program." *See* 487 U.S. at 414. Though noting that "claimants whose benefits [had] been fully restored through the administrative process would lack standing to invoke the Constitution under the statute's administrative review provision," the Court held that "the presence of alleged unconstitutional conduct that is not *separately* remedied under the statutory scheme [does not] imply that the statute has provided 'no remedy' for the constitutional wrong at issue." *Id.* at 424-25, 427-28 (court's emphasis). Declaring that "Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program," the Court held that the relief sought by the plaintiffs was "unavailable as a matter of law." *Id.* at 429.

In this case, plaintiffs' claim against the non-PBGC defendants arises from proceedings conducted under the Bankruptcy Code. The commitment of New GM to pay supplemental pension benefits to participants in the Delphi Hourly Plan covered by the Old GM - UAW Benefit Guarantee Agreement was one of the elements of the proposed sale under § 363. *See* Ex. X § 6.17(f). That sale required the approval of the bankruptcy court, and received it. *See Gen. Motors*, 407 B.R. at 520. The commitment of New GM to pay pension benefits to participants in

36

the Delphi Hourly plan covered by the Old GM - IUE and Old GM - USW Benefit Guarantee Agreements was one of the elements of the settlement agreement among Old GM, New GM, IUE, and USW.   *See* Ex. Z, Sub- Ex. 10.1, ¶ 1(a).  That agreement likewise required the approval of the bankruptcy court, and likewise received it.  *See id.*, Sub- Ex. 10.1, ¶ 13; Ex. 2A at 2.

   "The Constitution grants Congress the authority to establish 'uniform Laws on the subject of Bankruptcies.'" *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000) (quoting Art. I, § 8, cl. 4).  "Congress has wielded this power by creating comprehensive regulations on the subject." *Id.*  "The pervasive nature of Congress' bankruptcy regulation can be seen just by glancing at the Code." *Id.*  "'[A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike." *Id.* (quoting *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir. 1996)).

   The "complex[ity], detail[], and comprehensive[ness]" of the Bankruptcy Code suggest that "Congress has provided [within the Code] what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *See Chilicky*, 487 U.S. at 423.  Plaintiffs are not strangers to proceedings under the Bankruptcy Code.  To the contrary, they were litigants in the Delphi bankruptcy proceedings. *See* Ex. Y at 1-2.  Because Congress "has not failed to provide [within the Bankruptcy Code] meaningful safeguards or remedies for the rights of persons situated as [plaintiffs are]," no remedy under *Bivens* should be recognized here. *See Chilicky*, 487 U.S. at 425.

### 2. The Non-PBGC Defendants From Whom Plaintiffs Seek an Award Under *Bivens* Are Entitled to Qualified Immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The need for qualified immunity is particularly acute where, as here, officials are accused of having violated the Constitution while responding to a national or international emergency "unprecedented in the history of the American Republic." *See Iqbal*, 129 S. Ct. at 1953 (internal quotation marks omitted).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 129 S. Ct. at 815 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Indeed, [the Supreme Court has] made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)) (internal quotation marks omitted). "Accordingly, '[the Supreme Court] repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). In addition, the Court has held that "[a] district-court decision denying a Government officer's claim of qualified immunity can fall within

the narrow class of appealable orders despite 'the absence of a final judgment.'" *Iqbal*, 129 S. Ct. at 1945 (quoting *Mitchell* 472 U.S. at 530).

"Qualified immunity is an affirmative defense that must be pleaded and proved by the defendant." *Summe v. Kenton Cnty. Clerk's Office*, 604 F.3d 257, 269 (6th Cir. 2010). The assertion of the defense raises two issues. *See Pearson*, 129 S. Ct. at 815. The first is "whether the facts that [the] plaintiff has alleged (see Fed. R. Civ. P. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Id.* at 816. The second is "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). These issues may be considered in either order. *See id.* at 820.

As is shown below, the facts that plaintiffs allege do not make out a violation of a constitutional right. In addition, the constitutional right that the non-PBGC defendants allegedly have violated was not clearly established at the time of the alleged violation. For both of these reasons, the non-PBGC defendants from whom plaintiffs seek an award of damages under *Bivens* are entitled to qualified immunity even assuming, *arguendo*, that a right under *Bivens* should be recognized here.

**a.      The Facts That Plaintiffs Allege Do Not Make Out the Violation of a Constitutional Right.**

Two separate allegations lie at the heart of plaintiffs' claim against the non-PBGC defendants. First, plaintiffs allege that the Contested Commitments are subject to constitutional scrutiny. *See* 2d Am. Compl. ¶¶ 37, 60, 62. Second, plaintiffs allege that the Contested Commitments fail that scrutiny if subjected to it. *See id.* ¶ 59-60. As is shown above, however, plaintiffs have failed to state a claim that the Contested Commitments are subject to constitutional

39

scrutiny or, if they are, that they fail that scrutiny.  Points II & III, *supra*.  Because of those

failures, plaintiffs have failed to "make out a violation of a constitutional right."  *See Pearson*,

129 S. Ct. at 816.  For that reason, the non-PBGC defendants are entitled to qualified immunity.

*See id.*

> **b.    The Constitutional Right That the Non-PBGC
>         Defendants Allegedly Have Violated Was Not Clearly
>         Established at the Time of the Alleged Violation.**

"'[C]learly established' for purposes of qualified immunity means that '[t]he contours of

the right [allegedly violated] must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right."  *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "'This is not to say that an official action is

protected by qualified immunity unless the very action in question has previously been held

unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'"

*Id.*

"[C]learly established" also has other meanings.  First, "[t]he factors necessary to establish

a *Bivens* violation will vary with the constitutional provision at issue."  *Iqbal*, 129 S. Ct. at 1948.

"Where [as here] the claim is invidious discrimination in contravention of the First and Fifth

Amendments," the plaintiff must "plead and prove that the defendant acted with discriminatory

purpose."  *Id.*  "Under extant precedent purposeful discrimination requires more than 'intent as

volition or intent as awareness of consequence.'"  *Id.* (quoting *Personnel Adm'r v. Feeney*, 442

U.S. 256, 279 (1979)).  "It instead involves a decisionmaker's undertaking a course of action

'because of, not merely in spite of, [the action's] adverse effects upon an identifiable group.'"  *Id.*

"It follows that, to state a claim based on a violation of a clearly established right, [the plaintiff]

must plead sufficient factual matter to show that [the defendants] adopted and implemented" the contested classification "for the purpose of discriminating," rather than for a "neutral" reason. *Id.* at 1948-49.

Second, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S. Ct. at 1949. Accordingly, a plaintiff who seeks relief under *Bivens* "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. "In the context of determining whether there is a violation of clearly established right to overcome qualified immunity," "purpose rather than knowledge is required." *Id.* at 1949.

For a series of reasons, the non-PBGC defendants from whom plaintiffs seek an award of damages under *Bivens* did not violate a "clearly established" right in this case even assuming, *arguendo*, that they violated any right at all. First, the Supreme Court has established four separate tests for determining whether "challenged conduct may be fairly attributable to the State for purposes of a [constitutional] claim." *Vistein*, 342 F. App'x. at 127. In addition, the Court has held that "[w]hat is fairly attributable is a matter of normative judgment"; that "no one fact can function as a necessary condition"; and that no "set of circumstances [is] absolutely sufficient." *Brentwood*, 531 U.S. at 295. Under these circumstances, the "'pre-existing law'" concerning the attribution of private action to the state was not so clear that a "'reasonable official'" standing in the shoes of the non-PBGC defendants would have understood that he or she could be held responsible for the existence of the Contested Commitments. *See Wilson*, 526 U.S. at 615 (quoting *Anderson*, 483 U.S. at 640).

Second, the Supreme Court has moved in two different directions in cases involving government action allegedly taken for "political reasons."  In *Elrod* and other "political patronage cases," the Court has held that the First Amendment prohibits "all consideration of political affiliation in hiring for non-policy-level government jobs."  *See Vieth*, 541 U.S. at 294 (op. of Scalia, J.) (emphasis omitted); *McCloud*, 97 F.3d at 1542.  In *Citizens United*, the Court has held that "[r]eliance on a 'generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'"  130 S. Ct. at 910 (quoting *McConnell*, 540 U.S. at 296) (op. of Kennedy, J.)).  Under these circumstances, the "'pre-existing law'" concerning the legality under the First Amendment of action taken for "political reasons" was not so clear that a "'reasonable official'" standing in the shoes of the non-PBGC defendants would have understood that the Contested Commitments would be unlawful if entered into for such reasons.  *See Wilson*, 526 U.S. at 615 (quoting *Anderson*, 483 U.S. at 640).

Third, plaintiffs make no allegation suggesting that any of the non-PBGC defendants from whom they seek an award under *Bivens* "has violated the Constitution" through his or her "own individual actions," much less that any of those defendants has done so "for the purpose of discriminating."  *See Iqbal*, 129 S. Ct. at 1948, 1949.  For these reasons as well, no claim "based on a violation of a clearly established right" is stated here.  *See id.* at 1948-49.  The non-PBGC defendants from whom plaintiffs seek an award under *Bivens* are therefore entitled to qualified immunity even assuming, *arguendo*, that a right under *Bivens* should be recognized here.

**C.      Plaintiffs Are Not Entitled to a Judgment Declaring That the Contested Commitments Are Unconstitutional Because Such a Judgment Would Be Nothing More Than an Advisory Opinion.**

Subject to certain limitations, "any court of the United States * * * may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  However, "[t]he fact that a court *can* enter a declaratory judgment does not mean that it *should*":

> In all civil litigation, the judicial decree is not the end but the means.  At the end of the rainbow lies not judgment, but some action (or cessation of action) by the defendant that the judgment produces – the payment of damages, or some specific performance, or the termination of some conduct.  Redress is sought *through* the court, but *from* the defendant.  This is no less true of a declaratory judgment suit than of any other action.  The real value of the judicial pronouncement – what makes it a proper judicial resolution of a "case or controversy" rather than an advisory opinion – is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*

*Hewitt v. Helms*, 482 U.S. 755, 761, 762 (1987) (court's emphasis).

In this case, plaintiffs ask the Court to declare that the "selective provision of top-up benefits to certain Delphi retirees on the basis of associational status violates the Constitution." 2d Am. Compl. ¶ 61(a)(i).  As is shown above, however, plaintiffs are not entitled to an order directing the non-PBGC defendants to "extend the top-up benefits to all [Delphi] Salaried Plan participants" because the Court does not have authority to order the payment of supplemental pension benefits from the Federal Treasury.  Pt. IV(A), *supra*.  In addition, plaintiffs are not entitled to an award of damages under *Bivens* because no remedy under *Bivens* should be recognized here and because the non-PBGC defendants from whom plaintiffs seek an award under *Bivens* are entitled to qualified immunity.  Pt. IV(B), *supra*.  For those reasons, a judgment declaring that the "selective provision of top-up benefits to certain Delphi retirees on the basis of

43

associational status violates the Constitution" would be nothing more than an advisory opinion because it would not resolve plaintiffs' claim against the non-PBGC defendants in a way that "affect[ed] the behavior of [the non-PBGC defendants] toward [plaintiffs]."  *See Hewitt*, 482 U.S. at 761 (emphasis omitted).  For that reason, plaintiffs are not entitled to such a judgment.

## CONCLUSION

For the foregoing reasons, the renewed motion to dismiss of Treasury, the Auto Task Force, and defendants Geithner, Rattner, and Bloom should be granted.

Respectfully submitted,

TONY WEST
Assistant Attorney General
BARBARA L. McQUADE
United States Attorney
PETER A. CAPLAN
Assistant United States Attorney
SANDRA M. SCHRAIBMAN
Ass't Branch Dir., Dep't of Justice, Civil Division

s/ *David M. Glass*
DAVID M. GLASS, DC Bar 544549
Sr. Trial Counsel, Dep't of Justice, Civil Division
20 Mass. Ave., N.W., Room 7200
Washington, D.C.  20530
Tel: (202) 514-4469/Fax: (202) 616-8470
E-mail: david.glass@usdoj.gov
Attorneys for Defendants U.S. Department of the
Treasury, Presidential Task Force on the Auto
Dated: December 20, 2010                  Industry, Timothy F. Geithner, Steven L. Rattner,
and Ron A. Bloom