*Black v. PBGC*
No. 2:09-cv-13616-AJT-MKM

Renewed Mot. Dis. Def. U.S. Dep't Treas.,
Pres. Task Force on Auto Indus., Timothy F.
Geithner, Steven L. Rattner, Ron A. Bloom

Ex. T

United States Government Accountability Office

# GAO

## Report to Congressional Committees

**April 2010**

# TROUBLED ASSET RELIEF PROGRAM

# Automaker Pension Funding and Multiple Federal Roles Pose Challenges for the Future



**GAO**
Accountability * Integrity * Reliability

GAO-10-492

April 2010

**G A O**
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-10-492, a report to congressional committees

# TROUBLED ASSET RELIEF PROGRAM

## Automaker Pension Funding and Multiple Federal Roles Pose Challenges for the Future

## Why GAO Did This Study

Over $81 billion has been committed under the Troubled Asset Relief Program (TARP) to improve the domestic auto industry's competitiveness and long-term viability. The bulk of this assistance has gone to General Motors (GM) and Chrysler, who sponsor some of the largest defined benefit pension plans insured by the federal Pension Benefit Guaranty Corporation (PBGC). As part of GAO's statutorily mandated oversight of TARP, this report examines:

(1) the impact of restructuring on GM's and Chrysler's pension plans;

(2) the impact of restructuring on auto supply sector pension plans;

(3) the impacts on PBGC and plan participants should auto industry pension plans be terminated; and

(4) how the federal government is dealing with the potential tensions of its multiple roles as pension regulator, shareholder, and creditor.

To conduct this study, GAO interviewed officials at GM, Chrysler, a labor union, a supplier association, the Departments of the Treasury and Labor, and PBGC; and reviewed relevant statutes, reports, and documents concerning the automakers' restructuring and pension plan funding.

Treasury and PBGC generally agreed with the report's findings. Their technical comments and the technical comments provided by GM, Chrysler, and Delphi, were incorporated as appropriate.

View GAO-10-492 or key components. For more information, contact Barbara Bovbjerg at (202) 512-7215 (bovbjergb@gao.gov); or A. Nicole Clowers at (202) 512-2834 (clowersa@gao.gov).

## What GAO Found

The new GM and the new Chrysler that were established during each company's bankruptcy process in the summer of 2009 assumed sponsorship for all the old companies' U.S. defined benefit plans. Although the pension plans have been maintained, their future remains uncertain. According to current company projections, large contributions may be needed to comply with federal pension funding requirements within the next 5 years.

**Projected Contributions Needed to Fund GM and Chrysler Pension Plans (2010-2014)**



Projected cash payments (dollars in billions)

GM: 2010, 2011, 2012, 2013 (5.9), 2014 (6.4)

Chrysler: 2010 (0.40), 2011, 2012 (0.04), 2013 (0.93), 2014 (1.25)

Source: GAO analysis of GM and Chrysler funding projections for all U.S. qualified defined benefit pension plans each sponsors, based on valuation methods for required contributions defined under the Pension Protection Act.

Officials at the Department of the Treasury, which oversees TARP, expect both GM and Chrysler to return to profitability. If this is the case, then the companies will likely be able to make the required payments and prevent their pension plans from being terminated. However, if GM and Chrysler were not able to return to profitability and their pension plans were terminated, PBGC would be hit hard both financially and administratively. In early 2009, prior to the new companies assuming sponsorship, PBGC estimated that its exposure to potential losses for GM's and Chrysler's plans to be about $14.5 billion.

Meanwhile, automaker downsizing and the credit market crisis have created significant stress for suppliers and their pensions. During 2009, there was a rise in the number of supplier bankruptcies, liquidations, and pension plan terminations. In July, the nation's largest auto parts supplier, Delphi Corporation, terminated its pension plans with expected losses to PBGC of over $6.2 billion. Across the auto sector as a whole, in January 2009, PBGC estimated that unfunded pension liabilities totaled about $77 billion, with PBGC's exposure for potential losses due to unfunded benefits of about $42 billion, leaving plan participants to bear the potential loss of the $35 billion difference through reduced benefits.

Moreover, until Treasury either sells or liquidates the equity it acquired in each of the companies in exchange for the TARP assistance, its role as shareholder creates potential tensions with its role as pension regulator and overseer of PBGC in its role as pension insurer. In particular, tensions could arise if decisions must be made between allocating funds to company assets (thereby protecting shareholders, including taxpayers) or to pension fund assets (thereby protecting plan participants). As GAO reported previously, better communication with Congress and others about TARP interests could help mitigate such tensions.

# Contents

| **Letter** | | 1 |
|---|---|---|
| | Background | 4 |
| | New GM and New Chrysler Assumed Sponsorship of Pension Plans in Restructuring, but Face Future Funding Challenges | 12 |
| | Economic Stress in Auto Industry Has Endangered Auto Supplier Pensions | 24 |
| | Both PBGC and Plan Participants Incur Losses when Underfunded Plans Are Terminated | 30 |
| | Balancing Multiple Federal Roles May Create Tensions and Challenges | 42 |
| | Concluding Observations | 45 |
| | Agency Comments and Our Evaluation | 47 |
| **Appendix I** | **The Delphi Story** | 51 |
| **Appendix II** | **Legal Limits on PBGC Guaranteed Benefits** | 54 |
| **Appendix III** | **Recent Attrition Programs at GM and Chrysler** | 55 |
| **Appendix IV** | **Product Lines and Facilities Being Eliminated** | 58 |
| **Appendix V** | **History of Major Acquisitions and Divestitures** | 61 |
| **Appendix VI** | **Allocation of Assets to Participant Benefits** | 63 |
| **Appendix VII** | **PBGC Example Benefit Calculations** | 65 |
| **Appendix VIII** | **Comments from the Department of the Treasury** | 67 |

**Appendix IX**          **Comments from PBGC**                              68

**Appendix X**           **GAO Contacts and Staff Acknowledgments**          69

**Related GAO Products**                                                     70

**Tables**

Table 1: Defined Benefit Plans Sponsored by New GM and New
    Chrysler                                                            8
Table 2: Benefit Restrictions Based on a Plan's Funded Status              23
Table 3: Funded Status of Selected Suppliers' Defined Benefit
    Pension Plans (2008)                                                  28
Table 4: PBGC's Estimates of Potential Exposure for GM's and
    Chrysler's Pension Plans in Early 2009                                33
Table 5: Auto Supplier Pension Plans Terminated and Trusteed by
    PBGC, May 2009–January 2010                                          34
Table 6: Recent Attrition Programs at GM                                   55
Table 7: Recent Attrition Programs at Chrysler                             57
Table 8: GM Product Lines and Facilities Being Eliminated                  58
Table 9: Chrysler Product Lines and Facilities Being Eliminated            60
Table 10: Priority Categories for Allocating Participant Benefits          63
Table 11: Examples of Participants' Benefit Reductions If an
    Automaker Hourly Plan Were Terminated                                 65

**Figures**

Figure 1: Trends in the Funded Status of GM's and Chrysler's
    Pension Plans (2006-2009)                                            14
Figure 2: Trends in GM's Pension Plans' Liabilities and Assets            16
Figure 3: Trends in Chrysler's Pension Plans' Liabilities and Assets      17
Figure 4: Projected Calendar Year Contributions to GM's Pension
    Plans (2009-2014)                                                    21
Figure 5: Projected Calendar Year Contributions to Chrysler's
    Pension Plans (2009-2015)                                            22
Figure 6: PBGC's Estimate of Possible Exposure to Loss by
    Industry                                                             32

Figure 7: Size of GM's and Chrysler's Plans Compared with Total
    PBGC-Trusteed Plans     36
Figure 8: Determining If a Participant's Guaranteed Benefit Is
    Subject to Legal Limits     54

## Abbreviations

| | |
|---|---|
| AIFP | Automotive Industry Financing Program |
| ERISA | Employee Retirement Income Security Act of 1974 |
| GM | General Motors Company |
| IRS | Internal Revenue Service |
| PBGC | Pension Benefit Guaranty Corporation |
| PPA | Pension Protection Act of 2006 |
| TARP | Troubled Asset Relief Program |
| UAW | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America |
| VEBA | Voluntary Employee Beneficiary Association |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

April 6, 2010

Congressional Committees

Domestic auto manufacturers remain sponsors of some of the largest private defined benefit plans in the United States. The fate of these pension plans affects not only the benefits of current and future auto company retirees, but also the financial well-being of the Pension Benefit Guaranty Corporation (PBGC)[1]—the federal corporation that insures private sector defined benefit plans. During the past year, the U.S. automotive industry has undergone major restructuring, including the bankruptcy reorganization of two of the country's largest auto manufacturers and re-emergence as new companies—General Motors Company (GM) and Chrysler Group, LLC (Chrysler)—and the continued consolidation in the auto supply industry. Since 2008, the federal government has committed to provide over $81 billion under the Troubled Asset Relief Program (TARP) to assist the automobile industry.[2] These funds, along with loans from the Canadian government and concessions from nearly every stakeholder (including labor unions), were intended to allow the companies time to restructure to improve their competitiveness and long-term viability, which is critical to the future of both the companies and their pension plans. In exchange for this funding, the federal government acquired partial ownership in and made loans to the new GM and the new Chrysler that were established during the bankruptcy process. Treasury's new role as a shareholder adds an unprecedented and extraordinary element to the previously established government responsibilities of regulator and its relationship to PBGC as insurer.

Under our statutorily mandated responsibilities for providing timely oversight of TARP, we are continuing to report on the federal

---

[1] 29 U.S.C. §1302.

[2] The Emergency Economic Stabilization Act of 2008 authorized TARP, Pub. L. No. 110-343, Div. A, §§ 101-136, 122 Stat. 3765, 3767-3800 (codified at 12 U.S.C. §§ 5201-5241).

government's assistance to the U.S. automotive industry.[3,4] In this report, we focused on the impact of the recent restructuring on auto industry pension plans and the government's role in overseeing those plans and PBGC's role in insuring these plans. Specifically, our review focused on the following questions:

(1) How has restructuring affected GM's and Chrysler's pension plans and the outlook for the plans going forward?

(2) How has restructuring affected auto supply sector pension plans?

(3) What are the impacts on PBGC and plan participants should auto industry pension plans be terminated in the next 5 years?

(4) How is the federal government dealing with the potential tensions between its multiple roles as pension regulator and insurer, and its new roles as shareholder and creditor?

To describe how restructuring has affected GM's and Chrysler's pension plans and the plans' funding going forward,[5] we interviewed officials from each automaker. They provided us with an overview of their pension plans as well as a number of documents, including detailed actuarial information about their PBGC-insured pension plans. We interviewed Department of Treasury (Treasury) officials who are responsible for overseeing the assistance to GM and Chrysler (referred to as Treasury's "auto team") in Treasury's program office for TARP, the Office of Financial Stability.

---

[3]GAO is required to report at least every 60 days on findings resulting from, among other things, oversight of TARP's performance in meeting the purposes of the act, the financial condition and internal controls of TARP, the characteristics of both asset purchases and the disposition of assets acquired, TARP's efficiency in using the funds appropriated for the program's operation, and TARP's compliance with applicable laws and regulations. 12 U.S.C. § 5226(a).

[4]For more information on the restructuring of GM and Chrysler companies overall, see GAO, *Troubled Asset Relief Program: Continued Stewardship Needed as Treasury Develops Strategies for Monitoring and Divesting Financial Interests in Chrysler and GM*, GAO-10-151 (Washington, D.C.: Nov. 2, 2009); GAO, *Auto Industry: Summary of Government Efforts and Automakers' Restructuring to Date*, GAO-09-553 (Washington, D.C.: Apr. 23, 2009); and GAO, *Auto Industry: A Framework for Considering Federal Financial Assistance*, GAO-09-242T (Washington, D.C.: Dec. 4, 2008).

[5]While a portion of TARP funds for the auto industry have been used to assist GMAC LLC and Chrysler Financial, the former financing divisions of GM and Chrysler respectively, we did not review the effect of restructuring on the pension plans of these finance companies as they are now separate legal entities.

These officials provided information on Treasury's involvement in the restructurings and how it considered future plan funding when structuring the financing packages for the companies. We interviewed other Treasury officials, as well as officials at PBGC, and the Department of Labor (Labor). We also interviewed the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), which represents a significant number of the participants in the collectively bargained pension plans, and asked for their views on restructuring efforts and their effect on pension plans. Additionally, we reviewed materials related to restructurings, including corporate annual reports and bankruptcy documents, as well as relevant federal laws and regulations, and other materials related to defined benefit plans and plan funding, such as pension consulting briefs.

To describe how restructuring has affected the auto supply sector and its pensions, we interviewed officials from PBGC, Treasury, and the Motor and Equipment Manufacturers Association. We also reviewed materials related to key production parts suppliers in the auto industry, including corporate annual reports, bankruptcy filings, PBGC press releases, and industry publications.

To determine the potential consequences of plan termination for PBGC and plan participants, and to describe the tensions and challenges faced by the federal agencies responsible for the regulation and oversight of qualified defined benefit plans,[8] we interviewed officials from GM, Chrysler, UAW, PBGC, and the board representatives for PBGC's Board of Directors, comprised of the Secretaries of Commerce, Labor, and Treasury, the primary agencies charged with pension regulation and overseeing PBGC. We requested additional actuarial information from the automakers in certain instances and reviewed bankruptcy documents related to the individual automaker restructurings. We also reviewed relevant federal laws and regulations, and past GAO reports that addressed the topics of pension plan termination and managing multiple roles under TARP.

---

[8]To qualify for preferential tax treatment, pension plans must satisfy certain requirements related, for example, to minimal funding, vesting, and accounting. 26 U.S.C. § 401. Employers may deduct their contributions to qualified plans. Although such contributions are a form of compensation to them, employees do not claim such contributions as income for tax purposes, but the income from pensions is considered taxable when pension benefits are received.

To ensure the technical accuracy of the information contained in the report, we asked representatives of GM, Chrysler, and Delphi to review portions of a draft of this report. We conducted this performance audit between September 2009 and April 2010, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

The domestic auto industry—including automakers, dealerships, and automotive parts suppliers—contributes substantially to the U.S. economy, but has faced financial challenges in recent years. According to the Congressional Research Service, more than 435,000 U.S. automotive manufacturing jobs have been eliminated since 2000—an amount equal to about 3.3 percent of all manufacturing jobs in 2008.[7] The employment level first dipped below 1 million in 2007 and fell to 880,000 workers in 2008. The Detroit-based automotive manufacturers—GM, Chrysler, and the Ford Motor Company—have seen their share of the domestic market drop from 64.5 percent in 2001 to 47.5 percent in 2008. Prior to restructuring, GM and Chrysler reported losses in 2008 totaling $31 billion and $8 billion, respectively.

## TARP Assistance for the Auto Sector

Concerned that the collapse of a major U.S. automaker could pose a systemic risk to the nation's economy, in December 2008, Treasury established the Automotive Industry Financing Program (AIFP) under TARP. Through June 2009, $81.1 billion in AIFP funding has been made available to assist the auto industry. The largest part of the program's funding—about $62 billion—was provided to help GM and Chrysler fund their operations while they restructured. In exchange for this funding, the Treasury has become part-owner of the two new companies that re-emerged, receiving 60.8 percent of the equity in the new GM and 9.85 percent of the equity in the new Chrysler, and has a debt interest of about $14 billion in loans between the two.[8] Given the large taxpayer

---

[7]Michaela D. Platzer and Glennon J. Harrison, *The U.S. Automotive Industry: National and State Trends in Manufacturing Employment.* (Washington, D.C.: Congressional Research Service, 2009).

[8]Treasury also received $2.1 billion in preferred stock in GM.

investments in GM and Chrysler, in a recent report, we recommended that Treasury report to Congress on how it plans to assess and monitor the companies' performance to help ensure the companies are on track to repay their loans and to return to profitability. In response, Treasury said the agency intends to develop an approach for reporting on its investments in the auto industry that strikes an appropriate balance between its goal of transparency and the need to avoid compromising either the competitive positions of these companies or Treasury's ability to recover taxpayer funds.[9] More broadly, we also previously recommended that Treasury better communicate to external stakeholders, including Congress, about its TARP strategies and activities to improve the integrity, accountability, and transparency of the program. In response to this recommendation, Treasury noted that it was implementing a communication strategy to provide key congressional stakeholders more current information about its TARP activities.[10]

AIFP also established the Auto Supplier Support Program—a mechanism to extend credit to auto suppliers. Under this program, Treasury committed to fund up to $3.5 billion in loans to special purpose entities created by new GM and new Chrysler for the purpose of ensuring payment to suppliers. The program was designed to ensure that automakers receive the parts and components they need to manufacture vehicles and that suppliers have access to liquidity on their receivables.[11] According to Treasury officials, the program will terminate in April 2010.

## Restructuring in the Auto Sector

As a condition of receiving federal financial assistance, GM and Chrysler were also required to develop restructuring plans to identify how the companies planned to achieve and sustain long-term financial viability.[12]

---

[9]GAO-10-151.

[10]GAO, *Troubled Asset Relief Program: March 2009 Status of Efforts to Address Transparency and Accountability Issues*, GAO-09-504 (Washington, D.C.: Mar. 31, 2009); and GAO, *Troubled Asset Relief Program: June 2009 Status of Efforts to Address Transparency and Accountability Issues*, GAO-09-658 (Washington, D.C.: June 17, 2009).

[11]The remaining funds have been used: (1) for the Warranty Commitment Program, which provided funds to Chrysler and GM, but have been repaid in full; and (2) to provide assistance to GM's and Chrysler's financing divisions, now spun off as separate legal entities.

[12]For a more detailed discussion of Chrysler and GM restructuring efforts, see GAO-09-553 and GAO-10-151.

## GM

Prior to restructuring, GM was a publicly traded company that employed about 240,000 people worldwide. It had manufacturing facilities in 34 countries and sold more than a dozen brands of vehicles in about 140 countries. GM's core U.S. brands are Buick, Cadillac, Chevrolet, and GMC; other brands included Daewoo, Holden, Hummer, Opel, Pontiac, Saab, Saturn, Vauxhall, and Wuling.

GM filed for Chapter 11 bankruptcy protection on June 1, 2009, and on July 5, 2009, the bankruptcy court approved the sale of substantially all of old GM's assets to a newly formed company, referred to as "new GM." The new GM assumed sponsorship of both of old GM's U.S. qualified defined benefit plans.

## Chrysler

Prior to restructuring, Chrysler was a privately held company that employed about 54,000 people worldwide, including manufacturing facilities in four countries and vehicles assembled under contract in four others. Chrysler's major brands include Dodge, Chrysler, and Jeep.

Chrysler filed for Chapter 11 bankruptcy protection on April 30, 2009, and on June 9, 2009, the bankruptcy court approved the sale of substantially all of old Chrysler's assets to a newly formed company, referred to as "new Chrysler." The new Chrysler assumed sponsorship of all Chrysler's U.S. qualified defined benefit plans.

To implement the restructuring plans, both companies filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code. During the bankruptcy process, newly organized companies for both GM and Chrysler were established in the summer of 2009. These new companies purchased substantially all of the operating assets of the previous companies, while the old companies, which retained very few assets but most of the liabilities, continued in bankruptcy. The new companies also streamlined operations and substantially reduced their debt. Changes included reductions in the number of brands and models, closing factories and dealerships, and reducing their hourly and salaried workforces through early retirements, buyouts, and layoffs.

Automakers are highly dependent on a large motor vehicle parts supply industry. The auto supply chain consists of networks of suppliers, transportation carriers, fabrication sites, assembly locations, distribution centers, and locations by which components, services, information and products flow. The supply chain starts with suppliers who assemble raw components into more complex components which are processed or combined with additional components and eventually brought together by top-level suppliers to manufacture end products for use by the automaker. Each level in the supply chain depends on the financial health of the other for its survival.

The U.S. auto supply sector became unstable as the domestic market share of the global automotive marketplace declined, prices for raw materials and petroleum increased, and production cuts ensued. These financial pressures affected various levels of the supply chain, leading some suppliers to file for bankruptcy, including the nation's largest U.S. auto supplier, Delphi Corporation (a spin off of GM), which filed for bankruptcy in 2005. [13]

## Private Sector Pension Plans

About one-half of all U.S. workers participate in some form of employer-sponsored retirement plan, typically classified either as a defined benefit or as a defined contribution plan. Defined benefit plans generally offer a fixed level of monthly retirement income based upon a participant's salary, years of service, and age at retirement, regardless of how the plan's investments perform. In contrast, benefit levels for those with defined contribution plans depend on the contributions made to individual accounts (such as 401(k) plans) and the performance of the investments in

---

[13]For further details on Delphi, see appendix I.

those accounts, which may fluctuate in value. Over the last two decades, much of the private sector pension coverage has moved away from traditional defined benefit plans in favor of defined contribution plans and hybrid defined benefit plans,[14] thereby increasing portability for workers as they change jobs, but also shifting the risk and burden of financing retirement from employers to employees.

Domestic automakers sponsor some of the largest private sector defined benefit plans. According to a financial publication, as of year-end 2007, GM sponsored the largest defined benefit plans by a considerable margin, with nearly 60 percent more benefit obligations than the plan sponsor ranked second: AT&T, Inc.[15] The Ford Motor Company ranked fifth. At the time, Delphi, the auto supplier that spun off from GM in 1999, ranked 18th. Chrysler was not included in the publication's list, but, as of the beginning of 2008, it had about one-fourth of GM's benefit obligations, and would have ranked in the top 10 if its total benefit obligations were included on this list. Based on data gathered for previous GAO reports, in 2004, the plans sponsored by GM and Chrysler represented roughly 7 percent of the liabilities, 7 percent of the assets, and 2.5 percent of the total participants of the entire defined benefit system.[16] The defined benefit plans that continue to be sponsored by the new GM and new Chrysler are summarized in table 1. Unlike the new GM and new Chrysler, the "new Delphi" that emerged from Delphi's bankruptcy reorganization did not assume sponsorship of the company's pension plans. After Delphi froze its hourly pension plan in November 2008,[17] some Delphi hourly employees began to accrue credited service in the GM hourly pension plan according to the terms of agreements negotiated with various unions, while other

**Delphi**

Delphi evolved as part of GM until it was spun off as a separate entity in 1999. By 2005, the company employed more than 185,000 workers in 38 countries, making it one of the largest suppliers in the world. However, on October 8, 2005, Delphi Corporation and its U.S. subsidiaries filed for Chapter 11 bankruptcy protection. Four years later, most of Delphi's U.S. and foreign operations were sold to a new entity, known as "new Delphi," on October 6, 2009.

The former Delphi Corporation sponsored six defined benefit plans for its U.S.-based workers. Despite efforts to keep the pension plans ongoing, on July 31, 2009, PBGC terminated all six of Delphi's U.S. qualified defined benefit plans.

For more details on Delphi, see appendix I.

---

[14]Hybrid plans are legally defined benefit plans, but they contain certain features that resemble defined contribution plans.

[15]Rob Kozlowski, "The List: Funded Status of the Largest Defined Benefit Plans," *Financial Week*, June 16, 2008.

[16]See GAO-08-817 and GAO, *Defined Benefit Pensions: Survey Results of the Nation's Largest Private Defined Benefit Plan Sponsors*, GAO-09-291 (Washington, D.C.: Mar. 30, 2009).

[17]A plan freeze is a plan amendment that closes the plan to new entrants and may or may not reduce future benefit accruals for some or all active plan participants. A "hard freeze," referenced here, occurs when the plan is closed to new entrants and participants no longer accrue additional benefits. For other freeze types and a discussion of their effects, see: GAO, *Defined Benefit Pensions: Plan Freezes Affect Millions of Participants and May Pose Retirement Income Challenges*, GAO-08-817 (Washington, D.C.: July 21, 2008).

Delphi employees did not receive similar treatment. PBGC terminated all six of Delphi's U.S. qualified defined benefit plans in July 2009.

**Table 1: Defined Benefit Plans Sponsored by New GM and New Chrysler**

| Short plan name | Full plan name | Number of participants[a] | Collectively bargained plan[b] | Plan liabilities (dollars in millions)[c] | Plan status[d] |
|---|---|---|---|---|---|
| **GM's plans** | | | | | |
| Hourly Plan | General Motors Hourly-Rate Employees Pension Plan | 505,289 | Yes | (plan-level data not publicly available) | Open, but plan terms modified for certain new hires as of 10/15/2007[e] |
| Salaried Plan | General Motors Retirement Program for Salaried Employees | 197,098 | No | (plan-level data not publicly available) | Plan closed and frozen for certain participants 1/1/2007[f] |
| **Total GM** | | **702,387** | | **$98.1[g]** | |
| **Chrysler's plans** | | | | | |
| UAW Pension Plan | Pension Agreement between Chrysler LLC and the UAW | 134,689 | Yes | 14,003 | Open |
| Chrysler Pension Plan | Chrysler LLC Pension Plan | 44,329 | No | 2,973 | Closed 12/31/2003 |
| Salaried Employees' Retirement Plan | Chrysler LLC Salaried Employees' Retirement Plan | 46,217 | Yes (for some) | 2,567 | Closed 12/31/2003 |
| AMC Plan | American Motors Union Retirement Income Plan | 10,693 | Yes | 809 | Closed 12/31/1996 |
| Jeep Plan | Jeep Corporation - UAW Retirement Income Plan | 8,960 | Yes | 1,288 | Open |
| Chrysler IUE Pension Plan | Pension Agreement Between Chrysler LLC and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers | 4,011 | Yes | 205 | Frozen 3/31/2002 |
| Executive Salaried Employees' Retirement Plan | Chrysler LLC Executive Salaried Employee's Retirement Plan | 2,867 | No | 1,478 | Closed 12/31/2003 |
| Subsidiaries' Pension Plan | Chrysler LLC Subsidiaries' Pension Plan | 1,693 | No | 22 | Open |

| Short plan name | Full plan name | Number of participants[a] | Collectively bargained plan[b] | Plan liabilities (dollars in millions)[c] | Plan status[d] |
|---|---|---|---|---|---|
| Chrysler UPGWA/Guards Pension Plan | Pension Agreement between Chrysler LLC and the United Plant Guard Workers of America | 985 | Yes | 41 | Frozen 9/30/2005 |
| GEMA UAW Pension Plan | Global Engine Manufacturing Alliance UAW Pension Plan | 220 | Yes | 1 | Open |
| **Total Chrysler** | | **254,664[h]** | - | **$23,387** | |

Source: GM and Chrysler documents.

[a]GM participant data are as of September 30, 2008, and Chrysler participant data are as of January 1, 2008, (the most recent data available at the time of our study).

[b]A collectively bargained plan is a plan in which contributions to the plan or benefits paid by the plan (or both) are subject to the collective bargaining process. At least some or all of the employees covered by the plan are members of a collective bargaining unit that negotiates the contributions or benefits (or both).

[c]Data on plan liabilities are based on "projected benefit obligations" as measured in accordance with Financial Accounting Standards. GM data are as of December 31, 2008, and Chrysler data are as of January 1, 2009.

[d]"Closed" indicates closed to new hires, but active employees continue to accrue benefits; "frozen" indicates no employees are actively accruing benefits, sometimes called a "hard freeze"; future benefit accruals ceased as of the date indicated (unless otherwise noted). In all cases, the plan has not been terminated.

[e]The hourly plan was amended to provide a new cash balance benefit for all hourly new hires (except skilled trades) after October 15, 2007.

[f]Employees hired between January 1, 2001, and December 31, 2006, participated in a cash balance benefit under the plan, and this benefit was frozen as of December 31, 2006. Employees hired before January 1, 2001, received accrued defined benefits, and such benefits were frozen as of January 1, 2007, when a new lower defined benefit formula was implemented.

[g]Total includes a small amount of obligations (1-2 percent) for GM's unqualified salaried plan, but are the only GM data publicly available.

[h]Total simply sums participant totals across each plan and does not represent unique participants within Chrysler plans. For example, according to Chrysler officials, most Chrysler Pension Plan participants also participate in the Salaried Employees Retirement Plan and, thus, would be counted twice in the data.

## Federal Oversight of Private Sector Pensions

Three federal agencies are charged with responsibility for overseeing and regulating tax-qualified private sector pension plans: the Internal Revenue Service (IRS), an agency within Treasury; the Employee Benefits Security Administration, an agency within Labor; and PBGC, a government corporation.[18] Two overlapping statutory sources provide the basis for this

[18]PBGC is a wholly-owned government corporation—that is, the federal government does not share ownership interests with nonfederal entities. As such, PBGC must prepare annual budgets, produce audited financial statements, and submit a management report to Congress each year. 31 U.S.C. §§ 9101(3)(J), 9103, 9105 and 9107.

oversight: the Internal Revenue Code,[19] and the Employee Retirement Income Security Act of 1974 (ERISA).[20]  These laws specify, among other things, the standards of fiduciary responsibility for managing these plans, minimum funding requirements, the requirements for reporting information to the federal government and plan participants, and plan termination insurance.

PBGC was created by ERISA in 1974 as a federal guarantor of most private sector defined benefit plans and currently insures the pension income of nearly 44 million workers in over 29,000 plans. PBGC is a self-financing entity, funding its operations through insurance premiums paid by the plan sponsors, money earned from investments, and funds received from terminated pension plans. It is governed by a three-member board of directors consisting of the Secretary of Labor as the Chair, and the Secretaries of Commerce and Treasury as the remaining members. The board of directors is ultimately responsible for providing policy direction and oversight of PBGC's finances and operations, but the board members often rely on their representatives to conduct much of the work on their behalf. Currently, the board representatives for the members are the Assistant Secretary of Labor for the Employee Benefits Security Administration, the Under Secretary for Economic Affairs at the Department of Commerce, and the Assistant Secretary of the Treasury for Financial Institutions.

PBGC administers two separate insurance programs for private sector defined benefit plans: a single-employer program and a multiemployer program.[21]  The single-employer program covers about 34 million participants in about 28,000 plans.[22]  The multiemployer program covers about 10 million participants in about 1,500 collectively bargained plans that are maintained by two or more unrelated employers. If a multiemployer pension plan is underfunded and unable to pay guaranteed benefits when due, PBGC will provide financial assistance to the plan,

---

[19]26 U.S.C. §§ 1-9834. The Internal Revenue Code is also referred to sometimes as simply "the tax code."

[20]Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001- 1461).

[21]Unlike defined benefit plans, defined contribution plans are not covered by PBGC insurance. 29 U.S.C. § 1321(B)(1).

[22]A single-employer plan is a plan that is established and maintained only by employers in a single controlled group. Single-employer plans can be established unilaterally by the sponsor or through a collective bargaining agreement with a labor union.

usually a loan, so that retirees continue receiving their benefits. However, if a single-employer pension plan is underfunded and certain criteria are met, the plan sponsor may request termination of the plan (referred to as a "distress" termination),[23] and PBGC will pay retirees' benefits as they become due, up to certain limits as prescribed under statute and related regulations (see appendix II). PBGC may also initiate an "involuntary" termination under certain circumstances, such as when the possible long-run loss to PBGC is expected to increase unreasonably if the plan is not terminated.[24]  As of the end of fiscal year 2009, PBGC had terminated and trusteed a total of 4,003 single-employer plans.[25]

We designated PBGC's single-employer pension insurance program as "high risk" in 2003, including it on our list of major programs that need urgent attention and transformation.[26] The program remains high risk due to an ongoing threat of losses from the termination of underfunded plans. As of September 2009, PBGC had an accumulated deficit that totaled $22 billion, a $10.8 billion increase since September 2008.

---

[23]29 U.S.C. § 1341(c).

[24]29 U.S.C. § 1342(a).

[25]If a plan has sufficient assets, a plan sponsor may voluntarily terminate the plan without it being trusteed by PBGC (referred to as a "standard termination"). In such cases, the sponsor generally purchases a group annuity contract with an insurance company or makes lump sum payments so that participants are paid all the benefits accrued under the plan up to the date of termination. 29 U.S.C. § 1341(b). With respect to collectively bargained plans, there can be no distress or standard termination until the collective bargaining obligation has been rejected or modified—either through negotiated resolution or court order authorizing rejection of the agreement through the Bankruptcy Code. 11 U.S.C. § 1113 and 29 U.S.C. § 1341(a)(3).

[26]GAO, *Pension Benefit Guaranty Corporation Single-Employer Insurance Program: Long-Term Vulnerabilities Warrant "High Risk" Designation*, GAO-03-1050SP (Washington, D.C.: July 23, 2003).

## New GM and New Chrysler Assumed Sponsorship of Pension Plans in Restructuring, but Face Future Funding Challenges

As new companies, GM and Chrysler have streamlined their operations and have substantially less debt than their predecessors; nevertheless, the future viability of the companies and their pension plans is unclear. The bankruptcy agreements that provided for establishment of the new companies specified that they would assume sponsorship of the previous companies' U.S. qualified defined benefit plans, and made only one significant change to pension benefits. However, prior to the change in sponsorship, many of the pension plans had been closed to new hires or had ceased benefit accruals.[27] Moreover, since 2008, the funded status of the pension plans has been declining, and within the next 5 years, both companies project that, based on current estimates, they may need to make large contributions to their plans to comply with federal minimum funding requirements.

### Restructuring Shifted Sponsorship of GM and Chrysler Defined Benefit Plans with Prior Changes Mostly Intact

As a result of restructuring, sponsorship for all GM and Chrysler U.S. defined benefit plans shifted to the new companies. But beyond the shift in sponsorship, the only significant change to pension benefits that occurred was the elimination of a future pension benefit increase that was to compensate UAW retirees for increased required contributions to their retiree health care plans, beginning in 2010.[28] For the most part, the terms of the restructuring called for current levels of employee benefits—including pension benefits—to remain in place for at least 1 year. Specifically, the master sale agreements for both companies stipulate that, in general, union employees are to be provided employee benefits that are "not less favorable in the aggregate" than the benefits provided under the employee pension and welfare benefit plans, and contracts and arrangements currently in place; nonunion employees are to receive current levels of compensation and benefits until at least 1 year after the date the agreements are signed.

[27]See table 1 in the Background section for details.

[28]In 2007, both GM and Chrysler had reached agreements with UAW to transfer responsibility for retiree health care of UAW members to new independent voluntary employee beneficiary associations (VEBA) that were created to manage retiree health plans starting on January 1, 2010. As part of the funding arrangement for these new VEBAs, members would have to pay an additional monthly contribution toward their medical benefits, but the automakers agreed to increase members' pension benefits by a corresponding amount once these added payments were to begin. This pension benefit increase became known as the VEBA "pension pass-through." During the restructuring negotiations with GM and Chrysler, however, this benefit increase was eliminated before it was ever implemented.

More significant changes affecting GM's and Chrysler's pensions were made prior to last year's restructuring. For example, over the past decade, several of GM's and Chrysler's pension plans had been modified or closed to new hires, or had stopped allowing further benefit accruals. GM's salaried plan was closed and benefit accruals ceased for certain employees, while 4 of Chrysler's ten plans have been closed to new hires, and 2 other Chrysler plans have ceased benefit accruals (also referred to as being "hard frozen").[29] Nevertheless, new collective bargaining agreements were put in place in 2007 for both GM's and Chrysler's UAW-negotiated plans, calling for annual increases to the pension benefits for their participants.[30] In addition, both GM and Chrysler had implemented numerous attrition programs for both union and nonunion employees that provided various opportunities for early retirement and other types of added benefits as incentives to help mitigate the effects of downsizing. For a listing of attrition programs offered by these companies since 2004, see appendix III.

## Funded Status of GM and Chrysler Pension Plans Has Been Declining

As illustrated in figure 1, the funded status of GM and Chrysler pension plans has been declining since 2008. This is due, in part, to the economic downturn, which has brought significant financial stress to many sectors of the economy, including the auto industry. The significant decline in the stock market decreased the value of certain assets (such as equities) and increased the value of others (such as bonds), while low interest rates tended to increase liabilities.[31] Fluctuations in liabilities may also be

---

[29]See table 1 in the Background section for details.

[30]The 2007 UAW plan benefit increases included a $2.65 or 5.1 percent increase (per month, per year of credited service) in the active basic benefit, a $2.00 increase in the retiree basic benefit, and a retiree lump sum payment paid from the pension plan, among other changes.

[31]Liability valuations reflect the time value of money—that a dollar in the future is worth less than a dollar today. Using a lower interest rate would increase the present value of a stream of payments, while using a higher interest rate would decrease the present value of a stream of payments.

caused by changes to actuarial assumptions or other types of gains and losses.[32] However, in the case of GM and Chrysler, certain other factors are at play as well.

**Figure 1: Trends in the Funded Status of GM's and Chrysler's Pension Plans (2006-2009)**



Source: GAO analysis of documents provided by the automakers for all U.S. qualified defined benefit plans each sponsors.

Note: Funded status reflects measurements in accordance with Financial Accounting Standards. For each year, the data for GM's plans are as of December 31 of the preceding year; the data for Chrysler's plans are as of January 1 of the year cited. GM's data include a small amount of obligations (1-2 percent) for the unqualified salaried plan, but are the only GM data publicly available.

---

[32]Throughout this report, we have characterized the value of plan assets and plan liabilities based on available information obtained from financial statements and public filings. It is often the case that the value of assets and liabilities from these sources are substantially different than the value of assets and liabilities at the point of plan termination. We have reported previously that there are many factors that can increase plan liabilities immediately before plan termination, such as economic factors, benefit increases, and earlier-than-anticipated retirements. See GAO, *Pension Plans: Hidden Liabilities Increase Claims Against Government Insurance Program*, GAO/HRD-93-7 (Washington, D.C.: Dec. 30, 1992).

For example, a reduction in the number of workers is one key factor affecting the funded status of both companies' plans. Large numbers of workers have left employment as product lines are eliminated and plants are shut down. When workers are forced to leave their jobs before becoming eligible to retire, the liabilities for their expected future benefits will usually be less than previously recorded. However, for those workers who are eligible to retire early and choose to do so under the enhanced provisions of one of the numerous attrition programs, the liabilities for their expected future benefits will usually be greater than previously recorded. In other words, more workers will retire early and with more benefits than previously anticipated in the company's valuation of future benefit obligations.

GM began its downsizing even before its TARP-related restructuring efforts reduced the number of its North American brands from eight to four. According to a GM news release, approximately 66,000 U.S. hourly workers left the company under a special attrition program between 2006 and 2009.[33] Often the lump-sum payments and buyouts offered by these programs were paid from company assets, but when these benefits are paid from pension assets, there can be an impact on the plan's financial status.[34] GM noted that the attrition programs implemented between 2006 and 2009 contributed to an increase of estimated plan obligations during this period and—along with other factors, such as discount rate changes—played a role in the recent increase in GM's pension liabilities (see fig. 2).

[33]For a listing of recent GM attrition programs and their estimated impact on plan liabilities, see appendix III. For a detailed summary of recent GM plant closings, see appendix IV.

[34]From the perspective of the company's consolidated financial statement, it makes little difference whether payments are made from plan or company assets; but from the participant's perspective, if the level of plan assets has been diminished, it could have a significant impact on future benefits should the plan be terminated.

**Figure 2: Trends in GM's Pension Plans' Liabilities and Assets**



Source: GAO analysis of GM documents for both U.S. qualified defined benefit plans sponsored by GM.

Note: Plan liabilities (based on "projected benefit obligations") and assets reflect measurements in accordance with Financial Accounting Standards. For each year, the data are as of December 31 of the preceding year. Data include a small amount of obligations (1-2 percent) for GM's unqualified salaried plan, but are the only GM data publicly available.

Similarly, Chrysler's downsizing efforts also predate TARP. For example, its decision to eliminate four models within its three primary brands dates back to November 2007, and the company has implemented various attrition programs to accomplish this.[35] Due in part to these programs, over the past few years, Chrysler's pension liabilities have fluctuated while plan assets have been declining (see fig. 3). For example, Chrysler's UAW plan reported a $900 million increase in liabilities from 2007 to 2008, and the plan's 2008 valuation report noted that the cost of special termination benefits during 2008 were nearly $390 million. Total liabilities for the Chrysler Pension Plan increased by a smaller margin overall from 2007 to 2008, but the plan's 2008 valuation report noted that nearly $195 million in additional costs were being recorded due to special early retirements, added service costs, and curtailment loss.

---

[35]For a listing of recent Chrysler attrition programs and their impact on plan liabilities, see appendix III. For a detailed summary of recent Chrysler plant closings, see appendix IV.

**Figure 3: Trends in Chrysler's Pension Plans' Liabilities and Assets**



Source: GAO analysis of Chrysler documents for all U.S. qualified defined benefit plans sponsored by Chrysler.

Note: Plan liabilities (based on "projected benefit obligations") and assets reflect measurements in *accordance* with Financial Accounting Standards. For each year, the data are as of January 1 of the year cited.

Other factors that have affected the funded status of both GM's and Chrysler's plans are the special arrangements made with other companies in conjunction with acquisitions and divestitures.[36] For example, when an auto parts supplier, the former Delphi Corporation, was spun off from GM in 1999, the transaction included a negotiated agreement with various unions for a benefit guarantee for certain employees in the event that Delphi's hourly pension plan would be frozen or terminated.[37] When the company froze its hourly plan on November 30, 2008, as agreed, GM began providing covered employees with up to 7 years of credited service in the GM hourly plan while they continued to work at Delphi. Under this negotiated benefit guarantee, GM also agreed that upon plan termination, once PBGC determined the benefit to be paid subject to its guarantee limits, GM would pay eligible covered employees the difference to "top up" the benefit to the level provided under Delphi's hourly plan. Following the termination of Delphi's hourly plan in July 2009, GM estimated that the cost of implementing this benefit guarantee for all covered unions would be approximately $1.0 billion. In addition to the benefit guarantee for

---

[36]Most GM divestitures have resulted in no future pension benefit accruals for the affected employees under the GM plan at the time of divestiture, with only limited impact on the GM plan going forward. See appendix V for a summary of key acquisitions and divestitures since GM and Chrysler were founded.

[37]According to GM officials, Delphi salaried employees were never eligible for any pension benefit guarantees.

Delphi employees still in the Delphi hourly plan, in the fall of 2008, GM's hourly plan assumed responsibility for $2.7 billion in liabilities and $0.6 billion in assets from Delphi's plan, thereby increasing the GM plan's funding deficit by $2.1 billion.[38]

When Chrysler was sold by Daimler in 2007, the transaction included an agreement with Daimler to help protect the funded status of Chrysler's pension plans.[39] As part of this transaction, PBGC negotiated an agreement whereby Daimler provided a $1 billion termination guarantee and Chrysler made $200 million in additional pension contributions. Subsequently, in April 2009, this agreement was replaced by a new arrangement requiring Daimler to begin making annual contributions, even though the plans had not terminated. Under this arrangement, Daimler agreed to make payments totaling $600 million to Chrysler's pension plans over a 3-year period, with $200 million due in June 2009, 2010, and 2011. In addition, if the Chrysler pension plans were to terminate before August 2012 and are trusteed by PBGC, Daimler is to pay an additional $200 million to the PBGC insurance program.

**Both Automakers Project Large Contributions to Plans Will Be Required within the Next Five Years**

Although projections of plan funding are inherently sensitive to underlying assumptions, GM and Chrysler currently estimate that they may need to make large contributions to their pension plans within the next 5 years in order to meet minimum funding requirements.[40] They also may need to manage the funded status of their plans in order to avoid certain plan benefit restrictions and potential additional liabilities that may occur if the plans are determined to be "at risk."[41]

---

[38]In exchange for GM's agreement to assume this liability from the Delphi hourly plan, Delphi and its creditors released GM from all potential litigation arising out of the original 1999 Delphi spin off. For further details on the Delphi story, see appendix I.

[39]Chrysler merged with Daimler-Benz AG in 1998 and was operated as a separate business unit called "Chrysler Group" until it was sold in 2007.

[40]Statutorily prescribed pension funding requirements for single-employer plans specify how much a sponsor must contribute to its defined benefit plans each year. 26 U.S.C. §§ 412 and 430. In general, the minimum required contribution reflects the value of the plan's assets compared with the plan's benefit obligations, as measured by the present value of all benefits accrued or earned as of the beginning of the plan year (the plan's funding target) and the present value of all benefits that are expected to accrue or be earned under the plan during the plan year (the target normal cost).

[41]26 U.S.C. §§ 430 and 436.

While useful as indicators of the financial pressures that could lie ahead, the funding projections provided by GM and Chrysler are subject to much uncertainty because of factors that could result in changes in the size or timing of needed contributions to meet future years' funding requirements. For example, projections are particularly sensitive to the future economic environment, especially with respect to future interest rates and asset returns. Also, GM or Chrysler could make additional voluntary contributions to their plans, or funding rules could be affected by changes in legislation.

To strengthen pension funding, the Pension Protection Act of 2006 (PPA) made sweeping changes to plan funding requirements, effective for plan years beginning in 2008.[42] For example, the act included provisions that raised the funding targets for defined benefit plans, reduced the period for "smoothing" assets and liabilities, and restricted sponsors' ability to substitute credit balances for cash contributions. At the same time, as we have reported previously, the act did not fully close potential plan funding gaps, and it provided funding relief to plan sponsors in troubled industries.[43] In addition, in the face of a weakened economy, the Worker, Retiree, and Employer Recovery Act of 2008 provided plan sponsors with further relief from the changes,[44] as did IRS guidance in 2009 concerning interest rates that could be used to value plan liabilities in some cases.[45]

---

[42]Pub. L. No. 109-280, §§ 101-107, 120 Stat. 780, 784-820.

[43]GAO, *High Risk Series: An Update*, GAO-07-310 (Washington, D.C.: Jan. 31, 2007), 85.

[44]Pub. L. No. 110-458, 122 Stat. 5092.

[45]In March 2009, the IRS issued guidance clarifying that under Notice 2008-21, for a calendar year plan with a January 1, 2009, valuation date, the IRS would not challenge the use of the monthly yield curve for January 2009, or any one of the four months immediately preceding January 2009. Since interest rates were much higher on October 1, 2008, than on January 1, 2009, using the October 1, 2008, yield curve for the discount rate would significantly reduce required contributions for the 2009 plan year. Also, in September 2009, the IRS issued guidance providing automatic approval for a new choice of interest rates for 2010, regardless of what choices were made for earlier plan years (as codified in new regulations effective October 15, 2009).

Legislative proposals that would make additional changes to funding requirements are currently being considered.[45]

Nevertheless, according to GM's projections utilizing valuation methods defined under PPA, large cash contributions may be needed to meet its funding obligations to its U.S. pension plans beginning in 2013 (see fig. 4). GM officials told us that cash contributions are not expected to be needed for the next few years because it has a relatively large "credit balance" based on contributions made in prior years that can be used to offset cash contribution requirements that would otherwise be required until that time.[47] As of October 1, 2008, GM had about $36 billion of credit balance in its hourly plan and about $10 billion in its salaried plan. However, once these credit balances are exhausted, GM projects that the contributions needed to meet its defined benefit plan funding requirements will total about $12.3 billion for the years 2013 and 2014, and additional contributions may be required thereafter. In its 2008 year-end report, GM noted that due to significant declines in financial markets and deterioration in the value of its plans' assets, as well as the coverage of additional retirees, including Delphi employees, it may need to make significant contributions to its U.S. plans in 2013 and beyond.[48]

---

[45]401(k) Fair Disclosure and Pension Security Act of 2009, H.R. 2989, 111th Cong. tit. III (as reported by H.R. Comm. on Ways and Means, July 31, 2009) and American Workers, State, and Business Relief Act of 2010, H. R. 4213, 111th Cong. tit. III (as passed by Senate, March 10, 2010). Yet another factor that could affect funding projections is future labor negotiations. Both GM and Chrysler have plans that are collectively bargained with UAW, and the result of future negotiations could increase or decrease projected liabilities.

[47]26 U.S.C. § 430(f). Credit balances can be earned when a sponsor contributes more to its pension plans than required. Under certain conditions, sponsors can use these balances to offset required contributions until the balances are exhausted. Prior to PPA, credit balances could be augmented because they accrued interest at a rate determined by the plan to reflect the time value of money. PPA delineated two types of credit balances: so-called "carryover balances," generated under prior law, and "prefunding balances," generated after passage of the act. PPA also established certain standards on the use of credit balances, such as a requirement that balances be adjusted based on market conditions. Further, if a plan's funded ratio (determined with a reduction of assets in the amount of any carryover balance) is at least 80%, the plan sponsor may generally use its credit balance to offset any required contribution. The credit balances we refer to with respect to GM and Chrysler are specifically "carryover balances."

[48]The 2008 data on projected cash contributions are the latest publicly available data. GM was to file quarterly and annual financial reports for the period ending December 31, 2009, with the Securities and Exchange Commission by March 31, 2010. However, GM submitted a "notification of late filing" with the Commission and officials told us they plan to file the reports sometime in April 2010.

**Figure 4: Projected Calendar Year Contributions to GM's Pension Plans (2009-2014)**



Source: GAO analysis of GM planned funding projections for both U.S. qualified defined benefit plans sponsored by GM.

Note: Funding projections reflect audited data as of December 31, 2008 (the most recent publicly available at the time of our study). Projections utilize valuation methods for required contributions defined under PPA, and include any temporary funding relief as provided by the Worker, Retiree, and Employer Recovery Act of 2008.

Similarly, Chrysler's management expects that contributions to meet minimum funding requirements may begin to increase significantly in 2013, but are projected to be relatively minimal until then (see fig. 5). Chrysler, like GM, intends to use credit balances to offset the contribution requirements for some of its plans. As of end-of-year 2009, Chrysler had credit balances of about $3.5 billion for its UAW Pension Plan and about $1.9 billion across the other eight plans for which it provided funding information. In addition, Chrysler also has $600 million in payments from Daimler to help meet its funding requirements over the next few years.[49] Nevertheless, Chrysler's funding projections reveal that about $3.4 billion

___

[49]As noted earlier, Daimler agreed to make installment payments of $200 million in 2009, 2010, and 2011 (for a total of $600 million).

in contributions may be needed to meet its funding requirements over the 2009 to 2015 period.[50]

**Figure 5: Projected Calendar Year Contributions to Chrysler's Pension Plans (2009-2015)**



Projected cash payments (dollars in billions)

Source: GAO analysis of Chrysler planned funding projections for all U.S. qualified defined benefit plans sponsored by Chrysler.

Note: Funding projections include unaudited data for nine of Chrysler's ten plans provided to GAO in February 2010 (no information was provided for one plan). Projections utilize valuation methods for required contributions defined under PPA. For six of the nine plans with data, the projections explicitly included any temporary funding relief as provided by the Worker, Retiree, and Employer Act of 2008, except for a provision relating to adjustments, or "smoothing," to the value of plan assets.

In addition, both GM and Chrysler may need to manage the funded status of their plans in order to avoid incurring an "at-risk" status or triggering certain benefit restrictions. If a plan's funding level falls below certain specified thresholds, then it must use special "at-risk" actuarial assumptions to determine its minimum funding requirements and, in most

---

[50]Chrysler expected to provide its 2009 audited annual financial statement to Treasury and its other shareholders by April 2010. Chrysler plans to file quarterly and annual financial reports with the Securities and Exchange Commission beginning with its 2010 audited annual financial statements, which will be publicly available.

cases, increase its contributions.[51] For example, the most recent annual funding notice for the GM hourly plan reveals that the plan is in at-risk status for plan year 2008.[52,53]

Also, if a plan's funding level falls below certain specified thresholds, then certain restrictions may be placed on the benefits provided by the plan, such as lump sum withdrawals and plant shutdown benefits (see table 2).[54]

**Table 2: Benefit Restrictions Based on a Plan's Funded Status**

| If a plan's funded status is:[a] | Then, there is a restriction against: |
|---|---|
| At least 80 percent, but would be less than 80 percent taking the amendment into account | • plan amendments to increase benefits |
| At least 60 percent, but less than 80 percent | • 50 percent benefits paid in a lump sum (i.e., accelerated benefit payments) |
| At least 60 percent, but would be less than 60 percent, taking the unpredictable contingent event benefit into account | • unpredictable contingent event benefits (i.e., shutdown benefits) |
| Less than 60 percent | • future benefit accruals (i.e., accruals are frozen)<br>• all lump sum payments (i.e., accelerated benefit payments)<br>• unpredictable contingent event benefits (i.e., shutdown benefits) |

Source: GAO analysis.

[51]26 U.S.C. § 430(i). Once it is fully phased in, the test for determining if a plan is at risk will be whether its funding target attainment percentage for the preceding year, not applying at-risk requirements, is less than 80 percent and its funding target attainment percentage for the preceding year, applying at-risk requirements, was less than 70 percent. 26 U.S.C. § 430(i)(4).

[52]Plans determined to be "at risk" are required to use actuarial assumptions that result in a higher value of plan liabilities and, thus, require additional funding by the plan sponsor. 26 U.S.C. § 430(i)(1)(A)(i) and (i)(1)(B). For example, plans in "at-risk" status are required to assume that all workers eligible to retire in the next 10 years will do so as soon as they can, and that they will take their distribution in whatever form would create the highest cost to the plan, without regard to whether those workers actually do so.

[53]The notice for the GM's hourly plan covers the plan year beginning October 1, 2008, and ending September 30, 2009. GM's estimated plan funding requirements of $12.3 billion for the years 2013 and 2014 reflect funding needs for both its hourly and its salaried pension plans combined, including consideration of its hourly pension plan being in "at-risk" status. GM's salaried pension plan is not "at risk."

[54]26 U.S.C. §§ 436(b) and (d).

*Funded status described here is based on the "adjusted funding target attainment percentage." This percentage is the ratio of a plan's assets, reduced by any credit balances, to the value of the plan's liabilities (referred to as the "funding target attainment percentage") adjusted by adding the value of certain annuities. Special rules apply in bankruptcy.

## Economic Stress in Auto Industry Has Endangered Auto Supplier Pensions

Automaker restructuring, the credit market crisis, and the global recession have created significant economic stress across the auto supply industry. Federal efforts to aid the supply sector through a program that provided GM and Chrysler with funding to guarantee supplier payments benefited the automakers' top-level direct suppliers, but did little to support component and raw material suppliers. The restructuring of GM and Chrysler amid this difficult economic environment has had a ripple effect throughout the auto supply sector, likely contributing to the recent wave of supplier bankruptcies and pension plan terminations.

### Automaker Restructuring and Current Economic Conditions Have Created Significant Financial Stress for Suppliers

The auto supply sector is highly dependent on the success of the automakers that it supplies. For years, the auto supply sector has felt the impact of the problems facing the domestic auto market, including declining vehicle sales, and deep production cuts—resulting in overcapacity within the industry. In 2004, the Department of Commerce reported that the possibility of relying on increased auto sales that automatically translate into increased orders and components for U.S. suppliers no longer existed because U.S. automobile manufacturers had shifted from providing a ready market for many domestic suppliers of parts and components to operating on a global basis. The result of this shift was that automotive parts suppliers had to find niches in the global supply chains of U.S. auto companies or their foreign competitors to succeed.

Many auto suppliers broadened their sales base to remain competitive. With the domestic share of the market in decline, these suppliers diversified their business models to include just-in-time manufacturing capacity or sold their products to multiple automakers in North America, Europe, and Asia. For example, at the time it filed for bankruptcy, the U.S. auto parts supplier, Delphi Corporation, employed more than 185,000 workers in 38 countries in 2004, making it one of the largest suppliers in the world.[55] Still, according to a 2009 industry report, just 7 of the 29 U.S.-based suppliers listed among the top 100 global suppliers sold the majority of their products in North America. Suppliers serving the large U.S.

[55]For further details on Delphi, see appendix I.

automakers also have considerable overlap, with as many as 80 percent supplying parts to one or more automaker. For example, Chrysler reported that 96 percent of its top 100 suppliers also served either GM or Ford. Similarly, 27 of GM's top 39 suppliers also served as major suppliers for Chrysler. While this crossover allowed suppliers to spread their risk among domestic automakers, the impact of the global economic downturn affected many suppliers, and left suppliers that sold primarily to GM and Chrysler particularly vulnerable when the automakers filed for bankruptcy.

The recent global credit crisis and the rapid decline in auto sales left many of the nation's auto parts suppliers under significant stress with limited access to credit and facing growing uncertainty about their future business prospects. For example, GM's and Chrysler's decision to slow production by temporarily shutting down some U.S. operations in late 2008 led to interruptions in suppliers' operations and cash flow. As a result, many suppliers were left with excess inventory, were not paid for products they had shipped to automakers, and lacked the liquidity needed to settle their debts with their raw material and component suppliers. Concerns over the ability of the organizations to continue operations and, among other things, collect their receivables and pay their bills when due, led some suppliers to receive a "going concern" qualification from their auditors.[55] Lenders restricted credit and cash flow to suppliers, limiting their liquidity at the time when it was needed most. With limited cash flow, the suppliers experienced increasing pressure from their raw material and component suppliers. According to Chrysler, 43 percent of its suppliers had received requests from their suppliers for some form of payment term compression. Chrysler recognized the liquidity shortfall in the supplier network as a significant threat to its successful restructuring, and identified supplier insolvencies and supply chain disruptions as key risks to the critical assumptions in its restructuring plan. Another industry report indicated that at least 500 suppliers in North America (or 30 percent of the estimated 1,700 direct suppliers in the U.S.) may be at high risk of insolvency due to the effect of reduced volumes and the lack of credit availability. This credit crunch also affected bankrupt companies, which found securing financing to restructure their companies increasingly difficult.

---

[55]A "going concern" qualification is a reflection of the auditor's substantial doubt of the audited company's ability to remain in operation. Organizational weaknesses including overcapacity and high wage agreements, when combined with questions about their ability to continue as a going concern may have the effect of triggering loan and bond defaults and making it difficult for suppliers to raise new capital.

**Federal Assistance Program Helped Avert Catastrophe, but Provided Limited Support to Smaller Suppliers**

In an effort to help stabilize the auto supply base, in March 2009, also under TARP, Treasury established the Auto Supplier Support Program, which initially dedicated up to $5 billion in government-backed guarantees to GM and Chrysler for supplier payments in order to give suppliers the confidence they needed to keep shipping parts, paying their employees, and continuing operations. Treasury had rejected appeals from the auto supply sector for direct aid to assist a broader portion of the supplier industry because, according to Treasury officials, it had become clear that the vast network of suppliers had to engage in a substantial restructuring and capacity reduction to achieve long-term viability. The program was to ensure that GM and Chrysler received the parts and components they needed to manufacture vehicles and suppliers had access to credit from lenders. Under the program, any supplier that shipped directly to GM or Chrysler on qualifying commercial terms could be eligible to participate. Treasury left it up to the automakers to determine which suppliers qualified for the assistance. According to GM, 74 percent of its 1,300 suppliers were eligible for the program, but only 28 percent of its suppliers (38 percent of its eligible suppliers) received funds under the program.[57] Nearly half of the $947.8 million in program funds that GM dispersed went to 31 of its top 40 suppliers.[58] Shortly after the program began, Treasury reduced the amount of funding available under this program to $3.5 billion, at the request of the automakers. According to Treasury officials, the automakers made this request because conditions had changed: they no longer needed to maintain their prebankruptcy supply capacity, credit markets had opened up, and suppliers' access to capital had improved.

The program, as administered, helped a portion of the industry survive the downturn in production and vehicle sales, but did little to improve supplier access to traditional sources of capital, according to a leading auto supply industry group. The group noted that the program supported suppliers by making funds available to purchase receivables for parts

---

[57]In a hearing before the Senate Committee on Banking, Housing, and Urban Affairs in October 2009, a representative of nearly 700 parts suppliers testified that administrative obstacles, bank restrictions, and limitations on the types of receivables eligible for assistance had created a significant gap between those suppliers eligible to participate and those suppliers able to participate in the program. Restoring Credit to Manufacturers: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs, 110th Cong. (2009) (statement of David Andrea, Vice President, Industry Analysis and Economics, Motor and Equipment Manufacturers Association).

[58]According to GM, the 31 top suppliers that participated in the Treasury program accounted for less than 2 percent of GM's North American 2009 adjusted present value.

already shipped by participating suppliers, but that many troubled suppliers who had no outstanding debts to the automakers were excluded. According to Treasury officials, the program was not designed to address liquidity for troubled suppliers who were unable to move their inventory and had no receivables, including from GM and Chrysler, due to the extended shutdowns at the manufacturing plants. However, the group also noted that the suppliers who participated in the program were generally satisfied with the outcome, and that the supply sector as a whole believed that without the government's action, the effect of automakers' restructuring would have been catastrophic for suppliers.

## Suppliers Have Experienced a Wave of Bankruptcies and Pension Plan Terminations

Bankruptcy reorganizations and liquidations occur frequently in the volatile automotive supply sector, but the number of bankruptcies has recently increased. Some suppliers have gone bankrupt multiple times in a decade, while other suppliers have remained in bankruptcy proceedings for years before successfully emerging as a new entity. For example, the "new Delphi" (Delphi Automotive, LLP) emerged in 2009 after the former Delphi had been in bankruptcy proceedings for 4 years. Auto suppliers experienced a rise in the number of bankruptcies, liquidations, and pension plan terminations in 2008 and 2009. In November 2009, a survey by the Original Equipment Suppliers Association (Association)—a leading auto supply industry group—found that a majority of suppliers anticipated a 20 percent decline in their revenue and operating profits on a year-to-year basis. The Association also reported that at least 43 U.S. auto suppliers had filed for Chapter 11 bankruptcy protection between January and December 2009. Moreover, it was reported that an additional 200 U.S. suppliers had begun the liquidation process by selling off their assets to other suppliers or private equity companies. Chrysler reported that the proportion of its suppliers that were financially troubled had more than doubled, from 10 percent in October 2008 to 22 percent in February 2009, with the troubled suppliers accounting for $6.6 billion of the company's annual business. In addition, in the summer of 2009, a consultant group estimated that as many as 30 percent of North American suppliers were at high risk of failure. According to Treasury officials, many of Chrysler's troubled suppliers had difficulty accessing credit because of their concentrated exposure to Chrysler.

In the summer of 2009, the auto supply sector was also expected to shrink significantly through mergers and consolidation in order to survive. According to the Association's survey of its membership in June 2009, auto suppliers were operating at 46.4 percent capacity. In its restructuring plan, Chrysler stated that industry conditions required substantial and coordinated restructuring of the supply base, and that automakers must

concentrate their business in "surviving" suppliers. GM projected a 30 percent reduction in the number of suppliers, stating that such compression would allow GM to build and manage a competitive supply base. Several industry consultants noted that the path to long-term viability would require suppliers to reduce their number by 30 to 40 percent and secure more business from Asian and European transplant automakers. However, by early 2010, there were signs that the economic conditions for suppliers may have begun to stabilize. The Association's January 2010 and March 2010 surveys of its membership reported increased optimism across the sector, especially among larger companies.

Many U.S.-based auto suppliers sponsor defined benefit plans that are insured by PBGC. Each company failure could potentially result in PBGC having to assume responsibility for its pension plans, and PBGC officials told us that they are monitoring about 35 large auto suppliers. Even before last year's restructuring of GM and Chrysler, suppliers (like many other employers) were experiencing significant underfunding of their defined benefit plans. Table 3 shows 18 auto suppliers we identified that reported a combined $14.9 billion in unfunded pension liabilities in 2008.

**Table 3: Funded Status of Selected Suppliers' Defined Benefit Pension Plans (2008)**

Dollars in millions

| Supplier name | In bankruptcy proceedings in 2009 | Unfunded pension liabilities |
|---|---|---|
| Delphi Corporation | X[a] | $5,264.0 |
| Honeywell International | | 3,526.0 |
| Goodyear Tire & Rubber | | 2,129.0 |
| Eaton Corporation | | 1,614.0 |
| Johnson Controls, Inc. | | 402.0 |
| TRW Automotive Holdings | | 361.0 |
| Visteon | X | 326.0 |
| Lear Corporation | X | 254.7 |
| American Axle and Manufacturing Holdings, Inc. | | 254.5 |
| Tenneco, Inc. | | 169.0 |
| Dana Holding Corporation | | 149.0 |
| Cooper-Standard Holdings | X | 89.1 |
| BorgWarner, Inc. | | 87.1 |
| Hayes Lemmerz International | X[a] | 70.8 |

Dollars in millions

| Supplier name | In bankruptcy proceedings in 2009 | Unfunded pension liabilities |
|---|---|---|
| Dura Automotive Systems, Inc. | | 65.3 |
| ArvinMeritor, Inc. | | 42.0 |
| Modine Manufacturing Company | | 35.3 |
| Accuride | X | 26.8 |
| Total | | $14,865.6 |

Source: GAO analysis of recent corporate annual reports and filings. Data are for fiscal years ending in 2008 or 2009.
*Suppliers with pension plans that have been terminated and trusteed by PBGC.

In 2009, several of GM and Chrysler's suppliers filed for bankruptcy, and in some cases, PBGC intervened and assumed trusteeship of the companies' defined benefit plans. For example, in July 2009, PBGC terminated and assumed responsibility for the pension plans of 70,000 workers and retirees of the former Delphi Corporation, citing Delphi's inability to afford to maintain the plans. More specifically, according to PBGC officials, the key factors that led to this action were Delphi's failure to fund its pensions during bankruptcy, and the company's imminent sale and liquidation of its assets as it left bankruptcy protection. Other suppliers avoided bankruptcy, but still felt the effects of the slumping auto industry. For example, American Axle and Manufacturing Holdings, Inc., an auto part supplier that narrowly averted bankruptcy in 2009, estimated that the GM and Chrysler factory shutdowns had cost the company $100.6 million in sales and $29.3 million in operating income.

While some recent reports have indicated that the outlook for the automakers and suppliers may be improving, the ability of suppliers to fund their defined benefit plans in the future will rest, in part, on the continued viability of the automakers. Moreover, any revival in the auto supply sector may come too late for workers who have already had their pension plans terminated and their benefits reduced to the PBGC benefit guarantee levels.[69]

---

[69]For further details on PBGC's guaranteed benefit limits, see appendix II.

## Both PBGC and Plan Participants Incur Losses when Underfunded Plans Are Terminated

When an underfunded defined benefit plan is terminated, the PBGC bears the costs of any unfunded liabilities up to the guaranteed benefit amounts defined by ERISA, while plan participants bear the loss of benefits beyond these guaranteed amounts that would go unpaid.[60] According to Treasury officials, there is no indication that any of GM's or Chrysler's defined benefit plans will be terminated. Nevertheless, to hypothetically examine the potential impact if their plans were to be terminated, we explored how PBGC and plan participants would have been affected had the plans been terminated when these companies filed for bankruptcy in 2009, and the factors at play that could change that picture if the plans were to be terminated 5 years later.

## PBGC's Exposure Signals Potential Impacts on Both its Deficit and its Resources

Following the termination of an underfunded defined benefit plan, PBGC generally incurs losses that affect its deficit, as well as its resources. With respect to its deficit, the amount of loss to the single-employer fund is equal to the value of the unfunded guaranteed benefits required to be paid under ERISA.[61] Although this is generally considerably less than the total value of unfunded liabilities in a large auto sector pension plan, the loss can still be substantial. With respect to its resources, PBGC must assume responsibility for administering the terminated plan, including continuing benefit payments to retirees, determining the assets and liabilities of the plan as of the date of termination, calculating the guaranteed and nonguaranteed benefit amounts owed each participant in the plan, and keeping participants informed. When plans are large and complex, this can be an enormous task, requiring years to complete.

---

[60]This describes the situation when an underfunded defined benefit plan covered by PBGC's single-employer insurance program is terminated and benefits are paid subject to certain limits. 29 U.S.C. § 1322. If a plan is covered by PBGC's multiemployer insurance program, PBGC will provide financial assistance, but it will not trustee the plan or pay unfunded guaranteed benefits. 29 U.S.C. § 1341a. Also, while PBGC insures most defined benefit plans, it does not insure some categories, such as defined benefit plans sponsored by governments or churches. In addition, PBGC does not insure defined contribution plans. 29 U.S.C. § 1321(b)(1)-(3).

[61]29 U.S.C. § 1361.