PBGC's Deficit-Related
Exposure

Each year, PBGC assesses its exposure to losses from underfunded pension plans sponsored by financially weak companies. Its estimates of exposure are based on companies with credit ratings below investment grade or that meet one or more of the criteria for financial distress. PBGC classifies the plans sponsored by these companies as "reasonably possible" terminations.[62] At the end of fiscal year 2009, PBGC estimated that its exposure from reasonably possible terminations was approximately $168 billion, up from $47 billion a year earlier.[63] A significant part of this increase was due to the dramatic increase in exposure related to manufacturing, which PBGC attributed primarily to changes in the auto industry, as well as primary and fabricated metals (see fig. 6).

[62]For PBGC to classify a plan as a "reasonably possible" termination, it must have $5 million or more of underfunding, as well as meet additional criteria, such as that it has filed for bankruptcy, has requested a funding waiver, has missed a minimum funding contribution, or has a bond rating that is below-investment grade for Standard & Poor's or Moody's. At even higher risk are those companies PBGC classifies as "probables," which are those that PBGC deems likely to terminate in the future. For more information on this topic, see GAO, *Private Pensions: Questions Concerning the Pension Benefit Guaranty Corporation's Practices Regarding Single-Employer Probable Claims*, GAO-05-991R (Washington, D.C.: Sept. 9, 2005).

[63]PBGC's exposure to loss ultimately may be less than these amounts because of the limits on guaranteed benefits, as specified under ERISA and related regulations (see appendix II). However, calculations taking into account these limits are not specifically factored into PBGC's estimates of exposure, *per se*, because it is difficult to prospectively determine the precise extent and effect of the limits prior to a plan's actual termination.



**Figure 6: PBGC's Estimate of Possible Exposure to Loss by Industry**

Source: PBGC 2009 Annual Report.

[a]For fiscal years 2008 and 2009, manufacturing exposure was primarily from automobiles, auto parts, and primary and fabricated metals.

[b]For fiscal years 2008 and 2009, transportation exposure was primarily from airlines.

In May 2009, PBGC reported that unfunded pension liabilities across the auto industry as a whole totaled about $77 billion as of January 31, 2009, and accounted for about $42 billion of PBGC's total exposure of $168 billion.[64] This means that, should all the auto industry's underfunded plans insured by PBGC be terminated and trusteed, PBGC would be required to cover about $42 billion of the benefit amounts promised, adding to its deficit. Between the end of fiscal years 2008 and 2009, the deficit in

---

[64]PBGC calculates estimates of exposure by using information such as the reports submitted to IRS and corporate annual reports. Although guaranteed benefit limit calculations are not part of PBGC's estimate of its exposure, *per se*, its estimate nevertheless attempts to approximate the losses it would incur under ERISA upon a plan's termination. 29 U.S.C. § 1361. Also, PBGC officials noted that these estimates can change substantially over time due to volatility in discount rates and plan asset values.

PBGC's single-employer insurance program doubled in size from $10.7 billion to $21.1 billion.[65] Should all the underfunded auto industry plans fail, PBGC's January 2009 estimate indicated that its end of fiscal year 2009 deficit could triple in size. An increase of this magnitude would have implications not just for PBGC's accumulated deficit, but for its overall funding going forward, as the auto industry is responsible for contributing a significant portion of PBGC's premiums each year. According to PBGC's most recent data book, the motor vehicle equipment industry accounted for about 1.2 percent of all insured plans under the single-employer insurance program in 2007, but 6.1 percent of all insured participants and 7.3 percent of all premiums.

With respect to PBGC's exposure for GM's and Chrysler's pension plans in particular, PBGC calculated its potential exposure prior to when the new companies assumed sponsorship of the plans. Before the change in sponsorship, PBGC estimated that its exposure for GM's unfunded guaranteed benefits would be about $9.0 billion, and that its exposure for Chrysler's unfunded guaranteed benefits would be about $5.5 billion (see table 4).

**Table 4: PBGC's Estimates of Potential Exposure for GM's and Chrysler's Pension Plans in Early 2009**

(Dollars in billions)

|  | Estimated unfunded benefit liabilities | Estimated unfunded guaranteed benefit liabilities | Estimated unfunded nonguaranteed benefit liabilities | Estimated number of participants |
|---|---|---|---|---|
| GM | $27.3 | $9.0 | $18.3 | 673,286 |
| Chrysler | 10.4 | 5.5 | 4.9 | 249,251 |
| Total | $37.7 | $14.5 | $23.2 | 922,537 |

Source: PBGC estimates, calculated on a termination liability basis.

Notes: GM estimates are as of January 31, 2009; Chrysler estimates are as of April 30, 2009—the most recent PBGC estimates available. Totals exclude pension plans that are fully funded. PBGC officials note that volatility in plan asset returns and valuation discount rates may cause significant changes in these estimates over time.

[65]PBGC holds assets in two categories of funds: the trust funds and the revolving funds. The trust funds hold assets acquired from terminated plans; the revolving funds consist of premium receipts. Separate funds are maintained for the single-employer and the multiemployer programs. 29 U.S.C. § 1305.

Even without the change in sponsorship, actual losses to PBGC could be substantially different, as estimates of exposure are inherently difficult to calculate. For example, the significant volatility in plan underfunding and sponsor creditworthiness over time makes long-term estimates of PBGC's expected claims difficult. Moreover, there is a time lag in making these estimates. Estimates of exposure are generally based on company reports filed as of December 31 of the previous year. Thus, the dramatic increase in PBGC's aggregate reasonably possible exposure between fiscal years 2008 and 2009 depicted in figure 6 was primarily due to the deterioration of credit quality and poor asset returns that occurred during calendar year 2008. Subsequent changes in economic conditions (such as the steady rise in equity returns since March 2009) were not yet reflected in these estimates. In addition, actual losses due to terminated plans depend on PBGC's liability only for unfunded guaranteed benefits, but this is not factored into the estimates because it is difficult to determine the extent and effect of the limits on guaranteed benefits prior to actual termination.[65]

However, PBGC's exposure for unfunded guaranteed benefits in the auto supply sector has already begun to materialize. Over the past year, the plans of several large suppliers were terminated and trusteed by PBGC, and PBGC estimates that the unfunded guaranteed benefits that it will be required to pay to participants in the plans of these large suppliers will exceed $6.6 billion (see table 5). The estimate for the pension plans of the former Delphi Corporation alone is over $6.2 billion.

**Table 5: Auto Supplier Pension Plans Terminated and Trusteed by PBGC, May 2009–January 2010**

(Dollars in millions)

| Supplier | Estimated unfunded benefit liabilities | Estimated unfunded guaranteed benefit liabilities | Estimated unfunded nonguaranteed benefit liabilities | Estimated number of participants |
|---|---|---|---|---|
| Delphi Corporation | | | | |
| • Hourly Plan | $4,500.0 | $3,800.0 | $700.0 | 47,176 |
| • Salaried Plan | 2,700.0 | 2,200.0 | 500.0 | 20,203 |
| • Other plans | 65.0 | 60.0 | 5.0 | 2,229 |

[65]Following termination of a plan insured under the single-employer program, the net liability assumed by PBGC is equal to the present value of the future guaranteed benefits payable by PBGC less amounts provided by the plan's assets and amounts recoverable by PBGC from the plan sponsor and members of the plan sponsor's controlled group, as defined by ERISA. 29 U.S.C. § 1301(a)(14).

| Supplier | Estimated unfunded benefit liabilities | Estimated unfunded guaranteed benefit liabilities | Estimated unfunded nonguaranteed benefit liabilities | Estimated number of participants |
|---|---|---|---|---|
| Metaldyne Corporation | 157.0 | 153.0 | 4.0 | 10,771 |
| Hayes-Lemmerz International | 94.4 | 93.7 | 0.7 | 4,786 |
| Foamex LP | 79.0 | 76.0 | 3.0 | 5,504 |
| Fluid Routing Solutions Inc. | 29.7 | 24.9 | 4.8 | 2,400 |
| Proliance International, Inc. | 17.0 | 17.0 | 0.0 | 1,620 |
| Contech U.S., LLC | 13.6 | 12.0 | 1.6 | 532 |
| Stant Manufacturing, Inc. | 9.0 | 8.9 | 0.1 | 900 |
| **Total** | **$7,664.7** | **$6,445.5** | **$1,219.2** | **96,121** |

Source: GAO analysis of PBGC estimated data for each plan as of February 2010.

To help protect against further exposure, according to PBGC's 2009 annual report, the agency was continuing to monitor the auto industry and negotiate settlements for additional pension protections in several auto-related corporate downsizing cases. For example, in the case of Visteon Corporation, a large automotive supplier, PBGC negotiated an agreement in January 2009 that required Visteon to provide over $55 million in additional protections to workers at closed facilities by making cash contributions to the plan, a letter of credit to PBGC, and a guaranty by certain affiliates of certain contingent pension obligations. Similarly, in the case of Cooper Tire & Rubber Company, PBGC negotiated a deal in August 2009 that required the plan sponsor to strengthen the plan by $62 million, in connection with a plant closing in Albany, Georgia. According to PBGC, such protections can help prevent plan termination or, in the event that the plan does terminate, reduce the losses to the insurance program and participants.[67]

---

[67]29 U.S.C. § 1362(e), which authorizes PBGC to assess plan liability when there is a substantial cessation of operations by an employer.

GAO-10-492  Troubled Asset Relief Program

**PBGC's Resource-Related Exposure**

If PBGC were to become trustee of GM's and Chrysler's auto plans, the impact on its resources would be unprecedented. As illustrated in figure 7, the number of participants and trust fund assets that PBGC is responsible for managing would increase dramatically. Moreover, in addition to their sheer size, these plans have many of the characteristics that contribute to complexity and delays in processing, such as a history of mergers, complicated benefit formulas, movement of participants and assets across plans, and large numbers of participants subject to one or more of the legal limits on guaranteed benefits.[68]

**Figure 7: Size of GM's and Chrysler's Plans Compared with Total PBGC-Trusteed Plans**



Source: GAO analysis of PBGC and automakers' documents.
[a]Participant data for PBGC and the automakers is summed by plan; therefore, employees who participate in more than one plan are counted multiple times.

[b]PBGC data includes participants in all plans terminated and trusteed under the single-employer insurance program. (A very small number of payees—fewer than 200—are from multiemployer plans that were terminated and trusteed prior to October 1980. Since October 1980, PBGC no longer assumes trusteeship or pays benefits to participants of terminated multiemployer plans.)

[68]See GAO, *Pension Benefit Guaranty Corporation: More Strategic Approach Needed for Processing Complex Plans Prone to Delays and Overpayments*, GAO-09-716 (Washington, D.C.: Aug. 17, 2009).

<sup>a</sup>Automaker data include all U.S.-based defined benefit plans under each company's sponsorship. GM's participant data are as of September 30, 2008, and Chrysler's participant data are as of January 1, 2008 (most recent data available). Data on plan assets reflect measurements in accordance with Financial Accounting Standards. GM data are as of December 31, 2008; Chrysler data are as of January 1, 2009.

<sup>b</sup>PBGC data includes assets for all plans terminated and trusteed under the single-employer insurance program.

Among plans terminated and trusteed by PBGC, the average number of participants per plan is just under 1,000,[69] but most of GM's and Chrysler's plans far exceed this average. For example, as of the end of September 2008, GM's hourly plan had over 500,000 participants, and its salaried plan had nearly 200,000. Based on counts as of the beginning of 2008 (the most recent available), Chrysler's UAW Plan had about 135,000 participants, and the Chrysler Pension Plan had about 44,000 participants. Only two of Chrysler's ten plans had less than 1,000 participants. Taken together, the number of participants in these two companies' pension plans is equal to about 40 percent of all the participants in all the plans terminated and trusteed by PBGC since the agency was established in 1974. Even more striking, taken together, the amount of assets in these two companies' pension plans exceeds—by a considerable margin—the total amount of assets that PBGC is currently managing for all the plans it has trusteed combined (see fig. 6).

In addition to their large size, GM's and Chrysler's plans have many of the characteristics that, as delineated in a previous report,[70] contribute to complexity and delay in processing. For example, both GM and Chrysler have long histories of acquisitions, mergers, and divestitures, stretching over the past century (see appendix V). To determine the potential impact on any current or future retirees or beneficiaries of the plan, documentation concerning each change must be obtained, along with data about any affected employees. An employee's movement from one plan to another also can cause complexity in benefit calculations. Even within a plan, tiers can be created that treat some employees differently and make benefit calculations more complicated. For example, at both GM and Chrysler, different formulas were created for employees based on such things as the date employees began participating in their plans or whether or not they contributed to their plans.

[69] GAO-09-716.

[70] GAO-09-716.

Delays also result when PBGC must adjust participants' benefits to comply with legal requirements. PBGC guarantees participants' benefits only up to certain limits, specified under ERISA and related regulations.[71] Among GM's and Chrysler's plans, certain provisions and characteristics of participants suggest that many would likely be subject to one or more of these limits should the plans be terminated, as discussed further in the next section. Recent changes in the law added new provisions concerning the treatment of certain events, such as plant shutdowns and attrition programs (referred to as "unpredictable contingent events").[72] PBGC has begun to grapple with some of these complexities following the termination of the Delphi plans, as many of the benefits provided by the Delphi plans reflect negotiations with UAW and are similar to benefits provided by UAW plans across the auto sector.

In its 2009 annual report, PBGC noted that it has been taking steps to prepare for the possible trusteeship of large auto industry plans by defining the changes to its infrastructure that would be needed to handle the increase in workload. The types of changes examined as part of this effort included expanded contracts, additional staff, and increased capacity in its information technology system.

## High Earners and Early Retirees Are Most At Risk for Reduced Benefits

When ERISA's guarantees do not cover all pension benefits promised by an underfunded plan that is terminated, those participants whose benefits are reduced share in the losses from the plan's termination. In many cases involving terminated and trusteed plans, participants' full benefit amounts are guaranteed and their benefits are not reduced as a result of the termination. But in cases involving complex plans with generous benefit structures such as GM's and Chrysler's, large numbers of participants are likely to have benefits subject to the guarantee limits and, depending on the extent of plan underfunding at termination, these participants would be at risk of having their benefits reduced as a result. When PBGC calculated its exposure across the auto sector as a whole in January 2009—prior to the shift in sponsorship of GM's and Chrysler's plans to the

---

[71]29 U.S.C. § 1322(b)(1), (3) and (7), and 29 C.F.R. §§ 4022.21, 4022.24 and 4022.25 (2009). These guarantee limits are commonly referred to as the maximum limit, the "accrued-at-normal" limit, and the phase-in limit. For further details, see appendix II.

[72]PPA amended ERISA to provide a special phase-in rule for shutdown benefits and other unpredictable contingent event benefits. 29 U.S.C. § 1322(b)(8). PBGC intends to issue a separate rule to implement this section of the law, but the proposed rule has not yet been published.

new companies—PBGC estimated that about $35 billion in unfunded liabilities would be nonguaranteed benefits; that is, plan participants would bear losses for about $35 billion in benefits not funded by the company and not guaranteed by PBGC if all the at-risk underfunded plans across the sector were terminated. Of this $35 billion, about half ($18 billion) was attributable to GM's plans, and another $5 billion was attributable to Chrysler's plans.

Participants most often affected by the application of guaranteed benefit limits are high earners whose benefits exceed the maximum limit,[73] those who take early retirement, and those whose benefits increased due to recent plan amendments. We were unable to obtain precise data on the number of GM and Chrysler plan participants whose benefits might be reduced due to these limits; however, GM and Chrysler pension plans provide several options for early retirement, with supplemental benefits to those who retire before age 62 as a bridge to Social Security benefits. Under one type of guarantee limit (the accrued-at-normal limit),[74] any supplements being provided to retirees as of the date of plan termination, and any supplements to be provided to future retirees, would not be guaranteed. According to PBGC officials, a significant number of GM and Chrysler participants could be vulnerable to having their benefits reduced due to this limit should the pension plans be terminated. In addition, retirees whose benefits reflect increases in the 5 years prior to the date of plan termination could be subject to another type of guarantee limit (the phase-in limit).[75] For example, if GM's and Chrysler's plans had been terminated in 2009, this limit would have affected the increases in benefits provided in the 2007 UAW contracts negotiated with both GM and Chrysler, causing only a part of those increases to be guaranteed.[76] The

---

[73] In 2009, the maximum monthly guarantee limit for those age 65 with no survivor benefit was $4,500, or $54,000 annually. Retirees who are under age 65 as of the date of plan termination could be subject to a maximum limit on their monthly benefit that is considerably lower. For example, in 2009, the monthly maximum limit for a retiree age 60 was $2,925, and for a retiree age 50, just $1,575.

[74] For more details about the accrued-at-normal limit, see appendix II.

[75] For more details about the phase-in limit, see appendix II.

[76] In addition, this limit would have eliminated the additional $300 monthly benefit provided to certain post-65 retirees and surviving spouses in GM's salaried plan in exchange for elimination of their company-sponsored retiree health care.

increases included as benefit enhancements offered as part of recent attrition programs would be subject to the phase-in limit, as well.[77]

Although many participants would likely lose some portion of their nonguaranteed benefits if the automakers' plans were terminated, not all would be at equal risk. This is because when a pension plan is terminated and trusteed by PBGC, ERISA specifies that the remaining assets of the plan and any funds recovered for the plan from company assets be allocated to participant benefits according to a certain priority order (see appendix VI).[78] Due to this allocation process, if GM and Chrysler plans were terminated, participants who were retired (or eligible to retire) for at least 3 years would be most likely to have some or all of their nonguaranteed benefits paid, while those participants who retired early—especially those who retired under one of the special attrition programs—would be most at risk for having their benefits reduced.[79]

## Passage of Time Would Shift Termination Losses for PBGC and Plan Participants

The exposure to loss from plan termination would shift over time, but it is unclear whether PBGC or plan participants would be better off as a result. Hypothetically, if plans were to terminate 5 years into the future—in 2014 instead of 2009—overall losses could either increase or decrease, and how those losses would be shared between PBGC and plan participants would likely shift as well. For example, plan assets could grow or diminish over time, depending on investment returns and employer contributions. Plan liabilities could also grow or diminish over time, depending on interest rates, ages of participants, and whether benefits are revised in future years. In addition, more participants could acquire vested benefits over time, increasing liabilities; while more benefits would have been paid over time, decreasing liabilities.

How the losses due to unfunded benefits would be shared between PBGC (for guaranteed benefits) and plan participants (for nonguaranteed

---

[77]For a list of recent GM and Chrysler attrition programs, see appendix III.

[78]29 U.S.C. §§ 1322(c) and 1344.

[79]After benefits derived from employee contributions are paid, benefits of those retired (or eligible to retire) for at least 3 years are given priority status in this allocation process (priority category 3). In terminations of large complex plans, plan assets typically are depleted with the payment of benefits in this priority category. (See GAO-09-716, table 4.) For PBGC's example benefit calculations that illustrate how termination of the automaker pension plans might impact participant benefits, see appendix VII.

benefits) could also shift over time. For example, participants' monthly amount of guaranteed benefits would increase over time for three main reasons: (1) more workers would be eligible to retire with more generous benefits, based on years of service; (2) the maximum limits are updated each year and thus would increase, and people would grow older, so the cutbacks due to this limit would grow smaller; and (3) the benefit reductions due to the phase-in limit would be phased out. This increase in the monthly amount of guaranteed benefits would tend to shift costs from participants to PBGC. Meanwhile, over time, more participants will have been retired (or eligible to retire) for 3 years or more, and thus have benefits eligible for higher priority status in the asset allocation process.[80] In addition to shifting the distribution of benefits to be paid among different groups of participants, this could also cause more of the plan's remaining assets to be allocated to guaranteed benefits within this priority category, with less available to cover nonguaranteed benefits, resulting in a shift in costs from PBGC to plan participants.

Taking all these factors into account, it is unclear whether the passage of time would increase or decrease the overall cost of unfunded guaranteed benefits to be paid by PBGC compared with the loss of unfunded nonguaranteed benefits to be borne by plan participants. Clearly, improvements in the financial well-being of the companies and their pension plans would serve the best interests of both PBGC and plan participants.

---

[80]For examples of this impact on participant benefits, see appendix VII.

## Balancing Multiple Federal Roles May Create Tensions and Challenges

As a result of GM's and Chrysler's restructuring, the federal government has assumed new roles vis-à-vis the automakers as part-owner and lender, in addition to its traditional role as pension regulator.[81] On behalf of the U.S. taxpayer, Treasury has an interest, as a shareholder, in the financial well-being of the companies, as well as the viability of their pension plans.[82] These interests may diverge at times. Although Treasury has established policies designed to separate these interests, the perception of a conflict could arise, for example, should choices need to be made regarding the allocation of funds from the companies to their pension plans.

## Treasury Has Established Various Structures to Mitigate Any Risk Related to Conflicts

Under normal circumstances, transparency and disclosures to the public related to agency actions can often mitigate risks related to conflicts of interest. But, in this case, because this involves private companies and business sensitive information, Treasury is less able to rely on transparency and disclosure in its dealings with the automakers to mitigate any potential conflicts of interest. Nevertheless, as we have previously reported, what Treasury's goals are for its investment in Chrysler and GM, among other things, is important information for Congress and the public to have.[83] Although Treasury provides public information on TARP activities, including AIFP, through its legally mandated monthly reports to Congress, transaction reports, and others, these reports do not provide information on the indicators Treasury may use in assessing the goals for its auto investments and the status of the automakers' pensions. Identifying these indicators for Congress, and sharing as much of this information as possible, while still respecting the sensitivity of certain business information, could help Congress and the public better understand whether the investment in

---

[81]The IRS oversees the tax qualified status of pension plans and the Secretary of the Treasury serves as one of the three members on PBGC's board of directors. 26 U.S.C. § 401(a) and 29 U.S.C. § 1302(d). In addition, PBGC provides insurance for most private defined benefit plans. 29 U.S.C. § 1321.

[82]Previous reports have discussed the conflicts of interest that could be created by having the government both regulate and hold an ownership interest in an institution or company. See GAO, *Troubled Asset Relief Program: The U.S. Government Role as Shareholder in AIG, Citigroup, Chrysler, and General Motors and Preliminary Views on its Investment Management Activities*, GAO-10-325T (Washington, D.C.: Dec. 16, 2009); GAO, *Troubled Asset Relief Program: Status of Efforts to Address Transparency and Accountability Issues*, GAO-09-296 (Washington, D.C.: Jan. 30, 2009); and GAO, *Troubled Asset Relief Program: Additional Actions Needed to Better Ensure Accountability, Integrity, and Transparency*, GAO-09-161 (Washington, D.C.: Dec. 2, 2008).

[83]GAO-10-151.

the auto companies has been successful and help mitigate potential or perceived conflicts of interest.

Recognizing the potential for interested parties to perceive conflicts, Treasury has taken several other steps to mitigate its risk. First, to guide its oversight of the investments going forward and limit its involvement in the day-to-day operations of the companies, Treasury developed four core principles: (1) acting as a reluctant shareholder, for example, by not owning equity stakes in companies any longer than necessary; (2) not interfering in the day-to-day management decisions; (3) ensuring a strong board of directors; and (4) exercising limited voting rights. According to Treasury officials, use of these core principles defines the operating boundaries of the federal role within its ownership context by limiting the reach and ability of the government to exert its powerful influence on the business and operational matters of these companies. Officials noted that the core principle of not interfering in day-to-day decisions has been particularly helpful in dealing with political pressures related to business operations. For example, officials said that Treasury's auto team received about 300 congressional letters in 2009 regarding day-to-day management issues involving GM and Chrysler. Several of these letters asked about company decisions and strategies, or called on Treasury to exert influence on the companies' business decisions. Some letters lobbied either in favor of or against a certain practice or activity. Other letters have been passed along on behalf of a particular constituent concern. Treasury officials said that, because of their core principle, most of the time they can simply reply to such letters by reiterating their policy of not getting involved with the companies' business decisions, and as a result, they have been able to avoid having to respond to these pressures.

Second, to implement these core principles, Treasury established a protective barrier between the Treasury officials (beneath the Secretary level) who make policy-related decisions with respect to investments in the automakers and the Treasury officials who are responsible for regulating pensions or overseeing the operations of PBGC. In theory, this barrier prevents Treasury in its role as owner from interacting with Treasury in its role as pension regulator or overseer of PBGC. Treasury officials stated that, in the management of its investment in GM and Chrysler, the Treasury auto team does not communicate with the IRS or PBGC.

Given the importance of balancing its competing interests as regulator and part-owner, and mitigating the appearance of conflicts between these interests, it is essential that Treasury ensure that it has an adequate

number of staff with the appropriate skills and expertise to carry out its various tasks. Because of earlier reductions in the number of Treasury staff working on the AIFP and Treasury's stated plans to disband the team focused exclusively on managing Treasury's stake in the auto industry, we recently recommended that Treasury ensure it has the expertise needed to adequately monitor and divest the government's investments in Chrysler and GM.[84] We believe that ensuring sufficient staffing continues to be essential, particularly in light of the circumstances discussed here. Subsequent to our making this recommendation, Treasury officials said they hired two additional analysts dedicated solely to monitoring Treasury's investments in Chrysler and GM, and planned to hire one more.

| | |
|---|---|
| **Despite These Efforts, Tensions May Remain** | The steps taken to mitigate any risks likely to result should conflicts of interest arise—adoption of the core principles and establishment of a protective barrier—may help, but the tensions inherent in Treasury's multiple roles remain. This can be illustrated by the conflicting pressures that would likely be brought to bear in two critical and interrelated contexts: (1) how to respond to a decline in pension funding; and (2) how to decide when to sell the government's shares of stock. |

Treasury officials told us they expect both GM and Chrysler to return to profitability. If this is the case, and the companies are able to make the required contributions to their pension plans as they become due, then Treasury's multiple roles are less likely to result in any perceived conflicts. However, if the funding of any of GM's or Chrysler's defined benefit plans declines below certain funding levels set out in statute,[85] the company may request a waiver—that is, request permission from IRS (within Treasury) to reduce its required contributions to its plans over an extended period. Despite Treasury's protective barrier and the autonomy of IRS to grant or refuse such a waiver request apart from any influence from other units within Treasury, some may still perceive a possible tension between Treasury's interest in the value of its shareholder investment and Treasury's interest, through its oversight of PBGC, in ensuring the viability of the pension plans.

In addition, Treasury has been clear that it wants to divest its shares as soon as practicable, but it must weigh a variety of factors when making the

---

[84]GAO-10-151.

[85]26 U.S.C. §§ 412 and 430.

decision about when and how this should happen. Treasury officials said that on the basis of their analysis of the companies' future profitability, they believe that both GM and Chrysler will be able to attract sufficient investor interest for Treasury to sell its equity. However, circumstances that may appear advisable as to the best time to sell from a shareholder perspective—that is, which would maximize the return on the taxpayer's investment—could be at odds with the best interests of plan participants and beneficiaries. For example, Treasury could decide to sell its equity stake at a time when it would maximize its return on investment, but when the companies' pension plans were still at risk.

Finally, in the event that the companies do not return to profitability in a reasonable time frame, Treasury officials said that they will consider all commercial options for disposing of Treasury's equity, including forcing the companies into liquidation, which would likely mean that the companies' pension plans would be terminated and decisions would need to be made about the allocation of remaining company assets. In such circumstances, although there is a protective barrier preventing Treasury in its role as shareholder from interacting with Treasury in its role overseeing the PBGC, it may be difficult for the agency to make certain decisions without some perceiving a tension between these two separate roles.

## Concluding Observations

Treasury's substantial investment and other assistance, as well as loans from the Canadian government and concessions from nearly every stakeholder, including the unions, have made it possible for Chrysler and GM to stabilize and survive years of declining market share and the deepest recession since the Great Depression. However, because of the ongoing challenges facing the auto industry—including the still recovering economy and weak demand for new vehicles—the ultimate impact that the assistance will have on the companies' profitability and long-term viability remains uncertain. This, too, is the case for the companies' pensions. The companies' ability to make the large contributions that would be required based on current projections is mostly dependent on their profitability. Treasury officials who oversee TARP expect both automakers to return to profitability. Ultimately, much of the automaker recovery is not only dependent on how well the automakers turn their companies around but also how well the overall economy and employment levels improve.

The suppliers' future is even more complex. GM and Chrysler are expected to continue to reduce the number of suppliers that they use going forward. Suppliers have diversified their client base to include many other domestic and international automakers to minimize the impact of such cuts, but this

has caused their viability to be more dependent on a global economic recovery, which has been slow. As a result, supplier bankruptcies and pension plan terminations may continue for the near future.

In light of these conditions, the risks to PBGC and participants in auto sector pension plans remain significant. PBGC estimated its exposure for unfunded guaranteed benefits across the sector to be about $42 billion as of January 31, 2009, and the exposure for plan participants for unfunded nonguaranteed benefits to be about $35 billion. The federal government and its institutions, the automakers, and the unions have all made a concerted effort to ensure that GM and Chrysler do not fall. But, should the automakers not return to profitability, interests may no longer be aligned. Treasury officials said that they will consider all commercial options for disposing of Treasury's equity, including liquidation; this would likely mean terminating the companies' pension plans, and allocating remaining company assets. In such circumstances, it would be difficult for Treasury to make any decisions that would trade off the value of its investment against the expense of the pension funds, potentially exposing the government either to loss of its TARP investment or to significant worsening of PBGC's financial condition. This is not a choice the government wants to face, but this risk and its attendant challenges remain real.

We recently recommended that Treasury should regularly communicate to Congress about TARP activities, including the financial health of GM and Chrysler.[85] This would include information on the companies' pensions as an integral part of the companies' financial health. Treasury already provides some information on its investments in the automakers through its monthly reports to Congress. In response to our previous recommendations, Treasury said that it intended to develop an approach for reporting on its investments in the auto industry that strikes an appropriate balance between transparency and the need to avoid compromising the competitive positions of the companies, and that it was implementing a communication strategy to provide key congressional stakeholders more current information about its TARP activities. These reports could provide a vehicle to report publicly available information on the financial status of the automakers' pensions. Such disclosure could help mitigate the potential or perceived tensions that could arise with the federal government's multiple roles with respect to the automakers and,

---

[85]GAO-10-151.

when the time comes, could shed light on how Treasury's decision to divest will impact the companies' pension plans.

## Agency Comments and Our Evaluation

We obtained written comments on a draft of this report from the Department of the Treasury (see appendix VIII) and from PBGC (see appendix IX). Treasury generally agreed with our findings, but reiterated the importance of striking an appropriate balance in its public reporting between its goal of transparency and the need to avoid compromising the competitive positions of the companies or its ability to recover funds for taxpayers. Treasury noted that it already provides "a wealth of information" about AIFP on its Web site, and also provides periodic updates to oversight bodies, including GAO. It further noted that it will provide additional reports on its investments in Chrysler and GM as circumstances warrant, but that it will not communicate confidential business information due to the potential to negatively affect the value of the investments. Treasury concluded that, given its role as a shareholder, it would be inappropriate for it to report separately on the assets and liabilities in the automakers' pension plans to Congress and the public.

We understand the importance of protecting the automakers' proprietary interests. However, as we pointed out in our report, Treasury's role is multifaceted, serving not only as a shareholder and creditor for Chrysler and GM, but also as a regulator of pensions. As a creditor of these companies, Treasury should know and disclose the pension commitments, which represent liabilities for these companies. These liabilities must be taken into account when evaluating the financial status of these companies. GM and Chrysler are already required to disclose certain information about the status of their pensions in publicly available reports. By including this publicly available information on the status of the automakers' pension plans in its reports to Congress, Treasury could provide a more complete picture of the companies' financial health and help mitigate any perceived tensions between the various roles that the Treasury currently plays as shareholder, creditor, and pension regulator without compromising the companies' competitive positions.

Both Treasury and PBGC provided technical comments, which are incorporated into the report where appropriate. In addition, we received technical comments on certain segments of the draft report from GM, Chrysler, and Delphi, and have incorporated their comments where appropriate, as well.

We are sending copies of this report to other interested congressional committees and members, the Acting Director of PBGC, the Secretary of Labor, the Secretary of the Treasury, and other interested parties. In addition, the report is available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have any questions concerning this report, please contact Barbara Bovbjerg at (202) 512-7215 (bovbjergb@gao.gov) or A. Nicole Clowers at (202) 512-2843 (clowersa@gao.gov). Contact points for our offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix X.

Gene L. Dodaro
Acting Comptroller General
   of the United States

*List of Committees*

The Honorable Daniel K. Inouye
Chairman
The Honorable Thad Cochran
Vice Chairman
Committee on Appropriations
United States Senate

The Honorable Christopher J. Dodd
Chairman
The Honorable Richard C. Shelby
Ranking Member
Committee on Banking, Housing,
    and Urban Affairs
United States Senate

The Honorable Kent Conrad
Chairman
The Honorable Judd Gregg
Ranking Member
Committee on the Budget
United States Senate

The Honorable Max Baucus
Chairman
The Honorable Charles E. Grassley
Ranking Member
Committee on Finance
United States Senate

The Honorable David R. Obey
Chairman
The Honorable Jerry Lewis
Ranking Member
Committee on Appropriations
House of Representatives

The Honorable John M. Spratt, Jr.
Chairman
The Honorable Paul Ryan
Ranking Member
Committee on the Budget
House of Representatives

The Honorable Barney Frank
Chairman
The Honorable Spencer Bachus
Ranking Member
Committee on Financial Services
House of Representatives

The Honorable Sander M. Levin
Acting Chairman
The Honorable Dave Camp
Ranking Member
Committee on Ways and Means
House of Representatives

# Appendix I: The Delphi Story

Both as the former Delphi, prior to bankruptcy, and now as the "new Delphi," postbankruptcy, the Delphi Corporation has been a leading global supplier of mobile electronics and transportation systems, including powertrain, safety, thermal, controls and security systems, electrical/electronic architecture, and in-car entertainment technologies. Delphi evolved as part of General Motors (GM) until it was spun off as a separate entity in 1999. At the time it filed for Chapter 11 bankruptcy in 2005, the company employed more than 185,000 workers in 38 countries, making it one of the largest suppliers in the world.

The former Delphi Corporation sponsored six defined benefit plans for its U.S.-based workers:

- the Delphi Hourly-Rate Employees Pension Plan;

- the Delphi Retirement Program For Salaried Employees;

- the Packard-Hughes Interconnect Bargaining Retirement Plan;

- the Packard-Hughes Interconnect Non-Bargaining Retirement Plan;

- the ASEC Manufacturing Retirement Program; and

- the Delphi Mechatronic Systems Retirement Program.

Following Delphi's spin off from GM in 1999, GM agreed with its unions, including the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), to offer pension protections for certain employees in the event that Delphi's pension plans would be frozen or terminated. Specifically, under the agreement, GM agreed with three unions to provide certain former GM employees retired from Delphi certain pension benefits that would otherwise not be paid by Delphi or by the Pension Benefit Guaranty Corporation (PBGC) upon plan termination. Salaried and certain other union-represented employees did not receive similar contractual commitments from GM with respect to their pensions or other postemployment benefits, and they are suffering the full impact of their Delphi plans having been frozen and terminated.

In addition, GM agreed to provide transfer rights for certain Delphi hourly UAW-represented employees in the United States. Specifically, it provided these employees with "flowback" opportunities to transfer to GM as appropriate job openings became available at GM. GM employees in the U.S. had similar opportunities to transfer to Delphi. The original flowback

Appendix I: The Delphi Story

agreement provided that, when an employee transferred, the employee would be eligible for pension benefits which reflected the transferring employee's combined years of credited service. The parties did not transfer pension assets or liabilities in order to accomplish this. Rather, pension responsibility between Delphi and GM was allocated on a pro-rata basis based upon the employee's credited service at each company.

After Delphi and its U.S. subsidiaries filed for bankruptcy in 2005, there were extensive efforts involving negotiations between Delphi, GM, and other stakeholders to keep the pension plans ongoing. On September 30, 2008, the company froze its salaried plan, the ASEC Manufacturing Retirement Program, the Delphi Mechatronic Systems Retirement Program and the Packard Hughes Interconnect Non-Bargaining Retirement Plan. The company also reached agreement with its labor unions allowing it to freeze the accrual of traditional benefits under its hourly plan, effective as of November 30, 2008.

Delphi received the consent of its labor unions and approval from the court to transfer certain assets and liabilities of Delphi's hourly plan to GM's hourly plan. The first transfer involved liabilities of approximately $2.6 billion and assets of approximately $486 million (about 90 percent of the estimated $540 million of assets initially scheduled to be transferred). It was anticipated that the remaining assets would be transferred by March 29, 2009, upon finalizing the related valuations. In exchange for the first transfer, Delphi's reorganization plan released GM from all claims that could be brought by its creditors with respect to, among other things, the spin off of Delphi, any collective bargaining agreements to which the former Delphi was a party, and any obligations to former Delphi employees.

Although the first transfer had the effect that no contributions were due under the hourly plan for the plan year ended September 30, 2008, Delphi still had a funding deficiency of $56 million for the salaried plan and an approximate $13 million funding deficiency for its other pension plans for the plan year ending September 30, 2008. Delphi applied to the Internal Revenue Service (IRS) for a waiver of the obligation to make the minimum funding contribution to the salaried plan by June 15, 2009, and requested permission, instead, to pay the amount due in installments over the following 5 years. However, Delphi abandoned the waiver request when it became clear that it could not afford to maintain the salaried plan and that GM was not going to assume it.

In the second phase of the transfer, Delphi expected to transfer substantially all of the remaining assets and liabilities of the hourly plan to GM. In exchange for the second transfer, GM was to receive a $2 billion administrative claim when Delphi emerged from bankruptcy. In its 2008 annual report, Delphi was cognizant that the second pension transfer to GM was contingent upon its emergence from Chapter 11 under a modified plan of reorganization. If these conditions were not satisfied and the second transfer did not take place, it would likely be unable to fund its U.S. pension obligations. Specifically, Delphi stated that

> " . . . due to the impact of the global economic recession, including reduced global automotive production, capital markets volatility that has adversely affected our pension asset return expectations, a declining interest rate environment, or other reasons, our funding requirements have substantially increased since September 30, 2008. Should we be unable to obtain funding from some other source to resolve these pension funding obligations, either Delphi or the Pension Benefit Guaranty Corporation (the "PBGC") may initiate plan terminations."

Delphi's financial difficulties continued, and when the second transfer of pension assets and liabilities to GM was not implemented on July 31, 2009, PBGC terminated all six of Delphi's U.S. qualified defined benefit plans. PBGC assumed responsibility for the plans on August 10, 2009. According to PBGC, this step was necessary because Delphi had stated that it could not afford to maintain its pension plans and GM, which itself had reorganized in bankruptcy earlier in the year, had stated that it was unable to afford the additional financial burden of the Delphi pensions. PBGC stated that the Delphi pension plans were $7 billion underfunded when they terminated the plans. PBGC estimates that it will make up about $6 billion of that shortfall using PBGC funds. Following PBGC's takeover of the plans, on October 6, 2009, in accordance with Delphi's plan of reorganization, the former company sold its U.S. and foreign operations to a new entity, Delphi Automotive LLP, with the exception of four UAW sites in the United States and its steering business, which were sold to GM.

PBGC has acknowledged that the calculation of benefits for former Delphi plan participants will be a difficult, lengthy process due to the plans' complex benefit structures and the availability of documentation for all the mergers and acquisitions that have taken place throughout the life of the plans. On its Web site, PBGC stated that it could take 6 to 9 months from Delphi's date of trusteeship before it adjusted benefits to estimated PBGC benefit amounts. Moreover, PBGC noted that it could take several years to fully review the plan and finally determine all benefit amounts.

# Appendix II: Legal Limits on PBGC Guaranteed Benefits

To help protect the retirement income of U.S. workers with private sector defined benefit plans, PBGC guarantees participant benefits up to certain limits specified under the Employee Retirement Income Security Act of 1974 (ERISA) and related regulations. These limits include the phase-in limit, the accrued-at-normal limit, and the maximum limit, as illustrated below in figure 8.

**Figure 8: Determining If a Participant's Guaranteed Benefit Is Subject to Legal Limits**



Source: GAO analysis of ERISA, PBGC's implementing regulations and related documents.

[a]Benefit increases subject to phase-in limits also include "unpredictable contingent event benefits" (such as shutdown benefits). In addition, in cases involving bankruptcy, the date the bankruptcy petition was filed is treated as the termination date of the plan.

# Appendix III: Recent Attrition Programs at GM and Chrysler

**Table 6: Recent Attrition Programs at GM**

| Plan/program | Description | Estimated Impact on pension obligations[a] |
|---|---|---|
| **Hourly Plan** | | |
| 2006 Special Attrition Program | Hourly UAW employees and select Delphi UAW employees were offered the following:<br>• Lump-sum payment of $35,000 for normal or early voluntary retirement (paid from company assets).<br>• "Mutually satisfactory retirement" for age 50 and 10 years of service and preretirement leave for select employees, depending on plant location.<br>• Buyout of $140,000 for employees with 10 or more years of service and $70,000 for employees with less than 10 years of service (paid from company assets). | $1.2 billion decrease in obligations (34,400 acceptances) |
| 2008 Special Attrition Program | About 74,000 UAW-represented employees and 2,300 other union-represented employees were offered the following:<br>• Lump sum payment for retirement-eligible employees ($45,000 for production and $62,500 for skilled trade) funded from plan assets. Lump sum payable as an annuity, if elected.<br>• "Mutually satisfactory retirement" for age 50 and 10 or more years of service.<br>• Preretirement leave for employees with 26-29 years of service.<br>• Buyout of $140,000 for employees with 10 or more years of service, and $70,000 for employees with less than 10 years of service (paid from company assets). | $0.8 billion increase in obligations (18,700 acceptances) |
| Special Attrition Program 3.0 (February 2009) | About 57,000 hourly UAW employees were offered the following:<br>• $45,000 incentive value offered to production and skilled employees for normal/voluntary retirement and buyout. Incentive included $25,000 vehicle voucher plus $20,000 cash.<br>• "Mutually satisfactory retirement" for age 55 with 10 or more years of service, and age 50 with 10 or more years of service for select closed or closing plants.<br>All cash payments were funded from company assets. | $1.2 billion increase in obligations (February and June programs combined)<br>(7,000 acceptances in February program) |

**Appendix III: Recent Attrition Programs at
GM and Chrysler**

| Plan/program | Description | Estimated impact on pension obligations[a] |
|---|---|---|
| Special Attrition Program 3.1 (June 2009) | About 50,000 hourly UAW employees were offered the following:<br>• Normal/voluntary retirement incentive value of $45,000 (production) and $70,000 (skilled). Incentive included $25,000 vehicle voucher.<br>• Buyout incentive value of $70,000 for those with less than 10 years of service; $105,000 for those with 10 to 20 years of service; and $140,000 for those with 20 or more years of service. Incentive included $25,000 vehicle voucher.<br>• Preretirement leave offered to employees with 28 and 29 years seniority.<br>• "Mutually satisfactory retirement" for age 50 and 10 or more years of service.<br>All cash payments were funded from company assets. | (6,000 acceptances in June program) |
| **Salaried Plan** | | |
| 2008 Salaried Window Retirement Program | Voluntary retirement offers were extended to certain U.S. salaried employees, as follows:<br>• 6-month cash lump sum payment from the pension plan for all retirement-eligible employees (age 62 and older) who elect to retire or for employees under age 55 who will receive reduced benefits. Lump sum payable as an annuity, if elected.<br>• Enhanced window retirement factors for employees ages 55 to 61 who are eligible but do not elect the lump sum payment. | $0.3 billion increase in obligations (3,700 acceptances) |
| 2009 Salaried Window Retirement and Involuntary Severance Program (June 2009) | Offers were extended to about 5,700 salaried employees for retirements targeted for October 1, 2009, as follows:<br>• Unreduced pension benefits for participants age 58 and older as of October 1, 2009; participants ages 53-57 would receive enhanced window retirement benefits.<br>• Severance program provides monthly base salary payments up to 6 months (if classified) or 12 months (if executive). Severance payments to be paid from company assets. | $0.5 billion increase in obligations (3,000 acceptances) |

Source: GM documents.

[a]Estimated impact is based on measurements of pension obligations in accordance with Financial Accounting Standards. The measurements reflect remeasurements performed around the time of the respective attrition programs and changes in a number of variables that are incorporated into the remeasurement calculations, such as changes in present-value discount rates. All data included in this column are approximations.

Appendix III: Recent Attrition Programs at
GM and Chrysler

**Table 7: Recent Attrition Programs at Chrysler**

| Plan/program | Description | Estimated impact[a] |
|---|---|---|
| Incentive Program for Retirement (2006-2009) | • Normal retirement eligibility (that is, 30 or more years of service, or combination of age and years of service = 85), or age 60 with 10 or more years of service, or age 65 with one or more year of service.<br>• $50,000 lump sum payment plus $25,000 vehicle purchase voucher.[b] | $1,067 million increase in obligations (10,956 acceptances)[c] |
| Special Early Retirement (2006-2009) | • Age 55-62 with 10 or more years of service and not otherwise eligible for IPR.[c]<br>• Normal retirement benefit with no age reduction factor applied (in certain labor markets, nonviable age reduced to 50).<br>• No lump sum. | $401 million increase in obligations (3,141 acceptances) |
| Enhanced Voluntary Termination of Employment (2007-2009) | • $75,000 lump sum payment plus $25,000 vehicle purchase voucher (per "Plant Closure Agreements" - $100,000 plus $25,000 vehicle purchase voucher).[b] | $57 million decrease in obligations (7,636 acceptances) |
| Other miscellaneous programs (2006-2008) | | $184 million increase in obligations (438 acceptances) |

Source: Chrysler documents.

[a]Estimated impact is based on measurements of pension obligations in accordance with Financial Accounting Standards. The measurements reflect remeasurements performed around the time of the respective attrition programs and changes in a number of variables that are incorporated into the remeasurement calculations, such as changes in present-value discount rates. Data for 2006-2008 are based on actual numbers; data for 2009 are based on projected numbers, across all ten U.S. qualified defined benefit plans, as appropriate.

[b]Lump sum payments during 2008 paid with pension plan assets; payments before 2008 and after 2008 paid with company assets.

[c]Also includes data for the Separation Incentive Program.

[d]In 2008, the retirement age was 53 instead of 55 for certain salaried nonunion employees.

# Appendix IV: Product Lines and Facilities Being Eliminated

**Table 8: GM Product Lines and Facilities Being Eliminated**

| Product line | Current status | Location of plant shutdowns |
|---|---|---|
| Pontiac Vibe | Production ceased at the end of August 2009. | The New United Motor Manufacturing Incorporated facility (known as "Nummi") jointly operated by GM and Toyota in Fremont, CA, to close. |
| Pontiac | Production of the last Pontiac model will cease by the end of December 2010. | None identified to date. |
| Hummer | In February 2010, GM announced that the sale of Hummer to Sichuan Tengzhong Heavy Industrial Machinery Co., Ltd. could not be completed and there would be an orderly wind-down of Hummer operations. Currently approximately 850 units of the H3 model are being produced for a fleet customer. H3 production will cease at the end of June 2010. All other Hummer production ceased at the end of September 2009. | None identified to date. |
| Chevy Kodiak and GMC Topkick | Production ceased at the end of July 2009. | None identified to date. |
| Saturn | Following Penske Automotive Group's decision to terminate discussions to acquire Saturn in September 2009, GM announced that it would be winding down the Saturn brand and dealership network. Production ceased at the end of December 2009. | None identified to date. |
| Saab | Purchased by Spyker Cars, NV, on February 23, 2010. | The previously announced wind down of Saab operations has ended. Saab and Spyker will operate under the Spyker (AMS:SPYKR) umbrella, and Spyker will assume responsibility for Saab operations. |

Appendix IV: Product Lines and Facilities
Being Eliminated

| Product line | Current status | Location of plant shutdowns |
|---|---|---|
| Manufacturing plants | Total number of assembly, powertrain, and stamping facilities in the United States to be reduced from 47 in 2008 to 34 by the end of 2010 and 33 by 2012. | • Powertrain castings plant in Massena, NY, closed in May 2009.<br>• Stamping plant in Grand Rapids, MI, closed in May 2009.<br>• Assembly plant in Wilmington, DE, closed in July 2009.<br>• Assembly plant in Pontiac, MI, closed in September 2009.<br>• Stamping plant in Mansfield, OH, closed in January 2010.<br>• Powertrain engine plant in Livonia, MI, to close by July 2010.<br>• Powertrain components plant in Fredericksburg, VA, to close by August 2010.<br>• Powertrain plants: Flint North components plant and Willow Run Site, MI; and Parma, OH, components plant to close by August 2010.<br>• Stamping plant in Indianapolis, IN, to close by December 2011.<br>• Stamping plant and assembly plant in Shreveport, LA, to close by June 2012. |
| Parts | Three parts distribution centers closed. | • Parts distribution centers in Boston, MA; Columbus, OH; and Jacksonville, FL, closed on December 31, 2009. |

Source: GM documents.

Appendix IV: Product Lines and Facilities
Being Eliminated

Table 9: Chrysler Product Lines and Facilities Being Eliminated

| Product line | Current status | Location of plant shutdowns |
|---|---|---|
| Dodge Magnum and the Chrysler Pacifica, Crossfire, and PT Cruiser convertible. | Announced in November 2007 that these four models were to be eliminated from the product portfolio through 2008. Subsequently announced that the PT Cruiser would remain in production. | Production at several North American assembly and powertrain plants to be cut, which combined with other actions, was expected to reduce the number of hourly jobs by 8,500 to 10,000 people through 2008. See May 2009 updated list of plant closings provided below in last row of this table. |
| Dodge Ram pick-up truck | Announced in June 2009 that production would end effective July 10, 2009. | • St. Louis Assembly Plant North in Fenton, MO. See also below. |
| Service and parts operations | List of plants scheduled for closing, as of May 2009. | • St. Louis Assembly Plant South in Fenton, MO, closed October 2008.<br>• Assembly plant in Newark, DE, closed in December 2008.<br>• St. Louis Assembly Plant North in Fenton, MO, was to close by the end of September 2009. Production to be moved to Warren Truck Assembly plant.<br>• Conner Avenue Assembly Plant in Detroit, MI, was to close in December 2009.<br>• Stamping plant in Twinsburg, OH, was to close in March 2010. Existing volume to be transferred to Warren Stamping and Sterling Stamping plants.<br>• Assembly plant in Sterling Heights, MI; engine plant in Kenosha, WI; and axle plant in Detroit, MI, to close at the end of December 2010. |

Source: Chrysler documents.

# Appendix V: History of Major Acquisitions and Divestitures

| | GM | Chrysler |
|---|---|---|
| 1900s | **Founded September 16, 1908.**<br><br>**1908:** Acquired Oldsmobile and Reliance Motor Truck Company.<br><br>**1909:** Acquired Cadillac; Oakland Motor Car Company; Rapid Motor Vehicle Company (later renamed GMC Truck); and Champion (later renamed AC Spark Plug Company). | |
| 1910s | **1918:** Acquired McLaughlin Motor Company (later renamed General Motors of Canada) and United Motor Corporation.<br><br>**1919:** Acquired Fisher Body; Dayton Wright Company; Guardian Frigerator (later renamed Frigidaire); and Saginaw Malleable Iron Company (renamed Saginaw Products Company). | |
| 1920s | **1925:** Acquired Vauxhall Motors, Ltd., based in Luton, England.<br><br>**1929:** Acquired Adam Opel Corporation, located in Rüsselsheim, Germany; and Allison Engineering Company. | **Founded June 6, 1925.**<br><br>**1928:** Acquired Dodge. |
| 1930s | **1930:** Acquired Electro-Motive Engineering Corporation.<br><br>**1931:** Acquired Holden's Motor Body Builders Limited; merged with GM's Australia Proprietary, Limited, to form Holden's Limited, located in Melbourne, Australia.<br><br>**1933:** Acquired a controlling interest in North American Aviation; merged with GM's General Aviation division. | |
| 1940s | | |
| 1950s | **1953:** Acquired Euclid, Inc. | **1957:** Acquired Ensamblaje Venezolana, soon renamed Chrysler de Venezuela S. A.<br><br>**1959:** Acquired Chrysler South Africa Ltd. |
| 1960s | **1968:** Sold most of Euclid; renamed remaining facilities the Terex Division. | **1963:** Acquired Chrysler Hellas S. A., Greece.<br><br>**1965:** Acquired the outboard engine business of West Bend Company of Hartford, Wisconsin and the Lone Star Boat Company of Plano, Texas, forming the Chrysler Boat Corporation.<br><br>**1967:** Acquired Redisco, Inc., from American Motors Corporation and integrated it with Chrysler Credit to form Chrysler Financial Corporation. Also acquired 77 percent of Barreiros Diesel S. A. (Spain), and increased interest in Chrysler do Brasil (Brazil) to 92 percent. |
| 1970s | **1973:** Merged Allison Engineering with Detroit Diesel. | **1970:** Control of Rootes Group equity reached 73 percent; the company renamed Chrysler United Kingdom Ltd.<br><br>**1976:** Sold the Airtemp Division to Fedders Corporation.<br><br>**1978:** Sold the Chrysler Europe Division. |

Appendix V: History of Major Acquisitions
and Divestitures

| | GM | Chrysler |
|---|---|---|
| 1980s | **1981:** Sold Terex Division.<br>**1984:** Acquired Electronic Data Systems Corporation.<br>**1985:** Acquired Hughes Aircraft Company; merged with Delco Electronics to form a new subsidiary called Hughes Electronics.<br>**1988:** Spin off of Detroit Diesel.<br>**1989:** Purchased 50 percent equity in Saab Automobile AB of Sweden; later purchased the remaining 50 percent to become sole owner in 2000. | **1980:** Sold the Marine Division.<br>**1981:** Sold the Defense Division to General Dynamics.<br>**1984:** Reorganized into a holding company that included Chrysler Motors, Chrysler Financial, Gulfstream Aerospace and Chrysler Technologies.<br>**1987:** Acquired American Motors Corporation (and Jeep) for $800 million. |
| 1990s | **1993:** Sold Allison Gas Turbine.<br>**1996:** Sold Electronic Data Systems Corporation.<br>**1997:** Sold Hughes Aircraft to Raytheon.<br>**1999:** Spin off of Delphi; acquired exclusive rights to the Hummer brand name from AM General Corporation. | **1998:** Merged with Daimler-Benz AG; operated as "Chrysler Group," a business unit of DaimlerChrysler AG. |
| 2000s | **2002:** Acquired the bulk of Korean automaker Daewoo Motor's automotive assets and created a new company called GM Daewoo Auto & Technology.<br>**2003:** Sold Hughes Electronics.<br>**2005:** Sold Electro-Motive Diesel.<br>**2006:** Divested majority ownership in its financing unit, General Motors Acceptance Corporation (now known as GMAC).<br>**2007:** Sold Allison Transmission.<br>**2009:** Acquired five U.S.-based components plants from Delphi. | **2007:** Just over 80 percent of Chrysler and its related financial services business sold to Cerberus Capital Management for $7.4 billion.<br>**2008:** Spin off of Chrysler Financial Corporation. |

Source: GM's and Chrysler's Web sites.

# Appendix VI: Allocation of Assets to Participant Benefits

When a pension plan is terminated and trusteed by PBGC, ERISA specifies that the remaining assets of the plan and any funds recovered for the plan during the bankruptcy proceedings be allocated to participant benefits according to six priority categories (see table 10).[1]

**Table 10: Priority Categories for Allocating Participant Benefits**

| | |
|---|---|
| Priority category 1 | Accrued benefits derived from voluntary employee contributions. |
| Priority category 2 | Accrued benefits derived from mandatory employee contributions. |
| Priority category 3 | Annuity benefits that have been in pay status for at least 3 years before the plan's termination date, or could have been in pay status for at least 3 years before the plan's termination date had the participant chosen to retire at his or her earliest possible retirement date; however, benefits subject to the phase-in limitation (that is, benefit increases made within the last 5 years) are excluded. These benefits can be either guaranteed or nonguaranteed. |
| Priority category 4 | Other guaranteed benefits, and certain nonguaranteed benefits.[a] |
| Priority category 5 | Other vested nonguaranteed benefits that a participant is entitled to under the plan; however, benefits that result solely due to the termination of the plan—which are deemed "forfeitable"—are excluded. |
| Priority category 6 | All other benefits under the plan. This category includes nonvested benefits and "grow-in" benefits, which are benefits that are provided in some situations where the company continues to operate after the plan is terminated. |

Source: GAO analysis of PBGC documents.

Note: The distribution of plan assets is based on type of benefit, not retirement status, and many participants have benefits in more than one category.

[a]Specifically, the nonguaranteed benefits included in priority category 4 are those that are nonguaranteed because they are subject to the aggregate benefits limitation for participants in more than one plan that has been terminated with insufficient funds, or because they are subject to special provisions applicable to substantial owners (that is, those owning more than 10 percent of the company).

Funds recovered from bankruptcy proceedings are also allocated using these priority categories, but unlike plan assets, recoveries are required to be shared between participants' unfunded nonguaranteed benefits and

---

[1]29 U.S.C. §§ 1322(c) and 1344.

Appendix VI: Allocation of Assets to
Participant Benefits

PBGC's costs for unfunded guaranteed benefits.[2] As a result, recoveries are often more advantageous for participants than residual plan assets. PBGC allocates the participants' portion of the recoveries beginning with the highest priority category in which there are unfunded nonguaranteed benefits, and then to each lower priority category, in succession.[3]

---

[2] In cases when a plan's unfunded nonguaranteed benefits exceed $20 million, the total amount to be shared depends on the actual amount recovered. In all other cases, the amount to be shared is determined by an average of PBGC's recoveries over a 5-year period. ERISA section 4022(c).

[3] If the assets are not sufficient to pay for all benefits in a category, the assets are distributed among the participants according to the ratio that the value of each participant's benefit in that priority category bears to the total value of all benefits in that category. Within each priority category (except priority category 5), assets are allocated first to the participant's "basic-type" benefits (which include benefits that are guaranteed by PBGC, or that would be guaranteed but for the maximum and phase-in limits), and then to the participant's "nonbasic-type" benefits (which include all other benefits). If the plan assets available for allocation to priority category 5, which includes benefits subject to the phase-in limit, are insufficient to pay for all benefits in that category, the assets are allocated by date of plan amendment, oldest to newest, until all plan assets available for allocation have been exhausted.

# Appendix VII: PBGC Example Benefit Calculations

PBGC prepared example benefit calculations to illustrate how termination of the automaker pension plans might impact participant benefits, depending on the participant's situation (see table 11). The calculations assume that plan assets and recoveries are not sufficient to fund nonguaranteed benefits beyond a portion of those benefits in priority category 3 (that is, of those retired or eligible to retire for at least 3 years), and they focus on those who would lose the most under such situations. Although an early retiree eligible for priority 3 status would lose the least, all early retirees under age 62 as of the date of plan termination would lose a sizeable portion of their benefits until age 62 because their supplements are not guaranteed. The person who retired early under a special attrition program or plant shutdown benefit would lose even more, as the enhanced benefits under the special program would also not be guaranteed, reducing the person's lifetime benefit by more than half. Finally, the person not yet eligible to retire would lose the most. Compared to the benefits promised under the plan, he would not be able to retire for 5 more years and his payment would be less than a quarter of the amount promised. Over time, in general, more employees will be eligible to retire and qualify for priority 3 status, and the amount of retirees' monthly guaranteed benefits will increase.

**Table 11: Examples of Participants' Benefit Reductions If an Automaker Hourly Plan Were Terminated**

| | Plan benefit | PBGC benefit if plan terminates in 2009[a] | Changes to PBGC benefit if plan terminates 5 years later (in 2014) |
|---|---|---|---|
| **Example 1: Employee retires early in 2009** | | | **Employee retires early in 2014** |
| **Age 53 with 33 years of service (eligible for priority category 3)** | | | **Age 58 with 38 years of service (eligible for priority category 3)** |
| Benefit until age 62 | $3,200 | $1,750[b] | Incremental increase in PBGC benefit |
| Benefit after age 62 | 1,750 | 1,750 | Incremental increase in PBGC benefit |
| **Example 2: Employee retires early in 2009** | | | **Employee retires early in 2014** |
| **Age 50 with 30 years of service (not eligible for priority category 3)** | | | **Age 55 with 35 years of service (eligible for priority category 3)** |
| Benefit until age 62 | 3,200 | 1,500 | Incremental increase in PBGC benefit |
| Benefit after age 62 | 1,500 | 1,500 | Incremental increase in PBGC benefit |
| **Example 3: Employee retires early under special attrition program (or plant shutdown) in 2009 (0 percent phase-in)** | | | **Employee retires early under special attrition program (or plant shutdown) in 2009 (100 percent phase-in)** |
| **Age 55 with 25 years of service (not eligible for priority category 3)** | | | **Age 55 with 25 years of service (eligible for priority category 3)** |
| Benefit until age 62 | 2,600 | 600 | No loss of benefit enhancements due to phase in, substantial increase in PBGC benefit |

Appendix VII: PBGC Example Benefit
Calculations

| | Plan benefit | PBGC benefit if plan terminates in 2009[a] | Changes to PBGC benefit if plan terminates 5 years later (in 2014) |
|---|---|---|---|
| Benefit after age 62 | 1,400 | 600 | No loss of benefit enhancements due to phase in, substantial increase in PBGC benefit |
| **Example 4: Employee not yet retired when plan terminates in 2009** | | | **Employee retires early in 2014** |
| **Age 49 with 29 years of service (not eligible for priority category 3)** | | | **Age 54 with 34 years of service (eligible for priority category 3)** |
| Benefit until age 62 | 3,200<br>(beginning at age 50 with 30 years of service) | 700<br>(beginning at age 55) | Eligible to retire, benefits not deferred, substantial increase in PBGC benefit |
| Benefit after age 62 | 1,600 | 700 | Substantial increase in PBGC benefit |

Source: GAO analysis of PBGC documents.

[a]PBGC example calculations, assuming plan assets and recoveries are not sufficient to pay nonguaranteed benefits beyond a portion of priority category 3.

[b]PBGC benefit if priority category 3 is 70 percent funded. If more than 70 percent funded, part of the temporary supplement is payable, and could increase up to $2,750 if 100 percent funded.

GAO-10-492  Troubled Asset Relief Program

# Appendix VIII: Comments from the Department of the Treasury



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

March 26, 2010

Thomas J. McCool
Director, Center for Economics
Applied Research and Methods
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. McCool:

The Treasury Department (Treasury) appreciates the opportunity to review the GAO's latest draft report on Treasury's Troubled Asset Relief Program (TARP), titled *Troubled Asset Relief Program: Automakers' Pension Funding and Multiple Federal Roles Pose Challenges for the Future* (Draft Report). Treasury welcomes the recognition by the GAO that Treasury through TARP investments has helped make "it possible for Chrysler and GM to stabilize and survive years of declining market share and the deepest recession since the Great Depression." There is important work ahead and the GAO's Draft Report is constructive as Treasury continues to implement its Automotive Industry Financing Program (AIFP).

Although the Draft Report contains no new recommendations, it suggests that Treasury should not only report publicly on the auto investments but also on the "status of the automakers' pensions." As we have stated previously, in addition to providing a wealth of information on the AIFP on FinancialStability.gov and periodic updates to the oversight bodies, Treasury will provide additional reports regarding the status of its investments in the automotive companies as circumstances warrant. Treasury recognizes the importance, as noted by the GAO in its various reports, of striking an appropriate balance in its public reporting between our goal of transparency and the need to avoid compromising either the competitive positions of these automotive companies or Treasury's ability to recover funds for taxpayers. It would be inappropriate for Treasury in our capacity as a shareholder to separately report on the pension assets and liabilities under the GM and Chrysler pension plans, and we suggest directing these questions to GM and Chrysler.

Once again, Treasury appreciates the opportunity to review the Draft Report. Treasury also appreciates the GAO's close oversight of TARP as Treasury develops and implements its policies to stabilize the financial system. We look forward to continuing this constructive dialogue.

Sincerely,

Herbert M. Allison, Jr.
Assistant Secretary for Financial Stability

# Appendix IX: Comments from PBGC



**PBGC**
Protecting America's Pensions

**Pension Benefit Guaranty Corporation**
1200 K Street, N.W., Washington, D.C. 20005-4026

Office of the Director

March 26, 2010

Gene L. Dodaro
Acting Comptroller General of the United States
U.S. Government Accountability Office
Washington, D.C. 20548

Dear Mr. Dodaro:

Thank you for the opportunity to comment on the draft version of your report entitled, "Troubled Asset Relief Program: Automaker Pension Funding and Multiple Federal Roles Pose Challenges for the Future."

We appreciate GAO's calling attention to the automakers' defined benefit pension plans, their funded status, and the risk of loss faced by plan participants and PBGC's single-employer insurance program if these plans are terminated in the future. As the report correctly points out, improvements in the financial condition of the companies and their pension plans will strengthen retirement security for plan participants and reduce PBGC's exposure to loss. The report also serves to highlight the complexity of the environment in which PBGC operates as it strives to fulfill its mission. PBGC is actively monitoring the financial health of plan sponsors in the auto industry, as well as related corporate transactions that may affect defined benefit pension plans.

Under a separate cover, we have provided suggested technical corrections and other changes to further clarify aspects of the report.

GAO has consistently reported on matters affecting the retirement security of the American people, and we especially appreciate GAO's work in highlighting the challenges PBGC faces in "Protecting America's Pensions."

Sincerely,

Vincent K. Snowbarger
Acting Director

# Appendix X: GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contacts** | Barbara D. Bovbjerg, (202) 512-7215 or bovbjergb@gao.gov <br> A. Nicole Clowers, (202) 512-2834 or clowersa@gao.gov |
| **Staff Acknowledgments** | In addition to the contacts named above, Kimberley M. Granger and Raymond Sendejas, Assistant Directors; Charles J. Ford, Jonathan McMurray, Margie K. Shields, Sarah A. Farkas, Heather Halliwell, and Joseph A. Applebaum made significant contributions to this report. James Bennett, Jessica A. Botsford, Orice Williams Brown, Susannah L. Compton, Shannon K. Groff, Cheryl M. Harris, Susan J. Irving, Charles A. Jeszeck, Gene G. Kuehneman, Christopher D. Morehouse, Michael P. Morris, Robert Owens, Roger J. Thomas, and Craig H. Winslow also made important contributions. |

# Related GAO Products

*Troubled Asset Relief Program: The U.S. Government Role as Shareholder in AIG, Citigroup, Chrysler, and General Motors and Preliminary Views on its Investment Management Activities.* GAO-10-325T. Washington, D.C.: December 16, 2009.

*Troubled Asset Relief Program: Continued Stewardship Needed as Treasury Develops Strategies for Monitoring and Divesting Financial Interests in Chrysler and GM.* GAO-10-151. Washington, D.C.: November 2, 2009.

*Pension Benefit Guaranty Corporation: Workers and Retirees Experience Delays and Uncertainty when Underfunded Plans Are Terminated.* GAO-10-181T. Washington, D.C.: October 29, 2009.

*Troubled Asset Relief Program: Status of Efforts to Address Transparency and Accountability Issues.* GAO-09-1048T. Washington, D.C.: September 24, 2009.

*Pension Benefit Guaranty Corporation: More Strategic Approach Needed for Processing Complex Plans Prone to Delays and Overpayments.* GAO-09-716. Washington, D.C.: August 17, 2009.

*Troubled Asset Relief Program: June 2009 Status of Efforts to Address Transparency and Accountability Issues.* GAO-08-658. Washington, D.C.: June 17, 2009.

*Pension Benefit Guaranty Corporation: Financial Challenges Highlight Need for Improved Governance and Management.* GAO-09-702T. Washington, D.C.: May 20, 2009.

*Auto Industry: Summary of Government Efforts and Automakers' Restructuring to Date.* GAO-09-553. Washington, D.C.: April 23, 2009.

*Troubled Asset Relief Program: March 2009 Status of Efforts to Address Transparency and Accountability Issues.* GAO-09-504. Washington, D.C.: March 31, 2009.

*Troubled Asset Relief Program: Status of Efforts to Address Transparency and Accountability Issues.* GAO-09-296. Washington, D.C.: January 30, 2009.

*Auto Industry: A Framework for Considering Federal Financial Assistance.* GAO-09-242T. Washington, D.C.: December 4, 2008.

Related GAO Products

*Troubled Asset Relief Program: Additional Actions Needed to Better Ensure Integrity, Accountability, and Transparency*. GAO-09-161. Washington, D.C.: December 2, 2008.

*Pension Benefit Guaranty Corporation: Improvements Needed to Address Financial and Management Challenges*. GAO-08-1162T. Washington, D.C.: September 24, 2008.

*Defined Benefit Pensions: Plan Freezes Affect Millions of Participants and May Pose Retirement Income Challenges*. GAO-08-817. Washington, D.C.: July 21, 2008.

*PBGC Assets: Implementation of New Investment Policy Will Need Stronger Board Oversight*. GAO-06-667. Washington, D.C.: July 17, 2008.

*Pension Benefit Guaranty Corporation Single-Employer Insurance Program: Long-Term Vulnerabilities Warrant "High Risk" Designation*. GAO-03-1050SP. Washington, D.C.: July 23, 2003.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548 |

Please Print on Recycled Paper