*Black v. PBGC*
No. 2:09-cv-13616-AJT-MKM

Renewed Mot. Dis. Def. U.S. Dep't Treas.,
Pres. Task Force on Auto Indus., Timothy F.
Geithner, Steven L. Rattner, Ron A. Bloom

Ex. W



# FACTORS AFFECTING THE DECISIONS OF GENERAL MOTORS AND CHRYSLER TO REDUCE THEIR DEALERSHIP NETWORKS

SIGTARP-10-008
JULY 19, 2010



# SIGTARP

Office of the Special Inspector General
for the Troubled Asset Relief Program

July 19, 2010

## Factors Affecting the Decisions of General Motors and Chrysler to Reduce their Dealership Networks

## Summary of Report: SIGTARP-10-008

### Why SIGTARP Did This Study

For the U.S. automotive industry, the quarter ending June 30, 2009, was dominated by the bankruptcy filings of Chrysler LLC ("Chrysler") and General Motors Corporation ("GM"). As part of the bankruptcy proceedings, Chrysler terminated 789 dealerships on June 10, 2009, and GM planned to wind down 1,454 dealerships by October 2010.

The Department of the Treasury ("Treasury"), through the Troubled Asset Relief Program ("TARP"), has played a key role in the financing of GM and Chrysler, both before and during their restructuring. To date, Treasury has committed $80.7 billion to the two automakers under TARP's Automotive Industry Financing Program ("AIFP"). On February 15, 2009, President Obama announced the creation of an interagency Presidential Task Force on the Auto Industry ("Task Force") that would review the Chrysler and GM restructuring plans submitted as a requirement of their loan agreements. In addition, the Administration created a Treasury Auto Team ("Auto Team"), which reports to the Task Force and had the responsibility, among other things, of evaluating the companies' restructuring plans and negotiating the terms of any further assistance.

Questions arose as to how GM and Chrysler selected dealerships for termination and what benefit, if any, the companies gained from terminating the dealerships. SIGTARP received Congressional requests to conduct an audit on the dealership terminations from Senator Jay Rockefeller, Chairman of the Senate Committee on Commerce, Science, and Transportation, and Representative David Obey, Chairman of the House Appropriations Committee. This report addresses (1) the role of Treasury's Auto Team in the decision to reduce dealership networks, (2) the extent to which GM and Chrysler developed and documented processes for deciding which dealerships to terminate and which to retain, and (3) to what extent the dealership reductions are expected to lead to cost savings for GM and Chrysler.

SIGTARP interviewed key GM and Chrysler officials regarding the process and criteria used to analyze whether dealers would be terminated or retained and analyzed GM and Chrysler data to determine if the companies consistently followed their criteria. We also interviewed Treasury's Auto Team officials, auto industry experts, automobile dealers, and representatives from several dealer advocacy groups. Our work was performed in accordance with generally accepted government auditing standards.

In commenting on a draft of this report, Treasury stated that it strongly disagrees with many of the statements, conclusions and lessons learned of the report, and may respond more fully at a later date. A fuller description of Treasury's response is included in the *Management Comments and Audit Response* section of this report.

## What SIGTARP Found

Pursuant to their loan agreements with Treasury, as a condition of receiving additional TARP funding, GM and Chrysler were required to submit restructuring plans to the Treasury Auto Team in February 2009. GM's restructuring plan explicitly spelled out its plan to reduce its dealership network gradually, by approximately 300 dealers per year over the next five years. In March 2009, Treasury's Auto Team rejected both companies' restructuring plans. In GM's case, the Auto Team specifically highlighted GM's planned "pace" of dealership closings as one of the obstacles to its viability. In response to the Auto Team's rejection of their restructuring plans and in light of their intervening bankruptcies, GM and Chrysler significantly accelerated their dealership termination timetables, with Chrysler terminating 789 dealerships by June 10, 2009, and GM announcing plans to wind down 1,454 dealerships by October 2010.

The Auto Team's view about the need for GM and Chrysler to reduce their dealership networks and do so rapidly was based on a theory that, with fewer dealerships (and thus less internecine competition), like their smaller networked foreign competitors, the remaining dealerships would be more profitable and thus would permit the dealerships to invest more in their facilities and staff. For GM and Chrysler, the theory goes, this would mean better brand equity and would allow the manufacturers over time to decrease their substantial dealership incentives. In addition, the Auto Team felt the companies' best chance of success required "utilizing the bankruptcy code in a quick and surgical way" and noted further that it would have been a "waste of taxpayer resources" for the auto manufacturers to exit bankruptcy without reducing their networks.

Only time will tell whether and to what extent the rapid reduction of the number of dealerships will improve the manufacturer's profitability over time; SIGTARP's audit found that there are several aspects of how the Auto Team came to have this view about dealership reductions that are worth noting. One, although there was broad consensus that GM and Chrysler generally needed to decrease the number of their dealerships, there was disagreement over where, and *how quickly*, the cuts should have been made. Some experts questioned whether it was appropriate to apply a foreign model to the U.S. automakers, particularly in small markets in which the U.S. companies currently have a competitive advantage, and one expert opined that closing dealerships in an environment already disrupted by the recession could result in an even greater crisis in sales. Two, job losses at terminated dealerships were apparently not a substantial factor in the Auto Team's consideration of the dealership termination issue. Although there is some controversy over how many jobs will be lost per terminated dealership, it is clear that tens of thousands of dealership jobs were immediately put in jeopardy as a result of the terminations by GM and Chrysler. Finally, the acceleration of dealership closings was not done with any explicit cost savings to the manufacturers in mind.

Chrysler decided which dealerships to terminate based on case-by-case, market-by-market determinations, and did not offer an appeals process. SIGTARP did not identify any instances in which Chrysler's termination decision varied from its stated, albeit subjective selection criteria. GM's approach, which was conducted in two phases, was purportedly more objective, and it offered an appeals process. However, SIGTARP found that GM did not consistently follow its stated criteria and that there was little or no documentation of the decision-making process to terminate or retain dealerships with similar profiles, or of the appeals process.

## Lessons Learned

Although perhaps it is inevitable that public ownership of private companies will have the effect of blurring the Government's appropriate role, the fact that Treasury was acting in part as an investor in GM and Chrysler does not insulate Treasury from its responsibility to the broader economy. Treasury should have taken special care given that the Auto Team's determinations had the potential to contribute to job losses, particularly given that one goal of the loan agreements was to "preserve and promote jobs of American workers employed directly by the automakers and subsidiaries and in related industries." This audit concludes that before the Auto Team rejected GM's original, more gradual termination plan as an obstacle to its continued viability and then encouraged the companies to accelerate their planned dealership closures in order to take advantage of bankruptcy proceedings, Treasury (a) should have taken every reasonable step to ensure that accelerating the dealership terminations was truly necessary for the long-term viability of the companies and (b) should have at least considered whether the benefits to the companies from the accelerated terminations outweighed the costs to the economy that would result from potentially tens of thousands of accelerated job losses. Moreover, in light of the way in which the companies selected dealerships for termination, in the future, to the extent that Treasury takes action with respect to a TARP recipient that has the potential to affect so many jobs in so many different communities, Treasury should monitor the recipients' actions to ensure that they are carried out in a fair and transparent manner.



OFFICE OF THE SPECIAL INSPECTOR GENERAL

FOR THE TROUBLED ASSET RELIEF PROGRAM

1801 L STREET, NW

WASHINGTON, D.C. 20220

JUL 1 9 2010

MEMORANDUM FOR:   The Honorable Timothy F. Geithner, Secretary of the Treasury

SUBJECT:   Factors Affecting the Decisions of General Motors and Chrysler to Reduce their Dealership Networks (SIGTARP-10-008)

We are providing this audit report for your information and use. It discusses the decisions made by General Motors and Chrysler to reduce the number of auto dealerships in their dealership networks, identifies the role of the Treasury Auto Team in that process, considers the estimated cost savings that would result from decreasing the number of dealerships in each company's network, and lessons learned from this review. The Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") conducted this audit under the authority of Public Law 110-343, as amended, which also incorporates the duties and responsibilities of inspectors general of the Inspector General Act of 1978, as amended.

We considered comments from the Department of the Treasury when preparing the final report. The comments are addressed in the report, where applicable, and a copy of Treasury's response to the audit is included in the Management Comments Appendix D of this report.

We appreciate the courtesies extended to the staff. For additional information on this report, please contact Shannon Williams (Shannon.Williams@do.treas.gov / 202-927-8732) or Kurt Hyde (Kurt.Hyde@do.treas.gov / 202-622-4633).

Sincerely,

Neil M. Barofsky
Special Inspector General
for the Troubled Asset Relief Program

# Table of Contents

Introduction      1

In Response to the Auto Team's Determination that GM's Proposed Pace for
Closing Dealerships Was Too Slow and an Obstacle to Its Viability, GM
Accelerated Its Dealership Closures; Chrysler Also Accelerated, and at a Faster
Pace      7

Criteria Used by GM and Chrysler To Identify Dealerships to Close      16

Dealership Termination Decisions Were Not Based on GM's and Chrysler's
Cost Savings Estimates      25

Conclusions and Lessons Learned      28

Management Comments and Audit Response      33

Appendices

     A. Scope and Methodology      34

     B. Acronyms and Definitions      36

     C. Audit Team Members      37

     D. Management Comments      38

     E. Additional Tables      39

# Introduction

For the U.S. automotive industry, the quarter ending June 30, 2009, was dominated by the bankruptcy filings of General Motors Corporation ("GM") and Chrysler LLC[1] ("Chrysler"). As part of their bankruptcies, GM and Chrysler each planned to reduce dramatically the number of dealerships in their dealer networks. On June 2, 2009, GM announced plans to "wind down"[2] 1,454 (26 percent) of its 5,591[3] dealerships by October 2010, and Chrysler terminated 789 (25 percent) of its 3,181 dealerships on June 10, 2009. GM and Chrysler maintained that their pre-existing dealership networks were too large and needed to be reduced for the companies to become viable. The companies' leaders stated that a smaller network would result in greater sales *per dealership*, which would make the dealerships more profitable and thus enable them to invest in their facilities to meet GM and Chrysler standards and retain top-tier sales and service staffs.

In June 2009, the Senate Committee on Commerce, Science, and Transportation held a hearing on the dealership terminations. Subsequently, Senator Jay Rockefeller sent a letter to SIGTARP noting that the hearing demonstrated substantial confusion, even amongst dealers, as to how GM and Chrysler selected dealerships for termination and what benefit, if any, the companies gained from terminating the dealerships. Senator Rockefeller requested that SIGTARP review how GM and Chrysler decided which dealerships to terminate. Representative David Obey, Chairman of the House Committee on Appropriations, also sent a letter to SIGTARP asking for a review of GM and Chrysler's decision-making processes.

Consequently, SIGTARP began a review to meet the following objectives:

- to determine the role of the U.S. Department of the Treasury ("Treasury") Auto Team in the decisions to reduce dealership networks
- to determine the extent to which GM and Chrysler developed and documented processes for deciding which dealerships to terminate and which to retain
- to determine to what extent the dealership reductions are expected to lead to cost savings for GM and Chrysler

For a discussion of this audit's scope and methodology, see Appendix A. For definitions of the acronyms used in this report, see Appendix B. For the audit team members, see Appendix C. For management comments, see Appendix D. For additional tables, see Appendix E.

---

[1] Chrysler's corporate name was Chrysler LLC during much of the time period covered by this report. The automaker's current iteration is Chrysler Group LLC.

[2] GM issued "wind-down agreements" to 1,289 dealerships carrying GM's core brands (GMC, Chevrolet, Buick, and Cadillac), allowing them to operate until the agreement expires in October 2010, and to 165 standalone Pontiac and GMC Medium Duty dealerships, brands that were eventually phased out. GM also issued "partial" wind-down notifications to 2,385 dealerships that would no longer be able to sell one or more core GM brands. GM would later offer to restore dealer status to 216 complete wind-downs and 450 partial wind-downs, as discussed later in this report.

[3] This figure includes the 165 standalone Pontiac and GMC Medium Duty dealerships.

# Background

In recent years, the American automotive industry has faced challenges related to changing consumer preferences and perceptions, growing legacy costs, rising fuel prices, and ceding of market share to foreign competitors. During the recession, these factors coalesced into a historic crisis that threatened the survival of the domestic auto manufacturers. According to testimony from Ron Bloom, a Senior Advisor at the U.S. Treasury Department, in 2008 alone, the domestic auto industry lost 50 percent of its sales volume and over 400,000 jobs. Near the end of 2008, the financial conditions of GM and Chrysler were seriously deteriorating, and the two companies were virtually closed out of the private capital markets, meaning that they were not able to secure the day-to-day funding they needed to function and remain in business. Without assistance, both companies faced liquidation bankruptcies that would have resulted in substantial job losses and would have had a dramatic impact on the broader American economy.

As part of the Troubled Asset Relief Program ("TARP"), the Automotive Industry Financing Program ("AIFP") was created on December 19, 2008, to permit Treasury to invest in the automakers and their financing arms. The program's stated goal was to prevent a significant disruption of the American automotive industry that would pose a systemic risk to financial market stability and have a negative effect on the U.S. economy. To date, Treasury has committed $80.7 billion[4] through AIFP to facilitate restructuring and to support the automotive manufacturing companies and their financing arms to "avoid a disorderly bankruptcy of one or more automotive companies." On February 15, 2009, President Obama announced the creation of an interagency Presidential Task Force on the Auto Industry ("Task Force") that would review the Chrysler and GM restructuring plans submitted as a requirement of their loan agreements. Co-chaired by Treasury Secretary Timothy Geithner and National Economic Council Director Lawrence Summers, the Task Force has 21 members, including a number of *ex-officio* designees and Government staffers.

In addition to the Task Force, the Administration created a Treasury Auto Team (the "Auto Team"), which reports to the Task Force and had the responsibility of evaluating the companies' restructuring plans and negotiating the terms of any further assistance. Leading the Auto Team were two advisors: Ron Bloom, a former investment banker and head of collective bargaining for the United Steelworkers Union, and Steven Rattner, the co-founder of the Quadrangle Group, a private-equity firm.[5] The Auto Team had a staff of 15 people who conducted analyses in order to determine GM and Chrysler's viability. The Auto Team included Treasury employees who reported to Mr. Bloom and Mr. Rattner, who in turn reported to Secretary Geithner and Mr. Summers.[6] Although this group was responsible for managing AIFP, none of the Auto Team leaders or personnel had any experience or expertise in the auto industry.

---

[4] The $80.7 billion figure represents the funds provided directly to the companies and does not include commitments made under the Auto Warranty Commitment Program or the Auto Suppliers Support Program.
[5] Mr. Rattner left the Treasury Auto Team on July 13, 2009, leaving Mr. Bloom as the head of the Auto Team.
[6] For more information, please see the September 2009 Congressional Oversight Panel report, *The Use of TARP Funds in Support and Reorganization of the Domestic Automotive Industry.*

# TARP Assistance to General Motors and Chrysler

Under AIFP, Treasury committed to provide GM and Chrysler with financing from TARP funds.[7]  Pursuant to the loan agreements, which were both dated December 31, 2008,[8] the financings were intended to accomplish the following goals:

- enable the automakers and subsidiaries to develop viable and competitive businesses that minimize adverse effects on the environment

- enhance the ability and the capacity of the automakers and subsidiaries to pursue the timely and aggressive production of energy-efficient, advanced-technology vehicles

- preserve and promote jobs of American workers employed directly by the automakers and subsidiaries and in related industries

- safeguard the ability of the automakers and subsidiaries to provide retirement and health care benefits for their retirees and retirees' dependents

- stimulate manufacturing and sales of automobiles produced by GM and Chrysler

The loan agreements, set to expire in December 2011 for GM and January 2012 for Chrysler, included other conditions such as executive compensation limits, compliance with Federal fuel efficiency and emissions requirements, and in the case of GM, the provision of warrants to Treasury of non-voting stock and in the case of GM and Chrysler, additional notes.

Under their loan agreements, GM and Chrysler were required to submit to Treasury restructuring plans to show how they would use the assistance from the Government to achieve "long-term viability," which was defined as "positive net present value…taking into account all current and future costs, and can fully repay the government loan."[9] The restructuring plans were intended "to achieve and sustain [the automakers'] long-term viability, international competitiveness and energy efficiency," the loan agreements specified. President George W. Bush said that ensuring viability would require "meaningful concessions from all involved in the automotive industry," including employees, dealers, suppliers, and creditors.  Some of these meaningful concessions related to issues such as wages, benefits, health care, and reductions in capacity and dealership networks.

On February 17, 2009, both companies submitted their restructuring plans.  GM's plan called for reducing the number of plants from 47 to 32 by the year 2014, and the number of employees from 92,000 to 72,000 by the year 2012.  GM's restructuring plan also called for eliminating the

---

[7] Ultimately, Treasury committed $49.5 billion to GM and $12.5 billion to Chrysler.  In addition, GMAC LLC, GM's financing arm, received $17.2 billion, and Chrysler Financial, Chrysler's financing arm, received $1.5 billion, for a total of $80.7 billion.  As part of the companies' bankruptcies, a substantial portion of the TARP loans were converted into common stock, and, as a result, Treasury now owns 60.8 percent of GM's common stock (plus $2.1 billion in preferred) and 9.9 percent of Chrysler's.  Again, the $80.7 billion figure does not include commitments made under the Auto Warranty Commitment Program or the Auto Suppliers Support Program.

[8] The effective date of Chrysler's agreement was amended to January 2, 2009.

[9] Please see COP report referenced above.

Saturn, Saab, and Hummer brands and terminating 1,650 dealerships (approximately 300 per year) by 2014, as shown in Table 1.

### Table 1—Planned Dealership Reductions in GM's Restructuring Plan Submitted to Treasury in February 2009

| Type of Dealership | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Planned Reduction Number | Reduction as a Percentage of 2009 level |
|---|---|---|---|---|---|---|---|---|
| Metro[a] | 1,890 | 1,640 | 1,570 | 1,400 | 1,250 | 1,100 | 790 | 41.8 |
| Hubtown[b] | 1,210 | 1,160 | 1,030 | 1,000 | 950 | 825 | 385 | 31.8 |
| Rural[c] | 2,650 | 2,500 | 2,400 | 2,300 | 2,200 | 2,175 | 475 | 17.9 |
| Total | 5,750 | 5,300 | 5,000 | 4,700 | 4,400 | 4,100 | 1,650 | 28.7 |

[a] GM defines "Metro" as a large metropolitan area
[b] GM defines "Hubtown" as a midsize market that is growing and attracts customers from surrounding areas
[c] GM defines "Rural" as a small market with "no significant retail draw"
Note: Table includes both core and phased-out or sold brands
Source: SIGTARP analysis of GM Restructuring Plan

GM announced in its restructuring plan that, from 2009 to 2014, the company would "accelerate the right-sizing and re-shaping of its dealer network in major markets, increasing volume throughput in better locations." Having fewer, better-located dealerships would increase dealer profits, allowing for recruitment and retention of the best retail talent and more effective local marketing initiatives, GM's plan said. Improving the profitability of GM's independent dealers would help the company, GM said in the plan, by increasing sales, attracting private investment, and driving greater customer loyalty. "The Company's objective is to have the right number of dealers in the right locations operated by the right entrepreneurs," the restructuring plan said.

GM's right-sizing efforts had been under way for decades. From 1970 to 2008, GM reduced the dealership network by over 6,000 dealerships as a result of normal attrition, consolidation of franchises in smaller markets, and the discontinuation of the Oldsmobile brand. GM planned to continue reducing its network and also announced the phase out or sale of its Saturn, Saab, and Hummer brands which would achieve 502 (30 percent) of the 1,650 planned dealer closings by 2014. GM assumed that the remaining reductions would be achieved by three actions:

- consolidating dealerships in metro and suburban areas
- consolidating GMC, Pontiac, and Buick brands in the same dealerships (GM later phased out Pontiac and GMC Medium brands)
- normal attrition of dealerships

On February 17, 2009, Chrysler submitted its own restructuring plan to Treasury, which proposed measures to improve vehicle quality and fuel efficiency, as well as the overall product mix. The plan presented three scenarios for the future of Chrysler:

- Chrysler could continue as a standalone company with the help of $11 billion in loans from the Government.

- Chrysler could pursue a non-binding agreement already signed with the Italian automaker Fiat S.p.A. ("Fiat") and, with additional Government assistance, aim to sell more fuel-efficient cars to a wider range of markets.

- Chrysler could file for bankruptcy and embark on an orderly wind-down of the company.[10]

In contrast to GM's plan, the Chrysler restructuring plan did not contain any specific details about planned dealership closures, such as how many dealerships would close or what factors would be considered in deciding which dealerships to retain. However, the plan referred to Project Genesis, an ongoing Chrysler effort to reduce the number of Chrysler dealerships and to have each surviving dealership sell all three of its brands — Chrysler, Dodge, and Jeep.

As discussed in detail in the following section, the Auto Team reviewed the companies' proposals and rejected them, noting, among other things, that GM's proposed "pace" of closing dealerships was too slow and was an obstacle to its viability. Ultimately, Chrysler filed for bankruptcy on April 30, 2009, and GM followed on June 1, 2009. During their bankruptcies, GM and Chrysler accelerated the dealership termination process; the section beginning on page 16 details the companies' decision-making processes and the effects of the Consolidated Appropriations Act of 2010, which mandated arbitration for terminated dealers desiring such arbitration. The final section of this report, beginning on page 25, discusses the companies' estimates for how much money would be saved through the reduction of their dealership networks.

---

[10] Eventually Chrysler accomplished a combination of the second and third scenarios: Chrysler declared bankruptcy with additional Government assistance and Fiat purchased Chrysler's assets.

Figure 1 shows a timeline of key events discussed in this report from the formal announcement of the Task Force in February 2009 and the signing of the Consolidated Appropriations Act of 2010 in December 2009.

### Figure 1: Key Dates Regarding Dealership Terminations



Source: SIGTARP

[a] According to the Consolidated Appropriations Act, 2010, "The term 'covered dealership' means an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a covered manufacturer in effect as of October 3, 2008, and such agreement was terminated, not assigned in the form existing on October 3, 2008 to another covered manufacturer in connection with an acquisition of assets related to the manufacture of that vehicle brand or brands, not renewed, or not continued during the period beginning on October 3, 2008, and ending on December 31, 2010."

## In Response to the Auto Team's Determination that GM's Proposed Pace for Closing Dealerships Was Too Slow and an Obstacle to Its Viability, GM Accelerated Its Dealership Closures; Chrysler Also Accelerated, and at a Faster Pace

*This section discusses the role of the Auto Team and its advisors in the decision-making process to terminate dealerships.*

In response to Treasury's finding that GM's "pace" of planned dealership terminations was too slow and an obstacle to its viability, GM substantially accelerated its terminations. In its restructuring plan, GM initially proposed closing 1,650 dealers by 2014, but following the Auto Team's response, it instead identified 1,454 dealerships to be wound down by 2010 during its 2009 bankruptcy proceedings. Chrysler also accelerated its dealership terminations – it had planned to reduce its network from 3,181 in 2009 to about 2,000 dealerships by 2014 through Project Genesis (its effort at consolidating dealerships) and instead immediately terminated 789 dealerships during bankruptcy proceedings. The Auto Team encouraged network reduction for both companies based on advice they received from some industry experts that smaller dealership networks would allow GM and Chrysler to improve sales volume and better compete with import companies such as Toyota and Honda, as well as improve brand equity and the overall health of the remaining network. The Auto Team also encouraged the companies to terminate dealerships during bankruptcy proceedings, which provided the opportunity to close dealerships outside of state franchise laws, which could have made involuntary dealer closings more difficult and costly for the two companies.

Between February 17, 2009, the date that the auto companies released their restructuring plans, and March 30, 2009, the date that Treasury released its Viability Determinations in response to the plans, the Auto Team conducted a review of GM and Chrysler's submitted plans and prospects. According to the Viability Determinations, there were many individual considerations and no single factor was critical to the assessment, and the ultimate determination of viability was based upon a total consideration of all relevant factors, which differed for each company. Future Government assistance to GM and Chrysler was conditional on their resubmitting plans that demonstrated they could be viable.

For GM, the five key factors for the company's viability identified by Treasury were: adopting a more realistic assumption of GM's market share, which had been declining in recent years; improving pricing; improving the mix of products to steer the company away from trucks and sport utility vehicles ("SUVs"), which had high margins but were declining in popularity; reducing legacy liabilities such as employee pensions and health care costs; and reducing the number of brands and dealerships.

For Chrysler, the five key factors that Chrysler had to improve to ensure the company's viability were: dedicating more research and development to each platform; increasing product quality scores; improving the product mix (for example, adding more fuel-efficient autos); increasing

manufacturing capability; and expanding outside of North America to take advantage of developing markets.

For help in assessing the companies' plans, the Auto Team contracted with Boston Consulting Group ("BCG"), an advisor on business strategy, and the Rothschild North America ("Rothschild"), a financial advisor, to assess the automotive sector and to help evaluate GM's restructuring plan and the proposed Chrysler alliance with Fiat. Treasury specified in the contract with BCG that BCG have extensive auto industry expertise.[11] The contract with Rothschild likewise stipulated that "[t]he Treasury Secretary needs to acquire specialized financial analysis and advice for the automobile industry that is beyond the purview and expertise of Treasury Department personnel."[12] BCG provided data comparing average number of vehicles sold per dealership for GM, Chrysler and their competitors. Rothschild provided the Auto Team with information that included its projections of the overall growth in auto sales in the United States from 2009 to 2014 and GM's projected share of that market.

## Treasury Auto Team Reviewed Restructuring Plans With the Help of Outside Experts

Following the submission of the February 17 restructuring plans, the Treasury Auto Team, along with their external advisors, developed Viability Determinations for each company based on their review of the plans. The Viability Determinations, released on March 30, 2009, reflected the Auto Team's evaluation of the extent to which the restructuring plans would, if followed, allow GM and Chrysler to become viable companies. BCG and Rothschild were contracted to provide the Auto Team with feedback on the financial viability of the two companies. Following its Viability Determinations, the Auto Team also conducted its own research about potential job losses resulting from dealership closures and a study of the impact of terminations in Montana. Much of the information that the Auto Team received about the benefits for dealership determinations was based on the "Toyota Model," which suggested that smaller dealership networks would reduce competition among dealerships and increase sales volume for the remaining dealerships. It was believed that this would then allow the dealerships to invest more in their facilities, thus improving the brand equity of GM and Chrysler.

Rothschild created a Cost Benchmarking Analysis presentation in December 2008 that provided detailed information about GM, Chrysler and Ford's dealership network size and productivity measured against their top foreign competitors Toyota, Nissan, and Honda. An appendix to the presentation identified that, although the domestic manufacturers have significantly larger dealership networks, dealership network productivity data for 2007 U.S. new car and light truck

---

[11] Treasury signed its contract with Boston Consulting Group on April 3, 2009, and the contract was to run through October 2, 2009. The overall guaranteed minimum for this contract was $50,000 and the overall maximum for this contract was $7,000,000. According to the contract, its objectives were to provide management consulting services to: a) assist in Treasury's continued assessment of the automotive sector generally; b) assist in Treasury's work with GM to develop and evaluate a comprehensive restructuring and business plan acceptable to the government; and c) advise Treasury on the viability of the announced alliance between Fiat and Chrysler.

[12] Treasury engaged Rothschild through an Interagency Agreement with the Pension Benefit Guarantee Corporation ("PBGC"). The Interagency Agreement was signed by Treasury on February 25, 2009, and terminated on December 11, 2009. The total value of the agreement was $7,770,000.

sales per franchise shows that "foreign transplant [dealer] networks are significantly more productive" than their U.S. counterparts.

In March 2009, BCG provided Treasury with an analysis that compared the average annual sales of GM and Chrysler dealerships with those of their foreign competitors from 2005 through 2008. This analysis showed that on average GM and Chrysler dealerships sold fewer than 500 new vehicles per year, while Toyota and Honda dealerships averaged more than 1,000 new vehicles per year, as shown in Figure 2.

**Figure 2: Average Annual Sales for GM, Chrysler Dealerships and Their Competitors (2005-2008)**



Source:  Boston Consulting Group

In an interview with SIGTARP staff, a BCG managing director said that, in theory, if GM and Chrysler reduced the number of dealerships, the average sales at the remaining dealerships should increase, which would make them more profitable and enable them to invest more in their facilities. According to an Auto Team memo dated May 11, 2009, five weeks *after* it wrote its Viability Determination, dealership reductions generally involve near-term sacrifice and long-term gain. The memo notes that, according to BCG, the remaining dealerships typically recapture only 75 percent of the business of the terminated dealerships in year 1. By year 3, the Auto Team estimated, the sales would have returned to 100 percent. By year 5, the long-term gain would materialize as sales in the remaining dealerships would reach 125 percent of sales accomplished with the larger network as the benefits of a healthy dealership network start to materialize.

Rothschild provided the Auto Team with information that showed the anticipated growth in overall auto sales in the United States and GM's projected U.S. market share from 2009 to 2014. Rothschild assumed that overall new vehicle sales would grow from 10.5 million in 2009 to 16.8 million in 2014, but that GM's U.S. market share would fall from 19.5 percent to 18.3 percent during this period, as shown in Table 2.

**Table 2—Projected U.S. Auto Sales and GM's U.S. Market Share 2009-2014**

| Category | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| U.S. Market (SAAR[1]) (units in millions) | 10.5 | 12.5 | 14.3 | 16.0 | 16.4 | 16.8 |
| GM Market Share (percent) | 19.5% | 18.9% | 18.6% | 18.4% | 18.5% | 18.3% |
| GM Sales — U.S. Market (SAAR) (units in millions) | 2.0 | 2.4 | 2.7 | 2.9 | 3.0 | 3.1 |
| Increase in GM Sales (percent) | - | 20% | 12.5% | 7.4% | 3.4% | 3.3% |

[1]Seasonally Adjusted Annual Rate
Source: SIGTARP analysis of data provided by Rothschild

Therefore, GM's U.S. market share would continue to decline, but its overall sales would increase, based on the assumption that overall new vehicle sales would substantially increase. Following the release of the Viability Determinations, Rothschild and BCG continued to provide updated information to the Treasury Auto Team regarding modifications to GM's restructuring plan and Chrysler-Fiat due diligence, focusing on products, new product development, brands, technology, and turnaround practices.

The Auto Team also consulted with automotive financial industry experts from Bain Consulting, UBS, A.T. Kearney, JP Morgan, Deutsche Bank, Barclays Capital, Roland Berger, and Auto Nation. Mr. Bloom stated that these conversations were not limited to dealership terminations, but also covered issues related to the overall viability of GM and Chrysler. Mr. Bloom noted that these were off-the-record conversations and were not documented. However, according to Mr. Bloom, the experts supported dealership terminations as a necessary part of GM and Chrysler's restructuring.

Experts from four of the firms offered SIGTARP the following observations about reducing the number of dealerships:

- A UBS official stated that terminating GM and Chrysler dealerships was necessary to increase the companies' profitability. Dealerships tend to carry "buffer stock" or excess stock when competing with nearby dealers of the same brand. Fewer dealerships would lead to reduced inventory levels which, in turn, would reduce the amount of floor plan financing.

The reduction in floor plan financing and the corresponding manufacturer assistance needed by all dealerships would increase the profitability of the overall network and the manufacturer as well. An expert from Bain Consulting also stated many dealerships have too much inventory relative to their market area, particularly in smaller markets or markets where there are more dealers than necessary, because they have to have sufficient diversity in their inventory to cover the manufacturer's entire portfolio and to meet varied customer needs. This leads to higher floor plan financing costs per vehicle. In addition, because it is difficult for a smaller dealership to match its mix of inventory with actual customer demand, they end up with higher quantities of slow moving



*Floor Plan Financing*

Revolving lines of credit used to finance inventories of items, in this case, autos.

inventory that can lead to a need for increased customer and dealer incentives to sell their vehicles.

- An official from A.T. Kearney said that the large networks have resulted in more dealerships competing for a smaller share of the auto market, which keeps prices lower. An expert from UBS also stated that reducing the number of dealerships will reduce inter-brand competition, and would result in the dealerships being able to sell new vehicles more quickly, which would increase the profitability of the whole network.

- An expert from JP Morgan noted that although GM and Chrysler have lost significant market share over the past few decades, the size of their dealership networks has not decreased accordingly. The expert also noted that some dealerships derive a large portion of revenue from used cars, service, and parts — not from new vehicle sales — and therefore do not invest in facilities to support new vehicle sales. As a result, some dealerships have improperly trained sales people and poor facilities, which can affect customer service. Having better facilities and trained staff will improve the overall image of the dealerships and the brands they sell. The official stated that the most significant anticipated benefit of the closures will be an increase in brand equity.[13]

Based on the analysis provided by the contractors and conversations with industry experts, the Auto Team issued its Viability Determination that GM's proposed "pace" of closing dealerships was too slow and was an obstacle to its viability, and GM and Chrysler accelerated their planned dealership closures. SIGTARP found that the Auto Team was not involved in determining which dealerships to terminate.

According to Mr. Bloom, of the experts that he consulted, only one — from the Center for Automotive Research — voiced opposition, as noted below, to dealership terminations. However, SIGTARP interviewed that expert and one from J.D. Power and Associates, who was not consulted by the Auto Team. Both experts said that while metro areas were oversaturated with GM and Chrysler dealerships and reductions were needed in these areas, this was not the case in rural areas where GM and Chrysler had an advantage over their import competitors.

Those two experts told SIGTARP that import dealerships such as Toyota, Honda, and Nissan are not generally located in rural areas. The representative from the Center for Automotive Research disputed the Auto Team's assumption that closing rural dealerships would not affect sales in rural areas.[14] He noted that it was not likely that someone would drive 80 miles to buy a Cadillac when they could simply buy another vehicle at a closer dealership.

---

[13] The interview with the JP Morgan official was conducted on November 16, 2009.

[14] In August 2009, well after issuing its Viability Determinations, and in response to a meeting with U.S. Senator Jon Tester of Montana, the Auto Team analyzed the impact of dealership terminations in Montana. They concluded that the average drive to a GM dealership for a Montana resident, including residents of extremely remote areas, was 21.9 miles prior to the dealership terminations and increased only to 24.6 miles after terminations. Based on this analysis, the Auto Team said, GM and Chrysler would not be giving up market share even if they closed rural dealerships, although the Auto Team did not validate this study to determine if average driving distance can predict future auto brand loyalty, nor did they replicate this study in any other state.

He also noted that although sales volume in small towns may be lower, the cost of operating dealerships in small towns is lower as well. In addition, closing dealerships in small towns could ruin the "historic relationship" that GM has had with residents in small towns and force buyers to drive to metro areas, where there are more competitors. In the worst case, the loss of market share in small and medium-sized markets could "jeopardize the return to profitability" for GM and Chrysler, the representative said. Representatives from the National Automobile Dealers Association also concurred that dealership terminations would cause GM and Chrysler to lose market share in rural areas.

A former Chrysler Deputy CEO told SIGTARP that the "Toyota model" studied by the Auto Team — that fewer dealerships, located mostly in metro areas, would lead to higher sales and profitability for the remaining dealerships — would not work for Chrysler. This is because Chrysler sells trucks in rural markets as well as cars in Midwestern states where imported cars are less popular. He said that Chrysler will "never" get to the same throughput level as its import competitors. The former Chrysler Deputy CEO likened applying the Toyota model to Chrysler to "trying to turn our sons into daughters."

Some automotive industry experts also disagreed with the Auto Team's position. The representative from J.D. Power and Associates, for example, said that Chrysler's decision to terminate 789 dealerships within three weeks in an environment that was already disrupted by the poor economy could bring about an even greater crisis in sales. Although he did not disagree from a business standpoint that terminating some dealerships was necessary, he asked why Chrysler would want to "create a wave of chaos amidst [an economic] crisis." Indeed, in September 2009, Chrysler officials themselves told SIGTARP that closing dealerships too quickly would have an adverse effect on sales. Chrysler officials said that they expected that their rapid terminations would result in lost sales in the short term, that Chrysler will take several years to recover lost sales, and that future increases in market share will depend on penetrating new markets.

## Auto Team Determined that GM's and Chrysler's Restructuring Plans Were Not Viable; Companies Entered Bankruptcy and Terminated Dealerships

Based on the input from the experts it consulted and its own research, the Auto Team found that GM's overall plan was "not viable as it is currently structured," in part because GM relied on overly optimistic assumptions about the recovery of the company and the economy. In its Viability Determination dated March 30, 2009, Treasury listed five areas in which GM needed to improve its restructuring plan in order to become a viable company: more realistic assumption of its cash needs associated with legacy liabilities, reassessment of its market share assumption, improvement in prices, improved mix of products to steer the company away from high-margin trucks and SUVs, and an excess of brands and dealers.

Specifically with regard to GM dealerships, the Auto Team indicated that the automaker should accelerate the pace of dealership closings:

GM has been successfully pruning unprofitable or underperforming dealers for several years. However, its current pace will leave it with too many such dealers for a long period of time while requiring significant closure costs that its competitors will not incur. These underperforming dealers create a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales.

GM was given 60 days to submit a "more aggressive plan" overall, including planning for their dealership terminations, and was provided an additional $6 billion of TARP funds as working capital.

Treasury also listed five challenges for Chrysler in a separate Viability Determination: too small of a scale to dedicate enough research and development to each platform; low quality scores; insufficient product mix (for example, too few fuel-efficient autos); inflexible manufacturing capability; and too much geographic concentration in North America, which prevented Chrysler from taking advantage of developing markets. The Viability Determination for Chrysler did not address dealership terminations. The Auto Team concluded that Chrysler could succeed only if it developed a partnership with another automotive company.

Mr. Bloom stated that GM and Chrysler could use the terms of bankruptcy to eliminate dealerships quickly, and that it would have been a "waste of taxpayer resources" for the auto manufacturers to exit bankruptcy when they knew the networks would still have to be rationalized. Mr. Bloom referred to this as "taking the pain and getting past it." Mr. Bloom also said that the Auto Team considered dealership reductions to be "consistent with overall industry thinking." He told SIGTARP that the Auto Team assumed that GM's and Chrysler's remaining dealerships would perform better and that the brand equity for both companies would improve if GM and Chrysler terminated dealerships.

A Treasury document summarizing the efforts of the AIFP noted that, although Chrysler and GM were on two different paths, "their best chance of success may well require utilizing the bankruptcy code in a quick and surgical way." According to Treasury, this would not entail liquidation or a conventional bankruptcy. Instead a "structured" bankruptcy would function as a tool to "make it easier for Chrysler and General Motors to clear away old liabilities." One effect of this strategy is that dealerships could be closed more quickly. In an internal memo, Auto Team officials reiterated that their goal was to take advantage of the bankruptcy code to reject dealership franchise agreements without significant up-front costs.

However, Treasury officials knew that there might be difficulties with closing dealerships quickly. According to an internal Auto Team memo, "(t)he decision to terminate such a large number of distribution points in a very short time is arguably the most challenging component of the revised plan...Despite the significant execution risk, the management team believes it is imperative that the company capitalize on this unique opportunity to reconfigure the dealer network outside the confines of restrictive state franchise law,"

The impact of job losses was not a significant factor in the Auto Team's findings that GM's proposed pace would be an obstacle to its viability. Indeed, it was only after the decision was made that the Auto Team considered the impact its decision would have on job losses. In an internal memo dated April 20, 2009, the Auto Team estimated that GM dealership terminations

Case 2:09-cv-13616-AJT-DAS   Document 138-4   Filed 08/06/10   Page 19 of 46

would result in a short-term loss of 43,081 jobs and a long-term loss of 25,597 jobs. The memo also assumed that Chrysler would go out of business completely, resulting in 72,620 jobs lost in the short term and 43,580 jobs lost over the long term.

The memo notes that the average dealership employs 52 employees. The memo assumes that, at closed dealerships, about half of these employees (namely, the service professionals) would find other work quickly. Sales, managerial, and clerical staff, however, would have a more difficult time finding new jobs or would be permanently displaced. A Chrysler official cited a National Automobile Dealers Association statistic that 50 jobs might be lost for each dealership terminated, but also said that service or technical staff would find re-employment easily. GM officials disputed the NADA figure because many of the low-performing dealerships it terminated had fewer than 50 employees.

As a result of the comments in the Viability Determination, GM officials said their conclusion was to "move now" and quickly to "right-size" the dealership network. GM officials stated that it was their own decision to make the cuts by December 2010. GM accelerated its planned closings of dealerships during bankruptcy proceedings in June 2009 when it announced plans to close 1,454 dealerships by October 2010, rather than its originally planned closure of approximately 450 in the same time period. GM initially planned to close 1,650 dealers through 2014 (see Figure 3).

**Figure 3: Planned GM Dealership Reductions Pre- and Post-Bankruptcy**



—◆— GM Planned Dealerships Prior to Bankruptcy
—▣— GM Dealership Reductions Post-Bankruptcy

Source: SIGTARP analysis of data from GM

In response to verbal feedback from the Auto Team, Chrysler also accelerated its dealership closings. Chrysler officials said that bankruptcy offered Chrysler the opportunity to speed up

their plans for Project Genesis by reducing costs through closing dealerships. Prior to bankruptcy, the officials said that they had a difficult time closing dealerships because of state franchise laws. During its 2009 bankruptcy proceedings, Chrysler eliminated 789 of 3,181 dealerships — almost 25 percent of its dealership network. Chrysler officials also noted that bankruptcy offered an opportunity to speed up the existing strategic plan to consolidate its three brands (*i.e.*, Chrysler, Dodge, and Jeep) within one dealership, Project Genesis. Under Project Genesis, Chrysler had planned to reduce its network over time to about 2,000 dealerships by 2014. Chrysler asserted that the percentage of dealerships that sold all of its three brands increased from 62 percent to 84 percent as a result of eliminating 789 dealerships. The retained dealerships had generated 86 percent of new vehicle sales in 2008.

# Criteria Used by GM and Chrysler to Identify Dealerships to Close

*This section describes the processes that GM and Chrysler used to identify dealerships to terminate, GM's appeals process, and the status of the arbitration process for both GM and Chrysler.*

In June 2009, GM notified 1,454 dealerships that they would be wound down (terminated) in October 2010, and Chrysler notified 789 dealerships that they would be wound down in 22 days. GM allowed dealerships to appeal the wind-down decision; Chrysler did not allow appeals. In December 2009, legislation was enacted to allow dealerships to file for arbitration regarding these decisions.

## GM Wind-Down Decisions Were Made in Two Phases

In April 2009, before entering bankruptcy, GM officials met to determine the size and scope of dealer network reductions. GM's Dealership Network Planning and Investments team developed the methodology used to select which dealerships to wind down and which to retain. As part of this process, the Dealership Network Planning and Investments team also worked in coordination with executive leadership, legal counsel, regional managers ("zone" managers), and other GM personnel working for each brand (for example, Chevrolet, Buick, GMC, and Cadillac). According to testimony given by GM officials and documents presented during that testimony, the company's approach to reducing the dealership network involved applying "objective performance criteria" such as dealership sales, profitability, customer convenience, and market demographics. Excluding the reduction from the sale or phase out of Saab, Saturn and Hummer, GM sought to reduce its remaining dealership network from 5,591 dealerships to 4,137. GM expected that normal attrition would eventually lead to an "ideal" network of approximately 3,300 dealerships.

GM selected dealerships that would receive complete wind-down notices in two phases, but all the dealerships were provided wind-down agreements at the same time. During phase one in May 2009, GM identified 1,071 dealerships that it would not likely include in its network going forward.[15] These dealerships were notified of GM's intent in letters dated May 14, 2009, but did not receive official wind-down agreements until the following month. GM officials stated that these dealerships were selected to receive the May 14 letter (and subsequent wind-down) based on one of two criteria that provided an objective framework to evaluate all 5,591 dealerships:

---

[15] Of 1,096 dealerships initially identified for termination in phase one, 14 of the termination decisions were reversed before the official wind-down agreements were sent out, and 11 dealers voluntarily terminated before bankruptcy. The remaining 1,071 dealerships received wind-down agreements in June 2010.

- Dealer Performance Summary Score ("DPS") of less than 70

  Or

- annual sales of less than 50 new vehicles in 2008

GM officials noted that the DPS score has been used since 2002 as a measure of dealership performance and that dealerships can access their score on the same website they use to order vehicles and perform other sales-related functions. Our review confirmed that dealerships could access their scores through the website. SIGTARP found that only 26.1 percent of terminated dealerships viewed their DPS score on the website in 2008, and 47.5 percent did so in 2009. The DPS score is the sum of four weighted category scores: sales, customer satisfaction, capitalization, and profitability. GM arrived at each category score by applying a weighting to the ratio of actual performance to the expected performance, as described in Table 3:

### Table 3—GM DPS Score Categories

| Category | Weighting | Description |
|---|---|---|
| Retail Sales Index (RSI) | 50 percent | Ratio of actual sales to expected sales. GM calculates expected sales[a] based on a segment-adjusted state average. |
| Customer Satisfaction Index (CSI) | 30 percent | Ratio of actual score to expected score. GM calculates expected score based on a regional average. |
| Capitalization | 10 percent | Ratio of actual working capital to standard working capital. GM calculates standard by averaging a dealership's needs for working capital over a year. |
| Profitability | 10 percent | Ratio of actual dealer return on sales to expected return on sales. GM calculates expected return based on a regional average. |

[a] GM calculates expected annual sales, CSI, capitalization, and profitability, based on vehicle registrations, industry averages, and other historical data
Source: SIGTARP analysis of GM data

GM determined that dealerships with a DPS Score of 100 were average performers; those below 70 were considered poor performers and would not be retained. SIGTARP noted, however, that GM did not uniformly apply the phase one criteria to the entire network. For example, our analysis found that two of the wind-down dealers did not meet either criterion. Furthermore, we found that, of the dealerships that met only one of the two criteria:

- GM retained 355 (or approximately 41 percent) of the 858 dealerships that had a DPS score below 70.[16]
- GM retained 9 of the 394 dealerships that sold fewer than 50 new vehicles in 2008.[17]

---

[16] An additional 10 dealerships with a DPS score below 70 were in phase two wind-downs.

GM officials attributed these inconsistencies primarily to a desire to maintain coverage in certain rural areas where they have a competitive advantage over import auto companies that are not typically located in rural areas, although ultimately close to half of all of the GM dealerships identified for termination were in rural areas. Other dealerships were retained because they were recently appointed, were key wholesale parts dealers, or were minority- or woman-owned dealerships.

On June 1, 2009, GM filed for bankruptcy. As indicated earlier in this report, bankruptcy would permit GM to accelerate the process without the restriction of state franchise laws. Bankruptcy laws supersede various state franchise laws, which could have required litigation or arbitration. GM management had also determined that the company would need to wind down more dealerships than those designated in phase one to get close enough to the "ideal network size" of 3,380 dealerships.

In early June 2009, GM initiated phase two of their wind-down process and identified an additional 383 dealerships to wind down. By this point, GM management had decided to eliminate the Pontiac and GMC Medium Duty Truck brands as part of the restructuring, and, as a result, 144 of the 383 dealerships identified in phase two were ones that sold only those brands.[18] GM officials stated that they also used a "more aggressive" set of criteria in phase two than in phase one to select the remaining 239 dealerships for wind-down and bring the phase two total to 383. GM used the following criteria to select the 239 dealerships for wind-down:

> **State Franchise Laws**
>
> Franchise laws, which vary from state to state, are designed to protect the rights and interests of a franchise purchaser by requiring the franchisor (in this case Chrysler or General Motors) to follow specific guidelines in order to terminate the franchise agreement. For example, under Delaware law, a franchisor is prevented from unjustly terminating, failing to renew a franchise, or refusing to deal with a franchisee with whom the franchisor has been dealing with for at least two years without good cause or in bad faith. Franchisors are required to provide notice before terminating, or electing not to renew, a franchise agreement. Franchise laws also provide franchise purchasers with a legal remedy if a franchisor unjustly terminates, or threatens to or attempts to unjustly refuse to renew a franchise.

- DPS of 80 or less; or
- Unprofitable in 2006, 2007, and 2008; or
- Retail Sales Index below 70; or
- Non-GM brands in same facility and DPS below 100; or
- Buick-GMC or Cadillac dealership network viability[19]

SIGTARP found that GM did not wind down all the dealerships meeting the aforementioned criteria. For example, although 992 dealerships with a DPS below 80 were selected for closure, another 763 with a DPS below 80 were retained.[20] Similarly, for dealerships with a DPS of 100

---

[17] The balance of the 1,071 dealerships that were terminated met both criteria.

[18] A total of 165 wind-downs were related to discontinued brands (GMC Medium Duty Trucks and Pontiac). In phase one, 21 Pontiac dealerships received wind-downs; in phase two, 15 Pontiac dealerships received wind-downs. Also in phase two, 129 GMC Duty Trucks received wind-downs.

[19] *Buick-GMC dealership network viability* refers to GM's efforts to combine standalone Buick and GMC dealerships under one dealership. *Cadillac dealership network viability* refers to the reduction of the overall size of the Cadillac network to better compete with other luxury vehicle brands, such as Lexus and BMW.

[20] Of the dealerships with a DPS below 80, 15 additional were standalone dealerships that sold only the phased out Pontiac brand.

and a non-GM brand in the same facility, 226 were phase one wind-downs, 43 were phase two wind-downs, and 299 were retained.[21]  Additionally, SIGTARP noted that 39 wind-down dealers in phase two did not meet any of the performance-based criteria (DPS, RSI, new vehicles sold, non-GM dual).  During the time these decisions were made, GM did not document why some dealerships meeting the criteria were retained while others were wound-down.  GM officials responded to questions about these inconsistencies by stating that they made case-by-case decisions to determine whether to issue a wind-down agreement to dealerships that met any one of the criteria.  Officials also stated that two of the criteria, Buick-GMC and Cadillac dealer network activities, required review of individual market factors.  Therefore, GM officials had to contact various regional or field representatives over several weeks to obtain their reconstruction of the impetus for decisions made several months prior.

SIGTARP also found that GM was missing data to evaluate some of the dealerships based on the established criteria.  GM was missing at least one of the following criteria for 308[22] dealerships: DPS score, RSI, or 2008 retail sales.  We determined that a total of 61 dealerships that lacked at least one of these criteria were terminated, and 247 were retained.[23]  GM officials stated that the criteria were missing for 308 dealerships because the dealerships had not provided it or the dealership was new.  To make wind-down or retention decisions for dealerships that were missing DPS scores, GM officials said they instead considered RSI and new vehicles sold.

During the first week of June 2009, GM sent wind-down agreements to 1,454 dealerships to end their franchise agreements in October 2010.  To receive compensation as part of bankruptcy, dealerships were required to sign the wind-down agreements and submit them to GM by June 12, 2009.  The wind-down dealerships were allowed up to 16 months to terminate the business and sell existing inventory to retail customers; however, these dealerships could not order new vehicles.

GM agreed to provide $587 million in compensation to wind down dealerships.  Compensation for each dealership was determined using a formula that considered dealership rent, sales, and new vehicle inventory in late May 2009.  The dealerships were provided with an initial payment of 25 percent of the total compensation, and the dealerships will receive the remaining 75 percent of the total compensation on the completion of various milestones.  As of May 1, 2010, a total of 409 dealerships in wind-down sought to close their GM dealerships before October 2010.

## GM Allowed Dealers to Appeal Wind-Down Decisions

Subsequent to announcing the dealership closures and declaring bankruptcy, GM set up an appeals process.  Dealers were instructed to submit appeals to GM, but they still had to sign and submit their wind-down agreements by June 12, 2009.  For the appeals process, GM created an appeals review team and an Executive Review Committee, but did not establish criteria for the

---

[21] For dealerships with a DPS of 100 and a non-GM brand in the same facility, 12 additional dealerships were standalone dealerships that sold the phased-out Pontiac brand and no other GM brands.

[22] An additional three dealerships were missing data but were standalone dealerships that sold phased-out brands.

[23] A total of 172 dealerships that lacked all three of these criteria were retained, and four received wind-downs; 61 dealerships missing DPS scores received wind-downs, and 247 were retained.

review or for the reversal of wind-down decisions. GM officials stated the appeals review was based on a second look at the same data used in the original wind-down decisions. The appeals process opened on June 4, 2009, and closed on August 7, 2009.

GM received 935 appeals related to complete wind-downs and granted 64 reversals.[24] GM did not document the reasons for reinstating dealerships. When SIGTARP requested explanations of the reversals, GM contacted various field representatives to obtain their undocumented recollections of the reasons for reinstatements. The reasons provided to SIGTARP included the desire to maintain market coverage in rural areas, recent facility upgrades, corrections of erroneous score data, GM legal advice, and GM leadership review. Without proper documentation from GM, SIGTARP could not validate the reasoning or consistency of appeal decisions.

GM did not provide guidance on the specific data that dealerships were to submit as part of the appeals process. Our review of 323 appeals packages found that dealers submitted a variety of information that they deemed relevant. For example, some provided updated financial data, and others submitted letters from members of the community, as shown in the following excerpts from the appeals packages:

> We have not heard back from anybody. We have just moved into a brand new dealership 04/14/2009. We do not understand this letter. We would like to appeal this. Please look at our investment. We have moved to the corner of two major highways and invested over 2 million dollars. We feel you might not be aware of our new dealership since it was addressed to our old address and name.

GM reversed this dealership's closure, but did not document why the appeal was granted. However, GM officials stated that this appeal was granted after its DPS score data was corrected and its facility upgrades were considered.

The following excerpt is from a dealership appeal that was rejected. GM did not document why the appeal was rejected.

> As a recipient of GM's May 14th letter of anticipated contract non-renewal and the Wind-Down Agreement dated June 1, 2009, we request that you review and reconsider the decision to abandon the market of 80,000…in light of the enclosed information. Our continued partnership is truly best for our mutual clientele, the current and future GM customers in this vital area.…In an overwhelming show of support from the community, we have received nearly 300 letters and emails, most within a 24-hour period last week due to a grass-roots effort by customers.…We would be happy to provide all these letters if you wish to review them.…We respectfully request an opportunity to review the details

---

[24] GM received a total of 1,316 appeals related to both complete and partial wind-downs, and granted 86 reversals. 22 of the reversals were for dealerships that received partial wind-downs, 935 of the appeals were received from dealerships selected for complete wind-down, and 381 of the appeals were received from dealerships selected for partial wind-down, which involved eliminating one or more brands from a dealership, but keeping the dealership open.

> of our situation in person with an appropriate GM representative at your earliest convenience.

The following excerpt is from another appeal that was rejected. GM officials did not document why the appeal was rejected.

> We started out by getting very involved in the community and establishing our own brand as you would. Sponsorships ranging anywhere from the local high school football teams and cheerleaders, softball teams of all levels, Little League and Pee Wee Football…How can General Motors encourage and approve a dealer to make an investment in a franchised dealership and then in just 15 months after all of our investment tell us that there is no longer a market for the amount of dealers in this market. I could understand if that would have been 5 years later but not 15 months and two and a half million dollars later. Furthermore the commitment to our facility which was a 15-year lease with an option to purchase the facility at the end of 5 years is also a major factor that all parties were aware of at the time of the transaction. Could General Motors please tell me why we would be allowed to enter into this type of an arrangement when we are talking about just 15 months in business? My exposure on this facility is in excess of 4.5M over the next three and half years. I made the commitments and the investments based on your approval and your desire to have a dealer in this market.

## Chrysler Evaluated Dealerships Market by Market

Before filing for bankruptcy, Chrysler had been implementing a plan known as Project Genesis to consolidate dealerships and have each dealer sell all three of its brands—Chrysler, Dodge, and Jeep. The plan was scheduled to be completed in 2014. Chrysler's Network Operations-Dealer Operations team developed and executed a market-by-market dealership review that incorporated the goals of Project Genesis. During bankruptcy, Chrysler accelerated this plan and decided to terminate 789 dealerships within 22 days without providing any financial assistance to these dealerships. Chrysler officials noted that prior to bankruptcy, state franchise laws made it difficult to close dealerships and stated that the goal was to close dealerships quickly and to have the terminations coincide with the effective date of the bankruptcy sale. Unlike GM, Chrysler did not have an appeals process.

Chrysler used the following primary criteria to select dealerships to retain or terminate: whether the dealer's location was a desirable one targeted by Chrysler; which brands were offered; the number of new vehicle sales; and the Minimum Sales Responsibility ("MSR").[25] Chrysler also considered customer convenience, financial stability of the dealership's company, condition of the dealership's buildings and lots, and capacity of the facility's buildings and lots. Chrysler identified target locations using a market analysis performed by Urban Science, a consulting group. The analysis compared the number of dealerships and corresponding sales to competitors in 1,712 markets across the United States. To demonstrate how it applied the analysis, Chrysler provided SIGTARP with market maps detailing the target areas, number of dealerships and new

---

[25] Minimum Sales Responsibility is a ratio of the actual sales to the average number of vehicle registrations in a state. One hundred is considered average. The state average is broken down by market share and market segment (small, midsize, *etc.*).

vehicle sales for each competitor brand. The analysis also detailed Chrysler's percentage of market share in each area.

SIGTARP's analysis of terminations in 13 markets found that Chrysler's rationale for termination focused on implementing Project Genesis, retaining dealerships with higher sales and premium facilities and retaining those located in target areas. In two of the markets reviewed (see Table 10 in Appendix E), Chrysler terminated all of the dealerships because their performances were below average. Chrysler plans to seek new owners to replace the dealerships in these markets. Chrysler also identified at least 27 other terminated dealerships nationwide that they intend to replace with dealerships under new ownership. For a summary of the 13 markets, see Table 10 in Appendix E.

Table 4 below shows the rationale Chrysler used in its decision-making process for one market.

## Table 4—Example of Chrysler's Decision-Making in One Market

| Dealership | Brands | In Target Location | 2008 MSR | 2008 New Vehicles Sold | Terminated | Chrysler Rationale |
|---|---|---|---|---|---|---|
| Dealer A | Jeep | Yes | 442% | 486 | Yes | Blocking the addition of Jeep franchises in three other sales areas. |
| Dealer B | Dodge, Chrysler | Yes | 172% | 477 | No | In target area, above-average sales performance. Jeep brand to be added in August 2009. |
| Dealer C | Chrysler, Dodge, Jeep | Yes | 103% | 390 | No | In target area, above-average sales performance. New 2007 dealer and in line with project Genesis. |
| Dealer D | Dodge | Yes | 445% | 378 | No | In target area, above-average sales performance. Jeep brand to be added in August 2009. |
| Dealer E | Chrysler, Dodge | Yes | 162% | 190 | No | In target area, above-average sales performance. |
| Dealer F | Chrysler, Jeep | Yes | 82% | 145 | Yes | Below-average sales performance, not profitable, undercapitalized. |
| Dealer G | Chrysler, Jeep | Yes | 29% | 45 | Yes | Below-average sales performance, under-capitalized on finance hold, nearby dealership has above-average sales. |
| Dealer H | Dodge | No | 87% | 41 | Yes | Not in target area, below-average sales performance, not profitable. |

Source: SIGTARP analysis of Chrysler data

Three of the four terminated dealerships among these examples (F, G, and H) in Table 4 had the lowest MSR and lowest number of new vehicles sold. However, Dealer A, which had the highest sales and MSR, was terminated because the dealership was preventing Chrysler from adding the Jeep brand to surrounding dealerships, thus preventing Chrysler from implementing Project Genesis. The retained dealerships in this market accounted for 67 percent of the new vehicles sold and had an average MSR of 233 percent. The terminated dealerships accounted for 33 percent of the new vehicles sold and had an average MSR of 160 percent.

Chrysler asserted that the elimination of 789 dealers increased the percentage of dealerships that sold all three brands from 62 percent to 84 percent. In addition, retained dealers generated 86 percent of Chrysler's new vehicle sales in 2008.

## Arbitration and Reinstatement Offers

Following the GM and Chrysler dealership closure announcements, Members of Congress held hearings in the House and Senate at which auto manufacturing executives and auto dealers testified. According to an August 2009 Congressional Research Service ("CRS") report, "...some Members of Congress were sympathetic to the concerns of the dealers, citing instances in their districts and states where long-standing dealers had been notified of termination." During the summer of 2009, several legislative proposals were introduced which sought to reinstate dealerships terminated by GM and Chrysler. One amendment to the Government Appropriations Act, 2010 (H.R. 3170) offered by Representative Steven C. LaTourette required reinstatement of the terminated dealerships because "the closing of these dealerships was punitive and secretive." Ultimately, on December 8, 2009, House Majority Leader Steny Hoyer and Assistant Senate Majority Leader Dick Durbin announced compromise legislative language requiring binding arbitration to address the "ongoing dispute between GM, Chrysler, and dealerships that were closed during the companies' restructuring." The compromise language was included in the Consolidated Appropriations Act, 2010.

On December 16, 2009, President Obama signed the Consolidated Appropriations Act, 2010, into law (Public Law No. 111-117). Under the act, affected dealerships had to file for arbitration by January 25, 2010. According to data provided by the auto companies, 1,169 GM dealerships and 418 Chrysler dealerships filed for arbitration. The law requires cases to be submitted to the arbitrators by June 15, 2010, but allows arbitrators to extend this deadline by 30 days if necessary. The deadline has now been extended to July 15, 2010.

In March 2010, both GM and Chrysler decided to offer reinstatement to a limited number of dealerships that filed for arbitration. Officials from both GM and Chrysler told SIGTARP that the decision to offer reinstatement to some dealerships was in response to the legislation and the realization that it would not be a prudent use of company resources to go through arbitration with every dealership that filed. Furthermore, the companies' officials expressed doubt that all the arbitration cases could be completed by the deadline of June 15, 2010. On March 5, 2010, GM announced that it would be sending Letters of Intent ("LOI") offering reinstatement to 666 dealers that filed reinstatement claims, including to 216 complete wind-down dealerships and 450 partial wind-downs,[26] as shown in Table 5. GM officials said they did not believe that the reinstatements will negatively affect the dealership network, stating that economic conditions are better now than they had anticipated at this time last year and that they have a "sense they can support the new network." Ultimately officials stated that they did not believe the reinstatements would be detrimental to the network.

---

[26] GM offered LOIs to 148 dealerships that had been identified in phase one and to 68 dealerships that had been identified in phase two.

**Table 5—GM Letters of Intent Offered to Dealers**

| Type of Wind-Down | Metro | Hub | Rural | Total |
|---|---|---|---|---|
| Complete | 41 | 54 | 121 | 216 |
| Partial | 34 | 220 | 196 | 450 |
| Total | 75 | 274 | 317 | 666 |

Source: SIGTARP analysis of GM data

GM officials stated that dealerships receiving LOIs were selected based on the dealership's RSI, CSI, and the geographical impact on existing dealerships. The Letter of Intent allows a dealership to be reinstated after complying with its terms, which require the dealership to meet capitalization requirements, secure wholesale floor plan financing within 60 days and, if a non-GM brand was added after receipt of the wind-down agreement, the dealership must remove that brand.

On March 26, 2010, Chrysler announced that it would offer LOIs to 50 of the 789 dealerships that had been terminated. According to Chrysler, 46 of these dealerships were in rural markets; the other four were in metro and secondary markets. Chrysler officials stated that dealerships that were provided LOIs were in areas where no other dealership could protest the addition of other Chrysler brands, and were not likely to harm sales in the remaining network.

# Dealership Termination Decisions Were Not Based on GM's and Chrysler's Cost Savings Estimates

*This section discusses the cost savings that the auto companies estimated would result from terminating auto dealerships.*

GM reported that dealership terminations could yield cost savings of $2.6 billion (about $1.1 million per closed dealership); Chrysler expected to save $35.8 million ($45,501 per closed dealership). GM's estimate was significantly higher than Chrysler's because it included anticipated savings from reduced incentive payments to dealerships, which Chrysler did not include in its estimate. However, GM and Chrysler officials, along with Auto Team officials, emphasized that these estimates were not considered in their decisions to terminate dealerships, but were developed in response to congressional inquiries and in preparation for congressional testimony in June 2009, *i. e.*, after the terminations.

Indeed, key members of the Auto Team — including Messrs. Rattner and Bloom — stated that they did not consider cost savings to be a factor in determining the need for dealership closures. Nevertheless, GM officials stated that they developed the cost-savings estimate shown in Table 6 after being "pressed" during meetings with congressional representatives to explain the cost savings that would result from the dealership terminations. A Chrysler official said that the cost savings estimates had been originally developed in 2006 and 2007, before the issue of dealership terminations arose, and were updated based on SIGTARP's request. GM officials reiterated that the plan to reduce dealerships was based on making the remaining dealership network more profitable by increasing their sales volume. In fact, when asked by SIGTARP what GM will save by closing any particular dealership, one GM official stated the answer is usually "not one damn cent."

Furthermore, a GM official stated that removing a dealership from the network does not save money for GM—it might even cost GM money—and that savings cannot be attributed or assigned to any one dealership. According to one GM official, it was a "math exercise" to assign a savings amount to one dealership; it was difficult to estimate savings for a particular dealership because the savings are expected to be achieved when the entire dealership network plan is accomplished. GM's Dealer Network and Investments team said the cost savings estimate was their effort to quantify savings in response to the negative reaction to GM's plan to terminate dealerships and to the congressional "drumbeat" of statements that "this is a bad plan."

## Estimated Cost Savings

GM's and Chrysler's estimated savings can be grouped into two categories: incentive savings and structural or administrative savings, as shown in Table 6.

**Table 6—GM and Chrysler Estimated Cost Savings from Dealership Closures**

| Category of Savings Estimate | GM[a] | | Chrysler[b] | |
| --- | --- | --- | --- | --- |
| | Per dealership | Total | Per dealership | Total |
| Incentive Savings | 928,000 | 2,150,000,000 | 0 | 0 |
| Structural/Administrative Savings | 180,000 | 415,000,000 | 45,501 | 35,900,289 |
| Total Savings | | $2,565,000,000 | | $35,900,289 |
| Savings Per Dealership | | $1,108,000 | | $45,500 |

[a] GM's total is based on a reduction of 2,300 dealerships
[b] Chrysler's total is based on a reduction of 789 dealerships
Source: SIGTARP analysis of data provided by GM and Chrysler

GM's savings estimate is significantly higher because it includes $2.1 billion in anticipated incentive payment reductions that it currently pays to dealerships. GM's incentive savings are based on the assumption that once excess dealerships have been eliminated, sales and profitability for remaining dealerships will increase. GM believed that as dealership profitability improved, it would be able to reduce the incentives to dealerships to sell new vehicles. GM's savings estimates are also based on two other assumptions — that GM's new vehicle sales will increase from the current level of 1.5 million per year to 3.1 million by 2014, and that GM will eliminate about 800 additional dealerships through normal attrition and consolidations during the same time period.

Approximately 80 percent of GM's estimated total savings are classified as reductions in the anticipated incentive payments that it currently makes to dealerships. The total estimated savings include:

- $810 million by reducing the dealership discount on vehicles GM sells to its dealerships

- $380 million by lowering other incentives paid directly to dealerships (for example, GM anticipates that significantly lower dealership inventory levels in 2010 will reduce the need to use incentives to encourage dealerships to reduce their vehicle inventory)

- $350 million by reducing payments for Standards for Excellence, a program that provides payments to dealerships if they meet certain criteria, such as selling more new vehicles in the current year than in the comparable period of the prior year

- $350 million by reducing the incentive that GM currently pays dealerships to inspect vehicles when they are delivered from the manufacturer (GM plans to reduce the current payment to 15-20 percent)

- $140 million by reducing current levels of wholesale floor plan support, which provides a payment to dealerships to help them manage the cost of financing daily operations and purchasing new vehicle inventory

- $120 million by reducing reimbursement to dealerships by 15 to 20 percent for a full tank of gas for each new vehicle sold

Chrysler did not include incentive savings in its estimate. One Chrysler official noted that Chrysler did not project any incentive savings, and further stated it would be difficult to isolate savings derived from reduced incentives in a market where various dynamics can influence vehicle sales and the incentives that an auto manufacturer must offer.

GM and Chrysler also projected administrative savings from reducing the number of dealerships, as shown in Table 7.

## Table 7—Estimated Structural/Administrative Cost Savings

| Category of Savings Estimate | GM[a] | | Chrysler[b] | |
|---|---|---|---|---|
| | Per dealership | Total | Per dealership | Total |
| Local Advertising | 86,957 | 200,000,000 | 0 | 0 |
| Dealer Channel Network Alignment | 54,347 | 125,000,000 | 0 | 0 |
| Sales and Service Consultants/Field Staff | 17,391 | 40,000,000 | 3,802 | 3,000,000 |
| Dealer Website/IT Expenses | 17,391 | 40,000,000 | 4,183 | 3,300,000 |
| Training | 4,348 | 10,000,000 | 6,337 | 5,000,000 |
| Corporate Administration | 0 | 0 | 18,504 | 14,600,000 |
| Transportation | 0 | 0 | 10,139 | 8,000,000 |
| Other | 0 | 0 | 2,535 | 2,000,000 |
| Total Savings | | $415,000,000 | | $35,900,000 |
| Savings Per Dealership | | $180,434 | | $45,500 |

[a] GM's total is based on a reduction of 2,300 dealerships
[b] Chrysler's total is based on a reduction of 789 dealerships
Source: SIGTARP analysis of data provided by GM and Chrysler

GM's administrative savings estimate was higher primarily because it included savings from local advertising assistance and expenses associated with wind-down compensation provided to dealerships, which were not included in Chrysler's estimate. For example, GM estimated it would save $200 million in local advertising assistance, a dealer assistance program that GM intends to reduce over time when all of its planned wind-downs are completed. GM also estimated $125 million in savings for Dealer Channel Network Alignment, which refers to GM's historical expenses incurred to date to close dealerships, which will not be required at the same level once the wind-down process is complete.

Chrysler's largest cost savings estimate was $14.6 million in a reduction in administrative expenses from a smaller dealership network. Chrysler also anticipated that a smaller network would allow them to decrease training expenses, and that fewer delivery points for its parts distribution centers would reduce transportation expenses.

# Conclusions and Lessons Learned

In response to the Treasury Auto Team's rejection of GM's and Chrysler's restructuring plans and its explicit comment that GM's "pace" of dealership closings was too slow and an obstacle to its viability, GM and Chrysler substantially accelerated their dealership termination timetables. In GM's case, instead of gradually reducing its network by approximately 300 dealerships per year through 2014, as GM had proposed in the plan initially submitted to Treasury, GM responded to the Auto Team's decision by terminating 1,454 dealerships' ability to acquire new GM vehicles and giving them until October 2010 to wind down operations completely; for Chrysler (which also had originally planned to terminate dealers over five years), its acceleration was even more abrupt, with Chrysler terminating 789 dealerships (25 percent of its network) within 22 days.

The Auto Team's view about the need for GM and Chrysler to reduce their dealership networks and do so rapidly was based on a theory that, with fewer dealerships (and thus less internecine competition), like their foreign competitors, the remaining dealerships would be more profitable (through more sales volume and less floor plan financing costs) and thus would permit the dealerships to invest more in their facilities and staff. For GM and Chrysler, the theory goes, this would mean better brand equity (*i.e.*, better consumer perception through more attractive facilities and better customer service) and would allow the manufacturers over time to decrease their substantial dealership incentives. In addition, the Auto Team felt the companies' best chance of success required "utilizing the bankruptcy code in a quick and surgical way" and noted further that it would have been a "waste of taxpayer resources" for the auto manufacturers to exit bankruptcy when they knew the networks would still have to be reduced. The Auto Team was so convinced of the need for the acceleration of dealership closings that it highlighted GM's proposed pace of dealership closings (approximately 300 a year over five years) as one of the primary obstacles to its continued viability, and required GM to revise its proposal to address the Auto Team's concerns as a condition for receiving the additional TARP support that GM believed it needed to survive. Not surprisingly, GM's and Chrysler's plans for accelerated terminations soon followed.

Perhaps only time will tell whether and to what extent the Auto Team's theory proves valid; however, there are several aspects of the theory and how the Auto Team came to have this view about dealership reductions that are worth noting.

- One, although there was broad consensus that GM and Chrysler generally needed to decrease the number of their dealerships, there was disagreement over where, and *how quickly*, the cuts should have been made. Some experts that SIGTARP spoke to in connection with this audit questioned whether it was appropriate to apply the foreign model to the U.S. automakers, particularly in small markets in which the U.S. companies currently have a competitive advantage, a concern apparently not substantially considered by the Auto Team when they adopted this theory. The conclusion that the manufacturers should close dealerships more rapidly than originally planned was also criticized as being potentially counterproductive; one expert opined, for example, that closing dealerships in an environment already disrupted by the recession could result in

an even greater crisis in sales. Chrysler officials similarly told SIGTARP that closing dealerships too quickly would have an adverse effect on sales from which it would take several years to recover, and, even then, only if new markets were penetrated by opening new dealerships. The fact that, after the mandatory arbitration legislation was passed, GM offered to reinstate 666 dealerships[27] and Chrysler offered to reinstate 50 dealerships with a senior GM official stating that the final number of dealerships won't damage GM's ability to recover or grow the company, suggests, at the very least, that the number and speed of the terminations was not necessarily critical to the manufacturers' viability. It is worth noting that GM's top rival among U.S. automakers, Ford Motor Company, which is also carrying out plans to "aggressively restructure to operate profitably," is closing dealerships at a rate similar to that in GM's original restructuring plan which was rejected by Treasury.[28]

- Two, job losses at terminated dealerships were apparently not a substantial factor in the Auto Team's consideration of the dealership termination issue. Although there is some controversy over how many jobs will be lost per terminated dealership (the National Automobile Dealer Association's estimate of approximately 50 per dealership is challenged by the manufacturers as too high), it is clear that tens of thousands of dealership jobs were immediately put in jeopardy as a result of the terminations by GM and Chrysler. In the face of the worst unemployment crisis in a generation and during the same period in which the Government was spending hundreds of billions of dollars on a stimulus package to spur job growth, the Auto Team rejected GM's original plan (which included gradual dealership terminations), expressly indicated that GM's pace of terminations was too slow, and then encouraged the companies' use of bankruptcy to accelerate dealership terminations. These decisions — all based on the Auto Team's theory that GM and Chrysler would be better off by accelerating dealer terminations — contributed to the accelerated loss of potentially tens of thousands of jobs. Although the restructuring of GM and Chrysler inevitably required an overall reduction in their own workforces (and the termination of a certain number of poorly performing dealerships), it is not at all clear that the greatly accelerated pace of the dealership closings during one of the most severe economic downturns in our Nation's history was either necessary for the sake of the companies' economic survival or prudent for the sake of the Nation's economic recovery.

- Finally, the acceleration of dealership closings was not done with any explicit cost savings to the manufacturers in mind. Again, the anticipated benefits to GM and Chrysler from a smaller dealership network were far more amorphous — a better "brand

---

[27] Of these 666 dealerships, 216 were complete wind-downs, and 415 were partial wind-downs.

[28] According to Ford's 2009 annual report, concentrating efforts in its largest 130 metropolitan market areas, Ford closed an average of 200 Ford, Lincoln, and Mercury dealerships per year in calendar 2006, 2007, and 2008, and another 250 in calendar 2009, leaving a total of 3,550 dealerships at the beginning of 2010. Ford has a goal of an average of 1,500 vehicle sales per year for Ford dealerships and 600 per year for Lincoln Mercury dealerships. By focusing on closing dealerships located in metropolitan areas, Ford reflected its philosophy that "our dealers are a source of strength...especially in rural areas and small towns where they represent the face of Ford." This echoed comments industry experts made to SIGTARP advising that GM and Chrysler had less need to reduce the number of rural dealerships and instead should focus on closing dealerships in metropolitan areas.

equity" and the potential ability to decrease dealership incentives over time. GM prepared its cost savings estimate only at the request of Congress and only after the decisions to accelerate terminations had already been made. Chrysler provided Congress with estimated cost savings that had been developed three years prior. The disparity in the companies' cost-savings estimates are telling. Chrysler estimated a savings of only $45,500 per terminated dealership. GM, however, estimated cost savings of $1.1 million per terminated dealership. The difference in these estimates alone casts doubt on their credibility. Moreover, despite the fact that Treasury rejected GM's even less optimistic assumptions about their market share and profitability in its Viability Determination, GM's estimate was based on a projection that GM's sales would *double* by 2014. GM acknowledged that its cost savings (assuming the decreases in incentives could be realized) could only be calculated across its entire network and could not be calculated for a single particular closed dealership. Indeed, one GM official emphasized this point by telling SIGTARP that GM would usually save "not one damn cent" by closing any particular dealership.

Once the decisions to accelerate the dealership terminations were made, Chrysler decided which dealerships to terminate based on case-by-case, market-by-market determinations that examined whether the dealership's location was a desirable one, whether it offered all three of Chrysler's brands, the dealership's volume of new vehicle sales, and the dealership's score for Minimum Sales Responsibility, a ratio based on actual sales versus vehicle registrations broken down by market share and market segment. Chrysler did not offer an appeals process. Perhaps not surprisingly in light of the case-by-case nature of the process, SIGTARP did not identify any instances in which Chrysler's termination decision varied from its stated, albeit subjective selection criteria.

GM's approach, which was conducted in two phases, was purportedly more objective. In the first phase, GM claimed that the dealerships subject to termination were those meeting at least one of these criteria: a Dealer Performance Summary ("DPS") Score (a score based on a dealership's sales, customer satisfaction, capitalization and profitability) of less than 70; or annual sales of fewer than 50 new vehicles in 2008. In the second phase, GM stated that dealerships subject to termination were those meeting at least one of these criteria: those with a DPS of 80 or less; those that were unprofitable in 2006, 2007 and 2008; those with a retail sales index (a ratio of actual sales to expected sales based on a market average) below 70; those with non-GM brands in the same facility and a DPS of less than 100; or those interfering with GM's Buick-GMC Truck or Cadillac dealership network restructuring plans.

However, SIGTARP's review demonstrates that GM did not consistently follow its stated criteria. In the first phase, for example, two of the terminated dealerships did not fit into either termination category, and GM retained 364 dealerships that potentially qualified for termination. In phase two, GM terminated 39 dealerships that did not meet any of the objective criteria and retained more than 1,062 dealerships that met one or more criteria for termination. Just as troubling, there was little or no documentation of the decision-making process to terminate or retain dealerships with similar profiles, making it impossible in many cases for SIGTARP to determine the causes of deviations from the supposedly objective criteria. Similarly, although GM did have an appeals process and granted 64 reversals in cases of dealerships that would have

been completely wound down, it failed to set the criteria or process for appeals or to document its reasoning for granting or denying appeals.

## Lessons Learned

Although the auto dealership termination process is beginning to come to a close, several of the lessons from the process should be considered in the event Treasury once again is compelled to make decisions that directly affect the businesses in which it has invested. Although perhaps it is inevitable that public ownership of private companies will have the effect of blurring the Government's appropriate role, the fact that Treasury is acting in part as an investor in GM and Chrysler does not insulate Treasury from its responsibility to the broader economy. In particular, Treasury should have taken special care given that its determinations had the potential to lead to job losses, particularly given that one goal of the loan agreements was to "preserve and promote jobs of American workers employed directly by the automakers and subsidiaries and in related industries."

Here, before the Auto Team rejected GM's original, more gradual termination plan as an obstacle to its continued viability and then encouraged the companies to accelerate their planned dealership closures in order to take advantage of bankruptcy proceedings, Treasury (a) should have taken every reasonable step to ensure that accelerating the dealership terminations was truly necessary for the long-term viability of the companies and (b) should have at least considered whether the benefits to the companies from the accelerated terminations outweighed the costs to the economy that would result from potentially tens of thousands of accelerated job losses. The record is not at all clear that Treasury did either. The anticipated benefits to the companies of accelerated terminations were based almost entirely on the not-universally-accepted theory that an immediate decrease in dealerships would make them similar to their foreign competitors and therefore improve the companies' profitability, and the theory arguably did not take into account some of the unique circumstances of the domestic companies' dealership networks. Although Treasury consulted with several experts on the subject, it undertook no market studies to test the counterintuitive theory until after making its Viability Determination. More importantly, there was no effort even to quantify the number of job losses that the Auto Team's decision would contribute to until after the decision was made, and the effect on the broader economy caused by accelerated dealership terminations similarly was not sufficiently considered.

Stated another way, at a time when the country was experiencing the worst economic downturn in generations and the Government was asking its taxpayers to support a $787 billion stimulus package designed primarily to preserve jobs, Treasury made a series of decisions that may have substantially contributed to the accelerated shuttering of thousands of small businesses and thereby potentially adding tens of thousands of workers to the already lengthy unemployment rolls — all based on a theory and without sufficient consideration of the decisions' broader economic impact. That the automakers have offered reinstatement to hundreds of terminated dealerships in response to Congressional action without any apparent sacrifice to their ongoing viability further demonstrates the possibility that such dramatic and accelerated dealership closings may not have been necessary and underscores the need for Treasury to tread very carefully when considering such decisions in the future.

Furthermore, although it was certainly understandable for Treasury to defer to the automakers' management in selecting the criteria for closing dealerships, its decision not to monitor the process that they employed is far more questionable. In the absence of effective oversight, GM purportedly employed objective criteria but then deviated from such criteria, making termination decisions with little or no transparency and making a review of many of these decisions impossible; Chrysler's process did not even include an opportunity for dealerships to appeal the termination decision. In the future, to the extent that Treasury takes action with respect to a TARP recipient that has the potential to affect so many jobs in so many different communities, Treasury should monitor the recipients' actions to ensure that they are carried out in a fair and transparent manner.

# Management Comments and Audit Response

Treasury responded preliminarily to a draft of this audit by letter dated July 16, 2010, which is reproduced in Appendix D. In its response, Treasury states that it "strongly disagree[s] with many of your statements, your conclusions and the lessons learned." Treasury notes in particular, among other things, that "[i]n the absence of government assistance, both GM and Chrysler faced almost certain failure and liquidation, which would have resulted in the loss of hundreds of thousands of jobs across multiple industries," and that "the outcome under the restructuring plans is far better than the likely alternatives had the Administration not stood behind the companies." Treasury goes on to say that it will continue to review the report and may respond more fully at a later date.

SIGTARP looks forward to Treasury's more complete response to the audit. It is important to note that Treasury was provided an opportunity to review a discussion draft of the report and provide comments. Treasury did so, changes were made to the report as appropriate, and, at the end of that process, Treasury offered no material factual objections with that draft audit report. Treasury might not agree with how the audit's conclusions portray the Auto Team's decision making or with the lessons that SIGTARP has drawn from those facts, but it should be made clear that Treasury has not challenged the essential underlying facts upon which those conclusions are based.

More importantly, SIGTARP does not dispute that Government assistance was necessary to prevent the failure of GM and Chrysler, and nothing in the audit suggests otherwise. Treasury's letter seems to imply that Treasury was faced with the decision either to encourage the acceleration of dealership terminations substantially, as it did, or let the companies fail altogether. This is a false dilemma with no factual support: no one from Treasury, the manufacturers or from anywhere else indicated that implementing a smaller or more gradual dealership termination plan would have resulted in the cataclysmic scenario spelled out in Treasury's response; indeed, when asked explicitly whether the Auto Team could have left the dealerships out of the restructurings, Mr. Bloom, the current head of the Auto Team, confirmed that the Auto Team "could have left any one component [of the restructuring plan] alone," but that doing so would have been inconsistent with the President's mandate for "shared sacrifice," That the scale of terminations was not vital to the companies' survival has since been further demonstrated by the fact that the companies have offered reinstatement to hundreds of dealerships without concerns that such reinstatements will threaten their viability.
In any event, Treasury's criticism does not address SIGTARP's lessons learned — that Treasury (a) should have taken every reasonable step to ensure that accelerating the dealership terminations was truly necessary for the long-term viability of the companies and (b) should have sufficiently considered whether the benefits to the companies from the accelerated terminations outweighed the costs to the economy that would result from potentially tens of thousands of accelerated job losses in the midst of the greatest recession in generations.

# Appendix A—Scope and Methodology

We performed the audit under the authority of Public Law 110-343, as amended, which also incorporates the duties and responsibilities of inspectors general under the Inspector General Act of 1978, as amended. It was completed from July 2009 to July 2010 (Project No. 012). These were the audit's specific objectives:

1) Determine the role of the Treasury Auto Team in the decision to reduce dealership networks.
2) Determine the extent to which GM and Chrysler developed and documented processes for deciding which dealerships to terminate and which to retain.
3) Determine to what extent the dealership reductions are expected to lead to cost savings for GM and Chrysler.

We performed work at the Department of the Treasury in Washington, D.C. We also performed field interviews in New York, Michigan, and Virginia. The scope of this audit covered GM's and Chrysler's entire dealer networks—both terminated and retained populations.

To determine the role of the Auto Team in the decision to reduce dealerships, we interviewed members of the Auto Team, reviewed available documentation, and interviewed officials from GM and Chrysler. We also interviewed industry experts who were consulted by the Auto Team.

To determine the extent to which GM and Chrysler developed and appropriately documented consistent processes for deciding which dealerships to retain or terminate, we interviewed auto dealers and officials involved in the decision-making processes at GM and Chrysler. We analyzed the criteria and data used by both companies to make their decisions, and we determined whether or not dealerships met the criteria for termination or retention. We also analyzed a judgmental sample of GM retained and terminated dealerships and reviewed their Dealer Performance Summary scores, including the retail sales, customer satisfaction, and supporting financial data, including profitability and net working capital. For Chrysler, we analyzed a judgmental sample of retained and terminated dealerships and reviewed their sales performance, brand offering, and financial information (profitability and working capital). For Chrysler, we also selected markets across the United States and reviewed the decision-making process for each dealership in each market, with a specific focus on understanding the geographic/Project Genesis factor. Regarding GM's appeals process, we reviewed emails and appeals for the 86 reversals, along with general appeals emails.

To determine the extent to which the reductions would lead to cost savings for the auto manufacturers, we interviewed GM and Chrysler officials, auto industry analysts, and automobile dealers, and we reviewed any analyzed cost savings estimates provided by GM and Chrysler.

This performance audit was performed in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions

based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Limitations on Data

GM did not document the meetings during which decisions were made about dealerships in their networks. GM did not document the rationale for granting or denying appeal requests from dealerships. Chrysler did not document meetings held to determine dealership closures. The Auto Team did not document some of the meetings it held with auto industry analysts.

## Use of Computer-Processed Data

This audit did not use computer-processed data.

## Internal Controls

This audit did not address internal controls.

## Prior Coverage

No audits have been performed on dealership terminations with the same or similar objectives as this audit.

# Appendix B—Acronyms and Definitions

| Acronym | Definition |
|---|---|
| AIFP | Automotive Industry Financing Program |
| Auto Team | Treasury Auto Team |
| BCG | Boston Consulting Group |
| BMW | Bavarian Motor Works |
| CEO | Chief Executive Officer |
| CSI | Customer Satisfaction Index |
| DPS | Dealer Performance Summary |
| GM/GMC | General Motors/General Motors Company |
| LOI | Letter of Intent |
| MSR | Minimum Sales Responsibility |
| NADA | National Automobile Dealers Association |
| RSI | Retail Sales Index |
| SAAR | Seasonally Adjusted Annual Rate |
| SIGTARP | Special Inspector General for the Troubled Asset Relief Program |
| Task Force | Presidential Task Force on the Auto Industry |

# Appendix C—Audit Team Members

This report was prepared and the review was conducted under the direction of Kurt Hyde,
Director of Audits, Office of the Special Inspector General for the Troubled Asset Relief
Program. The staff members who conducted the audit and contributed to the report include:
Michael Kennedy, Shannon Williams, Leah DeWolf, and Sarah Reed.

# Appendix D—Management Comments



ASSISTANT SECRETARY

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

July 16, 2010

Neil M. Barofsky
Special Inspector General
Office of the Special Inspector General for the Troubled Asset Relief Program
1500 Pennsylvania Ave., NW, Suite 1064
Washington, D.C. 20220

    RE: SIGTARP Official Draft Audit Report

Dear Mr. Barofsky:

Thank you for providing the U.S. Department of the Treasury (Treasury) with a copy of your official draft audit report regarding the factors affecting the decisions of General Motors and Chrysler to reduce their dealership networks.

While we have conducted only a preliminary review of the report at this time, we strongly disagree with many of your statements, your conclusions, and the lessons learned. In the absence of government assistance, both GM and Chrysler faced almost certain failure and liquidation, which would have resulted in the loss of hundreds of thousands of American jobs across multiple industries. Instead, both companies worked with their stakeholders and underwent fair, open, and successful bankruptcies.

Today, both GM and Chrysler have emerged as stronger global companies. Of course, this process was not easy. It required deep and painful sacrifices from all stakeholders—including workers, retirees, suppliers, dealers, creditors, and the countless communities that rely on a vibrant American auto industry. Nonetheless, the outcome under the restructuring plans is far better than the likely alternatives had the Administration not stood behind the companies. The Administration's actions not only avoided a potentially catastrophic collapse and brought needed stability to the entire auto industry, but they also saved hundreds of thousands of American jobs and gave GM and Chrysler a chance to reemerge as viable, competitive American businesses.

Thank you again for the opportunity to review your report. We will continue to review it in detail and may respond more fully to your findings at a later date.

We look forward to continuing to work with you and your team as we continue our efforts to stabilize our financial system.

    Sincerely,

    Herbert M. Allison, Jr.
    Assistant Secretary for Financial Stability

# Appendix E—Additional Tables

### Table 8—GM and Chrysler Distribution of Dealership Networks Before and After Terminations

| Market Description | Dealer Count Before Terminations | | Number of Terminated Dealers | | Dealer Count After Terminations | |
|---|---|---|---|---|---|---|
| | GM | Chrysler | GM | Chrysler | GM | Chrysler |
| Metro | 1,671 | 869 | 465 | 275 | 1,206 | 594 |
| "Hubtown"[a]/Secondary | 1,330 | 619 | 275 | 190 | 1,055 | 429 |
| Rural | 2,590 | 1,446 | 714 | 263 | 1,876 | 1,183 |
| Non-Designated[b] (Chrysler Only) | N/A | 247 | N/A | 61 | N/A | 186 |
| Totals | 5,591 | 3,181 | 1,454 | 789 | 4,137 | 2,392 |

[a] Term used by GM to describe a mid-size market that is growing and attracts consumers from surrounding areas
[b] A non-designated market has been determined to be unable to support a full-line dealer in the future. A dealer in a non-designated market is allowed to stay until it voluntarily terminates, or its performance warrants taking action
Source: SIGTARP analysis of data provided by GM and Chrysler

### Table 9—Status of GM Wind-Down Dealership Funds as of 12/01/2009[a]

| | Total Amount | 25% Payment | 75% Payment |
|---|---|---|---|
| Total Amount[b] | $587,060,628.00 | $146,765,157.00 | $440,295,471.00 |
| Amount Paid | $159,306,755.50 | $143,225,733.25 | $16,081,022.25 |
| Amount Owed | $427,753,872.50 | $3,539,423.75[c] | $424,214,448.75 |

[a] This data pertains to 2,520 partial wind down dealerships and 1,840 complete wind down dealerships, and does not include dealerships that were rejected in bankruptcy
[b] 2,470,640 of the total amount is under dealership eligibility review
[c] 25 percent payment amount owed figure includes approximate 25 percent for Hummer
Source: SIGTARP analysis of data provided by GM

**Table 10—Summary of Dealership Sales Statistics for 13 Chrysler Markets Reviewed by SIGTARP**

| Market | Status | Average Minimum Sales Responsibility (MSR) | New Vehicle Sales (units) | Percent of Total Sales (Retained and Terminated) |
|---|---|---|---|---|
| 1 | Retained | 129% | 3840 | 82% |
|   | Terminated | 58% | 855 | 18% |
| 2 | Retained | 110% | 5,235 | 69% |
|   | Terminated | 104% | 2,302 | 31% |
| 3 | Retained | 139% | 2,420 | 79% |
|   | Terminated | 89% | 663 | 21% |
| 4 | Retained | 71% | 3,043 | 59% |
|   | Terminated | 79% | 2,151 | 41% |
| 5 | Retained | 108% | 1,011 | 92% |
|   | Terminated | 21% | 93 | 8% |
| 6 | | All dealerships were below average and terminated; new appointment selected | | |
| 7 | Retained | 223% | 1,435 | 67% |
|   | Terminated | 160% | 717 | 33% |
| 8 | Retained | 122% | 4,435 | 68% |
|   | Terminated | 80% | 2,113 | 32% |
| 9 | | All dealerships were below average and terminated; new appointment selected | | |
| 10 | Retained | 150% | 5,042 | 65% |
|   | Terminated | 70% | 2,764 | 35% |
| 11 | Retained | 85% | 3,020 | 79% |
|   | Terminated | 47% | 827 | 21% |
| 12 | Retained | 78% | 6,451 | 79% |
|   | Terminated | 68% | 1,673 | 21% |
| 13 | Retained | 135% | 46,562 | 74% |
|   | Terminated | 103% | 16,044 | 26% |

# SIGTARP Hotline

If you are aware of fraud, waste, abuse, mismanagement, or misrepresentations associated with the Troubled Asset Relief Program, please contact the SIGTARP Hotline.

*By Online Form:* www.SIGTARP.gov          *By Phone:* Call toll free: (877) SIG-2009

*By Fax:* (202) 622-4559

*By Mail:*          **Hotline: Office of the Special Inspector General
for the Troubled Asset Relief Program**
1801 L Street., NW, 4th Floor
Washington, D.C. 20220

# Press Inquiries

If you have any inquiries, please contact our Press Office:

Kristine Belisle
Director of Communications
Kris.Belisle@do.treas.gov
202-927-8940

# Legislative Affairs

For congressional inquiries, please contact our Legislative Affairs Office:

Lori Hayman
Legislative Affairs
Lori.Hayman@do.treas.gov
202-927-8941

# Obtaining Copies of Testimony and Reports

To obtain copies of testimony and reports, please log on to our website at www.sigtarp.gov.

