*Black v. PBGC*
No. 2:09-cv-13616-AJT-MKM

Renewed Mot. Dis. Def. U.S. Dep't Treas., Pres. Task Force on Auto Indus., Timothy F. Geithner, Steven L. Rattner, Ron A. Bloom

Ex. Y

**MORRISON COHEN LLP**
909 Third Avenue
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan
Michael R. Dal Lago

**Hearing Date: July 23, 2009 at 10:00 a.m.**
**Objection Deadline: July 15, 2009 at 4:00p.m.**

**MILLER & CHEVALIER CHARTERED**
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C.  20005
(202) 626-5800
Anthony F. Shelley (pro hac vice admission pending)
Timothy P. O'Toole (pro hac vice admission pending)

*Attorneys for the Objectors Dennis Black, Charles Cunningham, and
Delphi Salaried Retiree Association*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                    :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :
                                          :    Case No. 05-44481 (RDD)
                        Debtors.          :
                                          :    (Jointly Administered)
-------------------------------------------------------x

### OBJECTION TO DEBTORS' PROPOSED MODIFICATIONS TO DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED)

Dennis Black and Charles Cunningham, who are participants in the Delphi Retirement Program for Salaried Employees, and the Delphi Salaried Retiree Association ("DSRA"), which is an association of participants in the Delphi Retirement Program for Salaried Employees, hereby submit, through their undersigned counsel Morrison Cohen LLP and Miller & Chevalier Chartered, this Objection to:    *(A) the Supplemental Motion for Order (I) Approving Modifications to Debtors' First Amended Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization; and (B) the Request to Set*

#1787067 v4 \021081 \0001



*Administrative Expense Claims Bar Date and Alternative Sale Hearing Date* ("Modification Motion") and the Debtors' proposed modifications to the First Amended Plan of Reorganization ("Modified Reorganization Plan") of Delphi Corporation, et al., debtors and debtors-in-possession ("Debtors" or, collectively, "Delphi"), dated (as modified) June 1, 2009 ("Proposed Plan Modifications"). Objectors Black, Cunningham, and DSRA (collectively "Salaried Workers" or "Objectors") object to the Proposed Plan Modifications because the Proposed Plan Modifications depend on a termination of the Delphi Retirement Program for Salaried Employees ("Salaried Workers Plan") that is neither assured nor imminent.

## PRELIMINARY STATEMENT

1.     The participants in the Salaried Workers Plan are approximately 15,000 men and women who generally worked over two-thirds (or 25, plus, years) of their careers at General Motors Corporation ("GM") as, among other things, engineers, managers, and clerical workers. They became Delphi salaried employees after Delphi was spun off from GM in 1999. Some of these workers spent as little as a few months as Delphi employees prior to retirement, but of course had had lengthy careers at GM.

2.     The Salaried Workers Plan is underfunded by approximately $2 billion. In its Proposed Plan Modifications, the Debtors state unequivocally that the Salaried Workers Plan "shall be terminated." Modified Reorganization Plan § 7.17(c). More specifically, the Debtors suggest that the Salaried Workers Plan "may be involuntarily terminated by the PBGC." *Id.* at 10. To that end, the Proposed Plan Modifications contain a placeholder for a settlement *agreement* between the Pension Benefit Guaranty Corporation ("PBGC") and Delphi terminating the Salaried Workers Plan. Modified Reorganization Plan § 7.17(c). The Objectors believe that such a termination will likely result in a loss that could reach $300,000 per person during the 25-year life expectancy of most of the individual participants in the Salaried Workers Plan.

3.     The Proposed Plan Modifications, therefore, plainly suggest that termination of the Salaried Workers Plan is both definite and impending.   For at least two reasons, this suggestion is erroneous.

4.     First, the Salaried Workers believe that the Executive Committee of Delphi ("Excom") -- which is currently the plan administrator for the Salaried Workers Plan ("Plan Administrator") and, as such, is the only entity that can act on the Salaried Workers Plan's behalf with respect to procedures for terminating the Salaried Workers Plan -- is laboring under an inherent conflict of interest, and is thus precluded from entering any agreement concerning the Salaried Workers Plan with the PBGC.   As a result of this conflict, the Salaried Workers Plan, acting through its participants, pursuant to § 502(a)(2) of Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), is contemporaneously filing an action in the United States District Court for the Eastern District of Michigan to remove the Excom as the Plan Administrator[1] and, pending resolution of the Complaint in that action, to enjoin the Excom from taking any action with respect to the Salaried Workers Plan's termination, including negotiating with the PBGC. A copy of the Complaint will be filed with this Court as it becomes available.

5.     The Complaint in the action in the Eastern District of Michigan alleges that the Excom has breached its fiduciary duty to represent the interests of the Salaried Workers Plan's participants with undivided loyalty, 29 U.S.C. § 1104(a).   Indeed, at the same time that the Excom in its role as officers of Delphi is attempting to shed Delphi's liabilities in its ongoing Chapter 11 proceedings, which may well include termination of the Salaried Workers Plan, the

---

[1]   Because the Michigan action is an action in equity against directors of a corporation in their separate role as ERISA fiduciaries of the Plan, the automatic stay that protects the Debtors from suit is inapplicable. *See In re Nashville Album Productions, Inc.*, 33 B.R. 123, 124 (M.D. Tenn. 1983) (§ 362 does not prohibit entities from proceeding against officers, directors and/or stockholders of a corporation which has filed a bankruptcy petition. Section 362 only stays actions against the debtor or actions seeking to obtain property of the estate."). Furthermore, suit against a fiduciary under ERISA subjects the fiduciary to personal liability. *See* 29 U.S.C. § 1109(a). *See also In re UAL, Inc.*, 337 B.R. 904, 910 (N.D. Ill. 2006)("[t]he termination proceedings neither invokes a substantive right provided by Title 11 nor, by its nature, could it arise only in the context of a bankruptcy case").

Excom in its role as Plan Administrator owes an unwavering fiduciary duty to the Salaried Workers to act for their exclusive benefit, which may well include *preventing* termination of the Salaried Workers Plan altogether or in the manner and under the conditions Delphi prefers.   In light of this plain and irreconcilable conflict, the Excom must be replaced, the plaintiffs there assert, with a truly independent fiduciary who is concerned only with the rights and interests of the participants.

6.      Second, regardless of who the Salaried Workers Plan's administrator is, there are, under ERISA, a bevy of substantive and procedural requirements that must first be satisfied before a plan is terminated; it cannot simply be decreed by the employer, plan administrator, or the PBGC.   In fact, the termination contemplated by the Modified Reorganization Plan, as explained below, requires a hearing in a federal *district court* and can be granted only if the best interests of the pension plan participants so require.   And although this procedure can be bypassed in the event of an agreement between the Plan Administrator (*i.e.,* Delphi's Excom) and the PBGC, as discussed, the Salaried Workers seek in their Michigan action to remove the Excom as Plan Administrator and replace it with one who is independent and unconflicted.

7.      Given the Salaried Worker's action to replace the Excom as Plan Administrator, and given ERISA's substantive and procedural requirements for a plan's termination, the termination of the Salaried Workers Plan is neither assured nor imminent, and this Court should deny any Proposed Plan Modifications predicated upon a termination of the Salaried Workers Plan.

8.      Finally, as will be shown below, even if the Debtors somehow were attempting to terminate the Salaried Workers Plan in these bankruptcy proceedings, this Court lacks the jurisdiction to do so (absent certain circumstances not presented here).

## RELEVANT BACKGROUND

9.     On October 8 and 14, 2005, the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").[2]

10.     On December 10, 2007, the Bankruptcy Court entered an Order approving the Debtors' Amended Disclosure Statement With Respect To First Amended Joint Plan of Reorganization of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, and the Debtors commenced solicitation of the First Amended Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession. Ultimately, the plan was confirmed by Order, dated January 25, 2008 ("Confirmed Plan").

11.     According to the Debtors, a key component of the necessary exit financing of the Confirmed Plan was an investment agreement that the Debtors entered into with certain investors ("Plan Investors"). On April 4, 2008, Delphi announced that the Plan Investors refused to participate in the closing on the exit financing and, therefore, the Confirmed Plan never went effective.

12.     In its efforts to emerge from bankruptcy, the Debtors are now seeking to modify the Confirmed Plan pursuant to section 1127 of the Bankruptcy Code and to this end, on June 1, 2009, filed the Modification Motion.

13.     A critical component of the Modification Motion is the termination of the Salaried Workers Plan, which, under the Confirmed Plan was to continue unaffected. To effect this termination, the Modification Motion states that the Debtors, GM, the U.S. Treasury, and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims

---

[2] These cases were filed prior to October 17, 2005, the effective date for the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Thus, any references to the Bankruptcy Code herein shall be to the pre-BAPCPA Bankruptcy Code, as applicable.

against the Debtors and members of the Debtors' "controlled group" as defined in the Internal Revenue Code and/or ERISA.  Pursuant to that settlement agreement (which has not been filed) and as set forth in the Modified Reorganization Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion, which will receive the treatment given to holders of General Unsecured Claims, and the PBGC will receive a cash payment in the amount of $30 million. *See* Exhibit 2 to the Modification Motion, the Supplement to the Disclosure Statement.

**OBJECTION TO MODIFICATION**

14.     Among the provisions in Delphi's proposed Modified Reorganization Plan are those purporting to govern the fate of Delphi's various worker pension plans.  With respect to the Salaried Workers Plan, the Modified Reorganization Plan states quite clearly that the Salaried Workers Plan (along with other Delphi plans) "shall be terminated."  Modified Reorganization Plan at § 7.17.  Specifically, Delphi has represented that it "expect[s] that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC."  *Id.* at 10. To that end, the Modified Reorganization Plan contains a placeholder for a settlement agreement between the PBGC, and Delphi.  *See* Modified Reorganization Plan at § 7.17(c).

15.     As explained below, however, ERISA provides plan participants with a host of procedural and substantive protections in any termination proceeding, particularly in termination proceedings under "distress" circumstances – that is, under circumstances where a plan is underfunded and termination will mean that the participants' pensions will inevitably be reduced. In light of these protections, termination of the Salaried Workers Plan cannot be preordained by Delphi, the PBGC, or, with respect, this Court. Most notably, one method of termination -- namely, summary termination through agreement between the Plan Administrator and the PBGC -- presently cannot occur because the Excom (the current Plan Administrator), as a result of its

inherently disqualifying conflict of interest, is being sued by the Salaried Workers for breach of fiduciary duty and may well be replaced.  As a result, this Court, in deciding whether to confirm the Modified Reorganization Plan, should not assume that termination of the Salaried Workers Plan is imminent or inevitable, which dooms the Modified Reorganization Plan.

16.      In the sections that follow, we show:   (1) that the Plan Administrator for the Salaried Workers Plan is laboring under a conflict of interest; (2) that, as a result of this conflict, an action in the Eastern District of Michigan seeks to remove the Plan Administrator; (3) that because of the potential removal of the Plan Administrator, coupled with ERISA's substantive and procedural requirements for plan termination, the termination of the Salaried Workers Plan is neither assured nor imminent; and (4) that, because a necessary element of the Modified Reorganization Plan is a termination that is highly speculative, the Modified Reorganization Plan cannot be approved.

### A.      The Current Plan Administrator Is Laboring under an Inherent Conflict of Interest

17.      Delphi's Excom suffers from an inherent conflict of interest:  On the one hand, it has an obligation to Delphi's shareholders and creditors to ensure that Delphi emerges from its Chapter 11 reorganization, a task that may involve shedding as many of Delphi's liabilities – including pension liabilities – as possible.  On the other hand, as administrator of the Salaried Workers Plan, the Excom has an unwavering fiduciary duty to the Salaried Workers Plan's participants to act for their exclusive benefit, *see* 29 U.S.C. § 1104(a), a duty that entails doing everything in its power to maintain the Salaried Workers Plan or, at the very least, to preserve as many of the rights the participants have in the Salaried Workers Plan as possible. Despite this direct and irreconcilable conflict, the Excom is actively negotiating, or appears ready to actively negotiate, termination of the Salaried Workers Plan in a manner that could leave the Salaried

Workers without any rights or recourse to contest termination, all to the benefit of Delphi's shareholders and creditors.

18.     The Salaried Workers of course recognize that employers may wear "two hats," and thus may properly serve as the administrator of pension plans they sponsor. Indeed, "[w]hen employers wear 'two hats' as employers and administrators, they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Sys. Council Em-3 v. AT&T Corp.*, 972 F. Supp. 21, 30 (D.D.C. 1997). The Salaried Workers are further aware of the fact that, in the typical case, a plan sponsor's decision to terminate a plan is a "settlor function," and, as such, is unconstrained by any fiduciary duties the plan sponsor may owe in its role as plan administrator. *See, e.g., Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007) ("It is well established in this Court's cases that an employer's decision whether to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations."). However, neither the termination contemplated here, nor the role played by the Plan Administrator in that termination, is typical.

19.     The majority of plan terminations occur at the behest of the *plan sponsor* and are subject to the procedural hurdles erected by ERISA § 4041, 29 U.S.C. § 1341. Here, though, the Modified Reorganization Plan envisions a so-called "involuntary termination" under ERISA § 4042, 29 U.S.C. § 1342, which is initiated not by the plan sponsor, but rather by the *PBGC* in a federal district court. Thus, in the context of a § 1342 termination, the "decision whether to terminate an ERISA plan" is not a decision made by the plan sponsor at all, but rather by the PBGC. In short, an employer/plan administrator is plainly not "deciding" whether to terminate the plan, and thus cannot claim to be a "settlor" in connection with such a proceeding.

20.     Rather, both the text of § 1342 and the case law make clear that a plan administrator's role is one of a fiduciary. For example, the district court's sole focus in such a

proceeding is whether involuntary termination is necessary to guard against deterioration of the plan or to protect the interests of its participants. *See* 29 U.S.C. § 1342(c). Hence, an involuntary termination is allowed only where it serves the interests of plan participants, a standard that is plainly anchored in fiduciary concepts.

21.    Moreover, a decision about the extent to which a plan administrator should invoke the full panoply of substantive and procedural protections available in a § 1342 involuntary termination proceeding is plainly a decision about the *method* under which any plan termination should take place. It is black-letter law that a plan administrator's selection of a particular *method of plan termination* is a fiduciary function. *Larson v. Northrop Corp.,* 21 F.3d 1164 (D.C. Cir. 1994) ("Although the decision to terminate a pension plan is generally not subject to the fiduciary responsibility provision of ERISA, the Department of Labor has emphasized that activities undertaken to implement the termination decision are generally fiduciary in nature.") (internal quotation omitted); *Waller v. Blue Cross,* 32 F.3d 1337 (9th Cir. 1994) ("Plaintiffs do not dispute that "the decision to terminate a plan is a business decision and does not constitute a breach of fiduciary obligation. . . . By alleging that Blue Cross breached its fiduciary duty in the selection of annuity providers, plaintiffs attack not the decision to terminate, but rather the implementation of the decision. We believe that this distinction is dispositive and hold that Blue Cross acted in a fiduciary capacity when choosing annuity providers to satisfy plan liabilities.") (internal citations and quotations omitted).

22.    Indeed, selection of the method by which termination will take place is perhaps the most important part of a § 1342 proceeding. The statute contains a host of safeguards a plan administrator can invoke but also permits the plan administrator to negotiate and reach an agreement with the PBGC to completely bypass those protections. In this regard, it is significant that Congress conferred upon the *plan administrator* – not the plan sponsor – this ability to

accede to summary termination procedures, thus making clear that the role of determining whether to agree to summary termination is solely a fiduciary function. Congress would not likely have conferred this summary termination power – which, again, does away with the notice and hearing safeguards that apply to a typical § 1342 termination – if the plan administrator, in deciding whether to reach agreement with the PBGC, was free from any fiduciary obligations to the plan's participants.

23. In sum, because the termination contemplated here is an involuntary termination under 29 U.S.C. § 1342, the Excom's role is that of a fiduciary. Such a role entails unwavering loyalty to the participants in the Salaried Workers Plan. But because of the Excom's countervailing interest, to shareholders and creditors, in shedding Delphi's liabilities and emerging from Chapter 11, the Excom suffers from an inherent conflict of interest that precludes it from faithfully and independently discharging its fiduciary duties to the Salaried Workers. The gravity of this conflict is particularly acute given that Delphi and the PBGC -- if the description of the Modified Reorganization Plan is to be believed -- may currently be in the process of entering into a settlement agreement (the substance of which is not yet known) that may well contain an agreement on summary termination, which would allow Delphi and the PBGC to bypass the district court adjudication process – and its attendant safeguards for plan participants – normally required to effectuate a § 1342 termination.

**B.     The Salaried Workers Contemporaneously Are Filing an Action in Federal District Court to Remove the Excom as Plan Administrator**

24.     In light of the Excom's conflict of interest, the Salaried Workers Plan, acting through its participants, contemporaneously is filing an action in the United States District Court for the Eastern District of Michigan to remove the Excom as the Salaried Workers Plan's administrator. The Complaint alleges that the Excom has breached its fiduciary duty to the Salaried Workers Plan's participants under § 404(a) of ERISA, 29 U.S.C. § 1104(a), in two regards.

25.     First, as a result of its inherent conflict of interest, which substantially hampers the ability of the Plan Administrator to protect the interests of the Salaried Workers Plan's participants in any § 1342 proceedings, the Excom has breached its fiduciary duties by failing to remove itself in favor of an independent, conflict-free trustee who could pursue negotiations with the PBGC concerning the terms and circumstances of the Salaried Workers Plan termination, if any, while looking out only for the best interests of the participants. *See, e.g., Difelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007) ("Under ERISA, plan fiduciaries are assigned a number of detailed duties and responsibilities, which include the proper management, administration and investment of plan assets, the maintenance of proper records, the disclosure of specific information, *and the avoidance of conflicts of interest.*") (emphasis added).  Delphi's Excom is incapable, due to its conflict of interest, of conducting such negotiations in a way that protects the best interests of the participants, and thus should have removed itself in favor of the appointment of an independent trustee.  This, in fact, is precisely what the Excom did when it became apparent that it could not, free of conflict, file claims against Delphi in the bankruptcy; in that instance, it entered a limited agreement to delegate its fiduciary obligation to pursue claims against Delphi to an independent fiduciary (which is Fiduciary Counselors, Inc.).  Upon

realization of its conflict in connection with any plan termination negotiation at issue here, it should have taken an identical course.

26.     Second, despite seemingly having engaged in negotiations with the PBGC with an eye toward effectuating a § 1342 termination, the Excom has failed to inform the Salaried Workers of this significant development, which may well be adverse to the interests of the Salaried Workers. *See, e.g., Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997) ("the duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests"); *Eddy v. Colonial Life Ins. Co. of Am.*, 59 F.3d 201, 209 (D.C. Cir. 1995) ("Eddy I's recognition that a 'well-rooted' fiduciary duty exists under ERISA, and its holding that an ERISA fiduciary must affirmatively convey complete and correct material information . . . even in the absence of a precisely phrased inquiry.")

27.     Although the merits of the Complaint are obviously not before this Court, the Complaint is significant for purposes of this Objection because, as explained in the sections that follow, a plan administrator – particularly an independent one whose loyalties lie solely with the plan's participants – can wield considerable sway in a termination proceeding and can substantially hamper the ability of the PBGC to terminate a plan or can challenge a PBGC termination petition. As a result, the Salaried Workers' action further complicates and calls into doubt any contemplated termination of the Salaried Workers Plan.

C.      **In Light of the Procedural and Substantive Safeguards ERISA Provides to Pension Plan Participants in the Context of a Plan Termination, the Modified Reorganization Plan Erroneously Assumes that Termination Is Assured**

28.     Regardless of who the Salaried Workers Plan's administrator is, terminating a pension plan under ERISA is a complicated process that offers a number of protections to pension plan participants.   For this reason alone, plan termination, contrary to Delphi's representation in its proposed Modified Reorganization Plan, is far from a *fait accompli.*

### 1. **PBGC-Initiated Terminations under 29 U.S.C. § 1342**

29.     Delphi has indicated in its proposed Modified Reorganization Plan that the Salaried Workers Plan will be terminated involuntarily by the PBGC, presumably under 29 U.S.C. § 1342, which is the ERISA section governing involuntary terminations. *See* Modified Reorganization Plan, Preliminary Statement at 9 ("The Debtors expect that the salaried pension and certain subsidiary plans may be involuntarily terminated by the PBGC"). In general, an involuntary termination requires the PBGC to institute termination proceedings in a *district court* that require notice and a hearing before termination can be approved, procedures that hardly guarantee termination. While the PBGC can potentially bypass these procedures by reaching an agreement with the plan administrator and effect what is known as a "summary termination," *see Jones & Laughlin Hourly Pension Plan/PBGC v. LTV Corp.*, 824 F.2d 197 (2d Cir. 1987), the Salaried Workers' Michigan action would prevent the PBGC from doing so without first reaching agreement with a true fiduciary of the participants – *i.e.*, someone who would only have the participants' interests in mind when negotiating over whether and how any distress termination should take place.

>           *a)      An Involuntary Termination Under 29 USC § 1342 Requires
>           the PBGC to File an Action in the District Court that is Subject
>           to Notice and Hearing Safeguards*

30.     The involuntary termination statute, 29 U.S.C. § 1342, provides for an adversarial termination process that offers a number of procedural and substantive protections to pension plan participants. The typical involuntary termination requires the PBGC to file an action in federal *district court* seeking to terminate the plan. In order to avail itself of this option, the PBGC, as a threshold matter, must first determine that one of the following four conditions is satisfied:

- the plan has not met the minimum funding standard required under *section 412 of the Internal Revenue Code of 1986* [*26 USCS § 412*], or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of such Code [*26 USCS § 6212*] has been mailed with respect to the tax imposed under section 4971(a) of such Code [*26 USCS § 4971(a)*],

- the plan will be unable to pay benefits when due,

- the reportable event described in section 4043(c)(7) [*29 USCS § 1343(c)(7)*] has occurred, OR

- the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a).

31.     Importantly, the PBGC may not cavalierly make a § 1342(a) finding and expect it to be honored in court, but rather must develop an administrative record that reflects its careful consideration of the relevant factors. In *Pension Benefit Guaranty Corp. v. Rouge Steel Co.*, 2006 U.S. Dist. LEXIS 2685, at *14 (E.D. Mich. Jan. 10, 2006), for example, the court vacated the PBGC's termination decision and remanded to the agency for further development of the record because "the administrative record [did] not indicate that all relevant factors [had] been considered." As the court explained, "without a fully developed administrative record, the court cannot fully ascertain whether or not it was reasonable for PBGC to anticipate that its liability would be unreasonably increased, as stated in 29 U.S.C.A. § 1342 and as argued by PBGC in support of their motion." *Id.* at *14.

32.     Assuming the PBGC has undertaken a thorough § 1342(a) analysis and determines that termination is appropriate, the PBGC must then notify the plan administrator of its intent to terminate and provide to it a copy of the administrative record.   29 U.S.C. § 1342(c)(1) and (3). This notification typically takes the form of a "Notice of Determination" wherein the PBGC states its justification for its determination decision, how it intends to proceed, and the proposed plan termination date. *See Association of Flight Attendants-CWA,*

*AFL-CIO v. Pension Benefit Guaranty Corp.*, 2006 U.S. Dist. LEXIS 1318, at *13 (D.D.C. Jan. 13, 2006). At this point, either the PBGC or the plan administrator, if determined to be in the best interests of the plan participants, may apply to the "the appropriate United States district court" for the appointment of a plan trustee to administer the plan. *See* 29 U.S.C. § 1342(b).

33.     After having satisfied the statute's notice requirement, and with a trustee in place (if applicable), only then may the PBGC "apply to the appropriate United States *district court* for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c)(1) (emphasis added). The PBGC's application to the district court, however, in no way guarantees termination. First, it is subject to challenge by the plan trustee, *see* 29 U.S.C. § 1342(c)(1) ("If the trustee . . . disagrees with the determination of the [PBGC] [to terminate the plan], he may intervene in the proceeding relating to the decree."), and plan participants likewise are interested parties who have participated in district court proceedings to challenge termination. *See, e.g., Pension Benefit Guaranty Corp. v. United Air Lines, Inc.*, 436 F. Supp. 2d 909 (N.D. Ill. 2006). Second, regardless of whether the trustee mounts a challenge to the PBGC's determination, the court does not simply accord blind deference to the PBGC's termination findings. As the Seventh Circuit has explained, although a court would normally have to defer to agency findings promulgated after notice and comment rulemaking, "the PBGC has not promulgated any rules pertinent to this subject." *In re UAL Corp.*, 468 F.3d 444, 450 (7th Cir. 2006). Rather, in acting under § 1342, "[a]ll the PBGC does is commence litigation, and its position is no more entitled to control than is the view of the Antitrust Division when the Department of Justice files suit under the Sherman Act." *Id.*

34.     In short, an involuntary termination under 29 U.S.C. § 1342 can only be effectuated by a district court (not a bankruptcy court), is rife with procedural hurdles for the PBGC, and can become an even more difficult task if a plan trustee is appointed that challenges the PBGC's termination decision. As explained, the Salaried Workers currently have an action pending in federal district court to remove Delphi's Excom as the Plan Administrator and to replace it with an independent administrator, who would then be in a position to seek the appointment of a plan trustee if and when the PBGC initiates termination proceedings. As such, the Salaried Workers are prepared to make full use of the protections afforded by § 1342, thus throwing the inevitability of the Salaried Workers Plan termination into considerable doubt.

>     **(b)     The PBGC May Bypass the Procedures in § 1342 Only upon Agreement with the Plan Administrator, Whom the Salaried Workers Are Seeking to Replace**

35.     Notwithstanding the notice and hearing safeguards normally required by § 1342, the PBGC may, in a narrow circumstance, terminate a plan under § 1342 outside of a formal district court adjudication and adversarial process. The PBGC can utilize so-called "summary termination" procedures *only if* the PBGC and the plan administrator agree between themselves to terminate the plan, and only if they agree on the appointment of a trustee:

> If the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee *without proceeding in accordance with the requirements of this subsection* (other than this sentence) the trustee shall have the power described in subsection (d)(1) and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties described in subsection (d)(3).

29 U.S.C. § 1342(c)(1) (emphasis added).

36.     An agreement between the PBGC and the plan administrator, therefore, is a necessary predicate to the availability of summary termination. Although Delphi's Excom may well be inclined -- for the expedience of the shareholders and creditors -- to enter into such an

agreement with the PBGC, its willingness is a direct product of its inherent conflict of interest. Indeed, this is precisely the basis for the action to replace the Excom with an independent administrator. If the Excom is ultimately replaced, an agreement between the PBGC and the Salaried Workers Plan's new independent administrator, while possible, may be unlikely or at least is not assured. Hence, the Court cannot assume that the PBGC and the Plan's administrator – whoever it may be – will enter into a summary termination agreement.

### 2.   Plan Administrator-Initiated Terminations under 29 U.S.C. §1341

37.    Although the termination of the Salaried Workers Plan contemplated in the Modified Reorganization Plan is an involuntary, PBGC-initiated termination whose outcome, as explained above, is not preordained, termination would be no more assured in the unlikely event that an alternative termination path is pursued. Most pension plan terminations are initiated not by the PBGC pursuant to § 1342, but rather by the plan administrator under 29 U.S.C. § 1341. These terminations take one of two forms: a "standard termination" under § 1341(b), or a "distress termination" under § 1341(c). Although only a distress termination is even possible under the facts here, both forms offer a number of procedural hurdles that do not guarantee termination.

38.    In the first place, § 1341 imposes a mandatory 60-day notice requirement regardless of whether a "standard" or "distress" termination is pursued. Specifically, the plan administrator – "[n]ot less than 60 days before the proposed termination date" – must provide each "affected party . . . a written notice of intent to terminate stating that such termination is intended and the proposed termination date." 29 U.S.C. § 1341(a)(2). Thus, the very earliest a § 1341 termination can occur is two months after all affected parties have received notice of the administrator's intent to terminate.

39.    Even if the notice requirement was satisfied and even if Delphi's Excom remained as Plan Administrator, a so-called "standard termination" is unlikely to occur for a very simple reason:   in order to effectuate such a termination, the plan must be "sufficient for benefit liabilities (determined as of the termination date)," *see* 29 U.S.C. § 1341(b)(1)(D), a criterion that the Salaried Workers Plan surely cannot satisfy.

40.    A "distress termination," on the other hand, while not precluded under the facts here, is laden with procedural requirements, and likely would result in a § 1342 adjudication proceeding anyway.  Apart from notice (§ 1341(a)(2)) and actuarial certification requirements (§ 1341(c)(2)(A)), not only must the PBGC determine that one of four "distress criteria" are met, § 1341(c)(2)(B), but, in the case of a Chapter 11 reorganization, the bankruptcy court must hold a contested hearing and find that, "unless the plan is terminated, [the debtor] will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process," *see* 29 U.S.C. § 1341(c)(2)(B)(ii). And even if all of these requirements are satisfied, the PBGC must then determine that the plan is sufficient to pay what are known as "guaranteed" benefits; if it is unable to make such a determination – which would likely be the case here – the PBGC must initiate the aforementioned proceedings under § 1342. *See* 29 U.S.C. § 1341(c)(3)(B). In light of these requirements, a § 1341 termination, therefore, cannot be effectuated simply by an agreement inserted in a bankruptcy reorganization plan. In any event, based on Delphi's representations in its Modified Reorganization Plan, a § 1341 termination – even if possible as a "distress termination" – is unlikely to be pursued (given the mention there of a *PBGC-initiated* termination).

**D.    Because a Necessary Element of the Modified Reorganization Plan Is a Termination That Is Highly Speculative, the Modified Reorganization Plan Cannot Be Approved**

41.    Again, in its proposed Modified Reorganization Plan, Delphi has represented that it expects the PBGC to terminate the Salaried Workers Plan. Generally, the participants would receive considerable procedural protections in such proceedings, as the district court is empowered to issue a termination decree only when it is unequivocally necessary to protect the participants' best interests. While Delphi's Excom, as Plan Administrator, has an ability to bypass these procedural protections by reaching a termination agreement with the PBGC, ERISA assumes that an administrator would do so only when acting in the best interests of the participants.

42.    The Excom, however, has, as noted, an inherent conflict of interest that prevents it from acting with undivided loyalty to the Salaried Workers in connection with any negotiations over the precise method and circumstances of the Salaried Workers Plan termination. To remedy this conflict, the Salaried Workers seek in the other action to replace the Excom with an administrator who is independent, and, as a result, will agree to termination only if doing so is in the best interests of the participants. But even apart from the Salaried Workers action, this Court − in light of the procedural barriers to plan termination − should not accept at face value any suggestion or implication by the Debtors that termination of the Salaried Workers Plan is either assured or imminent, since even other routes to termination are lengthy, require notice and participation, and will likely be challenged.  Given that, under all of the circumstance, Delphi's assumption in the Modified Reorganization Plan that the Salaried Workers Plan shall be involuntarily terminated is not presently imminent and indeed may not occur at all, the Court should not approve the Modified Reorganization Plan.

## WAIVER OF MEMORANDUM OF LAW

43.    The Salaried Workers request that the Court waive and dispense with the requirement set forth in Rule 9013-1(b) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York that any papers filed in response to a motion shall have an accompanying memorandum of law.  No novel issue is raised by this Objection and the authorities relied upon are cited herein.  Accordingly, the Salaried Workers submit that a waiver of the Rule 9013-1(b) requirement is appropriate in these circumstances.

**WHEREFORE,** for the reasons stated above, the Salaried Workers object to the Modification Motion and the Modified Reorganization Plan and respectfully request that approval of the modifications relating to the Salaried Workers Plan be denied and this Court grant such other and further relief as is just and proper.

Dated: New York, New York
      July 15, 2008

*Attorneys for the Objectors Dennis Black, Charles Cunningham, and Delphi Salaried Retiree Association*

**MORRISON COHEN LLP**

By:   */s/ Joseph T. Moldovan*
     Joseph T. Moldovan
     Michael R. Dal Lago

     909 Third Avenue
     New York, New York   10022
     (212) 735-8600

**MILLER & CHEVALIER CHARTERED**
Anthony F. Shelley (pro hac vice admission pending)
Timothy P. O'Toole (pro hac vice admission pending)
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C.  20005
(202) 626-5800