REDACTED VERSION OF SEALED DOCUMENT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| Dennis Black, *et al.*, | ) | |
| | ) | |
| | ) | Case No. 2:09-cv-13616 |
| Plaintiffs, | ) | Hon. Arthur J. Tarnow |
| | ) | Magistrate Judge Mona K. Majzoub |
| v. | ) | |
| | ) | |
| Pension Benefit Guaranty Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs Dennis Black, Charles Cunningham, Ken Hollis, and the Delphi Salaried Retirees Association (collectively, "Plaintiffs") move for summary judgment in their favor on all Counts of their Second Amended Complaint as to Defendant Pension Benefit Guaranty Corporation's liability. A memorandum of law in support of and explicating the bases for this Motion is attached in accordance with Local Rule 7.1. Plaintiffs further request that the Court thereafter order briefing on the appropriate remedy and relief to be afforded Plaintiffs.

**REDACTED VERSION OF SEALED DOCUMENT**

Dated:  September 21, 2018

Respectfully submitted,

  /s/ Anthony F. Shelley

Alan J. Schwartz (P38144)
JACOB & WEINGARTEN, P.C.
25800 Northwestern Highway
Suite 500
Southfield, Michigan 48075
Telephone:  248-649-1900
Facsimile:  248-649-2920
E-mail:  alan@jacobweingarten.com

Anthony F. Shelley
(admitted E.D. Michigan Dec. 22, 2009)
Timothy P. O'Toole
(admitted E.D. Michigan Dec. 22, 2009)
Michael N. Khalil
(admitted E.D. Michigan Sept. 24, 2010)
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC  20006
Telephone:  202-626-5800
Facsimile:  202-626-5801
E-mail:  ashelley@milchev.com
              totoole@milchev.com
              mkhalil@milchev.com

*Attorneys for Plaintiffs*

REDACTED VERSION OF SEALED DOCUMENT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| Dennis Black, *et al.*, | ) | |
| | ) | Case No. 2:09-cv-13616 |
| Plaintiffs, | ) | Hon. Arthur J. Tarnow |
| | ) | Magistrate Judge Mona K. Majzoub |
| v. | ) | |
| | ) | |
| Pension Benefit Guaranty Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

REDACTED VERSION OF SEALED DOCUMENT

## CONCISE STATEMENT OF ISSUES

(1) Defendant Pension Benefit Guaranty Corporation ("PBGC") terminated Plaintiffs' pension plan (the "Plan") in the summer of 2009 pursuant to an agreement between the PBGC and the pension plan's administrator. Plaintiffs' Second Amended Complaint raises important constitutional and statutory questions regarding whether a hearing before this Court was required to protect the rights and interests of the Plan's participants, including Plaintiffs, and whether, if not, the PBGC's termination of the Plan nonetheless was arbitrary and capricious.  The first question presented is whether, in order to avoid reaching those constitutional and statutory questions, the record demonstrates that the PBGC would have carried its burden of proof in a hearing before this Court, conducted pursuant to 29 U.S.C. § 1342(c), by demonstrating that the Plan had to be terminated as of July 31, 2009, to avoid any unreasonable increase in the liability of the PBGC's insurance fund?  Plaintiffs answer "no."

(2) Was the PBGC's termination of the Plan invalid because the PBGC failed to obtain a Court order, under 29 U.S.C. § 1342(c), adjudicating that the Plan must be terminated in order to avoid any unreasonable increase in the liability of the PBGC's insurance fund?  Plaintiffs answer "yes."

(3)  The actions of plan administrators are subject to ERISA's fiduciary duty of loyalty, one of the highest duties known under the law.  This duty of loyalty requires that a plan administrator act with an eye focused solely on the best interests of the plan's participants, and avoid situations where the administrator's own interests conflict with those of the participants.  Is the PBGC's termination of the Plan additionally invalid under 29 U.S.C. § 1342(c), given that the PBGC relies upon a plan termination agreement entered with a plan administrator that put its own corporate interests ahead of those of the Plan's participants?  Plaintiffs answer "yes."

(4)  Did the PBGC's termination of the Plan also violate the U.S. Constitution because it deprived Plaintiffs of their vested pension benefits (and the rights associated with those benefits) with no pre-deprivation process at all?  Plaintiffs answer "yes."

(5)  Finally, given that there were viable alternatives to termination that the PBGC failed to pursue, given that the PBGC acquiesced in the Plan's termination in service to interests beyond the statutory considerations enumerated in 29 U.S.C. § 1342(c), and given that the termination otherwise rested on irrelevant factors, were the PBGC's actions in terminating the Plan arbitrary and capricious and therefore invalid under the Administrative Procedures Act?  Plaintiffs answer "yes."

REDACTED VERSION OF SEALED DOCUMENT

## CONTROLLING AUTHORITIES FOR RELIEF SOUGHT

U.S. Const. amend. V

29 U.S.C. § 1342

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

*In re UAL Corp.*, 468 F.3d 444 (7th Cir. 2006)

*Zinermon v. Burch*, 494 U.S. 113 (1990)

Fed. R. Civ. P. 56

ECF No. 193, Order Sustaining Plaintiffs' Objections to Magistrate Judge's Scheduling Order, Granting Plaintiff's Motion for Adoption of Scheduling Order, Administratively Terminating PBGC's Motion for Protective Order, Administratively Terminating Plaintiffs' Motion to Compel Discovery, and Entering Scheduling Order (Sept. 1, 2011)

REDACTED VERSION OF SEALED DOCUMENT

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CONCISE STATEMENT OF ISSUES ....................................................i

CONTROLLING AUTHORITIES FOR RELIEF SOUGHT ................................. iii

TABLE OF AUTHORITIES ................................................ viii

EXHIBIT LIST TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ............................................................xvi

INTRODUCTION .................................................................1

STATEMENT REGARDING DISCOVERY ........................................6

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................11

    A.    ERISA....................................................................11

    B.    The GM-Delphi Relationship...........................................13

    C.    Plaintiffs ...............................................................16

    D.    The PBGC's Efforts to Protect the Delphi Plans During Bankruptcy ........................................................16

    E.    Delphi's Proposal for a GM Reassumption of the Salaried Plan, and the PBGC's Embrace of that Proposal .................18

    F.    The Financial Crisis and GM's Request for Federal Aid...................21

    G.    The PBGC Continued Its Advocacy on Behalf of the Salaried Plan as the Treasury Began to Familiarize Itself with the GM/Delphi Relationship .........................................25

    H.    As the Auto Team Inserted Itself Into Negotiations Over Delphi, the PBGC Ceased Advocating for GM's Reassumption of the Salaried Plan........................................40

    I.    The PBGC's Initial Decision to Terminate the Delphi Plans ...................................................................50

    J.    The Emergence of New GM and New Delphi ....................62

STANDARD OF REVIEW ......................................................................73

ARGUMENT ........................................................................................75

I.    BECAUSE THERE WERE VIABLE ALTERNATIVES TO
      TERMINATION THAT THE PBGC COULD HAVE
      PURSUED, THE PBGC COULD NOT HAVE OBTAINED
      AN ORDER FROM THIS COURT ADJUDICATING THAT
      THE PLAN'S TERMINATION WAS NECESSARY UNDER
      § 1342(c), AND THE COURT SHOULD PROCEED TO
      CONSIDER COUNTS ONE THROUGH FOUR........................................75

      A.    GM's Dependence on Delphi Parts Provided the PBGC
            With Sufficient Leverage to Avoid the Plan's
            Termination ...........................................................................78

      B.    Similarly, the PBGC's Liens and Claims on Delphi's
            Foreign Assets Provided the PBGC With Tremendous
            Leverage to Persuade Delphi's Purchasers to Consider
            Assuming the Plan...................................................................91

      C.    The PBGC's Termination Case Is Further Undermined
            by the Fact That, Compared to Other Similarly-Sized
            Plans, the Salaried Plan Was Relatively Well Funded.......................96

      D.    Extra-Statutory Factors Undergirded the PBGC's Actions
            in Terminating the Plan .........................................................100

      E.    The Record in Full Establishes that the PBGC Cannot
            Prove It Would Have Succeeded in Obtaining a Judicial
            Termination Decree in July 2009, Had It Tried ..............................108

II.   BECAUSE THE DELPHI PLAN WAS TERMINATED
      WITHOUT THE NECESSARY COURT ADJUDICATION,
      PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A
      MATTER OF LAW ON COUNT 1 ........................................................111

      A.    The Plain Language of § 1342(c)(1) Requires That the
            PBGC Obtain a Court Decree Before Terminating a Plan,
            Even If the Plan Administrator Agrees to Plan
            Termination ..........................................................................112

B.  Requiring the PBGC to Obtain a Court Decree Before Terminating a Plan Best Serves ERISA's Objectives and Comports With the Statute's Legislative History .............................120

C.  It Is Undisputed That the PBGC Failed to Obtain a Court Decree Before Terminating the Plan, Making Summary Judgment Appropriate .......................................................124

III.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT 2 BECAUSE DELPHI EXECUTED THE TERMINATION AGREEMENT IN A CORPORATE RATHER THAN FIDUICARY CAPACITY, RENDERING IT INVALID.................................................................................125

A.  An Employer's Decision to Enter Into a Summary Termination Agreement With the PBGC Under 29 U.S.C. § 1342(c)(1) Is Subject to ERISA's Fiduciary Standards ...........................................................126

B.  Delphi Did Not Execute the Termination and Trusteeship Agreement With the PBGC According to ERISA's Duty of Loyalty ...........................................................134

IV.  BECAUSE THE PBGC'S SUMMARY TERMINATION OF THE PLAN DEPRIVED PLAINTIFFS OF THEIR DUE PROCESS RIGHTS, SUMMARY JUDGMENT IS APPROPRIATE ON COUNT 3.................................................137

A.  Plaintiffs Have a Protected Property Interest in Their Vested Pension Benefits...................................................138

B.  The PBGC Provided the Plaintiffs *No Process Whatsoever* Before Depriving Them of Their Protected Pension Benefits ...........................................................141

1.  Failing to Provide Plaintiffs a Hearing Before Depriving Them of Their Vested Pension Benefits Violated the Due Process Clause ...........................142

**REDACTED VERSION OF SEALED DOCUMENT**

2.    The Court Need Not Consider the Government's
      Interest in Foregoing a Pre-Deprivation Hearing in
      Evaluating the Adequacy of the Process in This
      Case — Zero Process Is *Per Se* Insufficient ........................... 146

3.    Assuming, Arguendo, that the PBGC's Interest in
      Foregoing a Pre-Deprivation Hearing is Relevant,
      that Interest is Still Insufficient to Justify its Failure
      to Hold a Pre-Deprivation Hearing .......................................... 149

V.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT
      ON COUNT 4 BECAUSE, EVEN ON AN ARBITRARY-
      AND-CAPRICIOUS REVIEW, THE PBGC'S
      TERMINATION OF THE SALARIED PLAN IS
      UNSUSTAINABLE ..................................................................... 156

CONCLUSION .................................................................................... 159

REDACTED VERSION OF SEALED DOCUMENT

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)...............................................................................143

*Beck v. PACE Int'l Union*,
    551 U.S. 96 (2007)..........................................................................127, 129

*Boddie v. Connecticut*,
    401 U.S. 371 (1971).......................................................................142, 143

*Boggs v. Boggs*,
    520 U.S. 833 (1997)...............................................................................121

*Botany Worsted Mills v. United States*,
    278 U.S. 282 (1929)...............................................................................118

*BP Am. Prod. Co. v. Burton*,
    549 U.S. 84 (2006).................................................................................112

*Bussian v. RJR Nabisco, Inc.*,
    223 F.3d 286 (5th Cir. 2000) ................................................................132

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................73

*Chao v. Hall Holding Co.*,
    285 F.3d 415 (6th Cir. 2002) ................................................................134

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)...............................................................................158

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)...............................................................................142

*Conkey v. Reno*,
    885 F. Supp. 1389 (D. Nev. 1995).........................................................148

*Coyne & Delany Co. v. Selman*,
    98 F.3d 1457 (4th Cir. 1996) ................................................................127

**REDACTED VERSION OF SEALED DOCUMENT**

*In re Delphi Corp.*,
 No. 05-44481, 2009 Bankr. LEXIS 4663 (Bankr. S.D.N.Y. July 30,
 2009) ........................................................................................71, 72

*Dodd v. United States*,
 545 U.S. 353 (2005) .........................................................................119

*Doe v. Cummins*,
 662 F. App'x 437 (6th Cir. 2016) ....................................................148

*Doe v. Devine*,
 703 F.2d 1319 (D.C. Cir. 1983) .......................................................156

*Donovan v. Bierwirth*,
 680 F.2d 263 (2d Cir. 1982) ....................................................134, 135

*Flannelly v. Bd. of Trs. of N.Y. City Police Pension Fund*,
 6 F. Supp. 2d 266 (S.D.N.Y. 1998) .................................................139

*Fusari v. Steinberg*,
 419 U.S. 379 (1975).........................................................................151

*Ginaitt v. Haronian*,
 806 F. Supp. 311 (D.R.I. 1992) .......................................................139

*In re GMC*,
 407 B.R. 463 (Bankr. S.D.N.Y. 2009).........................................22, 24

*Gregg v. Transp. Workers of Am., Int'l*,
 343 F.3d 833 (6th Cir. 2003) ...........................................................134

*Griffith v. Coburn*,
 473 F.3d 650 (6th Cir. 2007) .............................................................74

*Guba v. Huron Cty.*,
 600 F. App'x 374 (6th Cir. 2015) .....................................................142

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*,
 530 U.S. 238 (2000).........................................................................133

*Harris v. City of Akron*,
 20 F.3d 1396 (6th Cir. 1994) ...........................................................145

**REDACTED VERSION OF SEALED DOCUMENT**

*Henry v. City of Middletown, Ohio*,
  655 F. App'x 451 (6th Cir. 2016) ............................................................148, 149

*Holly v. City of Ecorse*,
  No. 05-74238, 2006 U.S. Dist. LEXIS 68160 (E.D. Mich. Sept. 22,
  2006) ..................................................................................................................147

*Hudson v. Palmer*,
  468 U.S. 517 (1984)...........................................................................................144

*In re Jones & Laughlin Hourly Pension Plan*,
  824 F.2d 197 (2d Cir. 1987) ......................................................................80, 120

*King v. Burwell*,
  135 S. Ct. 2480 (2015)...............................................................................113, 120

*Kuper v. Iovenko*,
  66 F.3d 1447 (6th Cir. 1995) ............................................................................134

*Larson v. Northrop Corp.*,
  21 F.3d 1164 (D.C. Cir. 1994)..................................................................130, 131

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996)...........................................................................................128

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982)...........................................................................................149

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)....................................................................................*passim*

*McDarby v. Dinkins*,
  907 F.2d 1334 (2d Cir. 1990) ...........................................................................138

*MCI Telecommc'ns Corp. v. AT&T Co.*,
  512 U.S. 218 (1994)...........................................................................................124

*McMahon v. McDowell*,
  794 F.2d 100 (3d Cir. 1986) .....................................................................134, 135

*Mertik v. Blalock*,
  983 F.2d 1353 (6th Cir. 1993) ..........................................................................144

REDACTED VERSION OF SEALED DOCUMENT

*Mid-Am. Waste Sys., Inc. v. City of Gary*,
    49 F.3d 286 (7th Cir. 1995) ............................................................116

*Mitchell v. Fankhauser*,
    375 F.3d 477 (6th Cir. 2004) ...............................................138, 141

*Mullane v. Cent. Hanover Tr. Co.*,
    339 U.S. 306 (1950)........................................................................142

*Nachman Corp. v. Pension Benefit Guar. Corp.*,
    446 U.S. 359 (1980).................................................................12, 132

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
    414 U.S. 453 (1974)........................................................................118

*Parratt v. Taylor*,
    451 U.S. 527 (1981), *overruled on other grounds, Daniels v.
    Williams*, 474 U.S. 327 (1986) ...............................................143, 144

*Payonk v. HMW Indus., Inc.*,
    883 F.2d 221 (3d Cir. 1989) ........................................127, 128, 131

*PBGC v. Republic Techs. Int'l LLC*,
    386 F.3d 659 (6th Cir. 2004) ........................................................155

*PBGC v. United Air Lines, Inc.*,
    436 F. Supp. 2d 909 (N.D. Ill. 2006).....................................79, 110

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)..........................................................................121

*Smith v. Shettle*,
    946 F.2d 1250 (7th Cir. 1991) ......................................................116

*Tackitt v. Prudential Ins. Co. of Am.*,
    758 F.2d 1572 (11th Cir. 1985) ....................................................156

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)........................................................................119

*Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*,
    615 F.3d 622 (6th Cir. 2010) ........................................................119

**REDACTED VERSION OF SEALED DOCUMENT**

*U.S. Dep't of Treasury v. Black*,
719 F. App'x 1 (D.C. Cir. 2017)........................................................................10

*U.S. Dep't of Treasury v. PBGC*,
222 F. Supp. 3d 38 (D.D.C. 2016)......................................................................9

*U.S. Dep't of Treasury v. PBGC*,
249 F. Supp. 3d 206 (D.D.C. 2017)..............................................................9, 52

*U.S. Dep't of Treasury v. PBGC*,
301 F.R.D. 20 (D.D.C. 2014)...............................................................................8

*In re UAL Corp.*,
468 F.3d 444 (7th Cir. 2006) ...............................................................4, 74, 122

*United States v. Williamson*,
154 F.3d 504 (3d Cir. 1998) ............................................................................115

*United Steel Workers v. PBGC*,
707 F.3d 319 (D.C. Cir. 2013).........................................................................157

*Varity Corp. v. Howe*,
516 U.S. 489 (1996)..................................................................................127, 132

*Waller v. Blue Cross of Cal.*,
32 F.3d 1337 (9th Cir. 1994) ....................................................................129, 130

*Wenk v. O'Reilly*,
783 F.3d 585 (6th Cir. 2015) .............................................................................73

*Whitman v. Am. Trucking Ass'n, Inc.*,
531 U.S. 457 (2001)...........................................................................................124

*Withrow v. Larkin*,
421 U.S. 35 (1975)..............................................................................................148

*Zinermon v. Burch*,
494 U.S. 113 (1990)....................................................................................144, 145

**Statutes**

5 U.S.C. § 706....................................................................................................156

11 U.S.C. § 363....................................................................................................62

**REDACTED VERSION OF SEALED DOCUMENT**

26 U.S.C. § 412 ...............................................................................17, 18

26 U.S.C. § 430 ...................................................................................18

Employee Retirement Income Security Act of 1974,
  88 Stat. 829, 29 U.S.C. §§ 1001 *et seq.* ......................................*passim*
  29 U.S.C. § 1001 ....................................................................120, 121
  29 U.S.C. § 1002 ...........................................................126, 129, 131
  29 U.S.C. § 1021 ...........................................................................121
  29 U.S.C. § 1024 ...........................................................................121
  29 U.S.C. § 1082 .............................................................................18
  29 U.S.C. § 1083 .............................................................................18
  29 U.S.C. § 1103 ...........................................................................121
  29 U.S.C. § 1104 ...................................................................121, 134
  29 U.S.C. § 1133 ...........................................................................121
  29 U.S.C. § 1301 .............................................................................77
  29 U.S.C. § 1302 ...........................................................12, 102, 157
  29 U.S.C. § 1303 ...............................................72, 133, 137, 157
  29 U.S.C. § 1305 .............................................................................77
  29 U.S.C. §§ 1305-1307 ..................................................................13
  29 U.S.C. § 1322 .............................................................................13
  29 U.S.C. § 1341 ...........................................................128, 129, 131
  29 U.S.C. § 1342 ......................................................................*passim*
  29 U.S.C. § 1344 ...............................................13, 139, 141, 150
  29 U.S.C. § 1362 .............................................................................18
  29 U.S.C. § 1368 .............................................................................18

Emergency Economic Stabilization Act of 2008,
  Pub. L. No. 110-343, 122 Stat. 3765 ..........................................21, 22

REDACTED VERSION OF SEALED DOCUMENT

## Other Authorities

H.R. Rep. No. 93-1280 (1974) (Conf. Rep.) ........................................122

154 Cong. Rec. H10702 (daily ed. Oct. 3, 2008) (statement of Rep. Slaughter)...........................................................................................21

1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 21:6 (7th ed. 2009)...........................................115, 116

*Employee Benefits Dictionary* (1992)....................................................97

Chris Isidore, *Auto Parts Makers Get $5B Bailout* (Mar. 19, 2009).......................32

Dep't of Labor, Field Assistance Bulletin No. 2014-01, *Fiduciary Duties and Missing Participants in Terminated Defined Contribtion Plans* 2 (Aug. 14, 2014) https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2014-01.pdf..............................129

https://quotes.wsj.com/index/DJIA/historical-prices.............................140

https://quotes.wsj.com/index/SPX/historical-prices.............................140

Past PBGC Directors and Executive Directors, https://www.pbgc.gov/about/who-we-are/pg/past-pbgc-directors-and-executive-directors (last updated Apr. 27, 2017) ......................................27

PBGC Annual Reports, https://www.pbgc.gov/about/annual-reports (last updated June 26, 2018) ...........................................................141

Remarks by the President to Chrysler Workers in Toledo, Ohio (June 3, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/06/03/remarks-president-chrysler-workers-toledo-ohio ..............108

Steven Rattner, *The Auto Bailout:  How We Did It*, Fortune (Oct. 21, 2009) http://archive.fortune.com/2009/10/21/autos/auto_bailout_rattner.fortune/index.htm ........................................................................33

Steven Rattner, *Overhaul: An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry* (2010) ..............36, 88

**REDACTED VERSION OF SEALED DOCUMENT**

Jim Ruttenberg, Peter Baker, & Bill Vlasic, *100 Days: Early Resolve: Obama Stand in Auto Crisis*, N.Y. Times, Apr. 29, 2009 ..................................33

*Time for Plan D*, Financial Times (Nov. 13, 2008)..................................................24

Gordon Trowbridge, *Poll: Most U.S. Voters Question Auto Aid*, The Detroit News (Mar. 5, 2009)...............................................................................32

A.D. Wilkie, *A Stochastic Investment Model for Actuarial Use* (1984) .................99

George F. Will, *TARP and ADD*, Newsweek (Nov. 21, 2008) ...............................24

REDACTED VERSION OF SEALED DOCUMENT

## EXHIBIT LIST TO PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 1 | Excerpts of Disclosure Statement with Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors, and Debtors-in-possession (Aug. 31, 2007) | Bankr. S.D.N.Y. ECF No. 9264 |
| 2 | ███████████████████ | PBGC-BL2-00900169 |
| 3 | Audit Report:  Treasury's Role in the Decision for GM to Provide Pension Payments to Delphi Employees, dated Aug. 15, 2013 (SIGTARP 13-003) | PBGC-BL2-01003705 |
| 4 | ███████████████████ | PBGC-BL2-00786835 |
| 5 | Letter from IRS to J. Whitson regarding approval of conditional waiver of minimum funding standard for Salaried Plan for plan year ending Sept. 30, 2006 (Apr. 4, 2008) | PBGC-BL2-0045671 |
| 6 | ███████████████████ | UST-BL-018099 |
| 7 | ███████████████████ | UST-BL-036872 |
| 8 | ███████████████████ | PBGC-BL2-00902655 |
| 9 | Press Release - PBGC Director Praises Pension Transfer from Delphi to GM (Sept. 25, 2008) | PBGC-BL2-00571388 |
| 10 | ███████████████████ | PBGC-BL2-00859399 |

REDACTED VERSION OF SEALED DOCUMENT

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 11 | ███████████████████ | PBGC-BL2-00782890 |
| 12 | ███████████████████ | PBGC-BL2-00829419 |
| 13 | ███████████████████ | PBGC-BL2-00797510 |
| 14 | Deposition Transcript of C. Dana Cann (Mar. 25, 2013) | N/A |
| 15 | ███████████████████ | PBGC-BL2-00717914 |
| 16 | PBGC document summarizing information from Delphi's Modified Disclosure Statement (Oct. 3, 2008) | PBGC-BL2-00714968 |
| 17 | ███████████████████ | PBGC-BL2-00786517 |
| 18 | ███████████████████ | PBGC-BL2-00827136 |
| 19 | ███████████████████ | PBGC-BL2-00826205 |
| 20 | Email from Keith Stipp with Discussion Points for Call Regarding GM Reassuming Delphi Salaried Plan (Dec. 4, 2008) | 110224-040548 |
| 21 | ███████████████████ | PBGC-BL2-00832004 |
| 22 | Email from Karen Morris Regarding Delphi Waiver Request  to GM's assumption of Delphi plan (Apr. 8, 2009) | PBGC-BL2-00770588 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 23 | Email Exchange Between Rodney O'Neal and Fritz Henderson Regarding GM Reassuming Delphi Plans (Jan. 25 and 26, 2009) | 110224-041074 |
| 24 | Email Exchange Arranging Meeting Between GM and Delphi Attorneys (Feb. 2, 2009) | 110224-041198 |
| 25 | PBGC Internal Emails Circulating Funding Projections for GM Reassumption of Delphi Plans (Jan. 22, 23, 2009) | PBGC-BL2-00779082 |
| 26 | PBGC Charts Containing Funding Projections for GM Reassumption of Delphi Plans | PBGC-BL2-00779089 |
| 27 | ███████████████████ | 110224-041080 |
| 28 | ███████████████████ | PBGC-BL2-00825056 |
| 29 | ███████████████████ | PBGC-BL2-00826188 |
| 30 | ███████████████████ | PBGC-BL2-00831236 |
| 31 | ███████████████████ | PBGC-BL2-00861745 |
| 32 | Email from PBGC to Treasury Regarding Delphi  (Feb. 10, 2009) | PBGC-BL2-00581947 |
| 33 | Compass Advisors Meeting Minutes from February 12, 2009 Official Committee of Unsecured Creditors' Meeting | PBGC-BL-0184871 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 34 | ███████████████ | UST-BL-000217 |
| 35 | Email regarding GM Revisions to Preliminary Comparison of Term Sheet Proposals/Identification of Open Issues (Feb. 18, 2009) | 110224-041412 |
| 36 | ███████████████ | REV00000248 |
| 37 | ███████████████ | REV00000836 |
| 38 | ███████████████ | PBGC-BL2-00847087 |
| 39 | ███████████████ | PBGC-BL2-00726559 |
| 40 | ███████████████ | UST-BL-000618 |
| 41 | ███████████████ | PBGC-BL2-00794872 |
| 42 | ███████████████ | PBGC-BL2-00832497 |
| 43 | ███████████████ | PBGC-BL2-00824169 |
| 44 | ███████████████ | UST-BL-017680 |
| 45 | ███████████████ | UST-BL-017681 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 46 | ▬▬▬▬▬▬ | REV00000154 |
| 47 | ▬▬▬▬▬▬ | REV00000767 |
| 48 | ▬▬▬▬▬▬ | UST-BL-035839 |
| 49 | ▬▬▬▬▬▬ | UST-BL-017803 |
| 50 | ▬▬▬▬▬▬ | PBGC-BL2-00827217 |
| 51 | Email from John Sheehan Describing Call with GM and Treasury (Mar. 7, 2009) | 110224-042856 |
| 52 | ▬▬▬▬▬▬ | PBGC-BL2-00823877 |
| 53 | ▬▬▬▬▬▬ | PBGC-BL2-00838281 |
| 54 | ▬▬▬▬▬▬ | PBGC-BL2-00793246 |
| 55 | Email Exchange Regarding Delphi Mediation Submission (May 22, 2009) | 110224-050596 |
| 56 | Deposition Transcript of Vincent K. Snowbarger (Mar. 12, 2013) | N/A |
| 57 | ▬▬▬▬▬▬ | PBGC-BL2-00824595 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 58 | ███████████████ | PBGC-BL2-00868853 |
| 59 | Email from Joseph House Communicating Disinvitation from Treasury Meeting (Apr. 3, 2009) | PBGC-BL-0185271 |
| 60 | ███████████████ | UST-BL-038157 |
| 61 | Treasury Privilege Log Description of Email Regarding Delphi Pensions (Apr. 15, 2009) | PL00000001 |
| 62 | ███████████████ | PBGC-BL2-00722443 |
| 63 | Email from M. Feldman to H. Wilson, Forwarding Email from J. Sheehan Regarding Delphi Meeting (Apr. 17, 2009) | UST-BL-038442 |
| 64 | Deposition Transcript of Joseph R. House (May 29, 2013) | N/A |
| 65 | Deposition Transcript of Terrence Deneen (Apr. 28, 2015) | N/A |
| 66 | Email Exchange Arranging Call Between J. House and M. Feldman, forwarded to T. Snyder (Apr. 14, 2009) | PBGC-BL2-00757434 |
| 67 | ███████████████ | REV00000627 |
| 68 | ███████████████ | PBGC-BL2-00847059 |
| 69 | Treasury Privilege Log - Descriptions of Memorandum Discussing Delphi's | PL00000002 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| | Liquidity Issues and Consequences of Shutdown | |
| 70 | ████████████ | UST-BL-018798 |
| 71 | ████████████ | UST-BL-038433 |
| 72 | ████████████ | UST-BL-017953 |
| 73 | ████████████ | REV00000652 |
| 74 | ████████████ | UST-BL-038490 |
| 75 | ████████████ | UST-BL-018926 |
| 76 | ████████████ | UST-BL-038511 |
| 77 | ████████████ | UST-BL-005961 |
| 78 | ████████████ | PBGC-BL2-00730437 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 79 | | PBGC-BL2-00795826 |
| 80 | | UST-BL-018932 |
| 81 | | PBGC-BL2-00793033 |
| 82 | | UST-BL-039752 |
| 83 | | PBGC-BL2-00758009 |
| 84 | | PBGC-BL2-00901435 |
| 85 | | PBGC-BL2-00764502 |
| 86 | | PBGC-BL2-00847064 |
| 87 | | UST-BL-038933 |
| 88 | | UST-BL-006032/UST-BL-006034 |
| 89 | | UST-BL-006075/UST-BL-006076 |
| 90 | | UST-BL-019135 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 91 | ███████████████████████ | PBGC-BL2-00902755 |
| 92 | ███████████████ | PBGC-BL2-00872407 |
| 93 | ███████████████ | PBGC-BL2-00832213 |
| 94 | Email from M. Feldman to J. House Requesting Delphi Call (May 22, 2009) | PBGC-BL-0058140 |
| 95 | ███████████████ | UST-BL-042155 |
| 96 | ███████████████ | UST-BL-003247 |
| 97 | Email Exchange Between Delphi Counsel and Matt Feldman regarding Delphi (May 29, 2009) | 110224-054417 |
| 98 | ███████████████ | PBGC-BL2-00722013 |
| 99 | ███████████████ | UST-BL-011324 |
| 100 | Excerpts of Supplement to Plan Modification Approval Motion, S.D.N.Y. Bankr. Filing  (June 1, 2009) | Bankr. S.D.N.Y. ECF No. 16646 |
| 101 | ███████████████ | REV00000876 |
| 102 | ███████████████ | REV00000856 |
| 103 | Email from J. House to PBGC Staff Regarding Treasury Meeting  (June 30, 2009) | PBGC-BL-0170325 |
| 104 | ███████████████ | PBGC-BL2-00792551 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 105 | ██████████████ | PBGC-BL2-00793138 |
| 106 | ██████████████ | PBGC-BL2-00823113 |
| 107 | ██████████████ | PBGC-BL2-00722130 |
| 108 | ██████████████ | PBGC-BL2-00832945 |
| 109 | Email from J. House to PBGC Staff re Update on Coord w/UST (July 8, 2009) | PBGC-BL2-00774642 |
| 110 | ██████████████ | REV00000753 |
| 111 | ██████████████ | REV00000799 |
| 112 | ██████████████ | REV00000874 |
| 113 | ██████████████ | REV00000875 |
| 114 | ██████████████ | PBGC-BL2-00782933 |
| 115 | ██████████████ | PBGC-BL2-00830191 |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 116 | Plaintiffs Black, Cunningham, and DSRA's Objection to Debtors' Prposed Modifications to Debtors' First Amended Plan of Reorganization (As Modified) (Bankr. S.D.N.Y. July 15, 2009) | N/A |
| 117 | ██████████████████████ | PBGC-BL2-00762865 |
| 118 | November 6, 2014 Recovery Valuation and Allocation Memorandum for Delphi Corp. (Nov. 6, 2014) | PBGC-BL2-00970978 |
| 119 | PBGC-GM Settlement Agreement (Bankr. S.D.N.Y. July 27, 2009) | N/A |
| 120 | ██████████████████████ | PBGC-BL2-00873459 |
| 121 | ██████████████████████ | PBGC-BL2-00899299 |
| 122 | ██████████████████████ | PBGC-BL2-00783350 |
| 123 | Actuarial Case Memo for Delphi Retirement Program for Salaried Employees (Sept. 30 ,2015) | PBGC-BL2-00997879 |
| 124 | March 2009 GM Funding Projections | PBGC-BL-0265641 |
| 125 | ██████████████████████ | PBGC-BL2-00837407 |
| 126 | Email from N. Ranade to J. House re IRC 412(e) (Feb. 4, 2009) | PBGC-BL2-00779152 |
| 127 | Email from N. Ranade to J. House regarding GM Projections - Clarification Needed (Mar. 12, 2009) | PBGC-BL2-00779147 |
| 128 | Expert Report of Dr. Noor Rajah, dated June 30, 2016 | N/A |

**REDACTED VERSION OF SEALED DOCUMENT**

| Exhibit # | Description | Beginning Bates Number |
|---|---|---|
| 129 | PBGC January 29, 2009 Delphi Update Memo | PBGC-BL2-00778962 |
| 130 | Sept. 16, 2008 Delphi Proposal to PBGC re Liens | PBGC-BL-0184842 |
| 131 | PBGC's Responses to Plaintiffs' First Set of Interrogatories, dated Jan. 17, 2014 | N/A |
| 132 | Deposition Transcript of C. Travia (Mar. 14, 2013) | N/A |
| 133 | ███████████████████████ | 110224-041254 |
| 134 | Deposition Transcript of K. House (Mar. 27, 2012) | N/A |
| 135 | Email from D. Cann to J. House and N. Ranade regarding GM Phone Call | PBGC-BL2-00778858 |
| 136 | ███████████████████████ | PBGC-BL2-01229861 |
| 137 | ███████████████████████ | PBGC-BL2-00891384 |
| 138 | Stipulation Concerning the Automatic Stay In Connection With the Commencement of an Action Against the Pension Benefit Guaranty Corporation | Bankr. S.D.N.Y. ECF No. 18896 |
| 139 | July 29, 2009 Bankruptcy Proceeding Motion Hearing Transcript | N/A |
| 140 | ███████████████████████ | REV00000778 |
| 141 | List of attendees at May 26, 2009 Mediation Session in the Bankruptcy action | PBGC-BL2-00004268 |
| 142 | Delphi Corporation - Pension Information Profile calculated on Dec. 17, 2009 | PBGC-BL-265639 |

REDACTED VERSION OF SEALED DOCUMENT

## INTRODUCTION

In the summer of 2009, Defendant Pension Benefit Guaranty Corporation ("PBGC") terminated the Delphi Retirement Program for Salaried Employees ("Salaried Plan" or the "Plan"), a defined benefit pension plan covering roughly 20,000 salaried employees and retirees of Delphi Corporation ("Delphi"). This lawsuit challenges the PBGC's termination of the Plan.

Delphi was originally a division of General Motors Company ("GM"), and the Plan's participants spent most of their careers as GM employees, earning the bulk of their pension benefits as participants in GM's salaried pension plan. Even after Delphi was spun off from GM in 1999, it remained GM's largest parts supplier for the next decade.

In the fall of 2008, Delphi proposed that GM reassume Delphi's pension plans. The PBGC supported this effort, using statutory liens and claims it possessed against Delphi assets as leverage to promote a GM reassumption. However, the PBGC abruptly ceased its efforts to save the Salaried Plan and acquiesced in its termination, following the intervention of the United States Department of Treasury ("Treasury"), which was at that time attempting to restructure the auto industry in general, and GM in particular. Because of the Plan's termination, the Plan's participants lost more than $500 million in vested

**REDACTED VERSION OF SEALED DOCUMENT**

pension benefits, and the insurance fund the PBGC administers suffered a $1.5 billion loss at that time.

Plaintiffs' lawsuit presents four grounds for invalidating the PBGC's termination of their pension plan. First, 29 U.S.C. § 1342(c), in the Employee Retirement Income Security Act of 1974 ("ERISA"), which governs PBGC-initiated plan terminations, requires that the PBGC obtain a court adjudication that termination is necessary under one of three statutory criteria. Here, however, the PBGC purported to accomplish the termination pursuant to a "termination and trusteeship agreement" with the Plan's administrator, ███████████████

██████████████ On this ground, the termination is procedurally defective (as with the second and third grounds described below).

Second, Delphi purported to execute the "termination and trusteeship agreement" pursuant to its powers as the Plan's administrator, meaning the act was subject to ERISA's fiduciary duty of loyalty. But instead of putting the interests of the Plan's participants first in considering whether to enter the agreement (as the duty of loyalty requires), Delphi entered into that agreement for its own corporate interests, thereby irretrievably tainting the agreement the PBGC used to consummate the termination and providing a separate and alternative basis to invalidate the termination.

REDACTED VERSION OF SEALED DOCUMENT

Third, the PBGC's termination of the Plan without a hearing violated the Fifth Amendment's Due Process Clause, in that it deprived Plaintiffs of a significant property interest without the requisite pre-deprivation process.

Fourth, Plaintiffs allege that the PBGC's termination of the Plan was invalid because the PBGC could not satisfy the standards for termination under 29 U.S.C. § 1342(a) and (c), and that its actions undertaken in connection with the termination were arbitrary and capricious.  The PBGC's termination actions resulted from the consideration of political factors rather than the relevant statutory criteria, and indeed the PBGC could have prevented the Plan's termination but for influence of these extra-statutory considerations.  Because the PBGC's actions in undertaking the termination– even if procedurally sufficient – are reviewable substantively to determine whether they were arbitrary or capricious, and because those actions were arbitrary and capricious given that the termination was avoidable and contrary to the relevant statutory criteria, the termination was unlawful.

In 2010, the Court denied without prejudice the PBGC's dispositive motions as to Counts 1-4, and specifically permitted discovery to proceed as to Plaintiffs' Second Amended Complaint.   Nonetheless, the PBGC resisted any discovery for approximately one year.  Plaintiffs, accordingly, moved to compel, which was effectively granted by the Court's September 1, 2011 Order, ECF No. 193, (the

REDACTED VERSION OF SEALED DOCUMENT

"September 1, 2011 Order"). In the September 1, 2011 Order, the Court ordered

the Parties post-discovery to submit dispositive motions addressing:

> under Count 4 whether termination of the Salaried Plan would have been appropriate in July 2009 if, as Plaintiffs contend, Defendants were required under 29 U.S.C. § 1342(c) to file before this court 'for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.'

*Id*. at 7 (quoting 29 U.S.C. § 1342(c)).

The Court further held that in addressing this question "and assuming that a

hearing was required before termination, this Court w[ould], pursuant to *In re UAL*

*Corp.*, 468 F.3d 444 (7th Cir. 2006), conduct a *de novo* review of the PBGC's

decision to terminate the Plan." *Id*. at 5. Because "[t]he only authority that the

PBGC has under § 1342 is to ask a court for relief," the PBGC, "[a]s the plaintiff,"

bears the "burden of persuasion." *Id*. (quoting *UAL Corp.*, 468 F.3d at 449-50).

The Court said that, if the PBGC fails to demonstrate that termination was proper

under the factors set forth in § 1342(c), then the Court will consider "the remainder

of the complaint pertaining to the PBGC." *Id*. The Court established this order of

inquiry as a matter of judicial economy, noting that it could, for instance, avoid the

constitutional and other procedural challenges to the PBGC's termination of the

Plan if, in reality, conducting a judicial adjudication of the propriety of termination

REDACTED VERSION OF SEALED DOCUMENT

(under the standard of review applicable in such proceedings) would have nonetheless led to the Plan's termination.

For the last seven years, Plaintiffs have fought costly battles to try and obtain discovery from the PBGC and Treasury.  While discovery is, amazingly, still not complete, Plaintiffs have gathered sufficient evidence to demonstrate that the PBGC cannot satisfy its burden of persuasion on whether the Plan would have been terminated in a lawful judicial adjudication under § 1342, because there were viable alternatives to termination, the most likely (though not only) option being a reassumption of the Salaried Plan into GM's still-existing salaried plan.  Given that the PBGC had significant liens and claims over Delphi assets essential to GM's supply-chain, the PBGC had substantial leverage to negotiate a reassumption, and in fact not only had the PBGC had been actively advocating for this result prior to the Treasury's intervention, but Delphi's unions used the same sort of leverage to negotiate significant pension benefits from Treasury (funded through the Troubled Asset Relief Program, *see infra* p.22) and the GM entity surviving its restructuring ("New GM").  As demonstrated below, the PBGC's decision to stop advocating for a reassumption by GM's salaried plan is unjustifiable in light of the PBGC's significant leverage and the relative affordability of a reassumption to New GM.

Additionally, the PBGC could have used its leverage, including its liens and claims on Delphi assets, to help negotiate an assumption of the Salaried Plan by the

REDACTED VERSION OF SEALED DOCUMENT

various parties that were competing to purchase Delphi's business and assets. The PBGC failed even to explore this possibility, notwithstanding the fact that it routinely does so in other cases, and it had a variety of tools available to it to make a pension assumption a competitive advantage to potential purchasers. Nonetheless, the PBGC acquiesced in the Plan's termination, not because of anything related to its statutory role under ERISA, but as a result of pressure imposed by the Treasury and the related Auto Task Force to support their chosen route to restructure the auto industry in general and GM in particular.

Because the PBGC cannot meet its burden of proof, that termination would have occurred in a judicial proceeding under § 1342, Plaintiffs remaining statutory and constitutional claims are ripe for consideration. And, Plaintiffs are entitled to summary judgment on Counts 1-4 as to the PBGC's liability. As a result, the Court should enter summary judgment in Plaintiffs' favor on Counts 1-4 as to the PBGC's liability and schedule briefing on the appropriate relief to be afforded Plaintiffs

## STATEMENT REGARDING DISCOVERY

In its September 1, 2011 Order, the Court anticipated that the Parties would be able to complete discovery by April 30, 2012, and that the Parties would submit dispositive motions by May 31, 2012. *See* ECF No. 193 at 7. Yet, as noted above, discovery still remains pending. As summarized below, this delay is a direct result

REDACTED VERSION OF SEALED DOCUMENT

of extraordinary efforts by both the PBGC and Treasury to prevent Plaintiffs from obtaining relevant documents requested more than six years ago.

Following the Court's September 1, 2011 Order, Plaintiffs served the PBGC with two sets of discovery requests in 2011, seeking 17 categories of documents. *See* ECF No. 197-1 and 197-2.  The PBGC refused to respond to any of these requests, ostensibly on relevance grounds, despite the fact that the requests plainly fell within the scope of the Court's September 1, 2011 Order, necessitating the filing of a motion to compel under Fed. R. Civ. P. 37.  *See* ECF No. 197.

Magistrate Judge Majzoub held a hearing on the motion to compel in February 2012, during which the PBGC's counsel acknowledged that the only way to uphold its refusal to produce documents was to disregard the Court's September 1, 2011 Order.  *See, e.g.*, ECF No. 205 at 10:14-12:22.  Judge Majzoub granted Plaintiffs' motion to compel in March 2012, ordering the PBGC to produce full and complete responses within 90 days.  *See* ECF No. 204 at 2.

Despite the Court's 90-day timetable, the PBGC subsequently sought and received from Plaintiffs agreements to extend the discovery schedule to allow the PBGC more time to produce responses to Plaintiffs' discovery requests.  By February 2013, the PBGC was still withholding tens of thousands of responsive documents, and Plaintiffs subsequently filed another motion to compel, ECF No. 218, which Judge Majzoub granted in August 2013.  *See* ECF No. 231.  The PBGC

REDACTED VERSION OF SEALED DOCUMENT

still refused to provide full discovery responses, even after the Court denied the PBGC's objections to the August 2013 Order in July 2014, *see* ECF No. 257; the PBGC then sought a writ of mandamus from the Sixth Circuit, which was denied in September 2014. *See* ECF No. 266.

The PBGC still refused to comply fully with the 2011 document requests, requiring yet another motion to compel, which Judge Majzoub granted in March 2016, noting that, "while the Court declines to do so, one could reasonably construe Defendant's argument as a *frivolous last-ditch effort to delay or ultimately avoid the production of these documents*." *See* ECF No. 282 at 7 (emphasis added).

Meanwhile, in January 2012, Plaintiffs served Treasury with a "narrow" subpoena *duces tecum*, seeking documents from just three Treasury officials, "relating only to Delphi." *See U.S. Dep't of Treasury v. PBGC*, 301 F.R.D. 20, 28 (D.D.C. 2014). Like the PBGC, Treasury also stonewalled Plaintiffs' attempts at discovery, refusing to produce any documents, and asking the United States District Court for the District of Columbia ("D.C. Court") to quash the subpoena, which motion the D.C. Court denied in June 2014. *Id*. at 30.

Nonetheless, Treasury withheld hundreds of responsive documents under an assortment of dubious privilege assertions, needlessly prolonging the proceedings before the D.C. Court. Indeed, in the summer of 2016, after the D.C. Court

REDACTED VERSION OF SEALED DOCUMENT

ordered Treasury to justify its privilege assertions through *in camera* submissions, Treasury, without any explanation, "suddenly withdrew its privilege assertions over nearly 75% of the documents."  *U.S. Dep't of Treasury v. PBGC*, 222 F. Supp. 3d 38, 41 (D.D.C. 2016).  In December 2016, the D.C. Court resolved a large portion of the remaining privilege claims, holding that Treasury had "miserably failed" to justify its remaining assertions of the deliberative process privilege, noting that in the process Treasury had "essentially wasted" the court's "precious and limited time."  *Id*. at 44-45.

There remained 85 Treasury documents in dispute, the majority of which were withheld pursuant to Treasury's assertion of the presidential communications privilege.  *See U.S. Dep't of Treasury v. PBGC*, 249 F. Supp. 3d 206, 209-10 (D.D.C. 2017).  In April 2017, the D.C. Court resolved those remaining privilege claims, upholding Treasury's assertion of the presidential communications privilege over 63 documents; however, noting Plaintiffs' assertion that the documents likely would "show pressure exerted by Treasury or the White House to terminate the Delphi [Salaried] Plan for impermissible or political reasons," the D.C. Court found that Plaintiffs' litigation need for these documents overcame the privilege, and ordered their production.  *Id*. at 212-13.

Treasury then sought a stay of the D.C. Court's disclosure order in order to decide whether it would appeal the order, and during a hearing on that motion, the

REDACTED VERSION OF SEALED DOCUMENT

Court specifically noted its "very serious concerns about whether the government's proceeding in good faith or not," observing that Treasury had "wasted the [c]ourt's time on three prior occasions."  *See* May 16, 2017 Mot. Hr'g Tr. at 4:9-14, *U.S. Dep't of Treasury v. Black*, No. 12-mc-100 (D.D.C. July 11, 2017), ECF No. 61.

Treasury ultimately appealed the disclosure order, and following multiple rounds of briefing and oral argument, the D.C. Circuit determined that the record was inadequate for appellate review, vacated the production order and remanded back to the D.C. Court to "balance the public interests at stake and more thoroughly analyze whether [Plaintiffs] demonstrated a need sufficient to overcome the privilege."  *U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, 3 (D.C. Cir. 2017).

On remand, the D.C. Court ordered additional briefing, which was completed on May 16, 2018.  In that briefing, Plaintiffs argued that each of the disputed Treasury documents likely contains information that goes to the heart of the § 1342(c) inquiry this Court has asked the Parties to address, because, *inter alia*, they will likely contain evidence as to the viability of a GM reassumption of the Salaried Plan, the leverage that the PBGC possessed to advocate for a GM reassumption, and whether Treasury improperly influenced the PBGC to acquiesce in the Salaried Plan's termination.  Notwithstanding that Plaintiffs continue to believe that this information could be critically important to their case, as

REDACTED VERSION OF SEALED DOCUMENT

demonstrated below, the record is sufficient to show that the PBGC could not have obtained a judicial decree adjudicating that the Plan needed to be terminated in July 2009.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following Statement of Undisputed Material Facts summarizes the lengthy history of the Salaried Plan's termination.  It shows:  (1) that the PBGC – laudably – initially sought to save the Plan; (2) that the financial crisis of 2008 and the federal government's subsequent effort to rescue the auto industry through the Auto Task Force resulted in the PBGC being frozen out of discussions regarding the Salaried Plan's future, notwithstanding the PBGC's statutory obligations under ERISA; (3) that the Auto Task Force ultimately insisted that the Salaried Plan be terminated, acting consistently with political imperatives (not with the PBGC's statutory directives or even Delphi's or GM's wishes) that as little federal money as possible be used to ensure the auto industry's survival; and (4) that the federal government – also for political reasons – ensured full pensions for union-backed workers similarly situated to Plaintiffs, leaving the Salaried Plan as essentially the only "road kill" in the Auto Task Force saga.

### A. ERISA

1. "On September 2, 1974, following almost a decade of studying the Nation's private pension plans, Congress enacted the Employee Retirement Income

REDACTED VERSION OF SEALED DOCUMENT

Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. §[§] 1001 et seq."

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980).  "One

of Congress' central purposes in enacting [ERISA] was to prevent the 'great

personal tragedy' suffered by employees whose vested benefits are not paid when

pension plans are terminated[,] . . . by making sure that if a worker has been

promised a defined pension benefit upon retirement -- and if he has fulfilled

whatever conditions are required to obtain a vested benefit -- he actually will

receive it."  *Id*. at 374-75.

　　　2.　　　Title IV of ERISA established the PBGC within the Department of

Labor to administer a mandatory government pension insurance program.  *See* 29

U.S.C. § 1302(a).  Governed by a three-person board of directors that comprises

the Secretaries of Labor, Treasury and Commerce, *see id*. § 1302(d)(1), the PBGC

has three statutory goals: (1) "to encourage the continuation and maintenance of

voluntary private pension plans for the benefit of their participants," (2) "to

provide for the timely and uninterrupted payment of pension benefits to

participants and beneficiaries" under covered plans, and (3) to maintain its

insurance premiums at the lowest possible level.  *Id*. § 1302(a).  The PBGC may

also seek a court adjudication to have a pension plan terminated involuntarily

where certain statutory criteria are present.  *See id*. § 1342.  In cases where there is

a possibility that a pension plan may be terminated involuntarily under § 1342, the

REDACTED VERSION OF SEALED DOCUMENT

PBGC may seek to serve as a statutory trustee, a fiduciary function similar to that of a plan administrator, that is responsible for conserving a plan's assets pending a termination determination, and ensuring that the plan's assets are distributed according to ERISA's asset-allocation scheme if a plan is ultimately terminated. *See id*. § 1342; 1344.  While ERISA's insurance guarantee is funded entirely by premiums the PBGC collects from plan sponsors, *see id*. §§ 1305-1307, 1322, the PBGC generally keeps the investment returns from the assets of terminated plans it trustees, and uses these investment returns to fund its own operations.  *See id*. § 1344(c).

### B.   The GM-Delphi Relationship

3.    Tracing its roots back to 1908, General Motors Company ("GM"), was "one of the world's largest automakers."  *See* ECF No. 48-9 at 1.  "For most of its history, GM itself manufactured a large proportion of the parts used in its vehicles.  In 1991, GM combined its parts manufacturing facilities into a single parts division, which was originally known as the Automotive Components Group and eventually renamed Delphi Automotive Systems.  This division produced parts primarily for GM and, to a lesser extent, other automakers."  Ex. 1 at DS-23.

4.    Delphi Automotive Systems "was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM."  *Id*.  "On January 1, 1999, GM transferred the assets, liabilities, manufacturing sites, and most of the employees assigned to

REDACTED VERSION OF SEALED DOCUMENT

Delphi Automotive Systems to the newly-created Delphi Automotive Systems Corporation, a wholly-owned subsidiary of GM . . . making Delphi an independent business." *Id*. Delphi Automotive Systems was renamed Delphi Corporation ("Delphi") in 2002.

5.      While Delphi initially met with some financial success, its financial condition subsequently deteriorated, and in October 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions for reorganization relief under Chapter 11 of the Bankruptcy Code, with the reorganization cases jointly administered under the caption "*In re Delphi Corporation,* et al., No. 05-44481 (RDD)." *See* ECF No. 66 at AR000373. The Delphi debtors continued to operate their businesses as debtors-in-possession, meaning that they could continue to operate as ongoing businesses, but could not engage in transactions outside the ordinary course of business without the prior approval of the bankruptcy court. *Id*. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 filings. *Id*.

6.      Delphi attributed its financial deterioration in large part to the collective bargaining agreements that GM had forced upon it through the spin-off. *See* Ex. 1 at DS-29 (asserting Delphi had been "required to assume the terms and conditions of the collective bargaining agreements negotiated by its unions and GM," with "increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by [those] agreements," which "limited Delphi's ability to

**REDACTED VERSION OF SEALED DOCUMENT**

compete effectively with its U.S. peers"). ███████████████

███████████████████████████████

██████████████████████████

█████████████████████████████████

█████████████████████████████

█████████████

7.      At the time of the spin-off, GM established two defined-benefit pension plans, with assets and liabilities transferred from their GM counterparts: the Delphi Retirement Program for Salaried Employees (*i.e.*, the "Salaried Plan"), and the Delphi Hourly-Rate Employees Pension Plan ("Hourly Plan"). *See* ECF No. 49-9 at 5. After their spin-off from the respective GM plans, Delphi became the sponsor and administrator of both plans.

8.      The Salaried Plan covered the majority of Delphi's non-unionized workforce, while the Hourly Plan covered Delphi's hourly employees in three unions, the United Auto Workers ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers ("IUE"), and the United Steel Workers (the "USW"). In connection with the spin-off, the UAW, IUE, and USW all negotiated agreements with GM in which GM guaranteed that, "if Delphi could not fully fund its pensions, GM would 'top up' or increase, pension benefit payments of the unions' hourly retirees to their full benefit levels under certain

**REDACTED VERSION OF SEALED DOCUMENT**

conditions (called 'pension benefit guarantees,' or 'top-up agreements')."  *See* Ex. 3 (SIGTARP Report) at 6.

### C.  **Plaintiffs**

9.      Plaintiffs Dennis Black, Chuck Cunningham, and Ken Hollis are participants in the Delphi Salaried Plan, and prior to the spin-off, were participants in the defined benefit plan that GM offered to its salaried employees, and spent the bulk of their careers as GM employees.  *See* ECF No. 145 ¶ 5; ECF No. 150 ¶ 5; ECF No. 7-4 ¶¶ 2-4.  As a result of the Plan's termination, Messrs. Black, Cunningham, and Hollis lost a substantial portion of their pension income.  *Id.* Plaintiff Delphi Salaried Retiree Association is an association comprising thousands of participants in the Delphi Salaried Plan or their beneficiaries, many of whom have suffered significant pension losses.  *See* ECF No. 47-4 ¶¶ 7-10, 14-16;

██████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 123 at 1 (PBGC actuarial case memo for the Plan noting $521,525,998 in unfunded non-guaranteed benefits).

### D.  **The PBGC's Efforts to Protect the Delphi Plans During Bankruptcy**

10.      ████████████████████████████████████

███████████████████████████████████████████████████

During that same time, the PBGC "worked successfully with 13 auto parts

companies that have emerged from Chapter 11 protection without terminating their pension plans. These include Federal Mogul Corp., Tower Automotive and Dana Corp." Ex. 9.

11.     Throughout its bankruptcy, Delphi continued to operate its business as a debtor-in-possession, and repeatedly reaffirmed its intention to maintain the Salaried Plan. While Delphi was in bankruptcy, it filed multiple applications with the Internal Revenue Service ("IRS") under 26 U.S.C. § 412(d) for funding waivers for the its pension plans. The PBGC was "extremely supportive" of Delphi's waiver requests, because it believed they were needed "to allow Delphi to emerge from bankruptcy with the plans ongoing." Ex. 10 at 3.

12.     On May 1, 2007, the IRS granted Delphi a conditional funding waiver for the plan year ending September 30, 2006 for the Salaried Plan, and approved multiple modifications to that conditional funding waiver in 2007 and 2008. *See* Ex. 5 at 1. Consistent with those funding waivers, Delphi did not make the full contributions to the Salaried Plan that would have otherwise been required under § 412; however, it consistently contributed "amounts necessary to fund benefits accrued on account of post[-bankruptcy] petition service." *See* ECF No. 66 at AR000423. Additionally, in connection with the funding waivers, Delphi provided the PBGC with a $50 million letter of credit in favor of the Salaried Plan, to be

**REDACTED VERSION OF SEALED DOCUMENT**

deposited as a Plan asset if Delphi failed to meet any of the funding waiver's conditional terms. *Id.*

13. To help protect against unnecessary pension plan terminations, the PBGC may assert liens and claims against a pension plan sponsor (and those companies within the sponsor's controlled group) to cover any missed contributions or even to cover the full amount of a plan's underfunding. *See* 29 U.S.C. §§ 1082, 1083, 1362, 1368; 26 U.S.C. §§ 412, 430. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████.

14. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

E. **Delphi's Proposal for a GM Reassumption of the Salaried Plan, and the PBGC's Embrace of that Proposal**

15. While Delphi remained committed to maintaining its pension plans throughout its bankruptcy, it also recognized as the capital markets dried up in

REDACTED VERSION OF SEALED DOCUMENT

2008 that it might require help from the pension plans' former sponsor (GM) to maintain those plans going forward.  GM had a history of providing financial support to Delphi.  For example, after the investors in Delphi's planned reorganization pulled out in April 2008, GM provided Delphi with "significant incremental liquidity necessary for Delphi to continue operating."  ECF No. 189-4 ¶ 11.  GM provided this support to Delphi in large part because of its operational importance to GM.  Between 1999 – 2009, Delphi was GM's largest component parts supplier.  *See* ECF No. 168-2 ¶ 5. "Consequently, if Delphi ever cease[d] shipping even a small fraction of production parts to GM, the GM plants relying on such shipments may run out of inventory of such parts and have to shut down within a matter of days," *id*. ¶ 7, and "a prolonged cessation in the supply of parts from Delphi to GM would have [had] a devastating effect on GM."  *Id.* ¶ 11.  In total, during Delphi's bankruptcy, "GM ha[d] been forced to spend billions of dollars and incur billions of dollars of additional liabilities primarily to protect its supply base by supporting Delphi."  ECF No. 168-3 ¶ 6.

16. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**



17.     At this point, Delphi proposed that GM reassume the pension

liabilities of some of its former employees, ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████   The PBGC's 30(b)(6) deponent testified that the

PBGC was "cheerleading for the transfer [*i.e.*, the reassumption], . . . utilizing [the

PBGC's] liens overseas as potential leverage to get it done." Ex. 14 at 67:6-14.

███████████████████████, GM agreed to assume over $2 billion in

Delphi pension liabilities associated with Delphi's Hourly Plan.  ECF No. 49-9 at

AR000031.  And in exchange for the pension transfer, the PBGC stated that it had

released more than $1.2 billion worth of liens it had asserted on Delphi assets.  *See*

Ex. 9 (Sept. 25, 2008 PBGC Press Release).

REDACTED VERSION OF SEALED DOCUMENT

18.     Because the PBGC continued to possess the ability to assert liens and claims against Delphi assets (*i.e.*, the plants that made the parts GM depended upon) to the extent the Delphi pension plans were underfunded, the resolution of Delphi's pension obligations, and the associated PBGC liens and claims, were a major threat to GM's supply and were one of the last major hurdles to resolving Delphi's bankruptcy.  *See, e.g.*, ECF No. 49-9 at 13 (AR000040); Ex. 15 (same).

19.     In September 2008, Delphi implemented a freeze of the Salaried Plan, *see* ECF No. 66 at AR000418, meaning that the Plan's participants' benefits were frozen, or fixed, and the Plan's liabilities (and therefore the exposure of the PBGC's insurance fund) were likewise frozen.  On October 3, 2008, Delphi filed a modified disclosure statement, noting that "Delphi now expects to be able to meet its pension funding strategy without the benefit of the previously issued pension funding waivers. . . . Delphi will need to satisfy its funding obligation to the Salaried Plan upon emergence in cash or qualifying employer securities.  This obligation is estimated to be $70 million as of October 1, 2008."  Ex. 16 at DS-96.

## F.     The Financial Crisis and GM's Request for Federal Aid

20.     In the fall of 2008, the United States "[stood] on the precipice of the most serious financial crisis since the Great Depression." 154 Cong. Rec. H10702 (daily ed. Oct. 3, 2008) (statement of Rep. Slaughter).  In response, on October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008

REDACTED VERSION OF SEALED DOCUMENT

("EESA"), Pub. L. No. 110-343, 122 Stat. 3765. Seeking "to immediately provide authority and facilities that the Secretary of the Treasury [could] use to restore liquidity and stability to the financial system of the United States," EESA authorized the Secretary of the Treasury "to establish the Troubled Asset Relief Program (or 'TARP')." EESA §§ 2(1), 101(a)(1), 122 Stat. at 3766, 3767. Subject to certain conditions, EESA authorized the Secretary of the Treasury to spend up to $700 billion to purchase "troubled assets." *Id.* § 115(a)(3), 122 Stat. at 3780.

21. The financial crisis impacted the auto industry. An Obama administration official testified that, "in 2008, the U.S. auto industry lost 50% of its sales volume and over 400,000 jobs." Ex. 3 at 4. "By the fall of 2008, GM was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more uncertain with each passing day. As a result, in November 2008, GM was compelled to seek financial assistance from the U.S. Government." *In re GMC*, 407 B.R. 463, 476-77 (Bankr. S.D.N.Y. 2009).

22. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

23.

24.     During this time, GM continued to tell Delphi that it was open to the idea of a reassumption of the Salaried Plan. *See, e.g.*, Ex. 20 at 2 (Dec. 4, 2008 Delphi email noting that Delphi was continuing to press GM to agree to take back the Salaried Plan, and that "[t]here have been some preliminary indications from GM that they are willing to consider this as part of a final solution");

REDACTED VERSION OF SEALED DOCUMENT

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

25.     "In December 2008, Treasury, under the Bush Administration, announced TARP's Automotive Industry Financing Program with the stated goal to prevent a significant disruption to the American automotive industry that would pose a systemic risk to financial market stability and have a negative effect on the U.S. economy."  Ex. 3 at 4.  Pursuant to that authority, and "after negotiations, the U.S. Treasury and GM entered into a term loan agreement on December 31, 2008, . . . that provided GM up to $13.4 billion in financing on a senior secured basis."  *In re GMC*, 407 B.R. at 477.  "Treasury's Loan and Security Agreement ('TARP loan agreement') required GM and Chrysler to each submit by February 17, 2009, for review and approval by the President's Designee a restructuring plan showing how they would use the TARP funds to achieve 'long-term viability.'"  Ex. 3 at 4.[1]

_____

[1] The government's decision to use TARP funds to rescue the auto industry was, to say the least, controversial.  *See, e.g.*, *Time for Plan D*, Financial Times (Nov. 13, 2008), http://www.ft.com/cms/s/0/471f2266-b1bc-11dd-b97a-0000779fd18c.html#axzz4KpUqxYGA ("Helping the carmakers, however, is not a job for the Tarp.  They have financial divisions, but are not financial companies."); George F. Will, *TARP and ADD*, Newsweek (Nov. 21, 2008), http://www.newsweek.com/george-f-will-tarp-and-add-84997 ("Can anyone

**REDACTED VERSION OF SEALED DOCUMENT**

### G.   The PBGC Continued Its Advocacy on Behalf of the Salaried Plan as the Treasury Began to Familiarize Itself with the GM/Delphi Relationship

26.     "[O]n January 16, 2009, Delphi filed amended Forms 5500 [] with the IRS that applied all contributions made to the . . . Salaried Plan[] in 2008, including the proceeds from the [$50 million] letters of credit, back to the plan year ended September 30, 2007." *See* ECF No. 66 at AR000424.  While "[a]pproximately $56 million remain[ed] due as a minimum funding contribution under the Salaried Plan for the plan year ended September 30, 2008, . . . . [a]s permitted under [ERISA] and [the Internal Revenue Code], Delphi elected to defer the contribution necessary to satisfy this remaining obligation until no later than the due date for minimum contributions, which [was] June 15, 2009 for the Salaried Plan." *Id.*  Additionally, "[o]n December 15, 2008, Delphi applied to the IRS for a waiver of the obligation to make the minimum funding contribution to the Salaried Plan by June 15, 2009, and permission to instead pay the amount due in installments over the next five years." *Id*.  Accordingly, Delphi had at least until June 15, 2009 to satisfy the Plan's minimum funding contributions, and potentially longer if the IRS granted its waiver request. ████████████████████

_____

discern the principle implicit—it certainly is not explicit—in the Troubled Asset Relief Program (TARP) that authorizes disbursement of perhaps $1 trillion in bailouts?  . . .  [TARP] has made Treasury Department bureaucrats into legislators; or perhaps it has made Secretary Hank Paulson the fourth branch of government.").

**REDACTED VERSION OF SEALED DOCUMENT**

████████████████████████████████████████████, the PBGC –
according to an email by the PBGC's Karen Morris, was now putting the waiver
request "on ice," pending "an agreement . . . under which [GM] will assume
Delphi's plan(s)," and noting that the "government's commitment to grant a
waiver" could be used as an "incentive" for GM to "take the plan(s)."  Ex. 22.

27.     On January 26, 2009, the heads of GM and Delphi engaged in a frank
piece of correspondence about the leverage the PBGC possessed to ensure a GM
reassumption:

> We must find a pension plan solution in which GM participates.  Your
> team has said that GM will not be permitted to address (or does not
> intend to address) legacy obligations relating to Delphi's [Salaried
> Plan] . . . . This does not make sense to us because, for example, if there
> is a distressed pension termination, *both GM and Delphi have been told
> by the PBGC that it will assert liens against Delphi ROW [rest of the
> world assets] and will sue GM for what the PBGC has told us it views
> as GM's prior unlawful follow-on plan at the time that the pension
> plans were split and transferred to Delphi*.  We will not be able to sort
> out a solution where GM takes the keep sites and the DIP lenders take
> the rest of the world without a pension solution that, among other
> matters, eliminates any contingent PBGC claims and related PBGC
> liens both in the US and in the rest of the world.

Ex. 23 at 3 (emphasis added).

28.     GM followed up by arranging a meeting with Delphi's attorneys in
early February 2009, with the purpose of "obtain[ing] factual info concerning the
state of play with the PBGC/Pension plans as well as understand[ing] better
Delphi's concerns relating to liens on foreign assets etc.  This is [important] so we

**REDACTED VERSION OF SEALED DOCUMENT**

have a full picture of the pension issues as we proceed." Ex. 24 at 1.  As these

discussions were taking place, both the PBGC and GM began preparing funding

projections for GM's pension plans that assumed a GM reassumption of the Delphi

pension plans.  *See* Ex. 25 at 1 (Jan. 23, 2009 internal PBGC email attaching

presentation with "4 new scenarios for GM" to account for assumption of the

Delphi pension plans); Ex. 26; ███████████████████████████

███████████████████████████

29.   ███████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████

30.   On January 20, 2009, President Obama took office, and that same day,

the PBGC's director under George W. Bush, Charles Millard, resigned.[2]  Vince

_____

[2] *See* Past PBGC Directors and Executive Directors,
https://www.pbgc.gov/about/who-we-are/pg/past-pbgc-directors-and-executive-directors (last updated Apr. 27, 2017).

**REDACTED VERSION OF SEALED DOCUMENT**

Snowbarger assumed the role of Acting Director of the PBGC. *See* Ex. 56 (V.

Snowbarger Dep. Tr.) at 14:17-18.

31.

32.

**REDACTED VERSION OF SEALED DOCUMENT**

33.     On February 10, 2009, the PBGC followed up on the meeting by emailing Treasury to argue that "[i]f GM does not absorb Delphi's pension liabilities, the cost to the U.S. government (Treasury and PBGC) for resolving GM/Delphi may increase by almost $6 billion, as PBGC's insurance funds will be called upon to honor benefit obligations under the Delphi pension plans."  Ex. 32 at 2.  A few days later, the PBGC's consultant, Compass Advisors, concluded its recommendations regarding the Delphi pension by urging that the PBGC "continue their full court press to convince GM and Government officials that the 414(L) transfer [of Delphi pensions back to GM] is in everyone's best interest [as] GM doesn't need two classes of employees and should provide pensions to all retirees."  Ex. 33 at 8.  The PBGC's advisor noted that the "PBGC can help GM with waivers if equity markets don't turn around in the next two years providing an adequate return on their pension assets."  *Id.*

34.     ███████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████  Similarly, Delphi and GM were at this time exchanging information on unresolved issues, and both agreed that "Delphi and GM recognize that the status of the Delphi [Hourly Plan] and Delphi [Salaried Plan] must be resolved in connection with Delphi's emergence

REDACTED VERSION OF SEALED DOCUMENT

from chapter 11. The status of the [Hourly Plan] and [Salaried Plan] will be discussed with the U.S. Government, including the Treasury Department and the PBGC." Ex. 35 at 9 (Feb 17, 2009 GM revisions to Delphi's side-by-side term sheet chart).

35.     On February 15, 2009, the President appointed the Auto Task Force to oversee the Administration's efforts to support and stabilize the domestic automotive industry, naming Treasury Secretary Geithner and NEC Director Summers to serve as co-chairs of the Auto Task Force. Ex. 3 (SIGTARP Report) at 4. Treasury created an "Auto Team" that was "delegated … the responsibility of evaluating the auto companies' restructuring plans and negotiating the terms of any further assistance." *Id.* at 4-5.

36.     "Leading the Auto Team was Steven Rattner, co-founder of Quadrangle Group, a private equity firm." *Id*. at 5. Ron Bloom, a former head of collective bargaining for the USW (one of the Delphi unions whose members were covered by Delphi's Hourly Plan) "served as his deputy and then the head of the Auto Team after Mr. Rattner left Treasury in July 2009." *Id*. "With a staff of 15 people, the other key members of the Auto Team who worked on GM's restructuring with Mr. Rattner and Mr. Bloom, included Matthew Feldman, who told the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") that he was brought in to be the bankruptcy lawyer for Treasury,

REDACTED VERSION OF SEALED DOCUMENT

and Harry Wilson, a former member of the hedge fund management firm Silver Point Capital." *Id*.

37.     Silver Point Capital, it so happened, was one of a group of hedge funds that had provided a significant amount of debtor-in-possession loans to Delphi (referred to throughout the bankruptcy proceedings as the Tranche C DIP lenders).  The Tranche C DIP Lenders were a driving force in Delphi's bankruptcy, and would ultimately (with the consent of the Treasury) become the owners of the New Delphi that emerged from Delphi's bankruptcy.  Interestingly, Mr. Feldman also had a connection with this hedge fund group -- his law firm (Willkie Farr & Gallagher) represented a group of Delphi's Tranche C lenders.  ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

38.     "The[] Auto Team officials told SIGTARP that they were directed by Treasury and the Administration to act in a 'commercially reasonable' manner. There were no policies and procedures defining commercially reasonable; it was subject to interpretation."  Ex. 3 at 5.  ████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**



Indeed, as Presidential advisor David Axelrod noted in an interview with the New York Times in April 2009, "'The issues were obvious – balancing [President Obama's] interest in seeing the companies survive and

REDACTED VERSION OF SEALED DOCUMENT

prosper for the benefit of the workers and communities in which they operate and all the offshoot businesses, versus the interests of American taxpayers . . . .  And overlaid on that is, when is it appropriate for the government to intervene?'"  Jim Ruttenberg, Peter Baker, & Bill Vlasic, *100 Days:  Early Resolve: Obama Stand in Auto Crisis*, N.Y. Times, Apr. 29, 2009, at A1; *see also* Steven Rattner, *The Auto Bailout:  How We Did It*, Fortune (Oct. 21, 2009) ("[a]n important part of our job was going to be to convince the stakeholders that the government wasn't going to be everyone's piggy bank.").[3]

39.    GM submitted its first viability plan to Treasury on Feb. 17, 2009. Ex. 3 at 7.  The same day, "the Auto Team sent a memo to Auto Task Force chairs Dr. Summers and Secretary Geithner with 'first-blush impressions' of the auto companies' restructuring plans.  As for GM, the memo listed four risks," including Delphi and its pension liabilities.  *Id.*  Consistent with this conclusion, during a Feb. 18, 2009 press conference, GM's Fritz Henderson, in responding to a question about Delphi, noted that while GM did not anticipate taking on any additional pension liabilities, "[i]f Delphi is unsuccessful in addressing its underfunded pension plans and raising exit financing, it would represent a significant risk to [GM's] revised Plan."  *Id.* at 6.

---

[3] http://archive.fortune.com/2009/10/21/autos/auto_bailout_rattner.fortune/index.htm.

**REDACTED VERSION OF SEALED DOCUMENT**



**REDACTED VERSION OF SEALED DOCUMENT**

42.

---

[5] Mr. Cann was at the time a financial analyst in the PBGC's Department of Insurance Supervision and Compliance, *see* Ex. 14 at 14:13-18, responsible for working "with ongoing pension plan sponsors," and "charged with keeping pension plans ongoing," or when a plan's continued survival is no longer possible, to shift "to risk mitigation and recovery maximization. *Id*. at 15:17-19. Because of the PBGC's "large exposure" to Delphi's pension plans, the PBGC was "keenly interested in what was going on at the company," and Mr. Cann began working on the Delphi matter for the PBGC around 2004. *Id*. at 17:22-19:13. The PBGC designated Mr. Cann as its deponent for several subjects related to Plaintiffs' 30(b)(6) deposition notice. *Id*. at 13:02-09.

REDACTED VERSION OF SEALED DOCUMENT

43.     Also, that day, the Auto Team had a meeting in Larry Summers's office to discuss, among other things, the question of how to determine when Treasury should use TARP funds to assist auto suppliers (like Delphi).  As noted above, the Administration was facing mounting skepticism regarding its use of TARP funds to bailout the auto industry.  *See supra* p.24, 32-33.  Consistent with this concern, Mr. Rattner has written that President Obama directed that he and Mr. Bloom should "'be tough [and] commercial,'" which Mr. Rattner understood as a direction that the Task Force reach its goals "in a way that was prudent from the taxpayer's standpoint."  Steven Rattner, *Overhaul:  An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry* at 132 (2010) ("*Overhaul*").  In order to balance its competing goals of saving the auto industry while using as little TARP funding as possible, the Task Force "quickly agreed that the administration's goal should be not to save suppliers per se but to save only those that were of *critical importance* to the automakers."  *Id.* at 90-91(emphasis added).  Additionally, in light of the concerns regarding the potential impropriety of government improperly interfering in the private sector, Mr. Rattner has written that "[t]hroughout its rescue operations, the Obama administration had wanted to minimize at least the appearance of intervention in the private sector."  *Id.* at 133-34.

**REDACTED VERSION OF SEALED DOCUMENT**

44.

---

[6] The actual memorandum has been withheld by Treasury pursuant to the presidential communications privilege, and is one of the documents currently in dispute in the Treasury subpoena litigation, which remains pending in the D.C. Court.

**REDACTED VERSION OF SEALED DOCUMENT**

45. ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

46. ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

47.

On March 7, 2009, Delphi and GM had a call during which GM related that it had told Treasury that Delphi's emergence funding and pension issues needed to be addressed in connection with GM's Viability Plan.  Ex. 51.

48.

REDACTED VERSION OF SEALED DOCUMENT

**H.** **As the Auto Team Inserted Itself Into Negotiations Over Delphi, the PBGC Ceased Advocating for GM's Reassumption of the Salaried Plan**

49.     By the beginning of March 2009, Treasury officials began to prepare for the possibility of a GM bankruptcy that would utilize Section 363 of the Bankruptcy Code.  Ex. 3 at 8.  "An Auto Team official testified in a deposition that 363 was selected because of speed, certainty, and the ability to leave behind liabilities that a commercial buyer would not want in the new company."  *Id*.  By the end of March 2009, Treasury had replaced GM's CEO and rejected GM's restructuring plan, determining that GM's "best chance at success may well require utilizing the bankruptcy code in a quick and surgical way."  *Id*. at 9.  Treasury's March 30, 2009 Viability Determination "gave GM until June 1 to resubmit the plan, and gave GM an additional $6 billion in TARP funds – enough working capital to continue operations over the following 60 days."  *Id*.

50.     "With only 60 days of funding from TARP, GM developed a new restructuring plan with significant influence and leverage from Treasury's Auto Team."  *Id*. at 11.  Under the TARP loan agreement, Treasury had the right to approve or prohibit transactions over $100 million that were not in the ordinary course of GM's business or any increase in pension obligations," and the TARP

REDACTED VERSION OF SEALED DOCUMENT

Special Investigator found that "Treasury's Auto Team had significant influence over GM's decisions, even in the areas where Treasury's consent was not required under the TARP loan agreement." *Id*. "One GM official told SIGTARP, 'Ultimately it was that GM is not in control. And GM is totally dependent.'" *Id*.

51.    According to the TARP Special Investigator's report, "[w]hat followed was the Auto Team's direct involvement in the decisions affecting GM. Treasury's Auto Team used their financial leverage as GM's only lender to significantly influence the decisions GM made during the time period leading up to and through GM's bankruptcy." *Id*. at 8. Indeed, "the Auto Team used their leverage as GM's largest lender to influence and set the parameters for GM to make decisions." *Id*. at 11. According to SIGTARP, "*[t]he Auto Team specifically pressed GM to be less generous in relation to Delphi and pensions.*" *Id*. at 13 (emphasis added).

52.    On March 23, 2009, the Auto Task Force intervened in Delphi's bankruptcy case and objected to GM's proposed purchase of the Delphi Steering transaction and GM's agreement to provide Delphi with additional interim financing. *See* ECF No. 189-4 ¶ 29. The Auto Team informed both Delphi and GM that there would be no additional financial support to Delphi, in any form, absent a "global solution." *See* ECF No. 189-6 (M. Feldman Dep. Tr.) at 135:4-8 ("[O]ur position has always been the same, which is if Delphi wanted funding from

REDACTED VERSION OF SEALED DOCUMENT

General Motors, there needed to be a signed deal that could lead to emergence from Chapter 11.").  In order to achieve its global solution, the Treasury took the lead in vetting offers from Delphi, and from a number of entities that were seriously considering acquiring Delphi or its business (including Delphi's DIP Lenders, Platinum Equity, and Federal Mogul) in deciding what form a new or reorganized Delphi would ultimately take.  *See generally*, ECF No. 189-4 ¶¶ 41, 43, 44, 48.

53.    Both GM and the Treasury determined that there could be no global solution that would secure GM's supply while Delphi assets were subject to the threat of PBGC liens and claims, which were a threat not only to GM's supply, but also to the potential for a speedy GM bankruptcy proceeding.  S*ee* ECF No. 168-3 ¶ 15 ("neither GM nor Parnassus (nor presumably any other potential purchaser) is willing to purchase the assets (or shares in the non-debtor affiliates that own the assets) while they are subject to the threat of the PBGC liens"); Ex. 3 at 13-14 ("GM officials told SIGTARP that GM needed PBGC to release liens on Delphi assets so Delphi could successfully emerge from bankruptcy…. 'Ultimately to get Delphi out of bankruptcy, we needed the [pension] plans to be terminated.'"); *see also* ECF No. 189-6 (M. Feldman Dep. Tr.) at 204:24-205:7 ("If I understand, if there could not have been a consensual resolution with the PBGC, and it would have taken 3 months to terminate the pension plan, would have had -- you would

REDACTED VERSION OF SEALED DOCUMENT

have had to weigh that delay in Delphi emergence against whatever economic benefits you had against -- in not taking the liability."). Thus, arriving at a global solution meant dealing with Delphi's pension plans and the PBGC's associated liens and claims.

54.    The Treasury negotiated directly with the PBGC on GM's behalf on Delphi-related issues, and one of the Treasury's perceived objectives in these negotiations was "induc[ing] PBGC to waive alleged 'rest of world' liens against Delphi's non-debtor affiliates . . . ." *See* Ex. 55 at 2.  However, the shift in negotiating partner was problematic for the PBGC, as the Treasury was wearing "at least" three conflicting hats: (1) through its Auto Team, it was the agency charged with restructuring the auto industry; (2) as a PBGC board member, it was one of three agencies charged with providing oversight and direction to the PBGC; and (3) as a major competing creditor in the Delphi bankruptcies that, as the chief lender to GM, would ultimately decide whether GM would be permitted to fund a reassumption of the Delphi pension plans. *See, e.g.*, Ex. 56 (V. Snowbarger Dep. Tr.) at 39:6-12, 62:13-63:2.  GM perceived a benefit to Treasury taking the lead on negotiations with the PBGC "because it was 'Government agency to Government agency' and *Treasury would get a better deal for GM*." Ex. 3 (SIGTARP Report) at 14  (emphasis added).

REDACTED VERSION OF SEALED DOCUMENT

55.    In the beginning of April 2009, financing issues in Delphi's bankruptcy reached a critical juncture.  On April 2, 2009, Delphi announced that an agreement had been reached amongst itself, its DIP lenders, GM and the Treasury to allow a short period of time for the relevant parties to negotiate a global solution to the Delphi situation.  ECF No. 49-9 at AR0000029.  Under this agreement, Delphi had until April 17, 2009 to deliver to the DIP lenders "a detailed term sheet," agreed to by both GM and Treasury, setting forth "the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's Chapter 11 cases."  *Id*.

56.    Failure by Delphi to deliver the term sheet by April 17 would trigger a $117 million repayment oblation to Delphi's DIP lenders on April 20, 2009, and failure to deliver both the term sheet and the repayment obligation would constitute "events of default" under the DIP credit agreements.  *Id*.  Those credit agreements also provided a five-business-day grace period, such that, in the event of an April 17, 2009 default, Delphi could continue to use its DIP borrowing until April 24, 2009, following which Delphi's DIP lenders could exercise all their remedies, including foreclosure on their collateral.  *Id*. at AR000030.  This possibility was alarming to the PBGC, because it threatened the PBGC's leverage.  As the PBGC noted in an internal memo:

> Among the collateral pledged to the DIP lenders is 100% of the stock
> in Delphi's foreign subsidiaries – stock currently owned by Delphi

**REDACTED VERSION OF SEALED DOCUMENT**

Automotive Systems Holding, Inc. ("DASHI"), a debtor entity. The foreign subsidiaries remain outside of bankruptcy, and according to . . . PBGC's outside financial advisor, comprise substantially all of the value of the Delphi controlled group. As such, PBGC must initiate a termination and set a date of plan termination ("DOPT") prior to April 24, 2009, or risk a controlled group break-up, whereby substantially all value available for PBGC recoveries leaves the controlled group.

*Id*.

57.     

58.     While Treasury initially invited the PBGC to attend the meeting, Treasury withdrew the PBGC's invitation shortly before the meeting began. *See* Ex. 59. In the meantime, as documented below, Treasury spent a great deal of time

REDACTED VERSION OF SEALED DOCUMENT

(without input from the PBGC) considering the investment it should allow GM to make in Delphi.

59.     On April 13 and 14, 2009, Delphi's DIP lenders had meetings with the Auto Task Force, during which "the DIP lenders presented an analysis of the cost to GM if Delphi were unwilling or unable to provide supply to GM should the DIP lenders exercise certain remedies resulting in a shutdown of Delphi."  ECF No. 189-4 ¶ 38.  "The analysis was the product of a detailed operational and financial analysis performed by third party consultants for the DIP lenders that had previously held senior management positions in GM's purchasing organization." *Id*.  "The analysis asserted that it would take GM years and tens of billions of dollars to fully re-source Delphi's products because Delphi is a sole source provider of many components for every vehicle GM produces."  *Id*.

60.     ██████████████████████████████████████████████████
████████████████████████████████████ Additionally, Mr. Feldman emailed fellow Auto Team member Harry Wilson regarding Delphi pensions and the "potential inheritance of pension/PBGC liability" (though the Treasury has withheld the substance of the communication, asserting that it was covered by the attorney-client privilege, *see* Ex. 61 (First Treasury privilege log, describing Item No. 30 re: UST-BL-005947) at 2.

**REDACTED VERSION OF SEALED DOCUMENT**

61. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████

62.     It was at about this time that the PBGC finally decided to engage with Treasury.  From this point forward, throughout August 2009, Treasury and the PBGC communicated about Delphi issues almost exclusively through two individuals, Joe House at the PBGC, and the Auto Team's Matt Feldman.  *See, e.g.*, Ex. 56 at 47:16-19; Ex. 64 at 118:4-19.

63.     Mr. Feldman has testified that he began his discussions with the PBGC with a clear agenda -- "to reach an agreement where the salaried Delphi plan[] would be terminated and General Motors would assume the hourly pension plan[]."  ECF No. 189-6 (M. Feldman Dep. Tr.) at 158:24-159:4.

REDACTED VERSION OF SEALED DOCUMENT

64.     Notwithstanding that the PBGC had previously been engaged in a "full court press" to have GM assume the Salaried Plan, once Treasury took over negotiating for GM, the PBGC took on a much more submissive role in those negotiations, eventually abandoning altogether its advocacy that GM reassume the Salaried Plan.  For instance, the PBGC simply stopped treating its interactions with Treasury as a negotiation.  According to Mr. House (the PBGC negotiator), "the word 'negotiation' doesn't really describe the nature of the liasing.  It was much more of a – a coordination exercise."  Ex. 64 (J. House Dep. Tr.) at 12:4-7.  Terrance Deneen, who served at the time as the PBGC's Chief Insurance Program Officer, and was Mr. House's supervisor at the time, made a similar observation, saying that, because both agencies were part of the same government, "I'm not sure it would be fair to characterize those as negotiations.  They were discussion of common issues and what we were going to do."  Ex. 65 (T. Deneen Tr.) at 97:21-98:03.

65.     The PBGC, however, did not view itself as an equal in the relationship.  Instead, the PBGC was, according to Mr. Deneen, a "mouse," and the Treasury's Auto Team "an elephant," and the PBGC could only "make sure that the elephant knew that we were there so we didn't get stepped on by mistake."  *Id.* at 82:13-15.  Going a step further, Mr. Deneen asserted that the PBGC's "was the smallest and least-important voice in any room."  *Id.* at 111:20-112:01.   Mr.

REDACTED VERSION OF SEALED DOCUMENT

Deneen asserted that the PBGC "didn't have tools" to advocate on behalf of a GM assumption of the Delphi plans, and that the PBGC's only hope to avoid termination of the Delphi plans was to "inform and urge." *Id.* at 116:07-16.

66.     Consistent with Mr. Deneen's view of the PBGC as an impotent subordinate agency with no tools or leverage at its disposal with respect to Treasury or GM, Mr. House testified that he could not remember a single instance of ever trying to persuade the Treasury to fund a GM reassumption of the Salaried Plan.  *See* Ex. 64 at 45:6-8 (Mr. House testifying he had no "recollection of trying to persuade Treasury of anything").

67.     The House/Feldman meetings began in earnest around April 16, 2009 ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Mr. House was unalarmed when Treasury disinvited the PBGC from the early April Delphi meetings, asserting that it was "for the best." *See* Ex. 59.  Finally, on April 14, 2009, Mr. House emailed Mr. Feldman to arrange a call to discuss Delphi.  *See* Ex. 66. ██████████████████████████ ███████████████████████████████████████████████████ ███████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

████████████████████████████████████████
█████████████████████████████████.

68.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

## I.   The PBGC's Initial Decision to Terminate the Delphi Plans

69.   On April 17, 2009, Mr. House, on behalf of the PBGC's Department of Insurance Supervision & Compliance ("DISC"), submitted a memo to the PBGC's Trusteeship Working Group ("TWG") requesting that the TWG concur with DISC's recommendation that the PBGC initiate termination of Delphi's Hourly and Salaried Plans prior to the April 24 deadline to allow the PBGC "to maximize its recoveries in the case." *See* ECF No. 49-9 at AR000038.  With regard to the Salaried Plan, DISC recommended termination under ERISA § 4042(a)(1), 29 U.S.C. § 1342(a)(1) (because the Plan had supposedly failed to meet the minimum-funding standard for the 2005 plan year), and § 4042(a)(2), 29 U.S.C. § 1342(a)(2) (because a foreclosure by the DIP lenders could potentially

REDACTED VERSION OF SEALED DOCUMENT

force a Delphi liquidation, whereby supposedly both Delphi "Plans risk[ed] abandonment"). *Id.* at AR000037-38.

70.    The DISC memo notes that, with respect to the Hourly Plan, the PBGC did not possess any statutory liens, but that more than $165 million in statutory liens had arisen in connection with the Salaried Plan. *Id.* at AR000034. The memo also states that "Treasury's interest in the negotiations is GM's role in the resolution, as GM requires ongoing support in the form of existing and prospective loans from Treasury." *Id.* at AR000035.  It goes on to say that "[b]ecause Delphi is still GM's largest supplier, Treasury is trying to weigh the benefits of additional GM investments in Delphi against the risks if the supply of parts from Delphi is interrupted." *Id.*

71.    Nonetheless, the memo stated that based on the previous day's conversation between Mr. House and Mr. Feldman, *id.* at AR000033 n.9, "GM assumption of the [Hourly Plan] is still a possibility." *Id.* at AR000033.  The memo does not explain why GM assumption of the Salaried Plan was no longer still a possibility; it omits mention of how, if at all, the PBGC was using the statutory liens in favor of the Salaried Plan to prevent its termination; and it does not even hint that the PBGC was still advocating to promote a GM reassumption of the Plan. *Id.*  But, the memo does note that "[i]f a Treasury resolution is reached that includes assumption of either of the [Delphi] Plans, PBGC can hold the notice

REDACTED VERSION OF SEALED DOCUMENT

of determination ("NOD"), if it has not yet been issued, or rescind the NOD, pending GM assumption." *Id.*

72.     At about this time, Treasury's Auto Team determined "that GM needed to be shepherded through a prepackaged bankruptcy." Ex. 3 (SIGTARP Report) at 17. The Auto Team believed that GM needed to have "a quick-rinse bankruptcy," because of concerns that "GM could not survive a lengthy bankruptcy and GM's failure would have broader systemic consequences." *Id.* at 18. In conjunction with this determination, on April 16, 2009, Treasury circulated a memo discussing "Delphi's liquidity issues and potential consequences of Delphi shutdown." *See* Ex. 69 (excerpts of Treasury's Privilege Log, Item Nos. 856 & 860) at 4. Treasury has withheld the memo pursuant to the presidential communications privilege, asserting that this memo was one of a handful of documents relating "to the President's decisions as to how the United States should address the financial distress of several of its large automobile corporations and protect the country from the potential consequences of their bankruptcy." *See U.S. Dep't of Treasury v. Black*, 249 F. Supp. 3d 206, 210 (D.D.C. 2017) (internal quotation omitted). ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████

**REDACTED VERSION OF SEALED DOCUMENT**

73.     Throughout the next few days, GM and Delphi's DIP lenders exchanged offers and counter-offers regarding a reorganized Delphi, *see, e.g.*, ECF No. 189-4 ¶¶ 39-40.  █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

74.     ████████████████████████████████████████

████████████████████████████   On April 21, 2009, the PBGC's Trusteeship Working Group (*i.e.*, the TWG) met to consider the recommendation to initiate termination of the Delphi Plans.  *See* ECF No. 58 at AR000022-24.

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

75.     On April 21, 2009, ████████████████████████████████

████████████████████████████████████████████████████, and

"Delphi's DIP lenders agreed to provide PBGC five-days written notice prior to

exercising their right of foreclosure, and PBGC agreed to forebear from

terminating until after it had received that notice."  *See* ECF No. 54 at AR000010.

76.     At about this time, Delphi's CEO testified to a "fundamental change

to the landscape" of Delphi's bankruptcy, "when GM, with the support of the Auto

Task Force, agreed to support a comprehensive resolution of the Delphi chapter 11

cases."  ECF No. 189-4 ¶ 39. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

77. ████████████████████████████████

████████████████████████████████

█████████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████

78. █████████████████████████████

█████████████████████████████████

██████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████

█████████████████████████████

████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

79. ██████████████████████████████████

80. ██████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

81.    "On May 5, 2009, counsel for the Auto Task Force sent a letter to Delphi disclosing that negotiations were ongoing with two potential buyers and setting a May 18, 2009, target for completion of negotiations."  ECF No. 189-4 ¶ 43. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

82.    On May 11, 2009, Treasury's Auto Team had a meeting with Larry Summers, President Obama's principal economic advisor, to discuss the team's plans for GM's expedited bankruptcy filing.  *See* Ex. 3 at 18.  "Treasury [had] determined that GM would need $30 billion, but the Auto Team was concerned about giving the TARP funds in a loan that would be too much debt on GM's balance sheet, so the Auto Team proposed to senior Treasury officials that

REDACTED VERSION OF SEALED DOCUMENT

Treasury fund GM's bankruptcy with a loan that would convert to common stock ownership in New GM – the purchaser of Old GM's assets in bankruptcy." *Id*. "This would mean that the Government would have a substantial ownership interest in a private company." *Id*.

83.     "Dr. Summers, Secretary Geithner, and ultimately President Obama approved an additional $30.1 billion in a TARP loan (in the form of a debtor-in-possession ('DIP') loan) that, when combined with the $19.4 billion in prior TARP injection, totaled $49.5 billion in TARP funds in GM." *Id*. "The TARP investment in GM would convert to 61% Government ownership of common stock in New GM." *Id*. The TARP loan was scheduled to be effective on June 1, 2009, and the Auto Team would plan to condition the TARP financing on GM exiting bankruptcy in only 40 days, in what Mr. Rattner referred to as a "quick-rinse bankruptcy." *Id*. "Treasury Auto Team officials were concerned that if GM's bankruptcy was prolonged, consumers would stop purchasing GM's automobiles, and GM would likely fail." *Id*.

84.     ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**



85.

86.     Throughout the remainder of May, the PBGC continued to advocate with Treasury for a GM reassumption of the Hourly Plan.  On May 26-27, 2009, certain key stakeholders in the Delphi bankruptcy participated in a court-ordered

**REDACTED VERSION OF SEALED DOCUMENT**

mediation; Delphi, the PBGC, GM, the Auto Task Force, and Delphi's DIP lenders were among the attendees.  *See* Ex. 141.  On May 22, 2009 (the Friday prior to the start of the mediation), Mr. Feldman emailed Mr. House to request another one of their off-the-record phone conversations, this time to discuss the upcoming mediation in light of a conversation that Mr. Feldman had just had with the Delphi mediator.  *See* Ex. 94.  Mr. House testified that he could not recall the substance of this conversation.  *See* Ex. 64 at 141:17-19.

87. ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████

88.      Again, notwithstanding the PBGC's statutory mission to preserve pension plans, its leverage to advocate for GM reassumption of the Plan, and the fact that the Treasury entered the mediation agreeing that the treatment of Delphi's pension plans was an open issue for discussion, Mr. House testified that during the

**REDACTED VERSION OF SEALED DOCUMENT**

mediation the PBGC attendees passively "sat in a room and read books all day," s*ee* Ex. 64 at 144:10-11.

89.     At the conclusion of the mediation, a "solution" emerged that involved the PBGC initiating termination of the Delphi Salaried Plan, the reassumption by GM of the Delphi Hourly Plan, and a settlement by the PBGC of all its liens and claims.  *See, e.g.*, Ex. 97 (May 28, 2009 email chain from Delphi's counsel to Mr. Feldman) at 1, stating that the PBGC:

> needs to hear from you on what GM/UST plan to do with the HRP and SRP. . .  in the event that GM takes the [Hourly Plan] and leaves behind the [Salaried Plan], the PBGC will terminate the [Salaried Plan] and will waive ROW liens on the [Salaried Plan] if they can receive some reasonable settlement on the termination liabilities.

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████; Ex. 64 at 147:6-165:6.

90.    ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ When asked about this

settlement proposal, the PBGC's Mr. House could not remember how the proposal

originated, or whether it was entirely a creation of Mr. Feldman.  Ex. 64 at 159:12-

160:1.  ████████████████████████████████████

██████████████████████████████████████

███████████████████

## J.      The Emergence of New GM and New Delphi

91.      "On June 1, 2009 GM filed a voluntary petition for reorganization

under Chapter 11 of the U.S. Bankruptcy Code[] and conducted a court-supervised

asset sale (under 11 U.S.C. § 363) in which substantially all of the operating assets

of the company were sold to General Motors Company, or New GM, and most of

the company's debt and liabilities remained in the possession of Motors

Liquidation Company, or Old GM."  Ex. 3 at 27 n.28.  Moreover, the additional

$30.1 billion in TARP financing became effective on this date, with the caveat

"that the loan would default if GM failed to obtain certain bankruptcy court orders

acceptable to Treasury by July 10, 2009 (40 days later)."  *Id.* at 18.  "New GM

would ultimately emerge from GM's bankruptcy on July 10, 2009."  *Id.* at 27 n.28.

REDACTED VERSION OF SEALED DOCUMENT

92.     Also on June 1, 2009, Delphi filed with the bankruptcy court modifications to its reorganization plan, which proposed, among other things, to effect its reorganization through a transaction with an affiliate of Platinum Equity, with the support of both Treasury and GM.  *See* Ex. 100 at 7-8.  The filing also announced Delphi's expectation that, in connection with the modified plan, the PBGC would "involuntarily terminate[]" the Salaried Plan, while the Hourly Plan would be "addressed by GM."  *Id*. at 10.

93.     ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████ According to Mr. Rattner, "'GM wanted to do something for the [Delphi] Salaried retirees.'"  Ex. 3 at 28 (quoting Mr. Rattner, with alteration in original).  ████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

However, Mr. Rattner told SIGTARP that while he "could not remember the specifics of the conversation," he determined that GM would not be permitted to do anything for the Salaried Plan participants because he "thought there was

**REDACTED VERSION OF SEALED DOCUMENT**

nothing defensible from a commercial standpoint that could be done for the Delphi

salaried retirees."  Ex. 3 at 28.

94.

**REDACTED VERSION OF SEALED DOCUMENT**

95.     On June 30, 2009, Mr. House and his supervisor at the PBGC, Terry Deneen, were summoned to a meeting at the Treasury with Mr. Feldman and Mr. Wilson.  Following the meeting, Mr. House emailed a number of PBGC staffers to say that he and Mr. Deneen had "just returned from a meeting over at [Treasury]. It is now clear that the Delphi Hourly Plan will not be assumed by GM, *and thus we will be terminating/trusteeing that pension plan along with the Salaried and the four small plans*."  Ex. 103 at 2 (June 30, 2009 PBGC email chain) (emphasis added).  The email makes clear that the decision was one made by Treasury, as up until that point Treasury's Auto Team had "consulted/deliberated exclusively amongst itself and [the White House/National Economic Council]."  *Id*. at 1. According to the email, Mr. Feldman would wait until the next day to inform GM of Treasury's decision.  *Id*. at 1-2.

96.     ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████

97.    ██████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Ex. 109 (July 8, 2009 PBGC email

chain noting that Mr. House had just spoken with Mr. Feldman, who had "made

progress discussing our proposal with a number of key folks in Treasury and at

White House"); ██████████████████████████████████

████████████████████████████████████████████

████████████

98.    ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ █

99.   █████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

---

[7] ████████████████████████████████████████████
████████████████████████████████████████ Initially, unlike members of the UAW, members of Delphi's splinter unions were not going to receive the so-called "top-ups" from the reorganized New GM (via TARP funds) to make up for pension benefits lost as a result of the termination of Delphi's hourly plan. *See, e.g.,* ECF No. 189-6 at 199:16 – 200:18 (discussing "top-up guarantee" and noting that "in the case of the UAW," Mr. Feldman understood that New GM would be assuming the agreement of Old General Motors to top-up benefits, while the agreement to top-up the benefits of the splinter unions had been left at the old General Motors). "However, after GM's bankruptcy, New GM decided to top up the pensions" of these splinter unions.  Ex. 3 at 27.

- 67 -

**REDACTED VERSION OF SEALED DOCUMENT**

100.

**REDACTED VERSION OF SEALED DOCUMENT**

101.   On July 10, 2009, New GM emerged from GM's bankruptcy.  *See* Ex. 3 at 27 n.28.

102.   ████████████████████████████████████████████████

████████████████████████████

103.   On July 15, 2009, Dennis Black, Charles Cunningham, and the DSRA filed in the United States Bankruptcy Court for the Southern District of New York an objection in *In re Delphi Corp.*, Case No. 05-44481, to Delphi's proposed modifications to its first amended plan of reorganization (as modified) because the proposed plan modifications depended on the termination of the Salaried Plan, which was "neither assured nor imminent."  *See* Ex. 116 at 2.

104.   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

105.   On July 21, 2009, the PBGC executed separate settlement agreements with Delphi and New GM resolving all of the PBGC's liens and claims with respect to the Delphi plans.  *See* Ex. 118 at 4 (Nov. 6, 2014 Recovery Valuation and Allocation Memorandum for Delphi Corp.).  The bulk of the PBGC's recovery came from its settlement with New GM, pursuant to which the PBGC received a $70 million cash payment from GM, along with a direct, non-voting equity membership interest from New GM in Delphi Automotive LLP ("New Delphi"),

**REDACTED VERSION OF SEALED DOCUMENT**

which was the purchaser of Delphi's foreign assets in the bankruptcy proceedings. *See* Ex. 119 (PBGC – GM Settlement Agreement).  On March 31, 2011, the PBGC sold its interests in New Delphi for $594 million, meaning that in total New GM paid more than $664 million in cash and equity to the PBGC in consideration for the release by the PBGC of its liens and claims on Delphi's assets.  *See* Ex. 118 (Recovery Val. Memo) at 4-6.  Pursuant to its settlement agreement with Delphi, the PBGC also received a $3 billion general unsecured claim in Delphi's bankruptcy proceedings, which the PBGC sold in 2011 for $53.2 million, i*d.* at 4-6, meaning that in total the PBGC received a settlement of approximately $717 million in exchange for releasing its liens and claims on Delphi's assets.  At the time of the Salaried Plan's termination, the PBGC asserted that there was a total statutory lien amount of $195.9 million in connection with missed contributions to the Salaried Plan, *see* ECF No. 37 ¶ 7, █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████  *See* ECF No. 52 at AR000036.

106.   On July 22, 2009, the PBGC issued a notice of determination ("NOD") to Delphi, notifying Delphi that the PBGC was instituting termination proceedings for the Salaried Plan under 29 U.S.C. § 1342(a)(1), (2) and (4) of ERISA, and that, under § 1342(c) of ERISA, the Plan "must be terminated in order

REDACTED VERSION OF SEALED DOCUMENT

to avoid any unreasonable increase in the liability of the PBGC insurance fund."
*See* ECF No. 53 at AR000003.  Asserting that the PBGC's TWG would "be unable to convene in light of the time constraints and circumstances," the NOD relied on the PBGC findings from its April 2009 termination record as the basis for its commencement of termination proceedings.  *See* ECF No. 54 at AR000010.

107.   The same day, the PBGC initiated an action in this Court, asking that the Court adjudicate that the Delphi Salaried Plan be terminated pursuant to 29 U.S.C. § 1342(c); that the PBGC be appointed trustee of the Salaried Plan pursuant to § 1342(c) and (d), and that the Court establish July 22, 2009 as the termination date of the Salaried Plan pursuant to § 1348(a)(4).  *See PBGC v. Delphi Corp.*, Case No. 2:09-cv-12876 (E.D. Mich., filed July 22, 2009).

108.   On July 26, and 27, 2009, Delphi conducted an auction pursuant to Section 363 of the Bankruptcy Code.  *In re Delphi Corp.*, No. 05-44481, 2009 Bankr. LEXIS 4663, at *18-19 (Bankr. S.D.N.Y. July 30, 2009).  In connection with that auction, Delphi's DIP Lenders purchased the majority of Delphi's foreign assets and businesses through a credit bid, and New GM purchased a number of Delphi's U.S.-based operating assets, including Delphi's Steering business.

109.   On July 30, 2009, the United States Bankruptcy Court for the Southern District of New York approved Delphi Corporation's modified plan of reorganization.  *See generally id*.  In that order, the court, among other things,

**REDACTED VERSION OF SEALED DOCUMENT**

overruled all objections to confirmation of the modified plan, while also

confirming that:

> Nothing in this order prohibits employees . . . adversely affected by any plan termination from (a) seeking to intervene in any district court action filed by the PBGC under section 4042 of ERISA, 29 U.S.C. § 1342, to terminate the plans or (b) pursuing any independent action against the PBGC regarding the termination of the plan under section 4003(f) of ERISA, 29 U.S.C. § 1303(f).

*Id.* at *127-28.

110. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

111. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Delphi executed the termination and

trusteeship on August 7, 2009, and the PBGC subsequently filed a notice of

voluntarily dismissal of its termination action.  *See PBGC v. Delphi Corp.*, No.

2:09-cv-12876, ECF No. 5 (E.D. Mich. Aug. 7, 2009).

REDACTED VERSION OF SEALED DOCUMENT

112.   On August 10, 2009, the PBGC executed the termination and trusteeship agreement, purporting to authorize the PBGC to terminate the Plan and serve as statutory trustee as of as of July 31, 2009.

113.   As a result of the termination, the PBGC ultimately determined that its insurance fund would cover roughly $1.495 billion in guaranteed benefits, but that participants would still lose approximately $521 million in unfunded non-guaranteed benefits.  *See* Ex. 123 at 1.

114.   The PBGC's final calculations stand in stark contrast to the estimates that the PBGC initially presented to the Court.  The PBGC initially asserted that it would cover $2.1 billion from its own resources to cover the unfunded guaranteed liability under the Plan, *see* ECF No. 37 at 4, meaning that the PBGC overstated its insurance liability by over $600 million.  Similarly, the PBGC overestimated the Plan's total liability by roughly $670 million, initially representing the total Plan liabilities as being $5.2 billion, *id*. at 3, while its final calculation came in at $4.53 billion. *See* Ex. 123 at 1.

## STANDARD OF REVIEW

Summary judgment is warranted "if the record shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Wenk v. O'Reilly*, 783 F.3d 585, 593 (6th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In

REDACTED VERSION OF SEALED DOCUMENT

determining whether summary judgment is proper, the Court "'must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party.'" *Griffith v. Coburn*, 473 F.3d 650, 655 (6th Cir. 2007) (citation omitted).

As noted earlier, *see supra*, p. 4, pursuant to its September 1, 2011 Order, the Court, in an exercise of judicial restraint, has asked the Parties to submit dispositive motions on whether, had a hearing been held prior to termination, the PBGC could have obtained an adjudication from the Court in July 2009 that the Salaried Plan's termination was necessary under 29 U.S.C. § 1342(c).  *See* ECF No. 193 at 4.  In addressing this question and assuming that a hearing was required before termination, the Court, pursuant to *In re UAL Corp.*, 468 F.3d 444 (7th Cir. 2006), indicated that it would conduct a *de novo* review of the PBGC's decision to terminate the Plan under 29 U.S.C. § 1342(c).  ECF No. 193 at 5.  Having the obligation to commence litigation under § 1342, the burden of proof to justify termination in that setting rests with the PBGC, as it "bears the same burden of persuasion" as the Antitrust Division of the Department of Justice would when it files suit under the Sherman Act.  *Id*.  In turn, showing that the PBGC could not under the applicable standard of review succeed in terminating the Salaried Plan via a judicial adjudication under § 1342 – or at least that the result was open to question – would ensure that the Court needed to reach the threshold procedural

REDACTED VERSION OF SEALED DOCUMENT

claims raised by Plaintiffs (*i.e.*, that a termination by agreement violated ERISA and the Constitution).

Accordingly, the first question is whether, after viewing the facts under a standard in which the PBGC bears the burden of proof, there is no genuine issue as to any material fact or as a matter of law that the PBGC could have obtained a decree from the Court in July 2009 terminating the Plan under § 1342(c).  If the Court answers this question in the negative, the burden on this motion shifts, and the Court evaluates Counts One through Four to determine whether Plaintiffs have demonstrated an entitlement to summary judgment.

## **ARGUMENT**

**I.     BECAUSE THERE WERE VIABLE ALTERNATIVES TO TERMINATION THAT THE PBGC COULD HAVE PURSUED, THE PBGC COULD NOT HAVE OBTAINED AN ORDER FROM THIS COURT ADJUDICATING THAT THE PLAN'S TERMINATION WAS NECESSARY UNDER § 1342(c), AND THE COURT SHOULD PROCEED TO CONSIDER COUNTS ONE THROUGH FOUR**

Under § 1342(c), after initiating termination proceedings, the PBGC may apply to a United States district court "for a decree adjudicating that a plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund."  29 U.S.C. § 1342(c)(1).  However, the PBGC did not obtain the § 1342(c) adjudication here, instead purporting to terminate the Plan pursuant to an agreement between it and the Plan's

REDACTED VERSION OF SEALED DOCUMENT

administrator.  As Plaintiffs demonstrate below, the PBGC could not have satisfied the statutory criteria at a § 1342(c) termination hearing because the Plan's termination was avoidable.  Accordingly, because the Plan's termination was not assured in a proceeding under § 1342(c), the PBGC's termination through other means was not harmless error and the Court must, as a result, decide Counts One through Four of the amended complaint, which challenge the procedure and substance of the manner in which the PBGC did terminate the Plan.

When it did initially apply to this Court for a decree of termination, The PBGC sought to justify the Plan's termination under § 1342(c)(1)'s third criterion, *i.e.*, that the Plan "must be terminated in order to avoid an unreasonable increase in the liability of the . . . fund."[8]  *See* ECF No. 53 at AR000003; *see also PBGC v. Delphi Corp*, Case No. 2:09-cv-12876 (E.D. Mich., filed July 22, 2009).  The "fund" in question is the insurance fund used by the PBGC as Title IV's insurance guarantor, to pay the benefits guaranteed by ERISA.  *See* 29 U.S.C. §§ 1301(a)(5), 1305(a).  Judged by this statutory standard, the Plan's termination was patently

---

[8] The PBGC's Trusteeship Working Group, which again is the internal PBGC body tasked with making termination recommendations, initially considered, and then rejected, seeking to terminate the Plan as being in the best interests of the Plan's participants, in light of the significant amount of unfunded, non-guaranteed benefits those participants stood to lose in connection with the Plan's termination. *See* Ex. 79.  Here, the PBGC has determined that the Plan's participants have lost roughly $521 million in unfunded, non-guaranteed benefits.  *See* Ex. 123 at 1.

REDACTED VERSION OF SEALED DOCUMENT

unjustifiable.  The Plan's termination *increased* the fund's liability by nearly $1.5 billion, and as the factual record demonstrates, that liability was entirely avoidable.

The PBGC had powerful negotiating leverage (especially, but not limited to, its liens and claims on Delphi assets) that it could (and should) have exercised to ensure the Plan's continuation.  Indeed, the PBGC initially sought to use its leverage to persuade GM, the Plan's original sponsor, to reassume the Plan, and it eventually did use that leverage to negotiate with Treasury a $664 million *recovery* from New GM in exchange for the PBGC's release of its liens and claims on Delphi's assets.  Had the PBGC instead used that leverage to negotiate a reassumption of the Salaried Plan into the GM salaried plan, not only could the PBGC have avoided the Plan's termination in the summer of 2009, the PBGC's own estimates show that the GM salaried plan could have been funded until at least 2018, at a lower cost to New GM than what it wound up paying to the PBGC as a recovery.

Additionally, during the spring of 2009, there were a number of businesses seriously considering purchasing Delphi's business, including Platinum Equity, Federal Mogul, and Delphi's DIP Lenders (who ultimately used Delphi's DIP debt to fund a credit purchase of a substantial portion of Delphi's foreign assets).  The PBGC's standard practice in similar cases is actively to negotiate with potential acquirers to convince them to assume the pension plan of the acquired company, in

**REDACTED VERSION OF SEALED DOCUMENT**

exchange for the PBGC's support in their bids to acquire the particular business. Here, the PBGC had substantial leverage for such a negotiation given its liens and claims on Delphi's assets, and the PBGC could have made assumption even more palatable by offering to allow the new sponsor to share in the PBGC's $717 million recovery in order to fund contributions to the Salaried Plan. However, the PBGC, again inexplicably, engaged in no such negotiations.

Given that the PBGC ignored these viable alternatives to termination, the PBGC could not have demonstrated at a § 1342(c) hearing that the Plan's termination was necessary to avoid an unreasonable increase in the PBGC's insurance fund. *See PBGC v. United Air Lines, Inc.*, 436 F. Supp. 2d 909, 924 (N.D. Ill. 2006) (under § 1342(c), reasonableness is "measured in the context of PBGC's economic position, the dollar amount of PBGC's increased liability, and *the ability of PBGC to avoid that liability*)" (emphasis added). As shown below, because the record shows that the Plan's termination was avoidable, the PBGC was not entitled to a § 1342(c) adjudication.

### A.     GM's Dependence on Delphi Parts Provided the PBGC With Sufficient Leverage to Avoid the Plan's Termination

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ Accordingly, in the latter part of 2008, through the beginning of 2009, PBGC advisors, staff, and

REDACTED VERSION OF SEALED DOCUMENT

leadership advocated that the PBGC use its leverage with GM to cause GM to reassume the Delphi pension liability (from both the Salaried and Hourly Plans) that it had shed in connection with Delphi's spin-off. *See, e.g., id.* ¶¶ 17-19, 23, 27, 29, 31, 33, 40, 41, 42, 48.

The primary source of the PBGC's leverage was its liens and claims on Delphi assets related to the unfunded pension liabilities for Delphi's pension plans. *See, e.g., id.* ¶¶ 17-19, 42, 48. As of July 21, 2009, the PBGC had perfected more than $195 million in statutory liens against Delphi assets on behalf of the Salaried Plan, and was asserting claims against the assets of Delphi's foreign, non-debtor controlled group members for the entire unfunded liability associated with Delphi's pension plans, giving rise to a lien ████████████ against those assets. *See* SUMF ¶ 105.

These liens and claims on Delphi assets were of significant operational and strategic concern to GM. From the time of the spin-off in 1999 through the time of the Plan's termination in 2009, Delphi was GM's largest parts supplier, and an interruption of Delphi parts could have had a crippling effect on GM and its ability to reorganize, providing the PBGC with powerful leverage to facilitate a GM reassumption of the Salaried Plan. *See, e.g.,* SUMF ¶¶ 15-18, 27, 28, 39, 42, 44-46 48, 53, 54, 78, 87, 89, 97, 105.

**REDACTED VERSION OF SEALED DOCUMENT**

In the fall of 2008, Delphi proposed that GM re-assume the pension liabilities of some of its former employees, and the PBGC looked for ways to help facilitate the transfer.  Using its foreign liens as "leverage," the PBGC helped Delphi convince GM to assume over $2 billion in liabilities associated with Delphi's *Hourly Plan* covering union workers, in exchange for which the PBGC released over $1.2 billion worth of liens asserted against Delphi assets.  *See id.* ¶ 17.

Beginning in the latter part of 2008, and throughout the early part of 2009, GM sought and received roughly $50 billion in TARP funding from the U.S. Treasury.  *See id.* ¶¶ 20-21, 25, 39, 49, 51, 91. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Because of GM's dependence on TARP financing, the determination regarding a GM pension transfer belonged ultimately to Treasury.  *See, e.g.*, *id.* ¶¶ 50-51, 61, 70, 76, 78, 79, 85. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED VERSION OF SEALED DOCUMENT

█████████████████████████████████████████████████████████

████████████████████████████████.  The PBGC continued this advocacy

prior to the intervention of the Auto Task Force and Treasury's Auto Team in

Delphi issues.  *See, e.g.*, *id.* ¶¶ 26, 29, 31, 32, 33, 40, 41, 47, 48.  ████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

Beginning in mid-April 2009, the PBGC's Joe House and the Auto Team's

Matt Feldman began a virtually exclusive coordination with one another regarding

Delphi and Chrysler pension issues.  *See id.* ¶ 62.  From this point forward, the

PBGC entirely ceased advocating for GM reassumption of the Salaried Plan, and

indeed, Mr. House has testified these interactions were not "negotiations," and that

he had no "recollection of trying to persuade Treasury of anything."  *See id.* ¶¶ 64,

66.  In contrast, Mr. Feldman began his discussions with the PBGC hoping "to

reach an agreement where the [Salaried Plan] would be terminated and General

Motors would assume the [Hourly Plan]."  *See id.* ¶ 63.  Between that mid-April

discussion, and through the time of the Salaried Plan's termination, the PBGC

made no effort to persuade Treasury to undertake efforts to save the Salaried Plan,

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████

REDACTED VERSION OF SEALED DOCUMENT

The PBGC's failure to use its liens and claims to advocate with Treasury for New GM to reabsorb Delphi's Salaried Plan into the GM salaried plan is statutorily indefensible. Again, termination under § 1342(c) in this instance is only justifiable if the PBGC cannot avoid the loss in question. The PBGC's refusal to use its leverage to try and convince Treasury that New GM should have assumed these liabilities is, as a result, dispositive of the termination question, especially given how strong that leverage was.

During this time period, the Treasury was making determinations about which liabilities New GM would assume. "As explained by an Auto Team official in a deposition, the [§] 363 bankruptcy sale allowed New GM and the Auto Team to assume Old GM's assets and 'cherry-pick' the liabilities that a 'commercial buyer' would want and New GM would need." Ex. 3 at 19. "GM's then-CFO Young told SIGTARP that GM and the Auto Team went down GM's balance sheet (including pensions and the supplier base), going over some line items in great detail." *Id*. at 19-20.

According to Treasury, "the strength of the negotiating parties during GM's bankruptcy and throughout labor negotiations was dictated by the leverage each group held." *Id*. at 21. The UAW, for example, "had significant leverage due to the threat of a labor disruption . . . . 'All you need is one missing part and it stops production.'" *Id*. at 22 (quoting a "GM official"). Additionally, the time

REDACTED VERSION OF SEALED DOCUMENT

constraints associated with Treasury's desire for a quick-rinse bankruptcy "was well known to the UAW and helped give it a bargaining advantage." *Id.* at 23. Further, "[t]he UAW had leverage because it knew and understood from Treasury's public statements that Treasury was committed to reorganizing GM and not letting GM fail." *Id.* at 24.  Among other things, the UAW was able to persuade Treasury and New GM to assume top-ups for its members that participated in the Hourly Plan, a liability that exceeded $1 billion.  *Id.* at 14.

Similarly, in September 2009, after New GM's emergence from GM's bankruptcy proceedings, New GM agreed to honor the IUE's and USW's Delphi top-up agreements, at an estimated cost of $350 million because "there was a clear inference that IUE could strike at Delphi, which would have shut down GM. GM's then-CFO Young told SIGTARP 'If Delphi shut down, we shut down.'" *Id.* at 32.  According to another GM official, "the unions got the agreement because liquidation of Delphi would have been a disaster for GM." *Id.* at n.38.  According to SIGTARP, "New GM agreed to top up the smaller unions because of the leverage those unions had to prolong Delphi's bankruptcy or strike, which GM believed would significantly impact its ability to survive." *Id.* at 39.

The PBGC's liens and claims on Delphi's assets provided it with the same sort of leverage that the UAW and IUE exercised to convince Treasury to authorize pension top-ups by New GM.  Again, the PBGC had liens and claims over Delphi

REDACTED VERSION OF SEALED DOCUMENT

plants that were critical to New GM's supply, meaning that the commercial necessity for removing those liens and claims warranted negotiation with the PBGC. *See* SUMF ¶¶ 15-18, 27, 28, 39, 42, 44-46, 48, 53, 54, 78, 87, 89, 97, 105. Ultimately, the UAW, IUE, and the PBGC all possessed the same leverage vis-à-vis New GM, which was a threat to supply at a time when New GM simply could not afford uncertainty.

Further proof of the PBGC's leverage is that it was ultimately able to negotiate with Treasury a $664 million recovery from New GM *in exchange for the PBGC's release of its liens and claims on Delphi's assets. See id.* ¶¶ 97, 105. Thus, at a minimum, Treasury agreed that the commercial necessity of removing the PBGC's liens and claims on Delphi assets was sufficient to justify a TARP-funded expenditure by New GM of $664 million. The PBGC's own contemporaneous estimates showed that this amount would have been *more than sufficient to save the Plan*. Indeed, again according to the PBGC's estimates, had New GM agreed to absorb the Salaried Plan back into the GM salaried plan, that amount would have been sufficient to fund the combined plan for roughly a decade.

In March 2009, the PBGC prepared a document projecting the necessary minimum funding contributions for the GM Hourly and Salaried Plans over the next eight years assuming a GM reassumption of the Delphi pension plans. *See*

REDACTED VERSION OF SEALED DOCUMENT

Ex. 124 (the "Funding Projections").  The Funding Projections,  showed that the cost to GM of a reassumption of the Salaried Plan was extremely affordable.

The Funding Projections calculated minimum contributions for GM's hourly and salaried pension plans under various scenarios, both with and without a reassumption of the two Delphi plans.  Under the most optimistic of the PBGC's Funding Projections involving reassumption of Delphi's Salaried Plan, GM would have needed to make only a $300 million contribution to the combined Delphi-GM salaried plan in 2009, and then would not have needed to make another contribution until 2018, at which time a $100 million contribution would have been required.  *See* Ex. 124 at 6 (scenario 3c).  Hence, the total contribution required to avoid the termination of the Salaried Plan *and* maintain it (along with GM's salaried plan) for the next 10 calendar years under this scenario would have been only $400 million.  Plus, again, GM itself *was open* to reassuming the Salaried Plan.  *See* SUMF ¶¶ 22, 24, 28, 34, 41, 93.

To put these numbers in context, under the PBGC's own projections, a reassumption of the Salaried Plan could have cost New GM $264 million less than the amount it paid in its settlement agreement with the PBGC, while

REDACTED VERSION OF SEALED DOCUMENT

simultaneously removing the liens and claims associated with the Salaried Plan's missed contributions and underfunding.  Additionally, and more importantly for the purposes of the § 1342(c) analysis, the PBGC would have been able to avoid entirely the $1.5 billion loss to the PBGC's insurance fund (not to mention the hundreds of millions of dollars the Salaried Plan's participants lost as a result of the Plan's termination).

As noted, the scenario above was the most optimistic of the PBGC's projections, and among other things, assumed that the GM salaried plan would take advantage of that plan's carry over balance and that it could amortize the additional Delphi liability over 17 years.  *See* Ex. 124 at 1.  While the second assumption (amortizing the Delphi liability over 17 years) would have been a departure from the standard 7-year amortization schedule, Congress had previously made an exception to this requirement for the airline industry, and the PBGC's inclusion of this scenario in its Funding Projections demonstrated its belief that GM could obtain similar exception here for the assumed Delphi liability.  *See also* Ex. 126 ("If we adopt [the 17 year airline special] rule for GM with Delphi transfer, we could possibly amortize the unfunded liability for all of GM"); Ex. 127 ("I am thinking that politically they would be able to get the legislative fix of extended amortization for the added Delphi liability only.").

REDACTED VERSION OF SEALED DOCUMENT

However, even under the *most pessimistic* of the Funding Projection's scenarios, in which neither a carry-over balance or an extended amortization were assumed, the cost to New GM was plainly affordable.  Under this more conservative scenario, $400 million would have been sufficient to avoid the Salaried Plan's termination and fund the combined plan through the 2014 calendar year.  *See* Ex. 124 at 6 (scenario 2).  While contributions of over approximately $2.5 billion would then be due to fund the combined Delphi-GM salaried plan through 2018, the GM salaried plan even without a Delphi assumption would still have required itself a $700 million contribution for this period of time, meaning that the cost attributable to GM's assumption of the Salaried Plan's for the calendar years between 2014-2018 was estimated at $1.7 billion under the PBGC's most pessimistic assumptions.  Given that this additional increment indisputably was – at least theoretically – available to Treasury from TARP,[9] and New GM's need for Delphi's parts, reassumption of the Delphi Salaried Plan was possible – or at least

---

[9] On the ability to tap TARP funds, Steve Rattner wrote in his book *Overhaul*: "[t]he existence of TARP allowed us to contemplate committing tens of billions of dollars freely, a surreal contrast to the normal process of prying money loose." *Overhaul* at 119.  When the Auto Team proposed to Larry Summers (Director of the National Economic Council) that they commit $100 billion to the auto bailout, "Larry barely batted an eye."  *Id*. Similarly, Mr. Feldman testified that Treasury "had a view, which was that we could provide unlimited capital to General Motors at zero cost of capital, and that if need be, we would do that[.]"  ECF No. 189-6 at 85:12-15.  Of course, all of these statements reflected what was factually possible, not politically optimal.

REDACTED VERSION OF SEALED DOCUMENT

not obviously impossible (with the burden of proof on the PBGC to show otherwise, *see supra* p. 73-74) – even using the most conservative of the PBGC's projections.

Moreover, this number (*i.e.*, the most pessimistic scenario) is overstated, not just because it failed to account for the possibility of the use of a carry-over balance or an extended amortization schedule, but also because all of the Funding Projection's assumptions utilized an unrealistically conservative estimate of the market return on assets of 8.5%, undervaluing the market return that the combined Delphi-GM salaried plan's assets would generate, and therefore overestimating the amount of contributions that would be necessary.

As Plaintiffs' expert witness, Professor Noor Rajah, noted, the Salaried Plan's termination occurred at a time when "the capital markets were at an all-time low, meaning that the plan's assets were severely depressed at the time." *See* Ex. 128 at 12. "Between January 1, 2008 and March 31, 2009, the S&P 500 decreased by approximately 44%. Between March 31, 2009 and May 31, 2015 [when Dr. Rajah's report was completed], the S&P 500 increased by approximately 94%. *Id.* at n.5. Consequently, instead of the 8.5% used in the PBGC's Funding Projections, Dr. Rajah would have expected an annual return of 12.3% per year between Oct. 1, 2009 and December 31, 2014, resulting in an additional $680 million in plan assets for the combined Delphi-GM salaried plan by the time these

**REDACTED VERSION OF SEALED DOCUMENT**

estimated contributions came due, which would have further reduced the size of the necessary contributions, and extended the time they were due.[10]  *Id.* at 18-19.

The viability of a reassumption into the GM salaried plan is further augmented by the fact that in June 2009, GM's Fritz Henderson approached the Auto Task Force's Mr. Rattner to say that GM wanted to do something for Delphi's salaried retirees, but that Mr. Rattner told SIGTARP that while he "could not remember the specifics of the conversation," he determined that GM would not be permitted to do anything for the Salaried Plan participants because he "thought there was nothing defensible from a commercial standpoint that could be done for the Delphi salaried retirees.[11]"  *See* SUMF ¶ 93.

Mr. Rattner's contention that there was nothing commercially defensible to do in this regard is, of course, belied by GM's strong commercial need to address the PBGC's liens and claims that had arisen in connection with the Salaried Plan's

---

[10] ███████████████████████████████████Compass Advisors, recognized this underlying economic dynamic.  *See* Ex. 129 at 1 ("[b]ecause Delphi does not have the liquidity to wait out the downturn, the company must be valued at what is believed to be the trough of the economic cycle"); ████████████████████ ████████████████████████████████████████████████████ ███████████████████████████

[11] In connection with this point, it is noteworthy that "at least one GM official told SIGTARP that GM thought there was some benefit to Treasury taking the lead on dealing with the PBGC because it was 'Government agency to Government agency' and Treasury would get a better deal for GM.'"  Ex. 3 at 14.

REDACTED VERSION OF SEALED DOCUMENT

underfunding, a fact that would have been evident if the PBGC had continued to prosecute its termination action in a § 1342(c) hearing, instead of withdrawing that action to bypass judicial review and terminate the Plan by agreement.  Put slightly differently, Mr. Rattner's statement to SIGTARP that the Auto Task Force did simply what was commercially reasonable should be viewed as *post hoc* rationalization and, frankly, spin.  In a commercial situation, those associated with the surviving entity would – to be sure – seek to cherry pick the liabilities it needed to keep.  But in a commercial situation, the leverage of the PBGC would have to be taken into account, and *the PBGC would then force changes to that roster to take care of the pensioners* if the surviving entity sought, in cherry picking, to discard pension plans.  What happened here did *not* replicate that commercial scenario.

In sum, the record is clear that a reassumption of Delphi's Salaried Plan into the GM salaried plan was a viable option in the summer of 2009, that New GM had strong commercial reasons to assume Delphi's Salaried Plan in exchange for a release of the PBGC's liens and claims, and that such an arrangement would have been the best result for all parties.  For this reason alone, Plaintiffs are entitled to a finding that, if had the Court held a § 1342(c) hearing, termination of the Salaried Plan would not have been appropriate in July 2009, because the PBGC would not have been able to demonstrate the necessity of the Plan's termination.  Termination was not necessary to avoid a loss to the PBGC's insurance fund, as there were

**REDACTED VERSION OF SEALED DOCUMENT**

other viable options far less costly to the PBGC (namely, compelling a

reassumption of the Salaried Plan into the GM salaried plan).

**B.** **Similarly, the PBGC's Liens and Claims on Delphi's Foreign Assets Provided the PBGC With Tremendous Leverage to Persuade Delphi's Purchasers to Consider Assuming the Plan**

In addition to its leverage with GM, the PBGC's liens and claims provided

the PBGC with leverage over Delphi's potential purchasers, which the PBGC

could (and should) have used to negotiate an assumption of the Salaried Plan by

the successful purchasers.

██████████████████████████████████████████ As the PBGC's Dana Cann explained in his deposition, the PBGC was able to achieve this result, at least in part, because "there was competition for the assets, and [the agreement to assume the pension plan] was a way for them to improve their bid without necessarily coming out of pocket." *See* Ex. 14 at 61:15-18.

Here, there were at least three groups of businesses in competition to purchase Delphi's business or its assets: Platinum Equity, Federal Mogul, and Delphi's DIP Lenders (who ultimately used Delphi's DIP debt to fund a credit purchase of a substantial portion of Delphi's foreign assets). ██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ Nonetheless, the PBGC has been unable to document a single instance where it spoke to these potential purchasers about their intentions regarding Delphi's pension plans. *See e.g.*, *id.* at 192:22-193:3.

Again, this failure is indefensible given the substantial leverage that the PBGC possessed to help convince one of these buyers to assume the Plan. As with GM, the existence of the PBGC's liens and claims on Delphi asset was a significant point of leverage for the potential purchasers. *See, e.g.*, ECF No. 168-3 ¶ 15 (asserting, in order to gain court approval for GM-PBGC settlement

REDACTED VERSION OF SEALED DOCUMENT

agreement, that "neither GM nor Parnassus (nor presumably any other potential purchaser) is willing to purchase the assets (or shares in the non-debtor affiliates that own the assets) while they are subject to the threat of the PBGC liens"); ██

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ Ex. 130 at 2-3 ("[t]he PBGC's purported liens are unnerving the Debtors' DIP lenders" making "both stakeholders and global suppliers very uneasy" and "overseas creditors and suppliers perceive that any fight with the PBGC is a fight with the U.S. government and that they will lose").

Nonetheless, the PBGC diverged from its normal practice and did not attempt to negotiate an assumption of the Salaried Plan with any of these potential purchasers. *See, e.g.*, Ex. 14 at 192:22-193:3; Ex. 131 at 6-7 (PBGC interrogatory responses failing to cite a single example of any efforts the PBGC "undertook to ascertain whether any entity other than Delphi, including GM, the DIP lenders, Platinum Equity, LLC, and Federal Mogul Corporation would have been willing to take over responsibility for the Salaried Plan"). The PBGC's failure to follow it standard procedures here, especially in light of this substantial leverage, would have been enough to defeat the PBGC's contention at a § 1342(c) hearing that termination was necessary.

REDACTED VERSION OF SEALED DOCUMENT

In addition, the PBGC could have made assumption more viable by offering to allow the new sponsor to use some or all of the PBGC's $717 million settlement from New GM and Delphi to fund the Salaried Plan' contributions.  In order to avoid the need for termination, the Salaried Plan's sponsor only needed to satisfy the $195 million in missed contributions, *see* Ex. 14 at 152:1-153:2 ("[m]y understanding is, for the salaried plan, they would have had to true up 200 million dollars").  Consequently, it would have required less than half of the PBGC's settlement with New GM to forestall the Plan's termination, without requiring the new sponsor to fund the pension true up at all.  Moreover, while the PBGC had not completed any recent minimum funding projections for Delphi on a stand-alone basis, *see, e.g.*, Ex. 132 (Dep. Tr. of C. Travia) at 11:8-9 (testifying that the last time that the PBGC completed Delphi minimum funding projections on a stand-alone basis was in the spring of 2008), ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

Still further, as Compass Advisors noted in the context of a potential GM reassumption, the PBGC could have offered to help the new sponsor "with waivers

REDACTED VERSION OF SEALED DOCUMENT

if equity markets don't turn around in the next two years providing an adequate return on their pension assets," Ex. 33 at 8, and indeed the Salaried Plan had a waiver request already pending, which had been put "on ice," pending any agreement by GM to assume the Plan. *See* SUMF ¶ 26.

And of course, the equity markets did turn around in the next few years. As noted above, between March 31, 2009 and May 31, 2015, the S&P 500 increased by approximately 94%. *See* Ex. 128 at 12 n.5. By looking at actual market returns, Dr. Rajah concluded that the Plan's minimum funding contributions would be even more affordable post-assumption, requiring an estimated $70 million in 2010, $300 million in 2011, and $210 million in 2012, with no further contributions required in 2013 or 2014. *Id.* at 24. Given the threat of the PBGC's liens and claims, and the availability of the $717 million in settlement funds to help fund contributions, the PBGC could have made the Salaried Plan's assumption not only viable, but attractive, to the buyers competing for Delphi's assets, and avoided a $1.5 billion loss to the pension insurance system. That the PBGC did not even explore this possibility shows why the PBGC went to such lengths to avoid judicial scrutiny of its actions.

REDACTED VERSION OF SEALED DOCUMENT

### C.  The PBGC's Termination Case Is Further Undermined by the Fact That, Compared to Other Similarly-Sized Plans, the Salaried Plan Was Relatively Well Funded

The PBGC's refusal to advocate on behalf of the Plan is even more unjustifiable given that, contrary to the PBGC's assertions, the Salaried Plan was a relatively well funded plan.

Because of the prospective nature of payments under a defined benefit pension plan, the law requires that plan sponsors "must contribute annually an amount necessary to make reasonably certain that the benefits promised will be available when employees become eligible to receive them," and these minimum contribution obligations will likely fluctuate from year to year.  V. Briggs, M. Kushner, and M. Schinabeck, *Defined benefit plan/defined benefit contribution plan*, *Employee Benefits Dictionary* at 41 (1992).

When Congress passed the Pension Protection Act in 2006, it updated "the rules for determining the minimum required contributions for qualified defined benefit pension plans."  Ex. 128 at 38.  Pursuant to the PPA, a plan sponsor's funding obligation is based on a calculation of "the 'shortfall' between the plan's assets and the plan's 'funding target' (i.e., liabilities) plus the anticipated increase in the plan's costs for the year ('the target normal cost')."  *See id.*

The PPA further requires that a plan complete annually an actuarial certification of its funded ratio under those rules, referred to as an "adjusted

REDACTED VERSION OF SEALED DOCUMENT

funding target attainment percentage, or "AFTAP," and imposes certain benefit restrictions on plans with AFTAPs of less than 80%, and even greater benefit restrictions for plans with AFTAPs of less than 60%. *See, e.g., id.* at 40-41. The AFTAP is "[o]ne measure of the funded status of [a] plan," Ex. 134 at 32:8-9, in which "the liability determination [is made] using rules spelled out [by Congress] in the Pension Protection Act," which is, "the present value of accumulated benefits for the participants in the plan as of [October 1, 2008]," using the interest rate prescribed "by the rules in the Pension Protection Act." *Id.* at 34:22-35:3.

On June 30, 2009 (*i.e.*, less than a month before the Plan's termination), Watson Wyatt (Delphi's actuary at the time) provided an AFTAP certification letter for the Delphi Salaried Plan for the then-current plan year, *i.e.*, the year that would end on September 30, 2009. *See* ECF No. 134-4 at 1. The AFTAP Certification for the current plan year was 85.62%, and the AFTAP Certification for the prior year was 86.9%. *Id.*

To put these numbers in perspective, Kevin House, one of the Watson Wyatt actuaries responsible for the Salaried Plan AFTAP certifications described above, testified that, "[f]rom a plan funding level perspective," the Salaried Plan's funded ratio "wasn't too dissimilar to a lot of large plans at the time, given the financial crisis that was going on." *See* Ex. 134 at 45:21-23. Mr. House further testified that not only was this not an "abnormally poor[]" funding level, but that he had

REDACTED VERSION OF SEALED DOCUMENT

seen plans that were well below a 60% funding level that had not been terminated. *Id*. at 37:25-38:12.

To be sure, consistent with the PPA's requirements, the Salaried Plan's 2008 AFTAP measured the Plan's funded status as of the beginning of the then-current Plan year, *i.e.*, as of October 1, 2008, and as noted above, the Plan's assets lost a significant amount of value in the subsequent months. Accordingly, a snap shot of the Plan's funded status as of the summer of 2009 would have shown that the Plan was less well funded as of July 2009 than as of October 2008. But that was true for every pension plan. For example, between September 30, 2008 and December 31, 2008, on an accounting basis, the GM salaried plan went from being overfunded by $2.3 billion to being underfunded by $1.7 billion, and GM's hourly plan declined by $11 billion in funding over the same period. *See* Ex. 135 at 1. This short-term decline in the GM plans' assets did not, of course, precipitate a termination action by the PBGC. ████████████████████████

████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

This is why "'[t]he actuary's usual horizon is many years ahead, and he is usually content to progress there by annual steps. It is therefore desirable . . . to have a stochastic model to describe the way in which appropriate investment

REDACTED VERSION OF SEALED DOCUMENT

variables have moved over the long term without being too concerned with very short term fluctuations.'" Ex. 128 at 25 (quoting A.D. Wilkie, *A Stochastic Investment Model for Actuarial Use* (1984)). ██████████████████ ███████ that the market would recover, and when it did, the Plan's assets would have recovered from the short-term market decline that all plans suffered during the bottom of the financial crisis. This was especially true given that Delphi had frozen the Salaried Plan in the fall of 2008, such that its liabilities would not continue to grow like other, unfrozen, pension plans. *See* SUMF ¶ 19.

One would, therefore, have expected, erroneously as it turns out, that the PBGC's recommendation regarding the Plan's termination would have included estimations regarding the Plan's minimum funding contributions under the scenarios described above. Yet, the PBGC's administrative record in support of termination is devoid of any discussion of the minimum funding contributions, and in fact the PBGC hadn't estimated Delphi's minimum funding contributions on a stand-alone basis since the Spring of 2008. *See generally* ECF Nos. 52-60 (AR000010-118). While, as noted above, the PBGC had recently completed minimum funding contributions in connection with a reassumption of the Delphi plans into GM's plans, there was no discussion of those projections leading up to the Plan's termination. *See id.*

REDACTED VERSION OF SEALED DOCUMENT

In short, while the PBGC has implied that Delphi's failure to make full funding contributions to the Plan while in bankruptcy justify the Plan's termination, the numbers above demonstrate that what mattered for determining the Plan's viability was the ability of a sponsor to be able to satisfy the Plan's minimum funding contributions, and that when compared to other similarly situated pension plans (nearly all of which were underfunded during the time in question), the Plan's funding level was not an objective barrier to its continued survival.

### D.   Extra-Statutory Factors Undergirded the PBGC's Actions in Terminating the Plan

The PBGC, then, cannot show that it would have been entitled to a § 1342(c) termination adjudication on the grounds that termination was necessary to avoid a loss to the PBGC insurance fund.  Instead, in light of its liens and claims, the PBGC had the ability to push for a GM reassumption of the Salaried Plan as part of GM's reorganization; GM's purchasers would have thought purchasing GM's assets with the Salaried Plan in place (but without PBGC liens attached or claims pending) was a good deal, and indeed the PBGC had pressed for similar purchase solutions in analogous prior instances; and the Salaried Plan was, financially speaking, in similar shape to the vast majority of pension plans at the time.  Under these circumstances, reassumption of the Salaried Plan by GM (and acceptable to GM's eventual asset purchasers) was a solution that had viability and that, most

REDACTED VERSION OF SEALED DOCUMENT

importantly, would have been far less costly to the PBGC (if it cost the PBGC anything at all), thereby dooming the PBGC under the statutory criteria in § 1342(c). In light of the above, it is clear that the PBGC cannot carry its burden of showing that the facts and the law indisputably indicate that the PBGC could have accomplished a judicial termination under § 1342(c) in July 2009, and the Court must address Counts One through Four in the amended complaint.

Given the viability of options other than termination, and particularly the PBGC's initial push for reassumption by GM of the Salaried Plan and the PBGC's typical stance in going to great lengths to protect pensioners (again, by its own estimation, it was able to save pension plans in 13 auto parts companies that were in bankruptcy during this same period of time), one necessarily is left to ask – why did the PBGC terminate the Salaried Plan? The record shows that the PBGC's actions were influenced by extra-statutory political factors.

Again, as described above, the record demonstrates that the PBGC dramatically altered its behavior after the intervention of Treasury's Auto Team. *See, e.g.*, *supra* 78-82. After its initial efforts to promote a GM reassumption of both of Delphi's large pension plans, the PBGC abruptly ceased all efforts to save the Plan after the PBGC's Joe House began coordinating on these issues with Treasury's Matt Feldman. *See id.* The PBGC's decision to abandon its advocacy of the Salaried Plan was objectively unreasonable in light of the substantial

**REDACTED VERSION OF SEALED DOCUMENT**

leverage it possessed to save the Salaried Plan, *supra* 82-91, its statutory goal of continuing and maintaining pension plans, 29 U.S.C. § 1302(a), and ERISA's requirement that a pension plan's termination is only appropriate under § 1342(c) where necessary under one of three statutory criteria. 29 U.S.C. § 1342(c).  And while the PBGC has never offered any explanation for its change and behavior, the record demonstrates that Treasury's political wishes played a decisive role.

█████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████  However, in deposition testimony, the acting director of the PBGC at the time of the termination, Vince Snowbarger, acknowledged the Treasury was wearing "at least" three conflicting hats in these interactions.  *Id.* ¶ 54.  First, as a PBGC board member, Treasury was one of three agencies charged with providing oversight and direction to the PBGC.  *Id*.  Second, through its Auto Team, Treasury was charged with restructuring the auto industry.  Third, Treasury, as the chief lender to GM, was as a major competing creditor in the Delphi bankruptcies that would ultimately decide whether GM would be permitted to fund a reassumption of the Delphi pension plans.  *Id*.  In sum, the Treasury's conflicting roles were problematic for the PBGC, in that they

**REDACTED VERSION OF SEALED DOCUMENT**

threatened to subvert the PBGC's interests in saving both of Delphi's pension plans, to Treasury's competing political and financial interests.

These same concerns played out in Treasury's approach to GM. Treasury wanted to find ways to keep liabilities off New GM's balance sheet and thus not noticeably subject to TARP subsidization. By Mr. Rattner's own admission, Treasury needed to show

REDACTED VERSION OF SEALED DOCUMENT

the public that "the government wasn't going to be everybody's piggybank." *See*

SUMF ¶ 38. However, Treasury knew that, again for *political* reasons, New GM

would be forced to assume significant liabilities related to the labor unions,

particularly the UAW. Delphi's salaried retirees, had no similar political leverage,

and it was the PBGC, not the Plan's participants, that was responsible for

negotiating the release of the commercial leverage associated with the Salaried

Plan's survival, *i.e.*, the PBGC's liens and claims on Delphi's assets. Treasury

then proceeded to use its influence with the PBGC to accomplish these political

goals.

Mr. Feldman of the Auto Team has testified that he began his discussions

with the PBGC in April 2009 with the express goal of achieving an agreement

where the Salaried Plan was terminated, while saving Delphi's Hourly Plan. *See*

*Id.* ¶ 63. GM perceived a benefit to Treasury taking the lead on negotiations with

the PBGC "because it was 'Government agency to Government agency' and

*Treasury would get a better deal for GM.*" *See id.* ¶ 54 (quoting Ex. 3 at 14)

(emphasis added).

**REDACTED VERSION OF SEALED DOCUMENT**

which was a disadvantage to the PBGC because its acting director, Mr.

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

████████████████████████████████.

Consequently, during the late-May 2009 bankruptcy mediation, rather than use its

liens and claims as leverage to negotiate in favor of the Salaried Plan, in an attempt

to save the Salaried Plan, the PBGC's representatives, according to Mr. House,

"sat in a room and read books all day."  *Id.* ¶ 88.

█████████████████████████████████████████

███████████████████████████████████████████ged

REDACTED VERSION OF SEALED DOCUMENT



**REDACTED VERSION OF SEALED DOCUMENT**

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████

Thus, the record demonstrates that Treasury sought to have the Plan terminated, in order to keep liabilities off of New GM's balance sheet, despite the strong commercial necessity that would have argued in favor of an assumption of the Plan by New GM, and further that the PBGC acquiesced utterly with Treasury's designs, contrary to its statutory mandate and the termination requirements of § 1342.  Treasury sought to keep the liabilities on GM's balance sheet as low as possible, because of the political necessity that federal funds be utilized as frugally as possible.  *See, e.g.*, SUMF ¶ 38.  Indeed, emphasizing the political success of his Administration's use of TARP funds in the auto situation, President Obama explained some years later (albeit when describing Chrysler's

REDACTED VERSION OF SEALED DOCUMENT

situation) that his Administration had with great care awarded funds to the auto makers and had now been paid back in full. *See* Remarks by the President to Chrysler Workers in Toledo, Ohio (June 3, 2011),

https://obamawhitehouse.archives.gov/the-press-office/2011/06/03/remarks-president-chrysler-workers-toledo-ohio. The President made no mention of the $1.5 billion liability to the Title IV insurance fund to cover guaranteed benefits associated with the Salaried Plan, as those were *not* on the GM balance sheet.[12]

### E. The Record in Full Establishes that the PBGC Cannot Prove It Would Have Succeeded in Obtaining a Judicial Termination Decree in July 2009, Had It Tried

What emerges from the full record is a picture of a PBGC that had substantial leverage through the combination of its liens and claims on Delphi

---

[12] It is important to note that the termination of the Salaried Plan and the Hourly Plan kept liabilities off of GM's balance sheet, and thus outlays from TARP lower, but still (according to the PBGC's estimates) cost the government billions in insurance payments for guaranteed benefits. However, these payment – *i.e.*, liabilities – would appear *on the PBGC's balance sheet*, not GM's. Relegating the Salaried Plan's participants to the PBGC's insurance system, rather than allowing a reassumption of the Salaried Plan by GM, was a result that cost Plan's participants dearly (through the loss of all benefits above guaranteed benefits); however, it served the political purpose of keeping the federal government's grants and loans to GM minimized. Ironically, the cost to the federal government (when one adds the TARP expenditures *and* the loss to the Title IV insurance fund) was much greater than would have been the case had the reassumption of the Salaried Plan by GM occurred and any such liabilities been added to GM's balance sheet, though perhaps less costly as a political matter. Indeed, this is precisely the pitch that the PBGC made to Treasury early in early 2009, before the PBGC's decision to acquiesce in the termination of the Salaried Plan. *See* SUMF ¶ 33.

REDACTED VERSION OF SEALED DOCUMENT

assets and GM's great dependence on Delphi parts to press hard for a reassumption of the Salaried Plan by GM (and later New GM) in its interactions with Treasury – a scenario that may even have cost GM less than what it paid to the PBGC to resolve the PBGC's liens and claims.  The record also establishes that the PBGC's leverage via the liens and claims likewise could have been sufficient to persuade Delphi's purchasers to accept a reassumption – a scenario made more feasible given the availability of the funds from the PBGC settlement with GM to fund Plan contributions, and given the PBGC's historic, consistent, and successful efforts to demand any solution for workers other than termination of the worker's plan (with the concomitant costs of paying guaranteed benefits to the PBGC).  But politics intervened through the more powerful Auto Task Force, which prevented the result likely to have occurred in a non-government setting (*i.e.*, a reassumption) from happening in order to keep TARP expenditures to a minimum and public criticism of the government's use of taxpayer funds for the auto industry as muted as possible.

Given this backdrop, had the PBGC continued with its § 1342(c) termination action, the PBGC would not have been able to demonstrate that termination was necessary to save money for the insurance fund.  Rather, the most probable result of a judicial adjudication pursuant to § 1342 would have been a finding that the termination could be "avoid[ed]" and, as a result, that a better scenario existed

REDACTED VERSION OF SEALED DOCUMENT

whereby the PBGC's insurance fund would *save* money, by avoiding the loss entirely.  *PBGC v. United Air Lines, Inc.*, 436 F. Supp. at 924.  An adjudicating court, looking out for the public interest, and ███████████████████████ ████████████████████████████████████████████, and with the PBGC bearing the burden of proof, would have demanded that the PBGC return to the battlefield to get a better deal, and the facts indicate the PBGC had all the leverage to do so.

Because the record does *not* establish that "termination of the Salaried Plan would have been appropriate in July 2009 if, as Plaintiffs contend, [the PBGC] were required under 29 U.S.C. § 1342(c)" to seek a judicial decree, ECF No. 193 at 7, the Court should proceed to consider Counts 1 through 4 of the Second Amended Complaint.  In other words, Plaintiffs have satisfied the Court's prerequisite from the September 1, 2011 Order for reaching the merits of the claims in the Second Amended Complaint.  And while Plaintiffs believe they have shown to the Court that, by any measure, the record indicates no judicial decree under § 1342 would have issued in July 2009, it should be enough given the summary-judgment stage of proceedings that they can establish genuine factual disputes as to whether the PBGC could have met the conditions for termination by judicial decree in July 2009.  In that latter instance, the Court's detailed review of the factual record and recognition even simply that the case is not clear as to

REDACTED VERSION OF SEALED DOCUMENT

whether the PBGC could have succeeded under § 1342 would mean it had properly and meaningfully exercised judicial restraint before considering momentous statutory and constitutional issues.  While the Court could hold a trial to determine any factual disputes regarding whether the PBGC could have met its burden under § 1342, and Plaintiffs would certainly zealously participate in such a trial, Plaintiffs also, respectfully, believe a summary-judgment showing that the PBGC cannot prove a lack of genuine factual disputes regarding its ability to have succeeded in July 2009 under § 1342 is sufficient to warrant consideration of the merits of Counts 1 through 4.

## II.    BECAUSE THE DELPHI PLAN WAS TERMINATED WITHOUT THE NECESSARY COURT ADJUDICATION, PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT 1

Count 1 alleges that in order to termination a pension plan under 29 U.S.C. § 1342(c), the PBGC must obtain a district court adjudication that the termination is necessary under the statutory criteria.  ECF No. 145 ¶ 39 (citing 29 U.S.C. § 1342(a), (c)).  Critically, ERISA requires the PBGC to

> apply to the appropriate United States district court *for a decree adjudicating that the plan must be terminated* in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.

29 U.S.C. § 1342(c)(1) (emphasis added).

REDACTED VERSION OF SEALED DOCUMENT

The statute forbids the PBGC from circumventing this process and terminating a plan via summary agreement with a plan's administrator. As explained below, this reading of § 1342(c)(1) is supported not only by the statute's plain text, but also by the purpose of the subsection and the purposes of ERISA more broadly. Because the PBGC failed to obtain the necessary court adjudication the Court should enter judgment in favor of Plaintiffs on Count 1.

**A.    The Plain Language of § 1342(c)(1) Requires That the PBGC Obtain a Court Decree Before Terminating a Plan, Even If the Plan Administrator Agrees to Plan Termination**

Because the Court's analysis of Count 1 presents a question of statutory interpretation, the Court must "start, of course, with the statutory text." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). "If the statutory language is plain, [a court] must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).

In this case, the text of the statute is clear: a plan cannot be terminated unless "the appropriate United States district court" issues "a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c)(1). This remains the case, even if the PBGC and a plan administrator agree to plan

REDACTED VERSION OF SEALED DOCUMENT

termination. In support of this conclusion, a brief review of portions of § 1342 is necessary at the start.

Subsection 1342(a) describes the PBGC's authority to initiate termination proceedings. Specifically, § 1342(a) allows, but does not require, the PBGC to institute termination proceedings whenever it determines that one of four conditions is satisfied. 29 U.S.C. § 1342(a). Additionally the statute *requires* the PBGC to institute termination proceedings when the PBGC determines that a plan cannot pay benefits *currently* owed. *Id.*

Subsection (a) establishes a single exception to the requirement that the PBGC follow the statutory plan termination procedures. That exception, which applies only to small plans, permits the PBGC to prescribe a "simplified procedure" to terminate such plans, "*as long as that procedure includes substantial safeguards* for the rights of the participants and beneficiaries under the plans . . . (*including the requirement for a court decree* under subsection (c))." 29 U.S.C. § 1342(a) (emphasis added). Thus, even in the context of the "simplified [termination] procedure" that applies to "small" plans, the PBGC must provide substantial procedural safeguards to protect plan participants, including the requirement of a court decree. *Id.* Given that Congress imposed the court-decree requirement when it crafted the small-plan exception, it stands to reason that court approval is certainly required when the PBGC and the administrator of a large plan

REDACTED VERSION OF SEALED DOCUMENT

*sua sponte* proceed to a termination in a streamlined manner through an agreement between themselves. *See id.*

Upon the institution of termination proceedings under § 1342(a), the PBGC (or the plan administrator) may request, pursuant to § 1342(b), that the court appoint a trustee to administer the plan for the duration of the termination proceedings. 29 U.S.C. § 1342(b). No one disputes that the PBGC and plan administrator can, by agreement, achieve appointment of a trustee without court involvement. *Id.*

If the PBGC chooses to, or is required to, initiate termination proceedings under § 1342(a), then the following procedure, set forth in § 1342(c)(1), applies:

- The *first sentence* of § 1342(c)(1) describes the circumstances in which the PBGC may apply to a district court for a decree adjudicating that the plan in question must be terminated.

- The *second sentence* permits a trustee appointed under § 1342(b) to either intervene in such proceedings or independently seek such a decree.

- The *third sentence* directs the court to authorize a trustee appointed under § 1342(b) to terminate the plan, but only after the court issues a decree applied for by the PBGC or the trustee.

- The *fourth sentence*, which is key to the parties' dispute, applies when two conditions are satisfied: the PBGC and plan administrator agree to (i) terminate a plan, and (ii) appoint a trustee. Then, the trustee will be subject to the powers set forth in § 1342(d)(1), as well as the duties set forth in § 1342(d)(3), which include the duties of a bankruptcy trustee and an ERISA fiduciary.

REDACTED VERSION OF SEALED DOCUMENT

Hence, the fourth sentence of § 1342(c)(1) relates solely to the powers given to the trustee.  That sentence provides as follows:

> *If* the [PBGC] and the plan administrator agree that a plan should be terminated *and* agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection (other than this sentence), [*then*] the trustee shall have the power described in subsection (d)(1) and . . . is subject to the duties described in subsection (d)(3).

29 U.S.C. § 1342(c)(1) (emphasis added).

This sentence structure represents a classic example of a case or condition, used by Congress to "limit the generality of the statute" by establishing "circumstances or conditions that must operate or occur before the act applies to a given individual."  1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 21:6 (7th ed. 2009) [hereinafter *Sutherland*]. Such conditions often begin with the words "if" or "where."  *Id.*  This "logical structure . . . clearly commands that a definite result . . . must follow."  *United States v. Williamson*, 154 F.3d 504, 505 (3d Cir. 1998); *see also Mid-Am. Waste Sys., Inc. v. City of Gary*, 49 F.3d 286, 290 (7th Cir. 1995) ("The if-then quality of the rule sets up a legitimate claim of entitlement to a particular decision if the condition holds.").

Put simply, if condition "X" is satisfied, then result "Y" must follow.  *See Smith v. Shettle*, 946 F.2d 1250, 1253 (7th Cir. 1991) ("No magic form of words is required to make a regulation mandatory; all that is required is that it be clear that

REDACTED VERSION OF SEALED DOCUMENT

if X (the substantive predicate), then Y (the specified outcome, from which the enforcement officials are not free to depart).")  And result "Y" is limited to *only* the "definite result" set forth in the apodosis, or main clause, of the sentence.  *See Sutherland* § 21:6 (explaining that the condition only serves to determine the set of facts subject to the result set forth in the statutory provision).

The fourth sentence of § 1342(c)(1) employs this very sort of "if X, then Y" structure.  In this case, however, Congress imposed two conditions:  an agreement between the PBGC and the plan administrator on termination of a plan ("X-1"), and an agreement between the PBGC and the plan administrator to appoint a trustee ("X-2").  29 U.S.C. § 1342(c)(1).  If both conditions are satisfied, then a specific consequence ("Y") is triggered:  the trustee is given the powers enumerated in (d)(1) and duties enumerated in (d)(3).  *Id.*  This can be considered "if X-1 and X-2, then Y." [13]

---

[13] Read correctly, the last sentence of § 1342(c) says that, if there is no dispute between the PBGC and the plan administrator over whether a plan should be terminated and over who should be the trustee (*i.e.*, they "agree" on these two subjects), then one set of issues before the adjudicating court – namely, the appointment of a trustee and the trustee's powers – can be quickly resolved by the PBGC and the plan administrator.  This makes good sense because the result is that a trustee immediately is put in place, who is then, with full powers, singly working with an eye toward conserving the assets in the participants' and beneficiaries' interests.  In other words, Congress thought the proverbial "federal case" need not be made out of every issue before the adjudicating court, if there was agreement between the PBGC and the plan administrator.  And allowing a shortcut on the limited issue of trusteeship harms no participant or beneficiary interests, since they

REDACTED VERSION OF SEALED DOCUMENT

The PBGC claims that the fourth sentence of § 1342(c)(1) allows it to bypass the court adjudication required by the first sentence of § 1342(c)(1). According to the PBGC, an agreement between it and the plan administrator to terminate a plan and appoint a trustee does more than just grant that trustee the powers laid out in § 1342(d)(1) and fiduciary duties laid out in (d)(3), as actually provided by the fourth sentence of § 1342(c)(1); the PBGC claims that the agreement also allows it to terminate that plan without a court decree. But notably absent from the "definite result" set out in the fourth sentence is this power to terminate a plan without a court decree. In effect, the PBGC asks the Court to add an additional result to the only one specifically enumerated by Congress. If the Court were to do so, it would transform the logic of the sentence to read: "if X-1 and X-2, then Y *and Z*."

The Supreme Court has repeatedly rejected that sort of logic pattern. *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,* 414 U.S. 453 (1974), for instance, involved the Rail Passenger Service Act of 1970, 42 U.S.C. § 547, which expressly provided for (i) a public cause of action "maintainable by the Attorney General," and (ii) a private cause of action only in cases "involving . . . labor agreement[s]." 414 U.S. at 456-57. An association of railroad passengers, which

---

are always protected by the trustee's obligation to act as their fiduciary (irrespective of how the trustee gains appointment and powers).

REDACTED VERSION OF SEALED DOCUMENT

brought a private suit to enjoin the announced discontinuance of certain passenger trains, argued that the statute "should *not* be read to *preclude* other private causes of action." *Id.* at 457 (first emphasis added).

Citing longstanding precedent, the Supreme Court invoked the "ancient maxim" of *expressio unius est exclusio alterius* and rejected the passengers' position. The Court explained that "'[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" *Id.* at 458 (quoting *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929)). "Since the Act creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created in [the statute] are the exclusive means to enforce the duties and obligations imposed by the Act." *Id.* at 458; *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) ("Congress was . . . aware of certain instances in which exceptions to the [Endangered Species Act's] broad sweep would be necessary. Thus, [the statute] creates a number of limited 'hardship exemptions'. . . . [But] there are no exemptions in the Endangered Species Act for federal agencies, meaning that under the maxim *expressio unius est exclusio alterius*, we must presume that these were the only 'hardship cases' Congress intended to exempt"); *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 630 (6th Cir. 2010) (denying an attempt to

REDACTED VERSION OF SEALED DOCUMENT

read an additional enforcement mechanism into a statute that already lists other enforcement mechanisms).

The fourth sentence in § 1342(c)(1) provides a specific outcome:  the appointed or agreed-upon trustee is given certain powers and duties – nothing more.  The Court must reject the PBGC's attempt to read into this sentence a "specified outcome" that appears nowhere in the text of the sentence itself.  Indeed, the Court "must presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Dodd v. United States*, 545 U.S. 353, 357 (2005) (internal quotation marks omitted).  Here, the text plainly states that a plan cannot be terminated unless "the appropriate United States district court" issues "a decree adjudicating that the plan must be terminated."  29 U.S.C. § 1342(c)(1).  The fourth sentence of § 1342(c)(1), which relates only to the powers of a trustee, does not change that.[14]

---

[14] The Second Circuit is the only federal court to consider the first sentence of § 1342(c)(1) in a meaningful way.  In its decision, which is not binding on this Court, it concluded that the PBGC could "proceed . . . in summary fashion without affording plan members pretermination notice and hearings to contest the propriety of the termination decision." *In re Jones & Laughlin Hourly Pension Plan*, 824 F.2d 197, 199 (2d Cir. 1987).  Yet, in that case the plan administrator and PBGC actually obtained a court decree, making the court's opinion on that point mere dicta.

REDACTED VERSION OF SEALED DOCUMENT

**B.    Requiring the PBGC to Obtain a Court Decree Before Terminating a Plan Best Serves ERISA's Objectives and Comports With the Statute's Legislative History**

Even if the Court were to conclude that § 1342(c) is ambiguous, the purpose of that provision (and of ERISA as a whole) as well as ERISA's legislative history support the conclusion that the PBGC was required to obtain a court decree before terminating the Salaried Plan.  *See King v. Burwell*, 135 S. Ct. 2480, 2492-93 (2015) (finding that when the text of a statutory provision is unclear, the court must turn to the structure and purpose of the statute to determine the provision's meaning).  At the end of the day, the Court "cannot interpret federal statutes to negate their own stated purposes."  *Id*. at 2493; *see also id.* (rejecting interpretation of statute that would lead to the result "Congress designed the Act to avoid").

The purpose of ERISA is to "protect . . . the interests of participants in employee benefit plans."  29 U.S.C. § 1001(b).  Congress explicitly said so itself, *see id.*, and the Supreme Court has recognized as much numerous times.  *See*, *e.g.*, *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (finding that the "principal object of [ERISA] is to protect plan participants and beneficiaries"); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983) (recognizing that ERISA was "designed to promote the interests of employees and their beneficiaries in employee benefit plans").

REDACTED VERSION OF SEALED DOCUMENT

Consistent with that purpose, ERISA provides an array of participant protections.  These include the right to certain notices (29 U.S.C. § 1021(f)), the requirement to provide plan documents and account information to participants (29 U.S.C. § 1024), the imposition of fiduciary duties on individuals responsible for plan management (29 U.S.C. §§ 1103, 1104), claims procedure protections (29 U.S.C. § 1133), and, of course, the insurance program that the PBGC administers.

Requiring a court decree ordering termination of a plan "in order to protect the interests of the participants" — in effect, imposing a judicial safeguard — comports with ERISA's purpose and is consistent with the statute's other built-in participant protections.  Indeed, § 1342(a) describes the "requirement for a court decree under subsection (c)" as a "substantial safeguard[]" of participant rights.  29 U.S.C. § 1342(a).  Without this judicial adjudication, there are no checks on the power of the PBGC and plan administrator to terminate a plan at their own behest, a decision with lasting and significant consequences to plan participants.

To protect those participant rights, Congress wisely determined that the judiciary, in its role as an independent check on executive power, is best suited to decide whether particular circumstances warrant plan termination.  As the Seventh Circuit has explained (and this Court alluded to in its September 1, 2011 Order), "[t]he only authority the PBGC has under § 1342 is to ask a court for relief.  That implies an independent judicial role." *In re UAL Corp.*, 468 F.3d 444, 449 (7th

REDACTED VERSION OF SEALED DOCUMENT

Cir. 2006) (refusing to apply "arbitrary and capricious review" to PBGC's determination under § 1342(c) that a plan should be terminated because the PBGC did not use its rulemaking or adjudication authority to arrive at its decision).

The PBGC, however, seeks to evade the very review process that Congress found necessary to protect plan participants. The PBGC should not be allowed to undermine the statute's principal purpose by terminating a plan based on an agreement between two interested parties. There can be little doubt that Congress imposed that pre-termination safeguard in all cases, without exception. The Conference Report describing the final ERISA bill is telling. It provides:

> In the case of small plans, the corporation may prescribe a simplified procedure and may pool assets of small plans so long as the rights of the participants and employers (including the right to a court decree of termination) are preserved. Furthermore, the corporation may agree with any plan administrator to designate a trustee who, without court appointment, is to have the usual powers of trustees appointed by the court.

H.R. Rep. No. 93-1280, at 373 (1974) (Conf. Rep.).

Along with the statutory text, this legislative history shows that Congress knew how to clearly establish exceptions to the procedures the PBGC must follow to terminate a plan when it wanted to do so. As discussed above, Congress unambiguously established a narrow exception allowing the PBGC to establish a "simplified procedure" for terminating small plans only. 29 U.S.C. § 1342(a). Moreover, when Congress crafted this exception, it considered the right to a court

REDACTED VERSION OF SEALED DOCUMENT

decree such a valuable participant protection that it still barred the PBGC from bypassing it, by requiring that any such "simplified procedure" for a small plan include "substantial safeguards for the rights of the participants . . . (including the requirement for a court decree)." *Id.*

Additionally, the legislative history passage (in the last quoted sentence above) confirms Plaintiffs' reading of the fourth sentence of § 1342(c), because it mentions only agreements regarding the appointment of trustees and the trustees' powers when referencing other agreements that the PBGC and "*any* plan administrator" may reach; nowhere in the passage (or, as far as Plaintiffs are aware, in any other part of the legislative history) did Congress suggest agreements could be reached by the PBGC and the plan administrator to terminate a large plan. Straightforwardly, the Conference Report indicates that Congress intended the fourth sentence of § 1342(c)(1) merely to endow a trustee appointed by agreement with the powers of a court-appointed trustee. These powers would enable the trustee, for instance, to act to conserve plan assets while the court adjudicated the plan termination. This explanation aligns completely with the plain text of the statute, under which an agreement between the PBGC and the plan administrator to terminate a plan and to appoint a trustee has a single consequence: the trustee designated by such an agreement possesses the same powers and duties as a trustee designated by court decree.

REDACTED VERSION OF SEALED DOCUMENT

Given the clarity with which Congress established the small plan exception under § 1342(a) and the value it placed on the court adjudication procedure, had Congress meant to allow the PBGC to bypass that requirement for other plans or in other circumstances, it would have carefully articulated such an exception. Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, [as] one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001) (citing *MCI Telecommc'ns Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994)).

### C. It Is Undisputed That the PBGC Failed to Obtain a Court Decree Before Terminating the Plan, Making Summary Judgment Appropriate

As described above, the PBGC initially took steps to comply with § 1342(c)'s requirement that it obtain a court adjudication. *See PBGC v. Delphi Corp.* No. 2:09-cv-12876 (E.D. Mich., filed July 22, 2009).  However, the PBGC then dismissed that action, *see id*. at ECF No. 5 (Aug. 7, 2009 Notice of Voluntary Dismissal),

**REDACTED VERSION OF SEALED DOCUMENT**



Because the PBGC did not obtain a court decree before terminating the Plan, and ERISA requires one, the Court should grant summary judgment in favor of Plaintiffs on Count 1.

**III.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT 2 BECAUSE DELPHI EXECUTED THE TERMINATION AGREEMENT IN A CORPORATE RATHER THAN FIDUICARY CAPACITY, RENDERING IT INVALID**

Count 2 alleges that even if a pension plan can be terminated by agreement between the PBGC and a plan administrator, the decision to select a summary method of termination can be undertaken, if at all, only by the plan administrator in a fiduciary capacity.  This is the only reading of the statute – assuming terminations by agreement are at all allowable – that would make logical sense, that is consistent with ERISA and trust law, and that would be consistent with Congress's insistence on any plan termination process including substantial safeguards for participants and beneficiaries.  If a decision to select a summary

REDACTED VERSION OF SEALED DOCUMENT

method of plan termination can be made by a plan administrator solely in a fiduciary capacity, then at the very least participants and beneficiaries (through their fiduciary) will have a real say in the process before their vested property interests (*see infra* p. 138-41) are diminished or extinguished.

A.     **An Employer's Decision to Enter Into a Summary Termination Agreement With the PBGC Under 29 U.S.C. § 1342(c)(1) Is Subject to ERISA's Fiduciary Standards**

Beginning, as one must, with the statutory language, whatever power the fourth sentence of § 1342(c) provides with regard to an agreement with the PBGC for termination, it expressly provides any power to a "plan administrator."  This is significant because a "plan sponsor" is a distinct and separate entity from a "plan administrator" under ERISA.  *Compare* 29 U.S.C. § 1002(3)(16)(a) (defining plan administrator) *with* 29 U.S.C. § 1002(3)(16)(b) (defining plan sponsor).

While plan administrators (at least those with discretion) are, by definition, fiduciaries under ERISA, plan sponsors are not.  *See, e.g.*, 29 U.S.C. § 1002(21)(A)(iii) ("a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the *administration of such plan*") (emphasis added).  Nothing in ERISA requires that the plan sponsor also be the plan administrator; consequently, plan sponsors usually do not have any fiduciary responsibilities unless they choose to retain some administrative powers.  *See, e.g., Coyne & Delany Co. v. Selman*, 98 F.3d 1457,

REDACTED VERSION OF SEALED DOCUMENT

1465 (4th Cir. 1996).  Moreover, an employer can have dual roles with respect to a

pension plan, in that the employer can serve as both plan sponsor and plan

administrator.  "Which hat the employer is proverbially wearing depends upon the

nature of the function performed."  *Beck v. PACE Int'l Union*, 551 U.S. 96, 101

(2007).

Thus, whatever the extent of the power granted to a plan administrator by

the fourth sentence of § 1342(c), it is vested in the plan administrator, not the plan

sponsor.  This is the beginning and the end of the inquiry.  Delphi could only have

had the power to execute the summary termination agreement in its capacity as

plan administrator; as such there can be no question that fiduciary obligations must

attach because "[t]he employer's decision . . . was not an action which could be

given effect as a corporate management decision."  *Payonk v. HMW Indus., Inc.*,

883 F.2d 221, 225, 227 (3d Cir. 1989); *see also Varity Corp. v. Howe*, 516 U.S.

489, 502 (1996) ("The ordinary trust law understanding of fiduciary

'administration' of a trust is that to act as an administrator is to perform the duties

imposed, or exercise the powers conferred, by the trust documents.") (internal

citations omitted).

To be sure, when a plan sponsor voluntarily decides to terminate a pension

plan under 29 U.S.C. § 1341, that decision is made using its non-fiduciary, settlor

"hat."  *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) ("When employers

REDACTED VERSION OF SEALED DOCUMENT

undertake [plan termination], they do not act as fiduciaries, but are analogous to the settlors of a trust") (internal citations omitted).  In these circumstances, 29 U.S.C. § 1341 provides the plan sponsor with two options:  it may pursue a standard termination or it may pursue a distress termination.  Regardless, the decision by a plan sponsor to terminate a plan, whether standard or distress, does not actually terminate the plan under ERISA; it is simply a business decision indicating that the employer wishes to cease providing a pension plan benefit to its employees.  *See Payonk*, 883 F.2d at 227 (explaining that electing to terminate a plan is "a corporate management decision").

After an employer unilaterally decides to terminate a plan under § 1341, it then dons the "hat" of a fiduciary if it, as opposed to a separate third-party administrator, actually implements the termination.  This is because plan termination implicates various discretionary actions that could affect participants' rights and benefits, such as choosing methods of locating all participants owed a distribution upon plan termination.  *See* Dep't of Labor, Field Assistance Bulletin No. 2014-01, *Fiduciary Duties and Missing Participants in Terminated Defined Contribtion Plans* 2 (Aug. 14, 2014)[15] ("[T]he fiduciary responsibility provisions of ERISA govern the steps taken to implement this 'settlor' decision, including

---

[15] https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2014-01.pdf

REDACTED VERSION OF SEALED DOCUMENT

steps to locate missing participants."); *see also* 29 U.S.C. § 1002(21)(A) (making a person a fiduciary to the extent he or she exercises discretion in connection with plan administration).

Similarly, the selection of a particular method of plan termination is a fiduciary function subject to ERISA's fiduciary obligations — for example, terminating a plan by purchasing annuities, versus issuing lump-sum distributions. *See* 29 U.S.C. § 1341(b)(3)(A)(i) ("[T]he plan administrator shall purchase irrevocable commitments from an insurer to provide all benefit liabilities under the plan"); *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1342 (9th Cir. 1994) (imposing fiduciary duties on plan administrator selecting annuity provider to distribute benefits under terminating plan); *see also Beck*, 551 U.S. at 102 (holding that if merger were a "permissible form of plan termination," then the decision not to consider merger in terminating a plan could be subject to fiduciary duties).  In *Waller v. Blue Cross of California*, for instance, the defendant terminated its retirement plan by purchasing annuities from a company that later entered conservatorship.  32 F.3d at 1338-39.  Participants in and beneficiaries of the plan alleged that the defendant violated its fiduciary duties by selecting a lower-cost annuity provider with an eye toward maximizing the residual plan assets, which would revert back to the company following termination.  *Id.* at 1341.  In response, the defendant argued that the mere act of selecting an annuity provider does not

REDACTED VERSION OF SEALED DOCUMENT

constitute a fiduciary act.  *Id.* at 1342.  The Ninth Circuit disagreed, finding the distinction between the "decision to terminate [and] the implementation of the decision . . . dispositive."  *Id.*  Citing Congress's intent in enacting ERISA, the court refused to excuse the defendant from its fiduciary duties "at such a critical moment in the life of the plan" — *i.e.*, one with significant bearing on participants' vested benefits.  *Id.* at 1343.

*Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C. Cir. 1994), similarly held that fiduciary standards affix to the implementation of plan termination.  In *Larson*, a participant alleged that upon plan termination Northrop Corporation purchased annuity contracts that failed to include an early retirement subsidy that had been provided by the plan.  *Id.* at 1166.  To resolve a statute of limitations issue, the court had to pinpoint the timing of the fiduciary breach, and it explained that because "activities undertaken to implement the termination decision are generally fiduciary in nature," a fiduciary breach, if any, "was fully completed when Northrop acquired the allegedly insufficient annuity."  *Id.* at 1169-70.  In other words, at that point, the company had selected its method of termination under § 1341, and had therefore made a fiduciary decision.

This reasoning applies even more forcefully in the context of § 1342, which explicitly refers to a plan administrator.  Assuming that the fourth sentence of § 1342(c) really does allow for plan terminations by agreement between the PBGC

REDACTED VERSION OF SEALED DOCUMENT

and a plan administrator, that would mean that the statute provided Delphi (in its role as *plan administrator*) with a choice:  it could agree to summary termination (which, pursuant to Plaintiffs' alternate *arguendo* reading of the statute in Count 2, terminated the plan without any further procedural protections), or it could disagree (in which case the PBGC would have been required to prove to a district court that the plan meets the statutory criteria for termination).  *See* 29 U.S.C. § 1342(c)(1).

A decision to use powers provided solely to a plan administrator under ERISA to agree to terms resulting in the termination of vested pension rights is not a business decision insulated from fiduciary considerations.  *Cf. Payonk*, 883 F.2d at 227.  To the contrary, it was an exercise of discretion assigned solely to the "plan administrator," *see* 29 U.S.C. § 1342(c)(1), who, by definition, acts subject to ERISA's fiduciary obligations.  *See id.* § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent . . . he has *any discretionary authority or discretionary responsibility* in the *administration* of such plan") (emphasis added); *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 295 (5th Cir. 2000) ("[a] fiduciary's acts undertaken to implement a plan's termination may [not] deviate from ERISA's [fiduciary duties]").  To the extent that § 1342(c) authorizes the PBGC to terminate a plan via agreement, Delphi could have had the power to execute the termination agreement – and formulate its terms – only in its capacity

REDACTED VERSION OF SEALED DOCUMENT

as plan administrator.  As such, there can be no question that fiduciary obligations attached.

"One of Congress' central purposes in enacting [ERISA] was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated[,] . . . by making sure that if a worker has been promised a defined pension benefit upon retirement -- and if he has fulfilled whatever conditions are required to obtain a vested benefit -- he actually will receive it." *Nachman Corp. v. PBGC*, 446 U.S. 359, 374 (1980).  Imposing fiduciary duties on individuals with discretion to impact participants' vested benefits was a critical element of the statutory scheme Congress created when it enacted ERISA.  *See e.g., Varity Corp.*, 516 U.S. at 496 ("ERISA protects employee pensions and other benefits . . . by setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans.").  Consistent with this intent, ERISA permits employers to terminate pension plans, so long as any decision that might denigrate vested benefits are made according to ERISA's fiduciary duties.  Because the mere act of *deciding* to terminate a fully funded pension plan does not innately affect vested benefits, Congress did not impose fiduciary duties on the business decision to terminate such a plan.  But because the method and terms of termination can, and often do,

REDACTED VERSION OF SEALED DOCUMENT

affect a participant's vested benefits, Congress imposed fiduciary duties on decisions made as part of *implementing* the decision to terminate.

Even more so, an agreement between the PBGC and a plan administrator to summarily terminate a plan necessarily strips participants of significant procedural protections for participants' rights and vested benefits (*e.g.*, court adjudication), leaving participants with just one final protection: a suit under § 1303(f) to undo the act where the fiduciary's agreement violated its fiduciary duties. Failing to subject summary termination decisions to fiduciary duties eliminates this one remaining safeguard and leaves plan participants wholly unprotected — a result directly in conflict with the purposes of ERISA.[16]

---

[16] Plaintiffs can sue, and seek relief against, solely the PBGC to nullify its agreement with Delphi, even with regard to Delphi's behavior. It is the PBGC that has been carrying out that agreement, and the PBGC is subject to suit in connection with plan terminations under 29 U.S.C. § 1303(f). Furthermore, the Supreme Court has established that, under ERISA and traditional trust law, a third party can be sued for participating in a fiduciary's breach, with appropriate equitable relief to be awarded against the third party for the fiduciary's breach. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245-53 (2000). Quite openly, Plaintiffs admit that they have not sued, and cannot sue, Delphi; but the bankruptcy court handling Delphi's bankruptcy has expressly approved Plaintiffs' suit against the PBGC on the theory espoused in Count 2. *See* SUMF ¶ 109; *see also* Ex. 138.

REDACTED VERSION OF SEALED DOCUMENT

### B.   Delphi Did Not Execute the Termination and Trusteeship Agreement With the PBGC According to ERISA's Duty of Loyalty

"The duties charged to an ERISA fiduciary are 'the highest known to the law,'" *see Gregg v. Transportation Workers of America, International*, 343 F.3d 833, 841 (6th Cir. 2003) (quoting *Chao v. Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002)), and include the duty of loyalty and the duty of prudence.  29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to act "solely in the interest of participants and beneficiaries" and "with the care, skill, prudence, and diligence . . . that a prudent man . . . would use").  The duty of loyalty requires that "'all decisions regarding an ERISA plan must be made with an eye single to the interests of the participants and beneficiaries.'"  *Gregg*, 343 F.3d at 840 (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995)).

Courts have consistently recognized that fiduciaries have an obligation under ERISA "'to avoid placing themselves in a position where their acts as directors or officers of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees.'"  *McMahon v. McDowell*, 794 F.2d 100, 110 (3d Cir. 1986) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).  "This duty may, in some circumstances, require the fiduciary to step aside in favor of a neutral referee, or at the least, to conduct an explicit inquiry into the potential for a conflict of interest." *Id.* (citing *Donovan*, 680 F.2d at 271).  This is

REDACTED VERSION OF SEALED DOCUMENT

a "rigorous standard," taken from the "common-law conception of a trustee." *Id.* (citing F. Douglas Raymond, "*ERISA Trusts and Tender Offers*," 13 Sec. Reg. L. Rev. 253, 257-59 (1985)).

Here, in entering an agreement summarily to terminate the Salaried Plan, the PBGC unlawfully entered into an agreement with a plan administrator who did not act as a fiduciary of the Plan. Instead, as the evidence below reveals, Delphi entered into the termination agreement believing it to be a "settlor" function to be undertaken in its corporate interest, rather in in the Plan participants' and beneficiaries' interests.

As noted above, in June 2009, Delphi proposed an amended plan of reorganization that contemplated the termination of the Salaried Plan in connection with a settlement that Delphi was negotiating with the PBGC. *See* ECF No. 17030 § 7.17, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. June 19, 2009). The PBGC and Delphi executed that settlement agreement on July 21, 2009, which in turn *required* Delphi to execute a termination and trusteeship agreement with the PBGC terminating the Salaried Plan if the PBGC issued a notice of determination pursuant to 29 U.S.C. § 1342(c). *See* ECF No. 18559, Ex. 1 § 3(a), *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. July 21, 2009). As a result, once it entered into that settlement agreement with the PBGC, Delphi committed itself to executing the termination agreement, subject to the discretion of the bankruptcy

REDACTED VERSION OF SEALED DOCUMENT

court (which would consider whether Delph was exercising proper business judgment to enter into it) and the PBGC (with its own institutional concerns), but without reference to *any fiduciary consideration*s.

Additionally, during a July 29, 2009 hearing on Delphi's proposed plan of reorganization, Delphi's counsel explicitly represented to the bankruptcy court that if Delphi were to execute the termination agreement with the PBGC, "in making the decision, Delphi acts in a settler or nonfiduciary capacity." *See* Ex. 139 at 193:20-21. Delphi's counsel then went further, emphasizing that "Delphi's board of directors ha[d already] directed the plan administrator, which is Delphi, to enter into the PBGC-Delphi settlement agreement, and upon [the bankruptcy court's] approval of it, to execute a termination and trusteeship agreement if that agreement is proposed by the PBGC." *Id.* at 194:7-11. Delphi's agreement with the PBGC was "necessary," according to Delphi's counsel, because "this is what will allow Delphi to reorganize and to move forward." *Id.* at 197:9-10. No documents that Delphi produced in discovery suggest that it considered the Plan participants' interests in making the determination to enter into the settlement agreement with the PBGC, or the termination agreement. And of course, the agreement turned out *not* to be in the participants' and beneficiaries' best interests, because it resulted in the substantial loss of vested benefits to them when all other similarly situated

REDACTED VERSION OF SEALED DOCUMENT

persons (such as union employees) retained their full benefits (through guaranteed benefits and top-ups). *See* SUMF ¶¶ 9, 98, 113.

Because there are no genuine disputes of fact that Delphi failed to execute the termination agreement according to its fiduciary duty of loyalty, and as a matter of law Delphi's actions in implementing and creating the terms for termination were subject to fiduciary obligations, Plaintiffs are entitled to summary judgment on Count 2. They are entitled to "appropriate equitable relief" against the PBGC pursuant to § 1303(f) for the PBGC's participation in the fiduciary breach.

## IV.  BECAUSE THE PBGC'S SUMMARY TERMINATION OF THE PLAN DEPRIVED PLAINTIFFS OF THEIR DUE PROCESS RIGHTS, SUMMARY JUDGMENT IS APPROPRIATE ON COUNT 3

The Court need only reach Count 3 if it rejects the Plaintiffs' arguments as to Count 1 and finds that § 1342(c) allows the PBGC and a plan administrator to summarily agree to terminate a pension plan. If the Court makes such a finding, it should nonetheless conclude that the summary termination in this case violated the Due Process Clause of the Fifth Amendment, which "'provides that certain substantive rights – life, liberty, and property – cannot be deprived except pursuant

REDACTED VERSION OF SEALED DOCUMENT

to constitutionally adequate procedures.'" *Mitchell v. Fankhauser*, 375 F.3d 477, 479 (6th Cir. 2004) (citation omitted).

The Sixth Circuit applies a two-part test to determine whether government action violates due process. First, the Court must "determine[] whether the plaintiff has a property interest entitled to due process protection." *Id.* at 480. Second, if the plaintiff has a protected property interest, then the Court "must . . . determine what process is due." *Id.* (internal quotation marks and citation omitted).

Here, the PBGC's summary termination of the Plan violated Plaintiffs' constitutional rights: Plaintiffs were stripped of their vested pension benefits (and the rights associated with those benefits) with no pre-deprivation process at all. The PBGC's actions robbed Plaintiffs of *any* opportunity to be heard before more than $520 million of vested pension benefits under the Plan were extinguished, benefits that were earned over a career of service, and were supposed to ensure their retirement security of the Plan's participants. As a result, and for the reasons discussed below, summary judgment is appropriate on Count 3.

## A. Plaintiffs Have a Protected Property Interest in Their Vested Pension Benefits

First of all, it is well-established that the right to receive vested pension benefits is a protected property interest. *See*, *e.g.*, *McDarby v. Dinkins*, 907 F.2d 1334, 1336 (2d Cir. 1990) (finding that the plaintiff had a "a protectible property

REDACTED VERSION OF SEALED DOCUMENT

interest in his city pension benefit"); *Flannelly v. Bd. of Trs. of N.Y. City Police Pension Fund*, 6 F. Supp. 2d 266, 268 (S.D.N.Y. 1998) ("An individual's disability benefits or pension has been found to constitute such a property interest."); *Ginaitt v. Haronian*, 806 F. Supp. 311, 317 (D.R.I. 1992) ("There is little question that the plaintiff has a property interest in his pension.").

As noted, the PBGC's termination of the Plan deprived Plaintiffs and other Plan participants of $521 million in vested pension benefits Plan-wide. *See* Ex. 123 at 1. This loss has been spread out over the Plan's 20,160 participants and beneficiaries. The PBGC's termination of the Plan resulted in substantial pension losses to Plaintiffs, and many of the DSRA's members suffered pension losses between 30% - 70%. *See* SUMF ¶ 9; ███████████████████████ ███████████████████████████████████ ██████████████████████████ But for the PBGC's termination of the Plan, these benefits would still be owed to Plaintiffs.

Additionally, pursuant to the termination and trusteeship agreement with the Plan's administrator, the PBGC assumed the role of statutory trustee to the Plan pursuant to § 1342. *See* SUMF ¶ 112. The statutory trustee holds the assets of a terminated plan in trust for the Plan's participants, and must allocate them as the benefits come due, according to the priority scheme laid out in 29 U.S.C. § 1344, based on the Plan's termination date. According to the PBGC's valuation, the

REDACTED VERSION OF SEALED DOCUMENT

Plan's assets were worth approximately $2.513 billion as of the termination date (July 31, 2009).  *See* Ex. 123 at 1.

However, as Plaintiffs' expert Dr. Rajah observed in his report, because of the timing of the Plan's termination, the "plan's assets were severely depressed" when the Plan was terminated in July 2009.  *See* Ex. 128 at 12.  "Between January 1, 2008 and March 31, 2009, the S&P 500 decreased by approximately 44%" while "[b]etween March 31, 2009 and May 31, 2015 [the time when Dr. Rajah completed his report], the S&P increased by approximately 94%."  *Id*. at n.5.  The numbers are even more dramatic when the last three years of market results are included in the comparison.  On July 31, 2009, the S&P 500 closed at 987, and on August 31, 2018 the S&P 500 closed at 2,901, an increase of roughly 194%.[17]  Similarly, the Dow Jones Industrial Average closed at 9,171 on July 31, 2009, and 25,964 on August 31, 2018, an increase of 183%.[18]

The timing of the PBGC's termination thus deprived the Plan's participants of their right to share in the market recovery that occurred over the last eight years. Unlike a normal trust, participants in a terminated plan normally (absent PBGC wrongdoing)  do not enjoy the increases to the trust's value over time.  Instead, once a plan is terminated, "[a]ny increase or decrease in the value of the assets of a

---

[17] *See* https://quotes.wsj.com/index/SPX/historical-prices.

[18] *See* https://quotes.wsj.com/index/DJIA/historical-prices.

REDACTED VERSION OF SEALED DOCUMENT

single-employer plan occurring after the date on which the plan is terminated shall be credited to, or suffered by, the [PBGC]." 29 U.S.C. § 1344(c). Therefore, the PBGC's decision to terminate the Plan (if sustained) as of July 31, 2009 was, at least from the point of view of the Plan's participants and the Title IV insurance fund, "made at the worst possible time, and on the basis of financial conditions that did not forecast the long-run expectation for the plan in a realistic or reasonable way." Ex. 128 at 12.

By terminating the Plan at the bottom of the market, not only did the PBGC deprive the participants of the benefit of this increase, the PBGC took for itself the ability to earn hundreds of millions of dollars in investment returns. According to the PBGC's last eight annual reports, since terminating and trusteeing the Plan, the PBGC has, on average, enjoyed an 8.2% annual return on funds held in its trust account (including the $2.5 billion it took from the Salaried Plan).[19]

## B.    The PBGC Provided the Plaintiffs *No Process Whatsoever* Before Depriving Them of Their Protected Pension Benefits

Given the property interests at stake, the PBGC's termination of the Plan can only be upheld if it was accomplished pursuant to "'constitutionally adequate procedures.'"  *Mitchell v. Fankhauser*, 375 F.3d 477, 479 (6th Cir. 2004) (citation omitted). While determining the process required under a given set of

---

[19] *See* PBGC Annual Reports, https://www.pbgc.gov/about/annual-reports (last updated June 26, 2018).

REDACTED VERSION OF SEALED DOCUMENT

circumstances *can* be complicated, in this case it is not.  The government provided

Plaintiffs with no notice or pre-deprivation opportunity to be heard at all.  In fact,

as described above, *supra* p. 124-25, it specifically withdrew its termination action

to avoid providing Plaintiffs with any process.  Because the Due Process Clause

requires the government to provide some level of process *greater than zero* before

stripping individuals of their protected property interests, the process here is *per se*

constitutionally insufficient

> 1.  <u>Failing to Provide Plaintiffs a Hearing Before Depriving Them
> of Their Vested Pension Benefits Violated the Due Process
> Clause</u>

The Constitution generally requires that "'an individual [must] be given an

opportunity for a hearing before he is deprived of any significant property

interest.'"  *Guba v. Huron Cty.*, 600 F. App'x 374, 382 (6th Cir. 2015) (quoting

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).  "Although

'many controversies have raged about the cryptic and abstract words of the Due

Process Clause . . . there can be no doubt that *at a minimum* they require that

deprivation of life, liberty or property by adjudication be preceded by notice and

opportunity for hearing appropriate to the nature of the case.'"  *Boddie v.

Connecticut*, 401 U.S. 371, 377-78 (1971) (quoting *Mullane v. Cent. Hanover Tr.

Co.*, 339 U.S. 306, 313 (1950)) (emphasis added).

REDACTED VERSION OF SEALED DOCUMENT

Plaintiffs' vested property rights were taken from them without any procedural safeguards — a clear violation of the Due Process Clause. The PBGC's termination of the Plan, effectuated by nothing more than an "agreement" between the PBGC and Delphi (who, as demonstrated above, had a conflict of interest), flies in the face of even the bare "minimum" required by the Due Process Clause. *See Boddie*, 401 U.S. at 378.

To be sure, in certain "rare and extraordinary situations," a pre-deprivation hearing is not required, and due process may be satisfied through post-deprivation procedures alone. *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972). This, however, is not such a situation. For example, in *Parratt v. Taylor*, the Supreme Court held that "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). The narrowness of this exception is illustrated by the facts in *Parratt*, where an inmate in a Nebraska prison alleged that prison officials violated his due process rights when they failed to deliver to him certain hobby materials that he had ordered and paid for. *Id.* at 530. The Court held that where a deprivation occurs, as it did in *Parratt*, "as a

REDACTED VERSION OF SEALED DOCUMENT

result of a random and unauthorized act by a state employee" as opposed to an "established state procedure," "it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." *Id.* at 541.  In *Zinermon v. Burch*, the Court went further, holding that "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990).

The current situation is not one of those "rare and extraordinary" circumstances, for two reasons.  First, the PBGC's termination of the Plan stripped Plaintiffs of their vested property rights pursuant to a procedure that the PBGC has repeatedly used to terminate plans.  Where deprivation results from an established government procedure, a pre-deprivation hearing is feasible, and required, to comply with the Due Process Clause.  *See Mertik v. Blalock*, 983 F.2d 1353, 1365 (6th Cir. 1993) ("[In c]ases in which a due process challenge is made to deprivations resulting from the enforcement of an established state procedure . . . the actions at issue are not random or unauthorized, and it is both practical and feasible for the state to provide pre-deprivation process to the aggrieved party."); *see also Hudson v. Palmer*, 468 U.S. 517, 532 (1984) ("[P]ostdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized

action.").  The challenge here is to an established procedure, namely a summary

termination procedure that the PBGC claims it has used in "the majority" of plan

terminations.  *See, e.g.,* ECF No. 45 at 6-7.  In short, there is no reasonable basis to

conclude that this was some "random, unauthorized action," rendering the

existence of any post-termination procedures irrelevant.  *Harris v. City of Akron*,

20 F.3d 1396, 1401 (6th Cir. 1994).

      Second, a pre-deprivation hearing was plainly feasible here, and failed to

occur only because the PBGC wanted to evade judicial review.  *See Zinermon*, 494

U.S. at 132 ("[i]n situations where the State feasibly can provide a predeprivation

hearing before taking property, it generally must do so regardless of the adequacy

of a postdeprivation tort remedy to compensate for the taking").  Not only did

Congress clearly contemplate that the PBGC would terminate pension plans

through district court adjudications – § 1342(c) sets out a detailed procedure for

doing so – but *the PBGC actually initiated those very proceedings in this case*.

*See* SUMF ¶ 107.  Again, on July 22, 2009, the PBGC filed an action in this Court

to terminate the Plan.  *Id*.  ████████████████████████████

████████████████████████████████████

██████████████████████████████

██████████████████████████  The PBGC then filed a

notice of voluntarily dismissal of its termination action.  *Id*.  The PBGC's use of

**REDACTED VERSION OF SEALED DOCUMENT**

this termination procedure was driven not by any exigent circumstances that made

continuing with the termination action impractical,  This is

plainly not a valid justification for foregoing pre-deprivation review.  Because the

PBGC could have feasibly continued with its termination action in the district

court, due process required the PBGC to have done so.

> 2.   The Court Need Not Consider the Government's Interest in Foregoing a Pre-Deprivation Hearing in Evaluating the Adequacy of the Process in This Case — Zero Process Is *Per Se* Insufficient

The PBGC has argued in prior briefing that the Court should apply the

framework set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319

(1976), and, relying on *Mathews*, it has claimed that a pre-deprivation hearing was

unnecessary because the government's interest in foregoing such a hearing

outweighed other pertinent factors.  *See* ECF No. 23-2 at 13-15.  As explained

REDACTED VERSION OF SEALED DOCUMENT

below, however, *Mathews* applies only when actual administrative procedures have

been provided.  For obvious reasons, *Mathews* is inapt here.

*Mathews* set forth several factors intended to determine whether

"administrative procedures provided . . . [were] constitutionally sufficient."  424

U.S. at 334-35.  Those factors include:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

*Id*.  As these factors make clear, the *Mathews* balancing test applies to

"administrative procedures" and is, therefore, relevant *only* where there are

procedures to assess.

Here, the *complete absence* of pre-deprivation procedures violated Plaintiffs'

due process rights.  When other courts have been tasked with evaluating the

constitutional sufficiency of a complete absence of process, they have found such

an absence *per se* unconstitutional and concluded that *Mathews* was irrelevant.  *See*

*Holly v. City of Ecorse*, No. 05-74238, 2006 U.S. Dist. LEXIS 68160, at *11 (E.D.

Mich. Sept. 22, 2006) ("It is not necessary for the Court to decide the extent of the

process that was due Plaintiff under these circumstances in order to determine if

his due process rights were violated because Plaintiff was not given any due

REDACTED VERSION OF SEALED DOCUMENT

process at all.  Defendant conceded during oral argument that Plaintiff did not receive notice or a hearing prior to deprivation."); *Conkey v. Reno*, 885 F. Supp. 1389, 1398 (D. Nev. 1995) ("The *Mathews v. Eldridge* analysis does not determine whether a complete absence of process is permitted, but merely what process is due.  Here, there was a complete failure of process.  The Court need not apply the *Mathews v. Eldridge* analysis to determine whether adequate process was given.").

While the Sixth Circuit has not directly addressed whether the *Mathews* balancing test is relevant when the government provides zero process, its prior holdings strongly suggest that the answer is "no."  The Sixth Circuit has refused to apply *Mathews* when the government deprives individuals of an "absolute" procedural requirement.  *See e.g.*, *Doe v. Cummins*, 662 F. App'x 437, 449 n.5 (6th Cir. 2016) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  In *Doe v. Cummins*, the Sixth Circuit observed that "the constitutional requirement of an unbiased decisionmaker is absolute," such that the *Mathews* balancing test would be inapplicable, and a violation "would automatically trigger a due-process violation, irrespective of any balancing of interests."  *See id.*

Like the right to an unbiased decisionmaker, the right to notice and a hearing before being stripped of an established property interest is also "absolute."  *See Henry v. City of Middletown, Ohio*, 655 F. App'x 451, 463 (6th Cir. 2016).  In *Henry*, the Sixth Circuit established that "however weighty the governmental

REDACTED VERSION OF SEALED DOCUMENT

interest may be," the government must *always* provide "*some* notice and *some* opportunity to be heard prior to final deprivation of a property interest." *See id.* at 463 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)). Because Sixth Circuit precedent precludes application of the *Mathews* balancing test to "absolute" procedural rights, and because notice and some opportunity to be heard *before* losing a property interest qualifies as one such "absolute" right, *Mathews* does not apply.

3. <u>Assuming, Arguendo, that the PBGC's Interest in Foregoing a Pre-Deprivation Hearing is Relevant, that Interest is Still Insufficient to Justify its Failure to Hold a Pre-Deprivation Hearing</u>

Finally, assuming, *arguendo*, that the PBGC's interest in foregoing a pre-deprivation hearing is constitutionally relevant, that interest is insufficient under *Mathews* to justify the PBGC's failure to hold a pre-deprivation hearing.

Mathews instructs that the first balancing factor is an evaluation of "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 334. While the PBGC has argued that the PBGC supposedly "did not deprive Plaintiffs of any property interest when it terminated the Plan," ECF No. 23-2 at 14, that contention simply is not credible. Here, as described above, the loss to the Plan's participants as a result of the termination is significant, ranging between 20-70% in many instances. *See* SUMF ¶ 9. ██████████████████

██████████████████████████████████

REDACTED VERSION OF SEALED DOCUMENT

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Similarly, the PBGC's argument that, as the result of the Title IV insurance guarantee, "Plaintiffs will receive more benefits from PBGC than they would have from the existing Plan assets alone," is not borne out by the facts.  Because the PBGC terminated the Plan at the bottom of the market, Plaintiffs were deprived of a stock market recovery in excess of 180% on $2.5 billion in Plan assets, *supra* p. 140, and the PBGC, by virtue of its termination actions, took those assets and earned hundreds of millions in returns over the same period.  29 U.S.C. § 1344(c) provides that those investment returns normally inure to the PBGC's benefit, and because of the statutory limits on Title IV benefits of terminated plans, the PBGC's benefit guarantee is insufficient to make up for the losses.

Finally, the benefit deprivation in *Mathews*, which involved government funded disability benefits, was a "temporary deprivation," in that the government conceded that claimants could later receive full retroactive payments if the termination was later determined to be erroneous.  *See Mathews*, 424 U.S. at 340.  Here, by contrast, the PBGC takes the opposite position.  According to the

REDACTED VERSION OF SEALED DOCUMENT

PBGC, once it terminates a pension plan by agreement with a plan administrator, its termination decision is irrevocable, and plan participants cannot receive more than their statutorily guaranteed benefits, regardless of whether § 1342(c)'s termination criteria are satisfied. Because "'the possible length of wrongful deprivation of . . . benefits [also] is an important factor in assessing the impact of official action on the private interests,'" the "degree" of such a permanent deprivation of private retirement benefits is a significant factor disfavoring "the validity" of the PBGC's "administrative decisionmaking process." *Id.* at 341 (quoting *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975)).

The second *Mathews* factor looks "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards." *Id.* at 343. This factor similarly militates decisively against upholding the PBGC's termination action.

In *Mathews*, the claimant had an opportunity to make an administrative showing to the Social Security Administration (SSA) prior to the termination of his benefits, and the Court noted there that that agency "periodically communicates with the disabled worker" during the administrative process, providing the claimant with the opportunity to submit relevant information to the agency prior to the termination decision. *Id.* at 337. Additionally, "[w]henever the agency's tentative assessment of the beneficiary's condition differs from his own

assessment, the beneficiary is informed that benefits may be terminated, provided a summary of the evidence upon which the proposed determination to terminate is based, and afforded an opportunity to review the medical reports and other evidence in his case file. He also may respond in writing and submit additional evidence." *Id*. at 337-38. Following this interaction with the beneficiary, a state agency makes a determination that the SSA could then accept or reject. *Id*. at 338. If the SSA accepts the termination recommendation, benefits are terminated, however the recipient may seek reconsideration by the state agency and supplemental review by the SSA. *Id*. at 338-39. He then has a right to a non-adversary evidentiary hearing before an SSA administrative law judge, subsequent discretionary review by the SSA Appeals Council, and finally judicial review. *Id*. at 339. As noted above, if the recipient obtains a positive ruling at any phase of this administrative process, he is entitled to full retroactive payments. *Id*.

Here, by contrast, there was no communication *at all* with the Plan's participants during the administrative proceedings preceding the Plan's termination. The PBGC put the Plan's participants on notice of its intentions only on July 22, 2009, *after* its administrative procedures (such as they were) had already concluded. *See* SUMF ¶ 106. Plaintiffs were not permitted any administrative opportunity to challenge the PBGC's determinations, █████████

████████████████████████████████████████████████

**REDACTED VERSION OF SEALED DOCUMENT**

██████████████████████████████████████████████████

████████████████████████████████

Worse still, the PBGC's administrative proceedings in this case did not follow their normal course.  *See* ECF No. 54 at AR000010.  While the PBGC normally convenes its Trusteeship Working Group to consider plan termination recommendations, it did not do so here, ostensibly because of "time constraints" presented by Delphi's DIP lenders communication, on July 15, 2009, that they would exercise their foreclosure rights on the stock of Delphi's foreign affiliates, which the PBGC was concerned could threaten its recovery rights.  *Id*. ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

REDACTED VERSION OF SEALED DOCUMENT

██████████████████████████████████████████████████

███████

In sum, instead of relying on its normal procedure, the PBGC bypassed that procedure without good cause, relying instead on an outdated record that failed to reflect the political considerations underlying the PBGC's actions, or the relevant statutory factors that would properly govern a § 1342(c) determination. The PBGC's administrative procedure provided no opportunity for Plan participants to engage administratively with the agency regarding its termination determination either *ex ante* or *ex post*, ████████████████████████████ ████████████████████████ At the risk of understating the case, the PBGC's pretermination procedures were neither fair nor reliable. A § 1342(c) pretermination hearing could have remedied these problems. *See supra* 75-112.

Last, "[i]n striking the appropriate due process balance," *Mathews* requires an assessment of "the public interest." *Mathews*, 424 U.S. at 347. This includes not only "the administrative burden" of requiring a predeprivation hearing, but also "other societal costs," *id.*, though "[t]he ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348. Here, the cost of allowing a single adjudication of the propriety of a plan's termination under the

REDACTED VERSION OF SEALED DOCUMENT

§ 1342(c) criteria is hardly prohibitive, especially given the complete dearth of process the PBGC usually affords plan participants.

Moreover, contrary to the PBGC's earlier arguments, *see* ECF No. 23-2 at 15, there was no danger here of increasing the loss to the Title IV insurance fund or the continuity of Plan payments pending a judicial adjudication of the Plan's termination.  If, after a court adjudication, the PBGC's termination decision was ultimately upheld, the Plan could be retroactively terminated as of the date that participants were put on notice (July 22, 2009), so the delay would not increase the liability of the insurance fund by a single cent.  *See, e.g., PBGC v. Republic Techs. Int'l LLC*, 386 F.3d 659, 665-68 (6th Cir. 2004).  As for the Plan's benefit payments, the § 1342 statutory trustee could take actions to limit temporarily benefit payments as necessary pending an adjudication; indeed, that is precisely what the language in the fourth sentence of § 1342(c) is supposed to accomplish. Providing participants with a hearing prior to terminating their pension plan would ensure that the most basic requirement of due process is satisfied: that participants are "given a meaningful opportunity to present their case."  *Mathews*, 424 U.S. at 349.

REDACTED VERSION OF SEALED DOCUMENT

## V.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT 4 BECAUSE, EVEN ON AN ARBITRARY-AND-CAPRICIOUS REVIEW, THE PBGC'S TERMINATION OF THE SALARIED PLAN IS UNSUSTAINABLE

Assuming, *arguendo*, that the Salaried Plan could be terminated simply

through an agreement between the PBGC and Delphi acting as plan administrator

(but supposedly not subject to a plan administrator's fiduciary duties of loyalty and

prudence and with a conflict of interest) without violating either ERISA or the

Constitution, the PBGC's decision to terminate the Plan, under the prevailing

circumstances, is still subject to judicial review.  Judge, now Justice, Ginsburg

writing at the time for the D.C. Circuit cogently emphasized that even an agency's

decision to enter into a negotiated agreement is subject to arbitrary-and-capricious

review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

> A court reviewing an agency's negotiation of a contract . . . properly may demand (1) a coherent, even if *post-hoc*, statement of the agency's bargaining objectives and concerns, that the court may compare against the objectives prescribed by law, and (2) an adequate account of the bargaining history, that allows the court *to determine whether the agency reasonably pressed its own objectives and did not unreasonably accommodate those of the other party to the negotiation*.

*Doe v. Devine*, 703 F.2d 1319, 1326 (D.C. Cir. 1983) (Ruth B. Ginsburg, J.)

(emphasis added); *accord Tackitt v. Prudential Ins. Co. of Am.*, 758 F.2d 1572,

1575 (11th Cir. 1985).  Put another way, even if the PBGC could circumvent the

requirement for a court adjudication that termination is warranted under § 1342(c),

it must still have engaged in reasoned, supportable action in agreeing to terminate

REDACTED VERSION OF SEALED DOCUMENT

the Plan, and to release its liens and claims on Delphi assets, in light of the facts before it and the applicable law.  *See United Steel Workers v. PBGC*, 707 F.3d 319, 323 (D.C. Cir. 2013) (finding APA imprinted into action under § 1303(f) against PBGC).

On the factual bases fully laid out earlier, the PBGC's actions in terminating the Plan cannot be sustained under an arbitrary-and-capricious standard, even accounting for any deference APA review usually affords federal agencies.  The starting point for determining the reasonableness of any agreement to terminate the Salaried Plan is the criteria set forth in § 1342(c), for that is the provision under which the PBGC claims authority to terminate the Plan (as opposed to authority to *initiate* termination proceedings).  Here, the PBGC claimed that termination was necessary under § 1342(c), in order to avoid any unreasonable increase in the liability of the PBGC's insurance fund.  *See* SUMF ¶¶ 106-07.  Further, as Justice Ginsburg indicated, the PBGC's agreement must show that it accommodated the overall objectives set forth in the relevant sections of ERISA and that the PBGC did not unreasonably accommodate the interests of other parties to its negotiations, such as Treasury, New GM, or Delphi.  One overriding interest in this part of ERISA is "to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants."  29 U.S.C. § 1302(a)(1).

REDACTED VERSION OF SEALED DOCUMENT

However, the PBGC did not act consistently with this statutory purpose. The undisputed facts show that the PBGC had powerful leverage to advocate for either New GM, *see supra* 78-91, or one of Delphi's potential purchasers, *supra* 91-95, to assume the Salaried Plan, thus preventing its termination.  But, it is also undisputed that, at least as of the middle of April 2009, the PBGC took no actions to avoid the Salaried Plan's termination, but instead acquiesced in that termination, in order to accommodate unreasonably, the objectives of Treasury.  *Supra* 100-112.  The PBGC's utter failure to press its own statutory goals, in conjunction with its passive accommodation of Treasury's objectives, demonstrate that the PBGC's termination actions are fatally arbitrary and capricious.

Moreover, through its own findings, the PBGC determined that termination was *not* in the best interests of the Salaried Plan's participants and beneficiaries. *See* SUMF ¶ 74.  Their interests are an overriding concern under ERISA (*see id.* ¶ 1) that the PBGC had to take into account and advance; yet, the PBGC acted *counter* to their interests, by its own admission.  Arbitrary-and-capricious review necessitates that an agency's decision be "based on a consideration of the relevant factors," and here the PBGC's termination was inconsistent with the overarching factor of the participants' and beneficiaries' best interests.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Thus, while the PBGC could have attempted to terminate the Plan through a judicial adjudication but

REDACTED VERSION OF SEALED DOCUMENT

could have relied on one of just three statutory criteria to be successful, its strategy instead to attempt to accomplish termination through an agreement (assuming that route is at all allowable) means the PBGC subjects itself to a broader review of its weighing of *all* relevant factors.  In this instance, the PBGC acted counter to the relevant (indeed, overriding) participant concerns and, anyway, failed to satisfy any of the three statutory factors in § 1342 for termination.  Its action in terminating the Plan is, as a consequence, arbitrary and capricious and unlawful, and Plaintiffs are, on this basis, entitled to summary judgment on Count 4.

## CONCLUSION

The Court should grant summary judgment in Plaintiffs' favor on Counts 1 through 4 of the Second Amended Complaint as to the PBGC's liability, and order briefing as to the remedy and relief to be afforded.

Respectfully submitted,

/s/ Anthony F. Shelley

| | |
|---|---|
| Alan J. Schwartz (P38144) | Anthony F. Shelley |
| JACOB & WEINGARTEN, P.C. | Timothy P. O'Toole |
| | Michael N. Khalil |
| 25800 Northwestern Highway | MILLER & CHEVALIER CHARTERED |
| Suite 500 | 900 Sixteenth St. NW |
| Southfield, Michigan 48075 | Washington, DC  20006 |
| Telephone:  248-649-1900 | Telephone:  202-626-5800 |
| Facsimile:  248-649-2920 | Facsimile:  202-626-5801 |
| E-mail:  alan@jacobweingarten.com | E-mail:  ashelley@milchev.com |
| | totoole@milchev.com |
| | mkhalil@milchev.com |

*Attorneys for Plaintiffs*

REDACTED VERSION OF SEALED DOCUMENT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2018, I caused the foregoing

electronically to be filed with the Clerk of the Court using the CM/ECF system

which will send notification of such filing to the following e-mail addresses:

owen.wayne@pbgc.gov (C. Wayne Owen)
david.glass@usdoj.gov (David M. Glass)
edward.w.risko@gm.com (Edward W. Risko)
rswalker@jonesday.com (Robert S. Walker)

<u>/s/ Anthony F. Shelley</u>
Anthony F. Shelley
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC  20006
Telephone:  202-626-5800
Facsimile:  202-626-5801
E-mail:  ashelley@milchev.com