UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DENNIS BLACK, ET AL., | Case No. 09-13616 |
| Plaintiffs, | SENIOR U.S. DISTRICT JUDGE ARTHUR J. TARNOW |
| v. | U.S. MAGISTRATE JUDGE MONA K. MAJZOUB |
| PENSION BENEFIT GUARANTEE CORP., | |
| Defendant. | |

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [305, 308]; AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [304]**

Plaintiffs, beneficiaries of Delphi Corporation's Retirement Program for Salaried Employees ("Salaried Plan"), commenced this ERISA action on September 14, 2009 after Defendant Pension Benefit Guarantee Corporation ("PBGC") and Delphi entered into an agreement to terminate the Salaried Plan.

Before the Court are the parties' cross-motions for summary judgment filed on September 21, 2018. For the reasons explained below, the Court **DENIES** Plaintiffs' Motion for Summary Judgment [305, 308] and **GRANTS** Defendant's Motion for Summary Judgment [304].

## FACTUAL BACKGROUND

### I. Delphi Pension Plans

Delphi Corporation ("Delphi"), formerly one of the world's largest automotive parts' suppliers, was originally established as an integrated division of General Motors ("GM"). In 1999, Delphi spun off of GM and was re-established as an independent company. *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 487 (E.D. Mich. 2008).

Delphi had two defined-benefit pension plans: the Retirement Program for Salaried Employees ("Salaried Plan"); and the Hourly-Rate Employees Pension Plan ("Hourly Plan"). The Salaried Plan covered Delphi's non-unionized workforce, while the Hourly Plan covered its unionized workforce.[1] The Salaried Plan—the subject of this litigation—had over 20,000 participants, including Plaintiffs Dennis Black, Chuck Cunningham, and Ken Hollis.

### II. PBGC

The PBGC is the agency responsible for administering pension insurance pursuant to Title IV of ERISA. "Before ERISA, lack of oversight and legal standards

---

[1] At the time of the spin-off, unionized employees, represented primarily by the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), entered into an agreement with GM according to which GM agreed to "top-up" or increase benefit levels in the event that Delphi was unable to fund its pensions. No similar agreement was entered into on behalf of the Salaried Plan employees.

often left pension plans without enough money, and employees who counted on those funds with nothing for retirement." *Pension Benefit Guar. Corp. v. Findlay Indus., Inc., et al.*, 902 F.3d 597, 601 (6th Cir. 2018) (internal citations omitted). In an effort to solve this problem, Congress established the PBGC to provide insurance for workers promised a defined pension benefit in the event that the sponsor terminated the retirement plan. *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375 (1980). The very purpose of the PBGC is to ensure that retirees receive their benefits notwithstanding their former employers' financial turmoil.

### III. Delphi Bankruptcy

In the years after its spin-off from GM, Delphi struggled to maintain financial independence. In October 2005, Delphi was forced to file for Chapter 11 bankruptcy. *In re Delphi Corp.*, 05-44481 (S.D.N.Y. Oct. 8, 2005) ("Delphi Bankruptcy Action").

PBGC was actively involved in Delphi's bankruptcy proceedings to try to mitigate risk to the insurance program. Early on in the bankruptcy, Delphi remained committed to funding the pension plans. With the state of the economy in 2008, however, upholding this commitment no longer seemed realistic for Delphi. By 2009, after Delphi's first reorganization plan had failed, there appeared to be only two options with respect to the pension plans given their untenable costs to Delphi:

either GM would absorb Delphi's pension liabilities; or PBGC would terminate the plans. Both PBGC and Delphi advocated for GM assumption.

## IV. GM Bankruptcy

In February 2009, President Obama established an Auto Task Force responsible for restructuring GM. The Auto Task Force and Treasury had "significant leverage and influence on GM's decisions . . . ." SPECIAL INSPECTOR GENERAL FOR THE TROUBLED ASSET RELIEF PROGRAM, TREASURY'S ROLE IN THE DECISION FOR GM TO PROVIDE PENSION PAYMENTS TO DELPHI EMPLOYEES 3 (Aug. 15, 2013) ("SIGTARP Report"). The Auto Task Force worked "independent of GM to prepare for a GM bankruptcy." *Id.*

In April 2009, the Auto Task Force raised the prospect of an expedited GM bankruptcy. Ultimately, the Treasury agreed to give $30 million in Trouble Asset Relief Program ("TARP") funds to GM, conditioned on a 40-day "quick-rinse bankruptcy." The Auto Task Force believed that this was "the best way to save the American automobile industry, concerned that GM could not survive a lengthy bankruptcy and GM's failure would have broader systemic consequences." *Id.* at 27.

The bankruptcy process allowed New GM to "cherry-pick" the liabilities that a "commercial buyer would want and New GM would need." *Id.* at 28. GM knew that it needed the UAW on board with any bankruptcy plan it would adopt, given that the UAW represented 99% of its unionized workforce and could stop production

with a strike. In late May 2009, GM's CEO met with the UAW President and the Auto Task Force to negotiate New GM's assumption of liabilities. The parties reached a collective bargaining agreement which included GM's assumption of the liabilities to top-up the Hourly Plan pensions. *Id.* at 33.

On June 1, 2009, GM filed for bankruptcy. As part of the bankruptcy proceedings, GM sold all of its assets to New GM, an entity formed on July 10, 2009.

**V. Negotiations Between Delphi, GM, PBGC, and the Treasury**

Although Delphi and PBGC worked together to avoid termination of the pension plans, eventually, Delphi proved incapable of sustaining the financial burdens of plan continuance. On April 21, 2009, PBGC's Trusteeship Working Group ("TWG") determined that both plans should be terminated in order to avoid any unreasonable increase in the liability of the insurance fund. Specifically, TWG authorized termination of the Salaried Plan under § 4042(a)(1) because the Plan had missed at least one required minimum-funding contribution. TWG further authorized termination of both the Salaried and Hourly Plans pursuant to §§ 4042(a)(2) and (a)(4)(c) and appointed PBGC as statutory trustee.

Just weeks after TWG had authorized termination of both the Salaried and Hourly Plans, PBGC and Delphi entered into a facilitated mediation with the Treasury, Auto Task Force, and GM. Through mediation, the parties came to a global resolution which included saving the Hourly Plan, but terminating the Salaried Plan.

According to this proposed solution, PBGC would terminate the Salaried Plan and release its remaining liens and claims on Delphi assets in exchange for a negotiated settlement, and GM would assume the Hourly Plan.

On June 1, 2009, Delphi moved to modify its First Amended Plan of Reorganization in the Delphi Bankruptcy Action to reflect the agreement reached during mediation. With respect to the pension plan liabilities, the proposed modification provided:

> Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM. The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim.

*In re Delphi*, Dkt. #16646 at 10.

## VI. PBGC's Assumption of the Delphi Pension Plans

On July 22, 2009, PBGC publicly announced its assumption of the Delphi pension plans. The Notice of Determination ("NOD") provided, in part:

> The Pension Benefit Guaranty Corporation today announced it will assume responsibility for the pension plans of 70,000 workers and retirees of Delphi Corp., the nation's largest producer of automotive parts. The PBGC will initiate action to become trustee of the plans, a process that could last up to several months.
>
> The PBGC is stepping in to protect the Delphi pensions because the restructuring Delphi cannot afford to maintain its pension plans and General Motors has stated it will not assume them. Delphi was spun off from GM in 1999.

> Since Delphi entered bankruptcy protection in 2005, the PBGC has worked intensively with Delphi, GM and other stakeholders to keep the pension plans ongoing. In September 2008 GM took on approximately $2.5 billion in liabilities of the Delphi Hourly Plan, and until its recent restructuring in bankruptcy, GM had been expected to assume the entire obligation for the hourly plan.
>
> Delphi sponsors six defined benefit plans for its workers. The Delphi Hourly Pension Plan covers 47,000 participants and has about $3.7 billion in assets and more than $8 billion in liabilities, according to PBGC estimates. The PBGC expects to be responsible for about $4 billion of the plan's shortfall of nearly $4.4 billion.
>
> The Delphi Salaried Pension Plan covers about 20,000 workers and retirees, and has $2.4 billion in assets and liabilities of $5 billion, according to PBGC estimates. The PBGC expects to be responsible for about $2.2 billion of its estimated $2.6 billion in underfunding . . . .
>
> The PBGC will pay pension benefits up to the limits set by law . . . .

Press Release, PBGC, PBGC to Assume Delphi Pension Plans (Jul. 22, 2009), *available at* https://www.pbgc.gov/news/press/releases/pr09-48.

## VII. Bankruptcy Court Approval of Delphi's Modified Plan of Reorganization

On July 30, 2009, following a hearing, the U.S. Bankruptcy Court for the Southern District of New York approved Delphi's Modified Plan of Reorganization over the objections of Plaintiffs Black and Cunningham. *In re Delphi*, Dkt. #18707. With respect to the PBGC settlement, the Court explained:

> The Debtors have demonstrated good, sufficient, and sound business purposes and justification for entering into the Delphi-PBGC Settlement Agreement, which was executed by Delphi and the PBGC

on July 21, 2009. The PBGC Settlement Agreement was filed with the Bankruptcy Court on July 21, 2009 (Docket No. 18559).

The record reflects that the Debtors would be unable to reorganize under the Modified Plan so long as the Debtors' liability under the Pension Plans covered by the Delphi-PBGC Settlement Agreement exists. The record also reflects, for purposes stated by the Court in its bench ruling at the Final Modification Hearing, that clear grounds exist under Section 4042 of ERISA, 29 U.S.C. § 1342, for the PBGC to initiate involuntary terminations of the Pension Plans, for the Debtors to enter into termination and trusteeship agreements with the PBGC, and that the PBGC has determined to seek involuntary terminations to reduce the PBGC's risk of loss of recovery relating to own exposure under the Pension Plans.

The consideration provided to the Debtors under the Delphi-PBGC Settlement Agreement is fair and reasonable, and is in the best interests of the estate, in light of the potential amount of a PBGC claim arising out of plan termination and the need to obtain releases from the PBGC to effectuate the sale pursuant to this Modified Plan and under the MDA Documents.

*Id.* at 38-39.

The Court further explained:

Section 4042 of ERISA, 29 U.S.C. § 1342, authorizes PBGC to seek termination of a pension plan upon making certain findings notwithstanding the provisions of a collective bargaining agreement and further permits the PBGC and the plan administrator to agree to termination of a plan without an adjudication. Section 4041(a)(3) of ERISA, 29 U.S.C. § 1341(a)(3). Upon the effectiveness of the Delphi-PBGC Settlement Agreement, all liabilities relating to unpaid contributions to the Pension Plans shall be released or discharged as set forth therein . . . .

Nothing in this order prohibits employees or unions adversely affected by any plan termination from (a) seeking to intervene in any district court action filed by the PBGC under section 4042 of ERISA, 29 U.S.C. § 1342, to terminate the plans or (b) pursuing any independent action

against the PBGC regarding the termination of the plan under section 4003(f) of ERISA, 29 U.S.C. § 1303(f).

*Id.* at 81-82.

### VIII. PBGC Commences an Action in the U.S. District Court for the Eastern District of Michigan

On July 21, 2009, PBGC made the decision to terminate the Salaried Plan. Authorization for this decision, and the reasons supporting it, came from the April 21, 2009 TWG recommendation. Concurrent with its assumption of the pension plans, PBGC commenced an action in this Court pursuant to 29 U.S.C. §§ 1342 and 1348(a), "seeking an order (a) terminating the Delphi Retirement Program for Salaried Employees (the "Delphi Salaried Plan"); (b) appointing PBGC as statutory trustee of the Delphi Salaried Plan; [and] (c) establishing July 22, 2009 as the termination date of the Delphi Salaried Plan . . . ." *PBGC v. Delphi Corp.*, 09-cv-12876 (E.D. Mich. 2009).

On August 6, 2009, Plaintiffs asked PBGC for its consent to intervene in the action. But, before Plaintiffs could file their motion to intervene, PBGC filed a notice of voluntary dismissal. *Id.* at Dkt. #5. The case was closed on August 10, 2009.

### IX. Salaried Plan Termination Agreement

On August 10, 2009, PBGC and Delphi executed an Agreement for Appointment of Trustee and Termination of Plan ("Termination Agreement"),

effective July 31, 2009. The Termination Agreement set forth the following reasons for termination of the Salaried Plan:

> PBGC has issued to the Company a Notice of Determination under 29 U.S.C. § 1342(a)(l), (2) and (4) that the Plan has not met the minimum funding standard required under section 412 of the Internal Revenue Code, the Plan will be unable to pay benefits when due, PBGC's possible long-run loss with respect to the Plan may reasonably be expected to increase unreasonably if the Plan is not terminated, and that the Plan should be terminated under 29 U.S.C. § 1342(c).

Def.'s Mot. Ex. 5. The effective termination of the Salaried Plan prompted the filing of this lawsuit.

## PROCEDURAL HISTORY

On September 14, 2009, Plaintiffs Dennis Black, Charles Cunningham, Kenneth Hollis, and the Delphi Salaried Retiree Association commenced this action against PBGC alleging violations of ERISA. On November 5, 2009, Plaintiffs filed an Amended Complaint [10] naming the U.S. Treasury, the Auto Task Force, Timothy Geithner, Steven Rattner, Ron Bloom, Does 1-50 (hereinafter referred to collective as "Treasury Defendants"), and GM[2] as Defendants, and adding due process and equal protection claims.

Plaintiffs filed a Second Amended Complaint ("SAC") [145] on August 26, 2010. The SAC sets forth the following claims against PBGC: Failure to Comply with ERISA's Requirements Regarding the Adjudication of Plan Terminations

---

[2] Plaintiffs voluntarily dismissed GM from this action on March 4, 2010. Dkt. #125.

(Count I); Failure to Comply with ERISA's Requirement that Any Summary Termination Agreement Be with a Plan Administrator Properly Acting in that Capacity (Count II); Violation of Due Process (Count III); and Plan Termination in Violation of ERISA (Count IV). The SAC also alleges an Equal Protection claim (Count V) against Treasury Defendants.

Treasury Defendants filed a Motion to Dismiss Count V [164]. On September 2, 2011, the Court granted the Motion. Dkt. #192. What followed was a seven-year discovery battle between Plaintiffs and remaining Defendant, PBGC.

Before the Court is PBGC's Motion for Summary Judgment [304] and Plaintiffs' Motion for Summary Judgment [305, 308], filed on September 21, 2018. The motions are fully briefed. The Court held a hearing on the motions on March 6, 2019.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## ANALYSIS

### I. 29 U.S.C. § 1342(c) does not Require Court Adjudication Prior to Termination of a Pension Plan

29 U.S.C. § 1342(a) provides that a corporation may institute proceedings to terminate a plan whenever it determines that: "(1) the plan has not met the minimum funding standard required under section 412 of Title 26, (2) the plan will be unable to pay benefits when due . . . or, (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated."

Section 1342(c) further provides that where a corporation is required under subsection (a) to commence proceedings, it may,

> apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund . . . .
>
> If [however] the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection

(other than this sentence) the trustee shall have the power described in subsection (d)(1) and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties described in subsection (d)(3).

Plaintiffs argue that § 1342(c) of ERISA required PBGC to obtain a district court adjudication that termination was necessary prior to terminating the Salaried Plan via agreement with Delphi. Plaintiffs further argue that termination of the Salaried Plan was improper in light of PBGC's negotiating leverage with GM. According to Plaintiffs, PBGC could have, and should have, exercised this leverage to negotiate with GM for GM assumption of the Salaried Plan.

Plaintiffs' argument is without merit. Section 1342(c) clearly sets forth two alternative procedures for termination of a pension plan: application to the district court for a decree that the plan must be terminated; or agreement between the corporation and the plan administrator that the plan should be terminated. Nearly every circuit to have considered this issue has found the same. *See, e.g.*, *Allied Pilots Ass'n v. Pension Ben. Guar. Corp.*, 334 F.3d 93, 97 (D.C. Cir. 2003); *Pension Comm. for Farmstead Foods Pension Plan for Albert Lea Hourly Employees v. Pension Ben. Guar. Corp.*, 991 F.2d 1415, 1418 (8th Cir. 1993); *Jones & Laughlin Hourly Pension Plan v. LTV Corp.*, 824 F.2d 197, 200 (2d Cir. 1987) (noting that Congress expressly dispensed with the necessity of a court adjudication); *In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 201 (3d Cir. 1983); *see also*

*Pension Ben. Guar. Corp. v. Durango Georgia Paper Co.*, 251 F. App'x 664 (11th Cir. 2007).

Section 1342(c) required neither PBGC nor Delphi to seek an adjudication prior to terminating the Salaried Plan via agreement. Despite Plaintiffs' assertions concerning PBGC's leverage, the record establishes that GM assumption of the Salaried Plan was not a viable option. Whenever offered the opportunity to assume the Salaried Plan, GM repeatedly, and emphatically, declined. In fact, no company offered to sponsor the Salaried Plan. Because funding the Salaried Plan could not continue without a sponsor, PBGC had no choice but to terminate. PBGC acted in accordance with § 1342 when, after determining that the Salaried Plan had not, and could not, meet the minimum funding standard, it executed an agreement with Delphi to terminate the Salaried Plan.

**II. PBGC Owed no Fiduciary Duties to Salaried Plan Participants**

Section 1342(c)(1) provides that where, as here, "the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee . . . the trustee is subject to the duties described in subsection (d)(3)." Section 1342(d)(3) explains that ". . . a trustee appointed under this section shall be subject to the same duties as those of a trustee under section 704 of Title 11, and shall be, with respect to the plan, a fiduciary within the meaning of paragraph (21) of section 1002 of this title and under section 4975(e) of Title 26 . . . ."

Plaintiffs argue that PBGC violated its fiduciary obligations to the Plan participants when it decided to terminate the Salaried Plan.

The problem with Plaintiffs' argument is that PBGC owed no fiduciary obligations to the Salaried Plan participants until after the Plan was terminated and PBGC became the Plan's statutory trustee under the Termination Agreement. Plaintiffs' claim of entitlement to sue PBGC for participating in "Delphi's fiduciary breach" is also without merit. Delphi's decision to terminate the Salaried Plan did not implicate fiduciary duties. *See Beck v. PACE Int'l Union*, 551 U.S. 96, 127 (2007) (holding that "an employer's decision whether to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations.").

Plaintiffs' interpretation of § 1342(c)(1) as somehow imposing fiduciary obligations on PBGC is unfounded. Adopting Plaintiffs' position would require this Court to make two unprecedented conclusions: first, that ERISA imposes fiduciary duties on Delphi, which cuts squarely against the Supreme Court's ruling in *Beck*; and second, that PBGC absorbed these duties when it negotiated a Termination Agreement with Delphi, which is unsupported by the plain language of the statute and the case law. Because PBGC owed no fiduciary duties to the Salaried Plan beneficiaries when it made its termination decision, the Court grants summary judgment for PBGC on Plaintiffs' ERISA claims.

### III. Termination of the Salaried Plan did not Deprive Plaintiffs of Due Process

Alternatively, Plaintiffs argue that termination of the Salaried Plan violated the Due Process Clause. To determine what procedural process is due prior to terminating pension benefits, the Court considers three factors: the private interest affected by termination; the risk of an erroneous deprivation of that private interest and the value of additional procedural safeguards; and the Government's interest, including the fiscal and administrative burdens additional protections would entail. *Mathews v. Eldridge*, 424 U.S. 319 (1976).

In *Jones & Laughlin Hourly Pension Plan*, the Second Circuit, applying the *Mathews* factors, held that the administrative procedures set forth in § 1342(c) satisfy due process. 824 F.2d at 202. The Court noted that termination of a pension plan without a hearing is a possibility expressly contemplated by ERISA and further noted and that the retirees were free to file claims against the plan administrator in bankruptcy court. *Id.* In addition, the Court explained that the regime's post-deprivation remedies, which included civil actions and restoration to pre-termination status, protected beneficiaries against the risk of erroneous deprivation. *Id.*

The analysis in *Jones & Laughlin Hourly Pension Plan* is wholly applicable here. Plaintiffs aired their grievances concerning termination in the S.D.N.Y. Bankruptcy Court. Furthermore, they fail to acknowledge that as a result of PBGC's

assumption of the Salaried Plan, over three-quarters of Plan beneficiaries will receive their full benefits.

By terminating the Salaried Plan via agreement with Delphi, PBGC acted in accordance with § 1342(c). Plaintiffs fail to meet their heavy burden of establishing that PBGC's conduct—which was authorized by statute—deprived them of due process. *See United Steelworkers of Am., AFL-CIO, CLC v. United Eng'g, Inc.*, 839 F. Supp. 1279, 1284 (N.D. Ohio 1993), *aff'd,* 52 F.3d 1386 (6th Cir. 1995) ("In challenging the constitutionality of economic legislation as a violation of due process or equal protection, a plaintiff must overcome a heavy burden.").

## IV. Plaintiffs Have Failed to Demonstrate that Termination of the Salaried Plan was Arbitrary and Capricious

Plaintiffs argue that even if PBGC's termination of the Salaried Plan violated neither ERISA nor the Due Process Clause, the Court should nevertheless find that PBGC acted arbitrarily and capriciously in violation of the APA.

Plaintiffs have offered no evidence to support this claim. The record establishes that the Salaried Plan was severely underfunded for guaranteed benefits at the time of termination—approximately 50% funded. There was no entity willing to sponsor the Salaried Plan upon Delphi's liquidation. As defense counsel explained at the hearing: "That is the paradigm situation where PBGC's guarantee is called upon . . . . [t]he money in the plan is taken over by PBGC, added to [PBGC's] funds, and it is used in part to defray the benefits due, supplemented by PBGC's insurance

funds to the extent that the plan is underfunded for guaranteed benefits." Hr'g Tr. 35:11-12; 19-22, Mar. 6, 2019.

In this case, PBGC and Delphi agreed to terminate the Salaried Plan because the Plan failed to meet the minimum-funding standard required under the Internal Revenue Code and would be unable to pay benefits when due. In light of Delphi's liquidation, PBGC faced the very real possibility of an unreasonable increase in long-run loss if the Plan was not terminated. Based on the record, this Court cannot conclude that PBGC acted arbitrarily and capriciously in terminating the Salaried Plan.

## CONCLUSION

For the reasons explained above,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment [305, 308] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [304] is **GRANTED**.

**SO ORDERED**.

Dated: March 22, 2019

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge